UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DR. THOMAS HUBBARD, PhD. | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | CA NO. 1:20-cv-00767-RP |
| | § | |
| SARAH ALLEN BLAKEMORE; and | § | JURY DEMANDED |
| JOHN DOES 1 – 10, | § | |
| *Defendants.* | § | |

## Defendant Sarah Allen Blakemore's Motion for Summary Judgment

Sarah Allen Blakemore ("Defendant" or "Blakemore") files this Motion for Summary

Judgment. In support, Blakemore would respectfully show the court as follows:

### I.        Summary Judgment Evidence

Exhibit A —  **Flyer**
Exhibit B —  **Affidavit of Colin Guy**
Exhibit B-1 — **Video of Hubbard speaking at 2011 American Philological Association**[1]
Exhibit C —  **Introduction to Special Issue on "Boys' Sexuality and Age of Consent"**
Exhibit D —  **Wikipedia Edit Request**
Exhibit E —  **Bryn Mawr Classical Review**
Exhibit F —  **Sexual Consent and the Adolescent Male, or What Can We Learn from the Greeks?**
Exhibit G —  **NAMBLA Webpage**
Exhibit H —  **Dallas Morning News Op-Ed**

### II.        Introduction

1.        Plaintiff Thomas Hubbard ("Plaintiff" or "Hubbard") is a professor in the Classics

Department at the University of Texas seeking to silence a former student through a libel lawsuit

brought over what fundamentally is a difference of opinion. The law does not afford Hubbard the

---

[1] A flash drive containing the video is being contemporaneously mailed to the Court per the Clerk's instructions.
The video may be viewed at https://www.youtube.com/watch?v=SV5BzhxQnHs

relief he seeks and his attempt to stifle criticism through misuse of the legal system should be rejected through summary judgment denial of his claims.

2.      Hubbard's libel claims are based on a flyer Blakemore circulated at the University of Texas voicing her opinions about Hubbard's academic writings on the sexual relationships between adult men and young boys in antiquity and what Blakemore views as an endorsement for allowing similar practices to occur in the modern era.[2] **Exhibit A**. The gist of Blakemore's flyer is that she finds the subject of Hubbard's scholarship objectionable and she therefore encourages others to join in calling for his removal from the University of Texas' faculty. In Blakemore's opinion, a professor opposed to age of consent laws and who lends his imprimatur to a group like NAMBLA is not fit to serve at the University of Texas and while Hubbard is entitled to disagree, he is not entitled to recover damages from Blakemore for expressing these opinions. Blakemore's flyer, taken as a whole, is an expression of her opinions and opinions are not a valid basis for a defamation claim.

### III.      Arguments and Authorities

3.      This lawsuit should not focus on the difference between a "pedophile" and a "pederast", or the propriety of relationships between adult men and adolescent boys, as Hubbard would have it. What this lawsuit is truly about is a professor at a public university seeking to silence a student who had the temerity to disagree with him and such an assault on the freedom of speech should never be sanctioned. Blakemore does not agree with Hubbard's view that prohibiting adults from engaging in sexual relationships with minors is harmful; that is her opinion and defamation law is

---

[2] Hubbard's complaints are primarily focused on the contents of Blakemore's flyer, although he does also make reference to a quote from Blakemore in the December 4, 2019 edition of the Austin American Statesman in which she expressed that she does not believe it is appropriate for teachers to promote breaking the law. This statement, like those in the flyer, is an expression of Blakemore's opinion and each of the arguments asserted herein in connection with the flyer apply with equal force to any libel or slander claim based on the foregoing quote and are incorporated herein by reference.

not intended to prevent the free expression of opinions. On the contrary, in *New York Times Co. v. Sullivan*, the United Supremes Court heralded the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks. . ." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 721 (1964).

4.      Blakemore's flyer expresses her uninhibited opinions based on a subjective interpretation of Hubbard's teachings. Blakemore's opinions on this subject are not defamatory as a matter of law. *Neely v. Wilson*, 418 S.W. 3d 52, 62 (Tex. 2013). To be actionable, a statement must assert an objectively verifiable fact rather than an opinion. *Id.* Whether a statement is an assertion of fact or opinion is a question of law for the court to decide. *Id.* In distinguishing between opinions and facts, courts have considered factors such as: the common usage of the specific language and whether or not it has a precise, well understood meaning or if it is indefinite and ambiguous; the statement's verifiability; the entire context of the publication; and whether the writing is in the nature of commentary or presented as "hard" news. *Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 341 (Tex. App.—San Antonio 1988) (applying the *Ollman* analysis), citing *Ollman v. Evans*, 242 U.S. App. D.C. 301, 750 F.2d 970, 974-75 n. 6 (D.C. Cir. 1984). Each of the foregoing considerations favors finding that the flyer was an expression of Blakemore's opinions and is therefore not actionable.

