**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS AUSTIN DIVISION**

| | | |
|---|---|---|
| **DR. THOMAS HUBBARD, PhD.** *Plaintiff,* | § § § § | |
| **v.** | § § | **CA NO. 1:20-cv-00767-RP** |
| **SARAH ALLEN BLAKEMORE; and JOHN DOES 1 – 10,** *Defendants.* | § § § | **JURY DEMANDED** |

# Defendant Sarah Allen Blakemore's Motion for Sanctions

Sarah Allen Blakemore ("Defendant" or "Blakemore") files this Motion for Sanctions. In support, Blakemore would respectfully show the court as follows:

## I. Background and Summary

1. Defendant brings this Motion for Sanctions seeking recovery of her attorneys' fees, which this Court is authorized to award under its inherent power and pursuant to 28 U.S.C.A. § 1927. The claims against Defendant were brought for an improper purpose and were brought as one of three lawsuits involving the same claims that should have been brought together to avoid unreasonable duplication of efforts that resulted in additional cost.

2. Plaintiff Thomas Hubbard ("Hubbard") has revealed through the lucrative settlement agreement with the University of Texas (the "University") attached to his Motion to Dismiss that the lawsuits brought against Blakemore and two other students were motivated by the improper purpose of pressuring the University to pay him to go away. **Exhibit 1**. Hubbard's $700,000 settlement includes a provision requiring that he dismiss the claims he filed against Blakemore and other students:

> Within five (5) days of Hubbard's Counsel receiving the lump sum payment identified below, Hubbard shall file a motion to dismiss with prejudice (and all sides bearing their own costs and fees) his pending Federal Lawsuits against Sarah Allan Blakemore and various John Does (1:20-cv-767-RP); Hollie Green (1:20-cv-1140-RP), and Zoe Elise Thomas (1:20-cv-1193-RP). On that date, Hubbard shall file, and not revoke, a motion to voluntarily dismiss the Federal Lawsuits, and a proposed order, to affect the same, with prejudice. Hubbard shall take any and all other steps reasonably necessary to dismiss the Federal Lawsuits with prejudice.

**Exhibit 1** at p. 5.

3. Hubbard has been trying to coerce the University into buying him out since at least August 16, 2009, when he offered to "drop all legal or grievance claims against the University or its employees" and "write no further letters of complaint to university administrators" in exchange for an extortionate payout. **Exhibit 2** at p. 4.[1] After the University rejected Hubbard's proposal in 2009, he filed a spurious complaint alleging age discrimination that was ineffective. A decade later, Hubbard again filed an EEOC complaint and apparently used the lawsuit against Blakemore and two other students as a bargaining chip to great effect in finally needling the University into paying him an amount very close to what he had first demanded in 2009. Hubbard has effectively used the legal system to procure ransom for three young women so that he could feather his retirement nest. The Court has inherent power to sanction this deplorable conduct, as well as statutory authority, and should repair the harm that Hubbard's loathsome negotiation tactics have caused by ordering him to compensate Blakemore for the attorneys' fees she has incurred in defending her constitutionally protected right to express her opinions about the quality and character of Hubbard's inutile scholarship.

4. Hubbard should be sanctioned not only for bringing this lawsuit for an improper purpose, but also for bringing and maintaining claims that he knew lack evidentiary support. Hubbard's

[1] Hubbard's salary at that time was $79,500 and he attempted to negotiate an early retirement package that would provide him $250,000 a year for three years. He would have received a windfall of over 3x what he had been earning had his scheme succeeded.

lawsuit against Blakemore included 10 unidentified "John Does" he alleged Blakemore was acting in concert with. Hubbard alleged that the Defendants (inclusive of Blakemore) "were the instigators and initiators of" an act of "mob violence", referring to an incident in which he alleges his "house was attacked and vandalized on December 9, 2019 by militants associated with an explicitly revolutionary organization (the Popular Women's Movement/Movimiento Femenino Popular) who spray-painted red graffiti on Dr. Hubbard's house in the form of bold letters spelling 'CHILD RAPIST' and a hammer and sickle." **Hubbard's Complaint** at ¶s 6 and 20. Asked about Blakemore's involvement in the attack on his house, Hubbard confessed in his deposition that "my initial assumption was she had nothing to do with it." **Exhibit 3** at p. 201. There has been no evidence developed through the course of this lawsuit to suggest that Hubbard's initial assumptions were wrong and his inclusion of Blakemore as an "instigator and initiator" of an act of "mob violence" is completely baseless.

