

OFFICE OF THE VICE PRESIDENT FOR DIVERSITY AND COMMUNITY ENGAGEMENT

THE UNIVERSITY OF TEXAS AT AUSTIN

*Office of Institutional Equity*
P.O. Box 7609 • Austin, Texas 78713-7609 • (512) 471-1849 • FAX (512) 471-8180 • www.utexas.edu/eos

November 30, 2010

TO:     Steven Leslie
         Executive Vice President and Provost

FROM:   Linda Millstone
          Associate Vice President for Institutional Equity

RE:     Formal Complaint: Thomas Hubbard
         Age Discrimination

Thomas Hubbard, Professor in the Department of Classics, College of Liberal Arts, filed a formal complaint of age discrimination on April 29, 2010. Dr. Hubbard filed his complaint against [redacted] Dr. Hubbard is alleging age discrimination with respect to the mid-year raises which occurred in Spring 2010. Specifically, Dr. Hubbard asserts that those over the age of 50 (which includes Dr. Hubbard) experienced a negative disparate impact with respect to the allocation of the mid-year monetary increases. The alleged behavior is administratively addressed through the University's Nondiscrimination Policy.

[redacted] was provided a copy of Dr. Hubbard's complaint on May 11, 2010. [redacted] sought extensions and submitted his response to the complaint was received on July 28, 2010.

**BACKGROUND**

Thomas Hubbard joined the University faculty as a Lecturer during the 1985-86 academic year. He was then hired as an Assistant Professor effective September 1988. Promoted to Associate Professor effective September 1993, Dr. Hubbard was promoted again to Full Professor effective September 1998. Dr. Hubbard's current salary is $79,500. His most recent salary increase was $3500 which he received effective September 1, 2008.

In the Fall semester of 2009, the University's Office of the Provost indicated that some faculty would receive a salary increase effective January 16, 2010. Ultimately, according to the updated website, 38% of faculty across the campus received some level of increase. Within the College of Liberal Arts, 36.2% of the faculty received mid-year raises.

**EXHIBIT 5**

INVESTIGATIVE PROCEDURE AND SOURCE MATERIAL

Thomas Hubbard's formal written complaint, with attachments, is found in **Attachment I**. ▮▮▮▮▮▮▮▮▮ response, with attachments, is found in **Attachment II**.

In addition to interviews with Dr. Hubbard and ▮▮▮▮▮▮▮ interviews were conducted with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

ALLEGATIONS

▮▮▮▮▮▮▮ responses to Dr. Hubbard's assertions are found below.

1. **The disparate impact is patent. Among the faculty within this department above the age of 50 on 12/31/2009, only 18% received mid-year raises. Among the faculty below that age, 83% received raises…Of these 17 who were technically eligible, two could quite reasonably be eliminated from consideration because they would not be continuing at the University past the end of this year [Gargarin and Kim]. This would change the percentages in an even more lopsided way: 20% of the remaining faculty above the 50 received raises and 100% of the remaining faculty under 50 received raises** [Hubbard, Page 1].

Please note two other faculty, both women, Deborah Beck (age 42) and Ayelet Haimson Lushkov (28), were not considered for raises. Hired as Assistant Professors in 2009, they earn $70,000 and $65,000 respectively. ▮▮▮▮▮▮▮ was also not considered as ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and an allocation would not come from the department, but would come from ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ provides context for the mid-year raises. In his response, he states the Dean of Liberal Arts announced during a September 14, 2009 meeting with ▮▮▮▮▮▮▮▮▮▮ that the President had directed no more than 25-35% of faculty within each college would receive these special mid-year raises. "It was emphasized that: 1) the mid-year process was fundamentally distinct from normal annual merit review; 2) strategic competitiveness reflects the impact a member's departure would have on a program's excellence, not the likelihood of their departure; 3) equity and compression should be viewed in the context of productivity and time in rank; and 4) in light of the recent report of the Provost's Gender Equity Task Force, we should be sure to consider the possibility of gender discrimination in addressing questions of equity" [▮▮▮▮ Page 1].