5.      Even when what is asserted as a factual statement is false, such a statement is not defamatory if "the truth about the person would injure their reputation just as much as the allegedly defamatory statement" and for this reason Hubbard's hair-splitting distinction between "pederasty" and "pedophilia" is an irrelevant distraction. *Johnson v. Phillips*, 526 S.W.3d 529, 535 (Tex. App.—Houston [1st Dist.] 2017). In determining whether a publication is defamatory, courts

must be "mindful that [they] consider each gist and passage in the context. . . as a whole, not in a vacuum." *Id.* at 539. When the contents of the flyer are viewed as a whole, the age-based distinction Hubbard seeks to draw between "pedophilia" and "pederasty" is immaterial. The flyer specifies that Blakemore finds Hubbard's academic writings objectionable and even specifies one such work, Boys' Sexuality and Age of Consent, by name. The flyer therefore provides ample context from which readers may readily discern that Blakemore is opposed to what she perceives as Hubbard advocating for lowering the age of consent in his academic product, which Blakemore finds objectionable regardless of what specific age Hubbard may believe a minor is capable of consenting to sex with an adult man.

**A.) Blakemore's opinions based on her subjective beliefs about Hubbard's teachings are not the valid basis for a defamation claim.**

6.     Blakemore's opinions are not actionable. The statements in the flyer should not be viewed in isolation, but within the context of the entire publication and surrounding circumstances, from which it follows that the flyer is intended only as condemnation of what Blakemore considers "Hubbard's disgusting ideals" and not as an assertion of fact. However, even a line-by-line analysis, as Hubbard has attempted in his petition, reveals nothing more than the strident opinions of a student vocalizing her criticism of Hubbard's academic hobby horse. When a proper analytical inquiry is applied to the flyer, there are no factors that support a finding that Blakemore's statements are anything other than a constitutionally privileged expression of her opinions.

> i.     *None of the specific statements identified by Hubbard are false statements of fact, but instead expressions of Blakemore's opinions.*

7.     Hubbard first complains about Blakemore's opinion that Hubbard has been "advocating for pederasty (pedophilia) for as long as he has taught at the University of Texas." Plaintiff's Original Complaint ("POC") at p. 2. This statement, the very first sentence in the flyer, provides

the appropriate context for readers to conclude that Blakemore's opinions are derived from her interpretation of Hubbard's academic writings and lectures. The next sentence refers to Hubbard using "his position" as a professor and the following sentence refers to "his academic writing." Within this context, it is apparent Blakemore's flyer is an expression of her opinion that Hubbard's writings constitute advocacy on behalf of pederasts and/or pedophiles. Hubbard has admitted his advocacy (and as such, even if the Court were to find this statement was factual in nature, it is nonetheless true and therefore not defamatory).

8.      At the 2011 annual meeting of the American Philological Association ("APA"), Hubbard discussed at some length his academic interest in members of NAMBLA, pederasts and pedophiles and the role he plays as advocate on their behalf. **Exhibits B and B-1**. In a recorded segment from the APA meeting, Hubbard states that it is a "moral obligation to speak for those who have no voice and to raise issues about even the most reviled members of our society, and certainly pedophiles, in quotation mark, would be among that group. . ." **Exhibits B and B-1**.  What is an advocate, if not one who, in Hubbard's own words, speaks for another?

9.      In Hubbard's Introduction to Special Issue on "Boys' Sexuality and Age of Consent", Hubbard further states that "I argue that legal regimes created to protect or control girls' sexuality cannot be transferred to boys' sexuality without engendering great harm." (Emphasis added.) **Exhibit C** at p. 3. Hubbard, by his own admission, is not playing the role of a neutral commentator in his writings, but is instead arguing in favor of a particular viewpoint, i.e. he is engaged in advocacy aimed at legalizing pederasty to prevent "great harm". In this article, Hubbard summarizes another of his articles, Sexual Consent and the Adolescent Male, or What Can We Learn from the Greeks?, by stating that he critically examined "contemporary American legislative regimes governing adolescent sexuality within a historical perspective" and

tested "the universalizing assumptions of contemporary discourse against the evidence of a <u>highly productive and successful social system</u> that incorporated specific social functions for adolescent male sexuality." (Emphasis added.) **Exhibit C** at p. 3.