5. Despite having initially brought suit against Blakemore and these 10 unidentified individuals in the same proceeding, Hubbard proceeded to file two additional lawsuits involving the same facts against two named individuals: Hollie Green (1:20-cv-1140-RP) and Zoe Elise Thomas (1:20-cv-1193-RP). The Court should question why Hubbard initially brought a single lawsuit against Blakemore and 10 co-defendants, but then elected to proceed with two separate lawsuits based on the same facts and circumstances against Green and Thomas. The Court may logically conclude that Hubbard's decision to proceed with a multiplicity of suits was intended for the improper purpose of driving up defense costs for the named defendants, while still maintaining the claims against the "John Does" for a more sinister purpose.

6. During the course of this lawsuit, Hubbard discovered that a professor at Brooklyn College, Liv Yarrow, had written a blog post expressing her criticism of scholars who had been convicted

of possession of child pornography and other crimes of a sexual nature involving minors. This blog post also made reference to Hubbard's lawsuit against Blakemore. Hubbard responded to the blog post with a letter to Yarrow in which he defended the criminal subjects of her blog post, downplayed the harmful nature of child pornography[2] and, significantly, threatened to implicate her as one of the "John Does" without any credible basis. **Exhibit 4**. Specifically, Hubbard wrote that "My lawsuit also lists ten John / Jane Does" and that it "might be to my advantage to name a foolish senior classicist as one of them," concluding "[a]re you confident enough in your assertions that you want to volunteer for that role?"[3]

7. Hubbard's $700,000 settlement with the University has revealed that the lawsuit against Blakemore was part of a broader campaign of asymmetric warfare aimed at coercing the University into paying a hefty ransom to dispose of a nettlesome tenured professor. Hubbard's abuse of the federal court system to gain leverage in his negotiations with the University is reason enough for sanctions. Sanctions are further warranted by his baseless conflation of Blakemore with the unnamed "John Does", unjustifiable multiplicity of suits, and his demonstrated willingness to use this lawsuit to harass others by threatening to drag them into it because, as he has stated, that "might be to my advantage." The Court may award sanctions under its inherent authority and under 28 U.S.C.A. § 1927, as discussed below.

---

[2] "The percentage of men who are found to access these images online and are later found to have molested children is very small. Indeed, during the decade or so that such images were fully legal in some European countries like Denmark and Czechoslovakia, and the longer period when they were legal in Japan, rates of actual child molestation went down, and then rose again after the images were banned. I in no way defend people who create or share certain images, but civil libertarians are concerned about the misuses of child pornography laws to seize legitimate art work, such as the photography of Will McBride, Jock Sturges, or Sally Mann, or anthropological records, such as those of Walter Williams. Therapists who work with CP offenders know that most of them are men with active fantasy lives, generalized antinomian tendencies, and often serious substance abuse problems, but they do not have histories of child abuse or even primarily pedophilic orientations."

[3] Hubbard has also threatened numerous other individuals and entities with litigation, but upon information and belief has only commenced suit against Blakemore, Green and Thomas. Hubbard appears to take delight in raising the specter of litigation as a tool for silencing any opinions he finds objectionable, a gross misuse of the federal court system.

## II.    Arguments and Authorities

8. Hubbard should be sanctioned for bringing a lawsuit against Blakemore for the improper purpose of extracting an overly generous retirement package from the University and for maintaining claims that Blakemore acted in concert to instigate an attack on his home, which he has admitted he never believed. The Court's inherent power to issue sanctions "parallels the provisions of Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927" and "those provisions do not repeal or modify the court's inherent power to address litigation abuse." *Thabico Co. v. Kiewit Offshore Servs., Ltd.*, No. 2:16-CV-427, 2017 U.S. Dist. LEXIS 124440, at *12 (S.D. Tex. 2017), citing *Chambers v. NASCO, Inc.* 501 U.S. 32, 45-46 (1991). Under both the Court's inherent power, Hubbard's conduct is sanctionable because he engaged in bad faith in pursuing frivolous claims with an improper purpose, maintained claims he knew had no factual basis, and vexatiously multiplied the proceedings by filing multiple lawsuits involving the same underlying circumstances.