According to ▮▮▮▮▮▮▮ the Classics Department's allocation was $37,438 and initially the Office of the Dean provided five (5) raise opportunities for faculty. ▮▮▮▮▮▮▮ sought permission to increase the number of faculty proposed for increases, and was told the College would accept between 5-7 raise opportunities. The Executive Committee (EC) and Chair met on September 25, 2009 and again on October 15, 2010 (due date for

recommendations to the Office of the Dean). The EC "reached consensus on three points: 1) 8 members met the criteria most clearly; 2) although the Dean had authorized only 5-7 raises, we would therefore propose 8; and 3) if the Dean approved, ▮ should allocate 8 raises in the range of roughly $4,000-$7,000 each. The 8 members selected to receive raises were: Dean Jones (54), Ebbeler (37), Gates-Foster (34), Moore (50), Perlman (58), Rabinowitz (36), Riggsby (44), and Taylor (49)" [▮ Pages 1-2]. When the Dean indicated only seven (7) raises were permitted, Dr. Moore's name was removed from the recommendations.

2. **The objective criteria for the raises has never been explained to the full department, despite public criticism…One EC member stated that they were required to give raises to all female faculty…The raises went only to Assistant Professors, Associate Professors, and two most recently promoted full professors…Instructions from the Provost's Office were that departments should award mid-year raises to address three types of problems: (1) gender equity for female faculty, (2) compression, and (3) strategic competitiveness with other institutions. Unfortunately, departments never received any clear definitions of these three terms from higher administrative levels** [Hubbard, Pages 2-3].

▮ denies the assertion that he told the EC to give all raises to female faculty. ▮ did indicate in his interview that his original understanding was that all women faculty would get raises. However, he indicated that he recalled discussion of the criteria outlined in ▮ statement and explained in this report. ▮ states that although four women did receive raises, they received them because he and the committee specifically found that they met the criteria outlined by the Provost and Dean [▮ Page 5]. The statements of ▮ are not inconsistent.

It is noted the mid-year adjustments were not the typical annual merit increase based on performance. Rather, the mid-year increase was targeted to correcting issues of compression, equity and addressing strategic competitiveness. While no written definitions of the criteria for salary increases were provided to departments, both ▮ ▮ recall a verbal explanation of ▮ definition of the criteria during ▮ meeting.

According to ▮ the College "emphasized that departments should adopt a long view and consider recent merit rankings only in terms of the larger goals specified by the President, namely, to address inequities arising from past allocations and to invest strategically in our future" [▮ Page 2]. ▮ writes, "Strategic competitiveness is a holistic factor reflecting a member's ongoing contributions to the overall excellence of our programs; and it is primarily forward-looking, focused on the impact someone's departure would have on our programs compared to peer programs in our field" [▮ Page 2]. He identifies Gates-Foster, Rabinowitz, and Taylor, junior archaeologists, as working effectively as a team to build the new major in Classical Archaeology, to

introduce new courses and to revamp and "energize" the graduate program, to build ties across campus, and to "to cultivate wider interest through outreach efforts." ▆▆▆▆ also describes "similar strategic synergies" in Greek (Dean-Jones and Perlman), Latin (Ebbeler, Moore, and Riggsby), ancient history (Perlman and Riggsby), and late antiquity (Ebbeler and colleagues in several other departments) ▆▆ Page 2-3].

▆▆▆▆ states that Dr. Hubbard's view is that strategic competitiveness is assessed by past performance and the likelihood of a faculty member finding alternative employment elsewhere. ▆▆▆▆ responds that the department's definition and the College's definition is the impact on the status of the department should a faculty member leave, not the likelihood that this would happen. "The emphasis falls squarely on the impact someone's departure *would have* on our program, not the *likelihood* of their departure" [▆▆ page 3].

Dr. Hubbard provides his analysis of faculty productivity solely in terms of publications and citations. While ▆▆▆▆ also disagrees with Dr. Hubbard's calculations, even setting that aside, ▆▆▆▆ states that the raises were not merit based in the sense of looking solely at publications and citations. Rather, the faculty member's publication record is only important in terms of overall productivity, and therefore is not necessarily reflective of their "strategic competitiveness" as that criteria was defined in awarding the mid-year raises.

Other factors figured into the raises as well, for example, "equity." ▆▆▆▆ defines equity as "an essentially comparative factor relating a member's current salary in the first instance to their contributions, record, and rank, but by extension also to the salaries of other comparable members" [▆▆ Page 4]. ▆▆▆▆ indicates that the EC "found no clear case of gender inequity...but we did conclude that all 4 eligible women were unduly exposed to salary compression" [▆▆ Page 4]. ▆▆▆▆ also asserts that he did not understand ▆▆▆▆▆▆ email to state that all women must receive a salary increase and that he did not believe the EC understood that all women would receive money.