10.     By characterizing the pederasty practices in Ancient Greece as "highly productive" and "successful", Hubbard has expressed his own subjective beliefs that, in Blakemore's opinion, are properly characterized as advocacy in favor of such practices. By proposing that age of consent laws engender "great harm", Hubbard has, in Blakemore's opinion, advocated for legal reform that would permit pederasty to occur. Hubbard's first complaint is based on Blakemore's subjective interpretation of Hubbard's own opinions and is therefore not actionable. Hubbard's own characterization of his role as giving voice to the "most reviled members of our society," i.e. pedophiles, suggests Blakemore's interpretation is informed by Hubbard's own statements.

11.     Hubbard next objects to the flyer's statement that Hubbard "used his position to further a community of individuals hoping to prey on underage boys." POC at p. 3. This statement represents Blakemore's subjective beliefs about the potential effects of Hubbard's writings. Hubbard admits his writings have been used by NAMBLA. On November 28, 2019, Hubbard submitted a request to Wikipedia to have his name removed from a list of individuals associated with NAMBLA, but in so doing acknowledges he is associated with this group. **Exhibit D**. Hubbard notes in this request to Wikipedia that his 2000 book, THE GREEKS AND GREEK LOVE, was "distributed to some NAMBLA members." *Id.* In his submission to Wikipedia, Hubbard also refers to a 2009 comment he posted on the website for the Bryn Mawr Classical Review, in which he provides some additional detail on NAMBLA's distribution of his writings: "My edited collection GREEK LOVE RECONSIDERED was not 'published by NAMBLA,' but the publisher did

reach an agreement with that group to distribute a few hundred copies through their Topics series."

**Exhibit E**.

12.     The copyright page from Hubbard's book reveals an even more direct connection to NAMBLA than his statement in the Bryn Mawr Classical Review suggests:

> Greek Love Reconsidered
> First published 2000 by Wallace Hamilton Press
> Published simultaneously as NAMBLA Topics 9
> © 2000 The North American Man/Boy Love Association

Defendant's Answer ("DA"), Exhibit C at p. 1.

13.     In addition to confirming that this publication was "published" by NAMBLA through its Topics 9 series, the copyright notice also refers to Wallace Hamilton Press, which is itself a NAMBLA "venture":

> **Peter Melzer** (also known as Peter Herman) is a resident of New York. He served as a member of NAMBLA's Steering Committee. Herman helped to write text for NAMBLA's website and for its publications. He was responsible for checking the organization's mailbox in New York, sending out membership information to those who requested it, and preparing fundraising correspondence. In one of the documents submitted by the plaintiffs, Melzer, explaining the rationale for registering Zymurgy, Inc. in New York, described the interrelationship of the various NAMBLA ventures: "We obtain the powerful DBA (doing business as) tool. We are already doing business as Gayme, Wallace Hamilton Press, NAMBLA publications, as well as NAMBLA itself." As a member of NAMBLA's Steering Committee, Melzer participated in controlling **[*29]** and directing the actions of Andriette, Reeves, Rhodes, and others as they purposefully engaged in public outreach activities conducted in or directed into Massachusetts on behalf of NAMBLA. Personal jurisdiction exists over Peter Melzer

*Curley v. N. Am. Man Boy Love Ass'n*, No. 00-10956-GAO, 2003 U.S. Dist. LEXIS 12488, at *28 (D. Mass. 2003)

14.     For Hubbard to deny that he was "published" by NAMBLA is simply false. He has not only been published by NAMBLA, but the hostile reproach he directs at NAMBLA's critics suggests he is sympathetic to the group's cause, which could be construed as an indication he has been acting in furtherance of NAMBLA's goals. Hubbard complains in this NAMBLA publication that another scholar's negative portrayal of pederasty "coincided with the systematic strategy of mainline, assimilationist gay rights organizations to marginalize any consideration of youth sexuality or reform in age-of-consent laws and instead present to the public the most unthreatening,

plain vanilla image of gays and lesbians—average, dull, middle-aged, middle-class couples with the same bland careers and 'marriages' as everyone else." DA, Exhibit C at p. 5. Hubbard further complains that the "man-boy love that was acknowledged and even celebrated by early homosexual activists has been marginalized within our own progressively democratic and homogenized society, isolated as the province of 'perverts' and 'child molesters,'" and levels the charge that "gay leaders today sell out their brothers (and in many cases their own repressed desires) by creating the public fiction that most gays are involved in long-term monogamous age- and class-equal relationships, and that the only men attracted to teenage boys are a few sickos in NAMBLA whom they would like to see in prison just as much as straight society does." DA, Exhibit C at p. 7.

15.     Blakemore has expressed her opinion that NAMBLA's adoption of Hubbard's writings and Hubbard's apparent sympathy for the organization's cause "furthers" NAMBLA's goals. Blakemore's opinion is well-reasoned, as it is reasonable to conclude that an advocacy group like NAMBLA would promote publications that it considers in furtherance of its goals. Hubbard cannot prove that NAMBLA's publicity of his work has not supported its goals and because it is not possible to objectively verify what precise reason NAMBLA had for including this material in its Topics series or what effect it had on its readers, Blakemore's opinion that Hubbard's writings "further" this community is not actionable as defamation.