9. The path from Hubbard's attempt to extort an early retirement package from the University in 2009 to the $700,000 settlement just reached with the University is not difficult to follow. And the unwitting role that Blakemore and other students played in Hubbard's shakedown is now clear.

10. Hubbard has long expressed dissatisfaction with the uninspiring trajectory of his career, noting in his 2009 demand that he had been considered for positions at prestigious universities ("Yale twice, NYU [and] Illinois") and that he blamed the University for his failure to obtain a more rewarding position at another school. **Exhibit 2** at p. 5. In turn, the University's response to Hubbard's age discrimination complaint included comments characterizing Hubbard as "a major obstacle to effective operations", noted that "his increasingly disruptive and damaging conduct threatens the continuing excellence of our programs" and further observed that "certainly most and

possibly all other faculty members would welcome his departure; and while that departure would inevitably cause short-term strain on our graduate program in Greek, it would greatly improve faculty morale, performance, and recruitment, graduate recruitment and training, administrative efficiency, and undergraduate instruction." **Exhibit 5** at p. 5.

11. Hubbard wanted to leave the University, but not without a payout far in excess of his salary. The University wanted him gone, but could not easily dispose of a tenured professor. Blakemore and other students were caught in the crossfire. With the context of this fractious and dysfunctional relationship between Hubbard and the University, Hubbard's decision to file suit in federal court against three University students who could not be expected to pay any judgment begins to make more sense. Hubbard was adamant he wanted to retire and a highly publicized lawsuit against Blakemore concerning a controversial topic provided powerful leverage that was lacking in his previous attempt to coerce the University into paying him to leave.

12. Courts have recognized similarly sleezy tactics as belying an improper purpose worthy of sanctions. In *Blakeman v. Philip R. Bishop & Bishop, Payne, Harvard & Kaitcer, LLP*, the court recognized that a lawsuit had been brought by the plaintiff "to advance his goal of coercing a settlement" in other litigation. *Blakeman v. Philip R. Bishop & Bishop, Payne, Harvard & Kaitcer, LLP* (In re W. Fid. Mktg.), Nos. 497-45416-BJH-11, 99-4173, 2001 Bankr. LEXIS 2244, at *61 (Bankr. N.D. Tex. 2001). With the benefit of the settlement agreement with the University and Hubbard's personnel files, his illicit motive in pursuing three separate lawsuits against Blakemore and two other students has become transparent.

13. In evaluating whether a suit was brought for an improper purpose, courts are to consider whether the suit at the outset would have been pursued without an improper purpose and whether the methods and manner of prosecuting the claim after the initial filing was to impose unnecessary

costs of defense. *FDIC v. MAXXAM, Inc.*, 523 F.3d 566, 584 (5th Cir. 2008). Even where a claimant initiates a lawsuit that reasonably appeared to have merit, pursuing such claim in a "manner calculated to increase the cost of defense" is grounds for sanctions. *Id.* Hubbard's claims against Blakemore and other students lack merit, his decision to pursue these claims cannot be logically explained absent an improper purpose, and he pursued these claims through a multiplicity of suits intended to unnecessarily increase defense costs.

*a.) Hubbard's claims against Blakemore were baseless and improperly motivated by a scheme to pressure the University into a lucrative settlement.*

14. Hubbard's claims against Blakemore lack merit, as the flyer that is the subject of his lawsuit is an expression of Blakemore's opinions and/or contains truthful statements, some of which Hubbard has since acknowledged without correcting his pleadings.

15. In his complaint, Hubbard alleged he had been defamed by a statement that he is associated with the North American Man-Boy Love Association (NAMBLA), but has since admitted that he a) published a book through a company operated as a front for NAMBLA (**Exhibit 3** at p. 74 / p. 66 of the deposition); has known Peter Herman a/k/a Peter Melzer, a prominent NAMBLA member, for 20 years and engaged in "a lot of e-mail exchanges with him over the last couple of years" (**Exhibit 3** at p. 70 /p. 52 of the deposition); and has attended two NAMBLA meetings "as part of my research") (**Exhibit 3** at p. 70 /p. 52 of the deposition).