Salary compression is defined by ▆▆▆▆ as "relating a member's current salary to the salaries of others in the Department whose contributions, record, and rank are comparable" [▆▆ Page 5]. ▆▆▆▆ addresses application of this criteria by identifying the three Assistant Professors, hired in 2006-07 as compared to the two hired in 2009; the two Associate Professors relative to the five Assistant Professors, and three full Professors "faced compression relative to the two Associates and other Professors, and withholding a raise from any of the three would create undue disparity among them" [▆▆ page 6].

On Pages 7-11 of his response, ▆▆▆▆ describes the criteria for inclusion or exclusion in the mid-year adjustment. With respect to Dr. Hubbard, he writes, "Hubbard is an active scholar who teaches courses at all levels. But he has long been a major obstacle to effective operations, and his increasingly disruptive and damaging conduct threatens the

continuing excellence of our programs…We therefore did not consider him for a raise. Certainly most and possibly all other faculty members would welcome his departure; and while that departure would inevitably cause short-term strain on our graduate program in Greek, it would greatly improve faculty morale, performance, and recruitment, graduate recruitment and training, administrative efficiency, and undergraduate instruction. Given his extremely negative impact for many years and especially recently, we see no problem of equity or compression in his case…" ███ Pages 9-10].

## CONCLUSIONS AND RECOMMENDATIONS

Dr. Hubbard's complaint of age discrimination with respect to the allocation of mid-year raises reflects his belief that those over the age of 50 were adversely affected by the allocation process used the Executive Council.

Dr. Hubbard provides comparative information from other departments within the College of Liberal Arts and other universities. He refers to previous disputes or complaints he has raised. None of these are relevant to the process which resulted in the division of $37,438 among the 5-7 faculty authorized by the Dean's Office

To support his claim of age discrimination, Dr. Hubbard provides statistical evidence. However, the number of eligible faculty is small so percentages do not tell the story. It should be noted that only Dr. Hubbard has raised the issue of age discrimination, none of the other faculty over the age of 50 who did not receive any increase have raised an age discrimination allegation.

There were twelve (12) faculty who were 50 or older in the Department of Classics at the time of the mid-year deliberations: Gargarin, S. White, Hubbard, Galinsky, Carter, Moore, Morgan, Nethercut, Palaima, M. White, Perlman and Dean-Jones. One (S. White) is the Chair of the Department; two (M. White and Morgan) have split appointments; two are on extended leave (Galinsky and Carter); one (Nethercut) has not published since 1992; and one (Gargarin) has announced his retirement. This leaves five (5) faculty 50 or older who might be considered: two received salary increases and one was proposed for an increase but denied by the Dean's office. This leaves Dr. Hubbard and Dr. Palaima. Further it should be noted that the highest paid faculty in the department are Dr. Palaima, Dr. Galinsky, and Dr. M. White, all of whom are over the age of 50.

Dr. Hubbard makes assertions of "politics" by the EC in the mid-year raise decisions which supports what he views as animus towards those over 50. It should be noted that the EC is comprised of seven (7) members, six (6) of whom are tenured. Dr. Hubbard is the only full time tenured faculty who has not served on past or future (next year's) EC. Dr. M. White has not served but he is appointed half-time in Classics and Dr. Moore had not served but has been elected to the EC for the 2010-12 year.

In interviews with persons identified by Dr. Hubbard, no one indicated their belief that age discrimination existed in the determination of mid-year increases. Those ███

███████████████ all indicated there was no discussion of age during the salary discussion meetings. No one mentioned age related comments or climate concerns.

While alleging discrimination on the basis of age is sufficient to initiate a complaint, the investigatory process is used to determine whether age was a factor or if there was a factor(s) other than age that explains the alleged discriminatory incident. In the course of interviewing Dr. Hubbard, he stated that he did not receive monitory recognition by the department because he is "independently minded." When asked how this relates to age, Dr. Hubbard stated that being independently minded comes with maturity. He indicated that he had a 1st Amendment right to speak out against departmental policy and that those with dissenting views should not be penalized. This belief, held by Dr. Hubbard, does not support his claim of age discrimination. In fact, it undercuts his argument in that he himself believes a non-age related reason, his outspokenness, was responsible for his failing to receive a raise. Additionally, ███████ has provided adequate age neutral justifications for the allocation of raises and I note that of the relevant five individuals over 50 who could be considered for the mid-year raises, two of them received raises and a third was proposed for a raise but was denied by the Dean's office. Contrary to Dr. Hubbard's contentions, it appears that the majority of faculty over 50 that could properly be considered for the mid year raises either received or were proposed for a raise.

Thus, I find insufficient support for Dr. Hubbard's allegation of age discrimination. Should you have any questions, or wish to discuss these findings further, please do not hesitate to contact me.