16.     Hubbard next asserts that he has been defamed by the assertion that "[i]n his academic writing" Hubbard "describes physical relationships between men and young boys as 'proper learning experiences'" and by the flyer's contention that publications such as BOYS' SEXUALITY AND AGE OF CONSENT encourage illicit acts between adults and minors. POC at p. 3. In his article SEXUAL CONSENT AND THE ADOLESCENT MALE, OR WHAT CAN WE LEARN FROM THE GREEKS?,

Hubbard asks "[t]o what extent can the evidence of the Greek model [of pederasty] be applicable to modern Western societies?" **Exhibit F** at p. 4. In response, he shares his subjective belief that the "Greek model" suggests that "where age-discrepant relationships are commonplace and positively reinforced, they cause little or no long-term harm to the younger partner and often confer great benefit." *Id.* Later in this same essay, Hubbard employs a series of rhetorical questions to express the potential benefits he believes should be available by adopting the "Greek model" and reforming age of consent laws:

> Yet sex education is always awkward within the nuclear family, where any positive discussion of sex gives off a whiff of incest and any negative discussion reeks of patriarchy. In this context, is pedagogical mentorship by a somewhat older, trusted and admired friend such a bad idea? As with most other skills, doesn't one learn by doing, as Dr. Rind has shown with his references to the evidence of primate behavior? And doesn't one learn the most from those who are already experienced, rather than from other blundering, ill-informed teenagers? And what about the special problems encountered by gay, lesbian, and queer youth, who often feel uncomfortable exposing their orientation to the peers they see every day in school? As Dr. Rind's studies have shown, most gay or bisexual men who as underage children had sexual relationships with an older man rate the relationship as something positive in their development, especially if it was non-coercive and sustained.

**Exhibit F** at p. 7.

17.     In the following paragraph, Hubbard states that "we must pose the question whether age of consent law should necessarily treat underage males and females the same, given the wide variance in their sexual drives and development" and suggests that "we have set up a legal regime that does great harm to underage males by suppressing and even punishing the entirely natural and powerful sexual urges that every male feels at the age of puberty, but cannot always fulfill with partners his own age. . ." Blakemore has interpreted the foregoing excerpts from Hubbard's writings and similar passages as an expression of his belief that pederasty in Ancient Greece is a proper subject of study, which is in fact the very focus of much of Hubbard's work. Whether or not his work

encourages illicit acts is a matter of opinion, but from Hubbard's suggestion that a "pedagogical mentorship" with an older individual might not be a "bad idea" and that it is better to "learn by doing" form an experienced adult as opposed to "blundering, ill-informed teenagers," Blakemore's subjective belief that this commentary encourages illicit behavior rests on a sound foundation. Whether or not this text actually encourages illicit behavior is not objectively verifiable and, as such, cannot be the valid subject of a defamation action.

18.     Hubbard argues that the assertion that he is advocating for pederasty is akin to "accusing someone who proposed reform to United States drug laws as someone who 'advocates for drug abuse.'" POC at pp. 4-5. Applying this analogy to Hubbard's writings cited above, the point Hubbard seeks to make is blunted. In this analogy, the hypothetical drug law reformist would be asserting that "as with most other skills, doesn't one learn by doing [drugs]?" and that studies have shown that most drug users rate their drug use as "something positive in their development." It is difficult to discern how the drug law reformist enticing his audience to "learn by doing drugs" with the prospect of achieving "something positive in their development" would *not* be considered an advocate for drug abuse in this hypothetical.

19.     Hubbard next complains that the flyer refers to a course he taught as the "Mythology of Rape" instead of "Mythologies of Rape." POC at p. 3-4. Hubbard speculates that this minor error was intended to create the false impression that "rape was, in itself, a mythological concept." No such statement exists in the flyer. Hubbard further objects that this course was not banned after one semester, but acknowledges that the "course was actually scheduled to be taught the following year" but was cancelled because "both his department and he decided that Dr. Hubbard was needed more to teach a larger enrollment course." Blakemore is entitled to her conclusion that the course was banned, as it had been scheduled, was then cancelled, and has not ever been offered again.

Again, there is no means by which to objectively verify the real reason the class has not been offered again and as such this statement is not actionable as defamation.