16. Hubbard has also alleged he was defamed by Blakemore's characterization of him as an advocate for pederasty. During his deposition, Hubbard was asked about his publication "Introduction to Special Issue on Boys' Sexuality and Age of Consent." **Exhibit 3** at p. 96 / p. 157 of the deposition. In that work, Hubbard discusses the proposition that a test originally developed for the cognitively impaired could be applied to children to assess whether they can give effective consent to sexual relations with an adult. *Id.* Hubbard was asked if that is a "good

idea" and responded "it's worth considering it." *Id.* at p. 158. In this article, Hubbard also comments that "any hope for positive change in the way our society treats its boys and their capacity for sexual self-realization (and self-control) must be embedded in a wider agenda of social reform, in conversation with a range of discourses on gender, sexual citizenship, and childhood in all its aspects." Following a question about this comment, Hubbard was expressly asked about his role as an advocate:

> So, you're advo -- are you advocating for a positive change in the way our society treats its boys here?
>
> A. Yes. That is the whole purpose of this scholarly journal.

**Exhibit 3** at p. 158.

17. Hubbard *admits* that he is an advocate for changing age of consent laws (perhaps substituting the safeguard they are intended to provide with some sort of test for the cognitively impaired to assess whether a child really wants to have sex with an adult), yet charges Blakemore with defamation for expressing her opinion that he is an advocate for pederasty. Hubbard is entitled to argue that there is some nuance that has been missed when he poses rhetorical questions like "[t]o what extent can the evidence of the Greek model [of pederasty] be applicable to modern Western societies?" But this is a difference of opinion, opinions are protected from the scope of defamation law, and Hubbard's claim against Blakemore is ultimately without merit.

18. Objectively, it does not make any sense that a university professor who associates with members of NAMBLA, has published work through a NAMBLA affiliated publisher, and waxes poetically about the hypothetical benefits of allowing young boys to engage in sex with adults would bring a lawsuit against a university student who almost certainly does not even have the

financial resources to pay him the unlikely event of an adverse judgment. Hubbard's decision to pursue this highly publicized lawsuit only becomes understandable when the link to his EEOC complaint against the University is exposed and the benefits he hoped would inure to him by bartering with the lawsuits brought against three university students.

*b.) Hubbard pursued his claims in a manner that warrants imposition of sanctions.*

19. If Hubbard's motivation in filing the lawsuit against Blakemore was truly motivated by a proper purpose, such as trying to repair his broken reputation, then he would not have agreed as a material term of the settlement with the University to drop the claims against Blakemore, Green and Thomas. These lawsuits were used as a bargaining chip and it is shameful for Hubbard to have exploited the federal court system to enhance his negotiations with the University. For that, he should be sanctioned.

20. Hubbard could have chosen to include Green and Thomas in the same lawsuit as Blakemore and the "10 John Does." Instead, he filed two nearly identical lawsuits for no discernable purpose other than to contribute to the cost that these three women would collectively incur. Three separate cases, three separate trials. Potentially three separate depositions of Hubbard following three separate series of written discovery exchanges. Three separate poker chips to toss in the pot when it came time to settle with the University.

21. The Court may take note of Hubbard's craven threat against Prof. Liv Yarrow when evaluating his credibility. Hubbard threatened to drag her from New York into a federal court in Texas as one of the "John Does" because it "might be to my advantage to name a foolish senior classicist as one of them." If Hubbard had a legitimate basis to suspect that Prof. Yarrow was one of the "John Does", he was under an obligation to name her as a person likely to have discoverable information in his disclosures; he did not. **Exhibit 6.** This threat against Prof. Yarrow was intended

solely to harass her, and just as baseless as the allegation that Blakemore acted in concert with these "John Does" and initiated and instigated the attack on Hubbard's house.