20.     Hubbard also objects to the statement that he is associated with NAMBLA, but again his own words betray him. POC at p. 4. In the same 2011 APA conference referenced above, Hubbard told the audience that he not only knows members of NAMBLA, but also that "I regard some of them as friends." **Exhibits B and B-1.** Hubbard proceeded to explain that he has worked to "gain the trust of those people" so that he can better understand them. *Id.* As previously discussed, he also approved dissemination of his work for use in NAMBLA's Topics series. It is disingenuous for Hubbard to deny any association with NAMBLA in this Court proceeding while having previously bragged about his close relationships with NAMBLA members at the APA conference in 2011. This statement is not actionable as defamation.

21.     Finally, Hubbard complains about the final paragraph of the flyer, which expresses Blakemore's opinion that Hubbard's position on pederasty as not only a worthy topic of study, but a potentially beneficial practice, is dangerous:

> We are calling for Dr. Thomas K. Hubbard's immediate removal from his position as a professor of the classics department at the University of Texas at Austin. *An individual who advocates for violent crime against teen boys* had no business teaching the leaders of tomorrow. *It is clear to us that the University of Texas does not have its student's safety, health, and welfare in mind. Hubbard's misconduct has been brought to administration before to no avail. We refuse to stand by while this man uses his status to promote pedophilia.*

POC at p. 4.

22.     This paragraph must not be read in isolation, but instead considered within the context of the entire publication, which itself must be considered within the broader context of Hubbard's body of work. In Blakemore's opinion, Hubbard is advocating to lower the age of consent because he a) believes such restrictions are harmful to young boys; and b) he believes that a "pedagogical mentorship" between an adult man and a young boy, which includes sexual contact, is beneficial.

Age of consent laws exist because society treats minors as incapable of consent, such that any sexual contact between an adult and a minor is an act of rape *and is therefore violent by its very nature*. From Blakemore's perspective, age of consent laws serve to protect minors from sexual violence and in her opinion Hubbard is advocating to remove a barrier intended to protect minors from what is presently considered criminal conduct. Accordingly, these statements are not actionable under defamation.

> ii.    *The four-part Ollman analysis compels a finding that the flyer is an expression of Blakemore's opinions.*

23.    The four-part inquiry set forth in *Ollman v. Evans*, which Texas appellate courts have considered a helpful framework for distinguishing opinion from fact, overwhelmingly supports a finding that the flyer is an expression of Blakemore's opinions, which are not actionable under defamation. Generally, this analysis requires examination of the type of language used, whether the statements are verifiable, the surrounding context and whether the publication is presented as commentary or as objective "hard" news. *Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 341 (Tex. App.—San Antonio 1988). Nothing contained in Blakemore's flyer supports a finding that it is anything but a passionate expression of her opposition to the subject matter of Hubbard's academic writings and teachings.

24.    The first step of the *Ollman* analysis requires consideration of whether the words employed have precise meaning conveying a verifiable fact or are instead indefinite, ambiguous, and therefore more in the nature of an opinion. *Id.* In *Yiamouyiannis*, the Court considered the use of terms such as "quack," "hoke artist," "fearmonger", and assertions that the plaintiff "lacks solid credentials" and "expresses incomprehensible mumbo jumbo." *Id.* The Court deemed this language "vintage hyperbole. . . not capable of proof one way or the other." *Id.* It concluded that

the challenged statements were "the speaker's shorthand way of opining that [the Plaintiff]. . . is not qualified to instruct the public about fluoridation."

25.     Blakemore's flyer similarly challenges the propriety of Hubbard instructing the public about what, in Blakemore's opinion, Hubbard considers the virtues of age discrepant relationships. Blakemore refers to Hubbard's teachings as "disgusting," "advocating for pederasty (pedophilia)", and opines that he "had no business teaching the leaders of tomorrow." **Exhibit A**. Individuals will differ in what they consider disgusting, what constitutes advocacy as opposed to neutral commentary, and who should be in the "business" of teaching and on what topics.

26.     Even the language referring to statutory rape as "violent" is not especially precise and there is room for disagreement as to what constitutes a "violent crime." In evaluating whether statutory rape should be considered a crime of violence factored into federal sentencing guidelines, Judge Richard Posner observed that "from the length of this opinion and the contrary judgment of the panel majority, it should be apparent that the interpretive issues is a difficult one" and that "we cannot be certain that we have gotten it right." *United States v. Shannon*, 110 F.3d 382, 389 (7th Cir. 1997). After extensive analysis, Posner concluded that under the circumstances before him, statutory rape was a violent crime even though there was no indication that force was actually used. *Id.* Posner reached this conclusion because sexual relationships between an adult and a minor pose a risk of injury, in part because minors may lack adequate sexual education and may therefore be more prone to contracting venereal diseases. *Id.* at 390. He further noted that certain offenses, like burglary, are deemed "violent" even though the perpetrator presumably wishes to avoid encountering other people, but it is a criminal act that nevertheless poses a risk of injury to another. Language in the flyer referring to "violent crime" should therefore not be considered precise, but

instead the type of ambiguous language that favors finding that the flyer is an expression of Blakemore's opinion.