*c.) Hubbard had no basis to assert that Blakemore instigated and initiated the attack on his house but maintained this claim without any evidentiary basis.*

22. Hubbard never had any reason to believe that Blakemore played any role in the attack on his house, but included this allegation without regard to the absence of any evidentiary support or reason to expect such evidence would be developed. Even after ample opportunity to develop this allegation, Hubbard never withdrew the claim that Blakemore was involved in the attack on his house. He admitted in his deposition he never suspected that she was involved: "my initial assumption was she had nothing to do with it."

23. Hubbard attempts to defend his careless conflation of Blakemore and the assailants who vandalized his house by speculating that her flyer may have motivated them. Following this same train of logic, it is not unreasonable that someone might conclude a predator may be emboldened to act by statements from Hubbard such as: "where age-discrepant relationships are commonplace and positively reinforced, they cause little or no long-term harm to the younger partner and often confer great benefit." **Exhibit 7** at p. 4. Presumably, one of Hubbard's colleagues in NAMBLA may read the words of an esteemed scholar on the subject and feel justified in relenting to unnatural urges previously supressed, confident by virtue of Hubbard's romanticization of these illicit relationships that no harm would ultimately result and that the minor would instead obtain some "great benefit".

24. While Blakemore has a valid basis for expressing her opinions about Hubbard in the flyer she distributed, Hubbard has no excuse for accusing Blakemore of engaging in a criminal conspiracy in his complaint. Hubbard may have assumed he could cower under the cloak of the litigation privilege, but while that privilege may shield him from liability, his wilful decision to

assert this claim in spite of his assumption "she had nothing to do with it" justifies sanctions under the Court's inherent power. Hubbard's tactical decision to subject three co-defendants to defending themselves in three separate proceedings should be viewed as an attempt to needlessly multiply proceedings that should have been heard in a single case. Hubbard and/or his counsel should therefore be subject to sanctions under this Court's inherent power and the statutory authority provided by 28 U.S.C. § 1927.

## III. Conclusion and Prayer for Relief

25. The requirement in Hubbard's settlement with the University that he dismiss his claims against Blakemore, Green and Thomas in exchange for a $700,000 payout is objective evidence from which the Court may conclude that Hubbard had an improper purpose in pursuing three separate lawsuits concerning the same underlying circumstances. Such a determination is supported by objective evidence of Hubbard's contentious relationship with the University and prior attempts to pressure it into paying him an exorbitant sum to take an "early retirement." Hubbard has maintained claims against Blakemore that he has admitted have no evidentiary basis by lumping her in with the unidentified assailants who vandalized his home. Hubbard's testimony has also revealed that his claims against Blakemore lack merit. Hubbard complains that he has been unfairly characterized as an advocate for pederasty, but extols its benefits and describes himself as an advocate for the youth he expects would be well served by reforming age of consent laws. Hubbard has demonstrated he lacks credibility or a conscience by threatening to include another professor in this lawsuit solely for the purposes of harassing her. The Court has inherent power and statutory authority to impose sanctions against Hubbard and should. Blakemore therefore respectfully requests this Court order Hubbard and/or his counsel to reimburse Blakemore the attorneys' fees she has incurred in defending against this lawsuit and for such


additional relief as the Court may consider appropriate, up to and including a fine in the amount of the settlement he obtained from the University by agreeing to drop his baseless claims against three of its students.

Respectfully Submitted,

**HOOVER SLOVACEK LLP**

By: *//s// Joseph O. Slovacek*
Joseph O. Slovacek
Texas State Bar No. 18512300
Leonard J. Meyer
Texas State Bar No. 13993750
Galleria Tower II
5051 Westheimer, Suite 1200
Houston, Texas 77056
Tel: (713) 977-8686
Fax: (713) 977-5395
slovacek@hooverslovacek.com
meyer@hooverslovacek.com

**ATTORNEYS FOR DEFENDANT
SARAH ALLEN BLAKEMORE**

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of August 2021, a true and correct copy has been served by electronic service on the following attorneys, pursuant to the Texas Rules of Civil Procedure.

Joseph D. Sibley
sibley@camarasibley.com
Camara & Sibley LLP
1108 Lavaca St.
Suite 110263
Austin, TX 78701
Telephone: (713) 966-6789
Fax: (713) 583-1131

**ATTORNEY FOR PLAINTIFF**

By: *//s// Joseph A. Slovacek*
Joseph A. Slovacek