27.     The *Ollman* analysis next asks whether the statements are objectively capable of being proven true or false. *Yiamouyiannis* 764 S.W.2d at 341. As previously noted, it is not possible to objectively determine if Hubbard's work has actually advanced the cause of groups like NAMBLA; it is not even possible to objectively determine what would constitute "furthering" NAMBLA's agenda. NAMBLA's stated mission includes "building understanding and support for [age discrepant] relationships," "educating the general public on the benevolent nature of man/boy love" and calling for a "fundamental reform of the laws regarding relations between youths and adults." **Exhibit G**. Hubbard's studies have, by his own admission, sought to better understand and explain sexual relationships between adults and minors through the lens of Ancient Greece and he has suggested that age of consent laws should be reconsidered with the benefit of this historical context. Blakemore believes Hubbard's work dovetails with NAMBLA's stated goals and there is no objective means of proving her wrong. Whether or not Hubbard agrees with Blakemore's characterization of his work, Blakemore's impressions of it are her own and her expression of her subjective assessment of his work is not actionable under defamation.

28.     The third *Ollman* factor requires consideration of the entire context of the challenged publication, "including cautionary language." *Yiamouyiannis*, 764 S.W.2d 338 at 341. "Cautionary language" includes explicit acknowledgment that statements are an opinion, the use of rhetorical questions and other language of the type to "put the reader on notice that what is being read is opinion and thus weaken any inference that the author possesses knowledge of damaging, undisclosed facts" such that "when the reasonable reader encounters cautionary language, he tends to 'discount that which follows.'". *Ollman v. Evans*, 242 U.S. App. D.C. 301, 750 F.2d 970, 983

(1984). The flyer is filled with language and phrases that flag it as an expression of opinion and not verifiable fact. The flyer refers to its stated purpose as a "Rally for the Removal of Dr. Thomas Hubbard." A rally, by its very nature, is a public gathering through which a group collectively states its shared opinion on a particular cause or political point. The flyer is filled with cautionary "red flags": "we are calling"; "it is clear to us"; "it is our goal." This use of the first person conveys to the reader that the statements contained within the flyer are subjective assessments and not a recitation of objectively verifiable facts.

29.     The final *Ollman* factor is closely related to the preceding factor, in that it calls for the Court to consider whether the tone of the text is in the nature of commentary or "hard" news. Again, the use of the first person is indicative that this publication would be at home in the Editorial Section of a newspaper rather than on the front page. No reasonable reader could view the flyer as "hard" news as the tenor of the text and its stated purpose are not neutral in nature like a news report, but instead represent a call to action for those who share in Blakemore's opinion of Hubbard's work.

30.     Each of the specific statements Hubbard has identified are protected opinions beyond the reach of defamation law. When the flyer is viewed in total and with appropriate context, it represents an expression of Blakemore's opinions and as such should not be considered defamatory as a matter of law.

   **B.) The distinction Hubbard tries to draw between 'pedophilia' and 'pederasty' is legally meaningless.**

31.     Hubbard labors to draw a distinction between "pedophilia" and "pederasty" and in his mind there may be a clear difference, but his opinion as to how these terms should be defined lends no weight to his claim that he has been defamed. POC at p. 3. For the general public, the term "pedophilia" has broader reach than Hubbard would afford it and would encompass sexual

relations involving minors of any age, as demonstrated below. There is no reason to conclude that the impact of Blakemore's flyer that Hubbard claims has harmed him would be any different if the word "pederasty" had been substituted for "pedophilia" in all instances.

32.     A statement is not defamatory if "the truth about the person would injure their reputation just as much as the allegedly defamatory statement." *Johnson v. Phillips*, 526 S.W.3d 529, 535 (Tex. App.—Houston [1st Dist.] 2017). The truth is that Hubbard has written extensively on the subject of sexual relations between adults and minors. Within the context of Hubbard's distinction between "pedophilia" and "pederasty", it follows that if his reputation would be injured as much by use of the term "pederasty" as it would be "pedophilia", then such a statement is not defamatory *even if* the terminology used was technically incorrect (which is denied.) In other words, if all of Hubbard's complaints are dismissed and this case boils down to the use of the word "pedophilia" as a substitute for "pederasty", Hubbard is still incapable of establishing that such language is defamatory because the alleged reputational harm would be the same.

33.     To begin, it should be noted that the flyer *does* refer to the subject of Hubbard's advocacy as "pederasty" and then first refers to it as "pedophilia" in a parenthetical, providing readers unfamiliar with the former term (of which there are likely many) with context in the form of a more recognizable term that has often been used interchangeably, as noted below. The flyer also makes reference to "teen boys", thereby providing readers with appropriate context from which to conclude that the writings Blakemore objects to are principally (and presumably) focused on relationships between adult men and adolescent boys.

34.     Nevertheless, it should also be noted that Hubbard's writings do not clearly delineate between pederasty and pedophilia based on a specific age or physiological characteristics, as he does in his petition, a distinction that one would expect would be more clearly made in his writings

if it held the significance he now assigns it. For example, Hubbard notes in SEXUAL CONSENT AND THE ADOLESCENT MALE, OR WHAT CAN WE LEARN FROM THE GREEKS that historically the "age of consent was as low as 10 or 12 in the mostly rural society of early 19th century America." **Exhibit F** at p. 8. He also observes that in Ancient Greece the "boundary line" for what constituted an "adult" was not set by date of birth, but instead by when a child first "gained enough self-confidence and *savoir faire* to himself initiate a relationship." *Id.* at p. 5. From the foregoing statements, and Hubbard's exhortation that this "flexibility" could "fit the modern world," it could reasonably be inferred that Hubbard believes the age of consent should be set as low as 10, or a more "flexible" approach should be applied in which any minor alleged to have initiated sexual contact should be deemed an "adult" and capable of consent.

35.    The distinction Hubbard now seeks to draw, which was not clearly communicated in his own writing, does not comport with common parlance. The term "pedophilia" has frequently been used by the media to describe sexual relations Hubbard would presumably classify as "pederasty" based on the age distinction he seeks to draw:

- The New York Post referred to a man accused of molesting a 13-year-old as a "prolific pedophile" in an April 29, 2020 report[3];

- On July 17, 2020, The Times Herald-Record reported on a lawsuit against a "notorious pedophile priest" accused of victimizing the plaintiff when he was in the 8th Grade[4];

- The UK's Daily Mail reported on a sting by online "paedophile hunters" who snared a Retired Army corporal who "tried to groom [a] '14-year-old boy" with a "string of 'sexualised' text messages" in a report published August 25, 2020.[5]

---

[3] https://nypost.com/2020/04/29/prolific-pedophile-priest-dies-in-new-jersey-nursing-home/

[4] https://www.recordonline.com/story/news/2020/01/03/suit-claims-more-abuse-by-late-goshen-priest/111705372/

[5] https://www.dailymail.co.uk/news/article-8662109/Army-corporal-78-snared-paedophile-hunters-tried-groom-14-year-old-boy.html

Case 1:20-cv-00767-RP   Document 8   Filed 09/09/20   Page 18 of 21

36.     Similar examples of the term "pedophile" being used in the context of accusations involving post-pubescent adolescents abound. The Court is no doubt familiar with the extensive coverage of Jeffrey Epstein, the deceased billionaire accused of abusing children between the ages of 13 and 16 and who is frequently referred to as a "pedophile" in the media, including by the New York Times.[6] Even the Associated Press, whose style book is relied on by reporters as the Bible for accuracy in news reporting, has referred to Epstein as a "convicted pedophile."[7]

37.     Perhaps more telling, Hubbard *himself* has cited publications in his own work that use the term "pedophilia" in relation to post-pubescent adolescents. In his article INTRODUCTION TO SPECIAL ISSUE ON "BOYS' SEXUALITY AND AGE OF CONSENT", Hubbard cites to an article by Richard Mohr called the "Pedophilia of Everyday Life." Mohr's article "makes an evident point that current social hysteria around pedophilia is matched by an endless eroticization of, and voyeuristic fascination with, children and teenagers in advertisements, film and news media." DOMESTIC VIOLENCE AND SEXUAL VIOLENCE: ARTICLE: TRANSCENDENT HOMOSEXUALS AND DANGEROUS SEX OFFENDERS: SEXUAL HARM AND FREEDOM IN THE JUDICIAL IMAGINARY, 17 Duke J. Gender L. & Pol'y 277, 303.

38.     The media routinely uses the term "pedophilia" to refer to sexual relations with a post-pubescent adolescent. Hubbard's peers in academia, who he has cited favorably, have also used the term "pedophilia" without the distinction Hubbard seeks to draw. It is therefore absurd for him to suggest that he has been defamed on the basis that the term "pederasty" should have been used in lieu of "pedophilia." Moreover, the probable effect on the reader of the statements in the flyer

---

[6] https://www.dailymail.co.uk/news/article-8662109/Army-corporal-78-snared-paedophile-hunters-tried-groom-14-year-old-boy.html

[7] https://apnews.com/7dc432ef3e1a4d6e80d9bae2f0fbc66c

is the same regardless of whether it is asserted that Blakemore considers Hubbard's work as advocating pedophilia versus pederasty.

39.     In a Dallas Morning News Op-Ed "A UT Professor 'researches' pederasty. Why are we paying for it?", the paper's editorial board examined the controversy over Hubbard's teachings that is the subject of the flyer.[8] **Exhibit H**. The newspaper reviewed Hubbard's article SEXUAL CONSENT AND THE ADOLESCENT MALE, OR WHAT WE CAN LEARN FROM THE GREEKS. *Id.* It concluded, as Blakemore has, that what "Hubbard learned from the Greeks, apparently, is that society really needs to reconsider age-of-consent laws that are intended to protect children from sexual predators." *Id.* The editorial proceeded to take issue with what it interpreted as Hubbard's suggestion that the "problem of boys without fathers in their lives might well be resolved by having men have sex with those boys." The article concluded that Hubbard's "paper urging the unraveling of age-of-consent laws is a hard read, as slovenly in its scholarship as it is grotesque in its conclusions." *Id.*

40.     The *opinions* expressed in the Dallas Morning News' Op-Ed piece mirror the *opinions* expressed in Blakemore's flyer and, just as significantly, demonstrate that it is not Blakemore's use of the word "pedophilia" that caused any alleged reputational harm to Hubbard, but his own writing. In other words, even when the full context of Hubbard's authorship was examined with the understanding that Hubbard was writing about "pederasty" and not "pedophilia", the Dallas

---

[8] The article was originally titled "A UT Professor Advocates Pedophilia. Why are We Paying for It?"

🛡 🔒 https://www.dallasnews.com/opinion/editorials/2019/12/18/a-ut-professor-advocates-pedophilia-why-are-we-paying-for-it/

The newspaper issued a correction drawing a distinction between pederasty and pedophilia, which is notable not because this distinction is itself significant, but because the opinions expressed in this article remained unchanged even after someone (presumably Hubbard) insisted that the term "pederasty" be substituted for "pedophilia." However, as noted above, while "pederasty" may have a more limited meaning than "pedophilia", that does not mean that the term "pedophilia", as commonly used, is not broad enough to encompass sexual activity with children 13 and older.

Morning News' editorial board still found what Hubbard was saying "grotesque" (or, as Blakemore characterized it, "disgusting.")

41.     The Op-Ed concluded by urging students to "do what they are doing" and "make your voice heard." That is precisely what the Constitution guarantees that Blakemore has the right to do, regardless of whether Hubbard or anyone else disagrees with the opinions she has expressed. The legal system cannot abide the claims Hubbard has brought against her without chilling her constitutionally protected right of expression. For this reason, Hubbard's defamation claims should be dismissed in their entirety and he should be left to defend his teachings in the court of public opinion.

42.     As a professor, Hubbard should be proud to take ownership of his work and encourage rigorous debate with those he is charged to educate should they not share his views. This Court should not judge the content of Hubbard's work, that is beyond its purview, but should be deeply troubled by how he handles dissent: not with a reasoned rebuttal, but by filing a lawsuit to stifle a student's speech.

## IV.     Conclusion

43.     Blakemore enrolled at the University of Texas to receive an education, but the only lesson Hubbard has taught is that "free speech" is costly when the legal system can be abused in an effort to bully dissenting opinions into submission. Summary judgment should be granted because Blakemore's expression of her opinion is not defamatory as a matter of law and we would respectfully request that it be granted without the need for further discovery so as to spare this student from spending funds that would be better spent furthering her education through classes with professors who respect their students' right to express themselves.

Respectfully Submitted,

**HOOVER SLOVACEK LLP**

*//s// Colin L. Guy*
Colin L. Guy
Texas State Bar No. 24083118
Galleria Tower II
5051 Westheimer, Suite 1200
Houston, Texas 77056
Tel: (713) 977-8686
Fax: (713) 977-5395
Email: guy@hooverslovacek.com

**WRIGHT & GREENHILL, P.C.**

*//s// Ross Pringle, Jr.  (w/permission)*
Ross Pringle, Jr.
Texas State Bar No. 16330001
900 Congress Ave., Ste. 500
Austin, TX 78701
Tel: (512) 476-4600
Fax: (512) 476-5382
Email: rpringle@w-g.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of September 2020, a true and correct copy has been served by electronic service on the following attorneys, pursuant to the Texas Rules of Civil Procedure.

Geoffrey L. Harrison
Michael C. Kelso
SUSMAN GODFREY LLP
Telephone: (713) 653-7807
Facsimile: (713) 654-6666
gharrison@susmangodfrey.com
MKelso@susmagodfrey.com

**ATTORNEYS FOR DEFENDANT**

*//s// Colin L. Guy*
Colin L. Guy