**UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| DR. THOMAS HUBBARD, PhD, | |
| *Plaintiff*, | |
| v. | Case No. 1:20-cv-767 |
| SARAH ALLEN BLAKEMORE and JOHN DOES 1-10, | |
| *Defendants*. | |

## DECLARATION OF JOSEPH SIBLEY

# EXHIBIT  A

Pursuant to the provisions of 28 U.S.C. § 1746, I, JOSEPH SIBLEY, voluntarily make the following Declaration based upon personal knowledge and declare under penalty of perjury and the laws of the United States that the following is true and correct:

1. "My name is JOSEPH SIBLEY.  I am over 18 years of age, suffer no legal disabilities, and am otherwise competent to make this declaration. I have personal knowledge of the facts stated herein and they are all true and correct.

2. "I am lead counsel for Plaintiff in the above-referenced cause.

3. "Attached as Exhibit A-1 is a true and correct copy of email correspondence involving myself and Blakemore's counsel, with the last email being sent on September 6, 2020.

4. "Attached as Exhibit A-2 is a true and correct copy of the Flyer that forms the basis, in part, of Plaintiff's suit against Defendant.

5. "Attached as Exhibit A-3 is a true and correct copy of the deposition (redacted for portions deemed confidential) of Sarah Allen Blakemore taken on May 28, 2021.

6. "Attached as Exhibit A-4 is a true and correct copy of Dr. Hubbard's position statement in his EEOC proceeding against UT.

7. "The first time I ever received notice of any claim for attorneys' fees for Blakemore was on June 14, 2021, after Dr. Hubbard had agreed in principle to resolve his claims, which included dismissal of this action.  I expected this to be "good news" to Blakemore after her poor deposition performance, but instead I was informed by Mr. Pringle that the Hoover Slovacek firm had billed "substantial" amounts of attorneys' fees early in the case—presumably

in connection with the defective motion for summary judgment—that apparently the insurance carrier was not covering. I responded by asking what the basis for such fees were. Mr. Pringle responded by suggesting this Court could find his claims "frivolous, unreasonable, or groundless". This was the first suggestion of such in the case. Attached as Exhibit A-5 is a true and correct copy of this email exchange.

8. "I found this particularly strange since just five months earlier, on January 25, 2021, Blakemore offered to pay $25,000.00 cash to settle Dr. Hubbard's claims and bear her own costs and fees. A true and correct copy of this email communication is attached as Exhibit A-6. It is my understanding that Blakemore made this offer despite having the documents in her possession that she now uses as her basis for arguing Dr. Hubbard filed this suit with an improper purpose.

9. "On July 28, 2021 I was served with a Motion for Sanctions under FRCP 11, which is attached as Exhibit A-7.

10. "The Dropbox link https://www.dropbox.com/sh/aaxjhtobtxqa2q0/AAA8LhSSIJ09dLQdWwJw HjcUa?dl=0 contains true and correct copies of videos of the attack on Dr. Hubbard's house, which shall be referred to as Exhibit A-8.

11. "Attached as Exhibit A-9 is a true and correct copy of an email I sent to Blakemore's counsel in response to a query on whether we were going to add additional parties.

August 20, 2021

_____   *Joe Sibley*
Joseph Sibley

# EXHIBIT

# A-1



<span>Joe Sibley &lt;sibley@camarasibley.com&gt;</span>

## Hubbard v. Blakemore

**Leonard J. Meyer** &lt;meyer@hooverslovacek.com&gt;                    Sun, Sep 6, 2020 at 7:57 PM
To: Joe Sibley &lt;sibley@camarasibley.com&gt;
Cc: Ross Pringle &lt;rpringle@w-g.com&gt;, "Colin L. Guy" &lt;guy@hooverslovacek.com&gt;, Susan Balagia &lt;sbalagia@w-g.com&gt;, Sasha Yamatina &lt;ayamatina@w-g.com&gt;, "Joseph O. Slovacek" &lt;slovacek@hooverslovacek.com&gt;, Tina Bartley &lt;bartley@hooverslovacek.com&gt;

Counsel,

I presume you didn't realize that today is the Sabbath. I take that seriously and I suspect others in this thread do as well. And I'm sure you know tomorrow is a holiday, which I take seriously and some in this thread may also take seriously. For these reasons, with all due respect and without comment on the substance of your communication other than its unfortunate timing, your deadline will not be met and any assumption you may draw from that is your own assumption without basis.

**Leonard J. Meyer**
**Equity Partner**





**HooverSlovacek LLP**
**Galleria Office Tower 2**
**5051 Westheimer Rd., Suite 1200**
**Houston, TX 77056**
**Office: 713-977-8686**
**Fax: 713-977-5395**
**www.hooverslovacek.com**



NOTICE OF CONFIDENTIALITY: This communication and any attachments to it are confidential and intended solely for the use of the person to whom it is addressed. The information contained in and transmitted with this email is subject to the attorney-client and attorney work product privilege. If you have received this email in error, please reply and notify the sender immediately. You are hereby notified that any disclosure, distribution, copying, or the taking of any action in reliance on the contents of this information is unauthorized and prohibited. Any email erroneously transmitted to you should be immediately destroyed. Nothing in this message may be construed as a digital or electronic signature of any employee of Hoover Slovacek LLP.

---

**From:** Joe Sibley <sibley@camarasibley.com>
**Sent:** Sunday, September 6, 2020 11:54 AM
**To:** Leonard J. Meyer <meyer@hooverslovacek.com>
**Cc:** Ross Pringle <rpringle@w-g.com>; Colin L. Guy <guy@hooverslovacek.com>; Susan Balagia <sbalagia@w-g.com>; Sasha Yamatina <ayamatina@w-g.com>
**Subject:** Re: Hubbard v. Blakemore


**FRE 408 Settlement Communication**


As I discussed with Ross last week, we need to conduct (mainly) third-party discovery on the identities of the John Does.  We are willing to defer any further substantive discovery on Ms. Blakemore for the time being and until we have completed this task, provided you all agree to not oppose the third-party discovery being conducted and to provide a list of persons that she communicated with (in the form of a sworn Interrogatory answer) regarding the subject matter of the flyer she distributed in the November/December 2019 time frame.


In other words, we will agree to focus our efforts on John Does first and then, after learning what we need to know in that regard, we can revisit the case against Ms. Blakemore and potentially discuss resolving our dispute against her. Her/your cooperation in regard to discovering the identities of the John Does will go a long way toward softening my client's stance toward Ms. Blakemore and making it more likely that we can resolve our dispute without the need for protracted litigation.


Let me know by close of business on Tuesday the 8th whether we can reach an agreement in this regard.


Best regards,


Joe


On Mon, Aug 31, 2020 at 1:44 PM Leonard J. Meyer <meyer@hooverslovacek.com> wrote:

Gentlemen,

We are extremely busy this week and next, and ask that we postpone this conference. As you know, the Court has yet to even issue a scheduling order setting a date for a scheduling conference and our deadline for such a conference between us is therefore likely quite a ways down the road.

We may also wish to have the benefit of rulings on preliminary motions before we even consider what if any discovery is actually necessary.

I will advise after issuance of a scheduling order available dates for conferring.

And I know of no other matters requiring discussion at this time.

**Leonard J. Meyer**
**Equity Partner**





**HooverSlovacek LLP**
**Galleria Office Tower 2**
**5051 Westheimer Rd., Suite 1200**
**Houston, TX 77056**
**Office: 713-977-8686**
**Fax: 713-977-5395**
**www.hooverslovacek.com**



NOTICE OF CONFIDENTIALITY: This communication and any attachments to it are confidential and intended solely for the use of the person to whom it is addressed. The information contained in and transmitted with this email is subject to the attorney-client and attorney work product privilege. If you have received this email in error, please reply and notify the sender immediately. You are hereby notified that any disclosure, distribution, copying, or the taking of any action in reliance on the contents of this information is unauthorized and prohibited. Any email erroneously transmitted to you should be immediately destroyed. Nothing in this message may be construed as a digital or electronic signature of any employee of Hoover Slovacek LLP.

**From:** Ross Pringle <rpringle@w-g.com>
**Sent:** Monday, August 31, 2020 9:48 AM
**To:** Joe Sibley <sibley@camarasibley.com>
**Cc:** Leonard J. Meyer <meyer@hooverslovacek.com>; Colin L. Guy <guy@hooverslovacek.com>; Susan Balagia <sbalagia@w-g.com>; Sasha Yamatina <ayamatina@w-g.com>
**Subject:** Re: Hubbard v. Blakemore

I can do this after 3 pm today or any time tomorrow.  Let me see when Leonard is available.

Thx.

## B. Ross Pringle

Wright & Greenhill, P.C  |  900 Congress Avenue, Suite 500  |  Austin, Texas 78701
*direct:* 512-708-5265  |  *main:* 512-476-4600  |  *fax:* 512-476-5382
rpringle@w-g.com  |  wrightgreenhill.com  |  Bio

   

This message is privileged and confidential.  If you are not the intended recipient, please delete the communication.

On Aug 29, 2020, at 7:48 PM, Joe Sibley <sibley@camarasibley.com> wrote:

Mr. Pringle,

I received your message but I was busy last week and am just now getting back to you.

8/19/21, 2:35 PM

What day works this week for a call to discuss the case and, I suppose, go ahead and have our 26f conference?

Look forward to working with you,

Joe

# EXHIBIT

# A-2

Students for Safety

FOR IMMEDIATE RELEASE:                                    Contact: Sarah Blakemore
Thursday, November 21, 2019                                        713-851-4247

### Rally for the Removal of Dr. Thomas Hubbard

AUSTIN, TX - Dr. Thomas K. Hubbard has been advocating for pederasty (pedophilia) for as long as he has taught at the University of Texas. Since 2000, Dr. Hubbard has used his position to further a community of individuals hoping to prey on underage boys. In his academic writing, Hubbard describes physical relationships between men and young boys as "proper learning experiences." Works like "Boys' Sexuality and Age of Consent" encourage these illicit acts. His course "Mythology of Rape" was banned at UT after only one semester.  Furthermore, Hubbard is heavily associated with the North American Man/Boy Love Association (NAMbLA), formerly the world's largest pedophile activist group. He is even on the list of associated individuals on the NAMbLA Wikipedia page.

We are calling for Dr. Thomas K. Hubbard's immediate removal from his position as a professor of the classics department at the University of Texas at Austin. An individual who advocates for violent crime against teen boys had no business teaching the leaders of tomorrow. It is clear to us that the University of Texas does not have its student's safety, health, and welfare in mind. Hubbard's misconduct has been brought to administration before to no avail. We refuse to stand by while this man uses his status to promote pedophilia.

It is our goal to make students aware of Hubbard's disgusting ideals even if the University of Texas protects him. It should be a student's choice whether to learn from a man with Hubbard's record.

###

# EXHIBIT

# A-3

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DR. THOMAS HUBBARD, PhD,      )
                              )
          Plaintiff,          )
                              )
VS.                           )
                              )   CASE NO. 1:20-cv-767
SARAH ALLEN BLAKEMORE and     )
JOHN DOES 1-10,               )
                              )
          Defendants.         )
----------------------------------------------------------

ORAL & VIDEO DEPOSITION OF SARAH ALLEN BLAKEMORE

May 28, 2021
--------------------------------------------------

          Oral & video deposition of SARAH ALLEN BLAKEMORE,

produced as a witness at the instance of the plaintiff,

and duly sworn, was taken in the above-styled and

numbered cause on the 28th day of May, 2021, from

10:08 a.m. to 6:38 p.m., before Patrick Stephens,

Certified Court Reporter, reported by stenographic means,

at the offices of Wright & Greenhill, P.C., 900 Congress

Avenue, Suite 500, Austin, TX 78701.

Sarah Blakemore                                                    May 28, 2021

---

**Page 2**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

      JOSEPH D. SIBLEY, ESQ.

      Camara & Sibley LLP

      1108 Lavaca St

      Suite 110263

      Austin, Texas 78701

      Telephone:  (713) 966-6789

      sibley@camarasibley.com

ON BEHALF OF THE DEFENDANT:

      B. ROSS PRINGLE, ESQ.

      HANNAH GALE, ESQ.

      Wright & Greenhill, P.C.

      900 Congress Avenue

      Suite 500

      Austin, Texas 78701

      Telephone:  (512) 961-4389

      rpringle@w-g.com

ALSO PRESENT:

      Manuel Martin, Videographer

      Kim Tindall & Associates

      Telephone:  (512) 771-6964

      mamartin73@gmail.com

---

**Page 4**

1          E X H I B I T S (Continued)

2

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 10 | Text Messages | 161 |
| 11 | Pinto E-mail | 182 |
| 12 | Patterson E-mail | 188 |
| 13 | Blakemore 211 | 189 |
| 14 | Agenda | 191 |
| 15 | Text Messages (Blakemore 191-A) | 197 |
| 16 | Jim Davis Message | 256 |
| 17 | Signal Communications | 258 |
| 18 | 26(f) Report | 274 |

---

**Page 3**

1             I N D E X

2  APPEARANCES .............................................. 02

3  SARAH ALLEN BLAKEMORE

4      Cross-Examination by Mr. Sibley ................. 06

5  Reporter's Certificate ................................... 291

6

7          E X H I B I T S

8

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | E-mails | 08 |
| 2 | Fee Schedule | 14 |
| 3 | Discovery Documents | 101 |
| 4 | Production Requests | 112 |
| 5 | Request for Admissions | 124 |
| 6 | 1st Interrogatories | 127 |
| 7 | 2nd Interrogatories | 155 |
| 8 | Yarrow E-mail | 158 |
| 9 | Yarrow Letter | 160 |

---

**Page 5**

1          P R O C E E D I N G S

2      VIDEOGRAPHER:  Today's date is May 28th, 2021,

3  and the time is 10:08 a.m.  We are on the record.  We are

4  located at the offices of Wright & Greenhill in Austin, Texas,

5  for the oral, video deposition of Sarah Allen Blakemore in the

6  matter of Dr. Thomas Hubbard, PhD, versus Sarah Allen

7  Blakemore, et al., Case Number 120-CV-767.

8      Would counsels please introduce themselves for

9  the record and whom they represent?

10      MR. SIBLEY:  Joe Sibley for the plaintiff.

11      MR. PRINGLE:  And I'm Ross Pringle.  I represent

12  Ms. Blakemore.

13      COURT REPORTER:  Ms. Blakemore, would you raise

14  your right hand for me?

15      THE WITNESS:  (Complies with request.)

16      COURT REPORTER:  Do you solemnly swear or affirm

17  the testimony you'll give will be the truth, the whole truth

18  and nothing but the truth, so help you God?

19      THE WITNESS:  I do.

20      COURT REPORTER:  All right.  Great.  You may take

21  over.

22    (Whereupon,

23        SARAH ALLEN BLAKEMORE

24    having been first duly sworn, testified as follows:)

25        CROSS-EXAMINATION

---

Sarah Blakemore                                                May 28, 2021

Page 6

1   Q   Good morning, Ms. Blakemore.
2   A   Good morning.
3       MR. PRINGLE:  Could you -- before we start, can
4   you put it on the record?
5       MR. SIBLEY:  Yeah.  We're -- Mr. Pringle and I
6   have agreed that, in accordance with how we proceeded in the
7   last deposition that counsel's objections will be limited to
8   objection, form, or, objection as sufficient to sustain,
9   preserve any issues, speaking objections, basically under the
10  state -- Texas state rules.
11      MR. PRINGLE:  Agreed.
12  BY MR. SIBLEY (resuming):
13  Q   Okay.  Good morning, Ms. Blakemore.
14  A   Good morning.
15  Q   What did you -- I'm assuming this is the first time
16  you've been deposed; right?
17  A   Yes, yes, it is.
18  Q   Okay.  What did you do to prepare for your deposition
19  today?
20  A   I --
21  Q   And -- and -- and you probably already know this, but
22  I don't want you to disclose any communications that may have
23  transpired between your counsel and yourself.  I just want to
24  know factually what took place, but not the substance of any
25  communications.  Okay?

Page 7

1   A   Certainly, yeah.  I have met with my attorneys, of
2   course, and I reviewed some of the productions that we have
3   given in this case and I watched a video on depositions, just
4   basic information about them called, The Perfect Witness.
5   Q   Okay.  Other than the discovery documents, are there
6   any other documents you recall reviewing in preparation for your
7   testimony?
8   A   I've reviewed the flyer, that's one that I can call
9   off the top of my head, but I think that's included in the
10  discovery documents.
11  Q   Right.
12  A   I don't think I've looked at anything else.
13  Q   Let me ask it this way:  Are there any documents you
14  reviewed in preparation for your deposition that were not
15  produced either by Professor Hubbard in this case or by
16  yourself?
17  A   No, not that I believe so, sir.
18  Q   Okay.  Did you -- other than your attorneys and other
19  than the video that you mentioned, did you refer [sic] with
20  anyone else in connection with your testimony today, like a
21  witness or some other third party?
22  A   I didn't speak to anybody about my testimony
23  specifically.  There are people that I have told that I'm being
24  deposed today, like my father and my mother, my sister and my
25  romantic partner.

Page 8

1   Q   Got it.  So no substantive discussion about your
2   testimony, just the fact that you were going to be deposed;
3   right?
4   A   Right, yeah.
5   Q   Okay.  All right.  You mentioned that you reviewed the
6   flyer --
7   A   Uh-huh.
8   Q   -- and I'm going to go ahead and introduce this as
9   Exhibit 1.
10      MR. SIBLEY:  (Provides exhibit.)
11      MR. PRINGLE:  Thank you.
12  BY MR. SIBLEY (resuming):
13  Q   And just take a look at that if you need to refresh
14  your memory about kind of -- I mean, I know it's not super long,
15  but --
16  A   Right.
17  Q   -- if you want to take a chance to look at it, let me
18  know when you're -- after you've had a chance to look at it.
19  A   Okay.  (Reviewing.)  Okay.  I'm ready when you are,
20  sir.
21  Q   Okay.  Let me go ahead and also, while we're at it,
22  introduce Exhibit Number 2 --
23  A   Uh-huh.
24  Q   -- and I think you'll recognize that as the
25  plaintiff's complaint in this case.

Page 9

1   A   Does -- does that mean that this is the original
2   filing that started this case?
3   Q   Yes, ma'am, I'll --
4   A   Okay.  I'm sorry.
5   Q   -- I'll represent that to you.  I think it says
6   Document 1 at the top of the -- of the document.
7   A   Okay.  Yeah.
8   Q   And I'm assuming you had seen the lawsuit.  You'd --
9   you'd seen it at some point; right?
10  A   Yes.
11  Q   Okay.  And if you would just turn in Exhibit 2 to
12  Paragraph 17.
13  A   Uh-huh.  (Complies with request.)  The -- it's the
14  number at the beginning with the paragraph numbers?
15  Q   Those are the paragraphs, yes, ma'am.
16  A   I'm going to take a second --
17  Q   Sure.
18  A   -- to look at this.  (Reviewing.)  Okay.
19  Q   And by the way, ma'am, is that an accurate quote from
20  the Austin American-Statesman in Paragraph 17 of Exhibit 2?
21  A   I -- I couldn't say that I remember the conversation,
22  but this seems accurate to me.
23  Q   How did you give the quote?  Was it verbally or was it
24  by E-mail?
25  A   It was -- it was verbally.  I believe I was on the

Sarah Blakemore                                                                    May 28, 2021

Page 10

1 phone with the -- with the reporter.
2    Q   Okay.  Is there anything -- I mean, I guess, let me
3 just ask it this way:  Is that an accurate representation of
4 your views about Dr. Hubbard's writings or his teachings in --in
5 Paragraph 17 of Exhibit 2?
6    A   Yes, sir, I believe it is.
7    Q   Okay.  All right.  Is it -- is it -- is it your
8 understanding that -- you understand you're being sued for
9 libel.
10   A   Yes, sir.
11   Q   Okay.  Is it your understanding that the statements
12 that you're being sued for are reflected in the flyer that is
13 Exhibit 1 and the quotation of your statements to the Austin
14 American-Statesman in Exhibit 2, Paragraph 17?
15   A   Yes, yeah.
16   Q   Okay.  Are there any other statements, oral or
17 written, that you think that you're being sued for in this case?
18   A   I don't exactly remember who quoted me in what.
19 I mean, there were a lot of news stories -- or at least I think
20 there were, but this -- this seems like the gist of it.
21   Q   Okay.  Well, let me ask you this:  In looking at the
22 flyer and in the -- the statement that was quoted in the Austin
23 American-Statesman in Exhibit 2, is there anything that, sitting
24 here today, you would say is inaccurate about the statements
25 that you made?  Like, is there anything factually false in those

Page 11

1 statements?
2    A   Not -- no, not that I know of, sir.
3    Q   Okay.  Well, let me ask it this way:  Is there
4 anything, sitting here today, that -- with respect to those
5 statements that you would change or perhaps supplement with some
6 additional language?
7        MR. PRINGLE:  Objection, form.
8 BY THE WITNESS (resuming):
9    A   What do you mean by supplement, maybe?
10   Q   Well --
11   A   Yeah, if you could just -- I don't understand.
12   Q   Sure.  Well, let me just ask it -- I'll ask two ways.
13   A   Okay.
14   Q   Is there anything you would change about the
15 statements?
16   A   No, sir.  I believe this is my -- this is my opinion,
17 yeah.
18   Q   Okay.
19   A   No, I wouldn't change the -- statements.  They are
20 -- they still represent my opinion.
21   Q   Okay.  They accurately represent your opinion;
22 correct?
23   A   Yes, uh-huh.
24   Q   Okay.  Is there anything that you would add to the
25 statements to clarify or, you know, otherwise -- I mean, I

Page 12

1 guess, yeah, clarify the statements to make sure that no one
2 could perceive them in a different way than the way you intended
3 them?
4    A   I don't believe so.  I -- I know that some people did
5 take my statements and go a bit further, like claiming that
6 Dr. Hubbard is -- I'm sorry -- a pedophile, and if I were to add
7 anything today, I believe I would add that that is not my
8 opinion and I don't think that that's true.  That's a
9 representation of his beliefs or his scholarship.  I do -- in
10 hindsight, I do feel bad that that happened, but at the end of
11 the day, this is a good representation of my opinions.
12   Q   Okay.  So one thing that you might have added for
13 clarity in hindsight -- we're talking hindsight here; right?
14   A   Yeah, certainly.
15   Q   Okay.  One thing you might have added for clarity in
16 hindsight is that you don't believe that Dr. Hubbard is a
17 pedophile.
18   A   Correct, yes.
19   Q   Okay.
20   A   Maybe.  Knowing -- knowing that people -- that people
21 represented my statements or took my statements to mean that, I
22 wish that that had not been the case.
23   Q   Right.  And by pedophile, that would mean actually
24 either wanting to abuse or actually abusing children.
25   A   Like, committing a crime, yeah.  I don't believe that

Page 13

1 Dr. Hubbard has committed any crime.
2    Q   Understood.  Was it -- was it your belief that he in
3 fact wanted to engage in inappropriate relations with underage
4 boys?
5        MR. PRINGLE:  Objection --
6 BY THE WITNESS (resuming):
7    A   That would be speculation to me.  I -- personally, I
8 don't -- I did not think that.  That wasn't really what I was
9 trying to get at the root of this.  It was more the -- the
10 scholarship that he was promoting and not any concern with
11 Dr. Hubbard's actions.
12   Q   Okay.  So at the time you made the statements, you
13 didn't have an opinion one way or the other about whether you
14 believe that Dr. Hubbard was in fact a pedophile?
15   A   Well, I -- I would say one way or the other to the
16 negative.  I didn't believe that Dr. Hubbard was that type of
17 individual.  Those people are usually caught by the law --
18   Q   I'm --
19   A   -- someone who has been through criminal proceedings,
20 and that's -- I know for a fact that that's not the case --
21   Q   Okay.
22   A   -- with Dr. Hubbard.
23   Q   Understood.  And that was at the time you authored the
24 flyer; correct?
25   A   Yes, sir.

Sarah Blakemore                                                    May 28, 2021

Page 14

1    Q   And -- and just to be clear, you were at least one of
2  the persons involved in authoring the flyer that's Exhibit 1;
3  correct?
4    A   I was the sole author of the flyer --
5    Q   Okay.  Okay.
6    A   -- yes, if that's what you're asking.
7    Q   Has your opinion since the flyer was authored changed
8  with respect to your views about whether Dr. Hubbard is a
9  pedophile?
10   A   I did not believe at the time of the publication of
11 this flyer that Dr. Hubbard was a pedophile.  I do not believe
12 that that is represented in this text, and that is currently
13 still my opinion.  I don't believe that Dr. Hubbard is a
14 pedophile.
15   Q   Okay.  Was there ever a point that you did believe he
16 was a pedophile?
17   A   No, no, there -- there was not.
18   Q   All right.  And I know you've -- and, look, I
19 understand that we're -- we're in litigation, and one of the --
20 one of the legal issues, as I'm sure you've come to understand
21 -- you're a moot-court person as I understand it.
22   A   Yes.
23   Q   Do you want to be a lawyer?
24   A   I do, yes.
25   Q   Okay.

Page 15

1    A   Uh-huh.
2        MR. PRINGLE:  Don't change your mind.
3        THE WITNESS:  This certainly -- this certainly
4  could come close to it, but it hasn't shaken me yet.
5        MR. SIBLEY:  Well, believe me, there's way more
6  boring and worse cases than this one.
7  BY MR. SIBLEY (resuming):
8    Q   But so let -- let me ask you this:  You understand
9  that there is a legal issue under the First Amendment for a
10 defamation case; right?
11   A   Yes, sir.
12   Q   And one of those issues is, in order to be actionable
13 for defamation, the statement complained of has to be a
14 statement of fact and not of opinion.  Do you understand that?
15   A   The actionable meaning that it's, like, a -- it's a --
16 it's a statement of fact only.  Sorry.  Would you explain that
17 again?
18   Q   Well, let -- let me put it this way:  You understand
19 that if I express my opinion that I don't like Dr. Hubbard and I
20 think he's a bad professor --
21   A   Uh-huh.
22   Q   -- that's not -- that's an opinion.  Would you agree
23 with that?
24   A   Yes.
25   Q   Okay.  If I say that Dr. Hubbard ran the red light and

Page 16

1  killed a bystander, that's a statement of fact; would you agree?
2    A   Yes.
3    Q   Because that's something we could objectively verify
4  in time and space; agree?
5    A   Yes.
6    Q   Okay.  And you understand that there's an issue in
7  this case as to whether there's statements in that flyer that
8  are fact or opinion.
9    A   Uh-huh.
10   Q   Do you understand that?
11   A   Yes, yes, I do.
12   Q   And I think I heard you use the phrase earlier that
13 the flyer accurately reflects your opinion; correct?
14   A   Yes, sir.
15   Q   Okay.  Well, let me ask you this:  Are there any
16 statements in the flyer that you would characterize as factual
17 and not opinion?
18   A   Okay.
19   Q   And take as much time as you need --
20   A   Yeah, let me take a moment.  (Reviewing.)  I believe I
21 could accurately characterize the last two sentences of the
22 first paragraph --
23   Q   If I give you a highlighter, would you mind
24 highlighting the statements --
25   A   Yeah, of course.

Page 17

1    Q   And -- and just to be clear -- you --
2    A   I'd be happy to read them out loud.
3    Q   Sure, you can do that.  But just to be clear, I'm not
4  -- by highlighting these statements, I'm not suggesting that
5  you're claiming everything in that sentence is necessarily
6  factual --
7    A   Uh-huh.
8    Q   -- but that the statement at least -- the sentence
9  contains at least some facts.
10   A   Yeah.
11   Q   Is that fair?
12   A   Yeah.
13   Q   Okay.
14   A   That seems reasonable to me.
15   Q   All right.  Now, you're looking at the last two
16 sentences of the first paragraph.
17   A   Yes, sir.
18   Q   Okay.
19   A   Uh-huh.  (Reviewing.)
20   Q   Okay.  Which portions of those sentences would you
21 consider factual?
22   A   So what I highlighted was, Furthermore, Hubbard is --
23 I did not highlight heavily because that is more of my opinion
24 -- associated with the North American Man/Boy Love Association.
25 I -- I can't exactly speak to whether or not it's still formally

Sarah Blakemore                                                May 28, 2021

Page 18

1 the world's largest pedophile advocacy group. I believe that
2 that is a statement of fact, though, and he is even on the list
3 of associated individuals on the NAMBLA Wikipedia page, I
4 believe, is a statement of fact.
5     Q    Okay.
6     A    At the time that this flyer was --
7     Q    Right.
8     A    -- published, of course.
9     Q    Right. Understood. All right. Go on and -- and you
10 can finish with the flyer and -- and tell me what else you think
11 might contain factual statements.
12    A    (Reviewing.) I believe that's it.
13    Q    Okay. So those are the only factual statements in the
14 whole flyer?
15    A    The -- the ones that -- in my current review, yes,
16 sir.
17    Q    Okay. So let me just ask you --
18    A    Uh-huh.
19    Q    -- the first sentence says, For as long as he has
20 taught at the University of Texas, and then it says, Since 2000.
21 Do you see that at the beginning?
22    A    (Reviewing.) That's two different sentences.
23    Q    Sure, but --
24    A    What are you -- sorry. I'm just trying to ask what
25 are you asking about that.

Page 19

1     Q    Well, let me ask you this: Is it -- is it a factual
2 statement that Dr. Hubbard has done something since the year
3 2000?
4     A    I mean, to -- that was -- that was definitely a
5 statement of my opinion that he's done something since 2000. I
6 was trying to use 2000, of course, as a objective marker of
7 time, but that was -- he could have been doing something before
8 then.
9     Q    Okay.
10    A    To me, that was just the time in which the scholarship
11 picked up --
12    Q    Okay.
13    A    -- which it was recognizable to me.
14    Q    All right. So you used 2000 as a sort of placeholder
15 for when you believe that the, as you say, scholarship picked up
16 on the issues that you complain about here?
17    A    Yes, sir.
18    Q    Is that fair?
19    A    Uh-huh.
20    Q    And I know it's normal language, but you -- and it's
21 natural, but if you can just say yes or no instead of uh-huh,
22 that would be --
23    A    Oh, excuse me. Yes, sir.
24    Q    I'm going to have to complain to the people who
25 published that deposition video and tell them to do a better job

Page 20

1 of that.
2     A    (Nonverbal response.)
3         MR. PRINGLE: Everybody gets one free swing;
4 right?
5         MR. SIBLEY: Right.
6 BY MR. SIBLEY (resuming):
7     Q    All right. Okay. You're an English major; right?
8     A    This is true, yes, right.
9     Q    And a part of English is reading comprehension. Is
10 that fair?
11    A    Uh-huh.
12    Q    Yes?
13    A    Yes, sir. Oh, yes. I'm sorry.
14    Q    And part of reading comprehension is understanding the
15 main idea of a passage. Is that fair?
16    A    Certainly.
17    Q    And sometimes the main idea -- I mean, you've taken
18 standardized tests, I'm assuming; right?
19    A    Yes, not a long time, but yes.
20    Q    Okay. I mean, you got into UT. It's not easy to get
21 in; right?
22    A    Maybe, but --
23    Q    Well, I mean, I'm an alumna, so I'm trying to get you
24 to help my pedigree here, but...
25    A    Yeah, I understand. Yes.

Page 21

1     Q    It's -- it's a good school.
2     A    Uh-huh.
3     Q    Yes? Okay. And generally -- I don't know what the
4 rules are now, but generally, you've got to take an SAT or an
5 ACT to get in; yes?
6     A    Yes, sir.
7     Q    Have you taken the SAT or the ACT?
8     A    I took the S -- the ACT, the one with the math.
9     Q    Ugh, okay.
10    A    It's -- it's -- there's a difference between the two
11 that the SAT is less heavy on math as the ACT, so...
12    Q    Really?
13    A    Yes.
14    Q    I didn't know that.
15    A    That's what they say.
16    Q    Okay. Well, I'm sure you've taken those -- I don't
17 know if it was on that test or -- at some point, you've taken a
18 test with a reading-comprehension set of questions; right?
19    A    Yes.
20    Q    And one of the questions that's often asked is, What
21 is the main idea; right?
22    A    Yes.
23    Q    And obviously the main idea is not written expressly
24 in the passage; correct?
25    A    Uh-huh.

Sarah Blakemore                                              May 28, 2021

Page 22

1   Q   Yes?
2   A   Yes, sir.
3   Q   Because otherwise it would be very easy to answer if
4 the question is, Does the passage say, quote/unquote, X, Y and
5 Z, unquote; right?  That would be easy.
6   A   That's correct, yes.
7   Q   So what the reading-comprehension tests are designed
8 to gauge is how well you understand the point that a -- an
9 author is trying to convey.  Would you agree with me?
10   A   I would, yes.
11   Q   Okay.  And would you agree with me that there are
12 things that are conveyed by this flyer that are not necessarily
13 expressly written out in the flyer?  Would you agree with that?
14   A   I -- I would have to be told specifically what you
15 think is -- is the, like, connotative meaning, but I'm sure that
16 someone -- this would be speculating -- I'm sure that someone
17 engaging in a -- a reader with this passage would find some
18 other -- would maybe find some other things that are expressly
19 written.  Yeah, I could agree with that.
20   Q   Right, because -- yeah, every -- every piece of
21 writing, unless it's extremely basic, generally conveys ideas
22 that are not expressly written in the passage.  Would you agree
23 with me?
24   A   I would, yes.
25   Q   All right.  And -- and there's -- there's at least

Page 23

1 some attempt to objectify what a main idea is given the fact
2 that we have standardized tests; right?
3   A   (Nonverbal response.)
4   Q   Whether or not we agree with whether that's a good
5 gauge of it, we have standardized tests on how someone reads a
6 passage and gets ideas; correct?
7   A   Right.  In academia, there is -- certainly is a hope
8 to objectify some things just so it could be standardized for a
9 test, yeah.
10   Q   Sure, but it's not just in academia.  I mean, when
11 someone reads a news article or a magazine article or whatever
12 they read, part of language is conveying ideas without having to
13 expressly write out everything that you want the reader to see;
14 right?
15   A   I would definitely agree with that, yes.
16   Q   Okay.  So I'm asking you, Ms. Blakemore, what are some
17 main ideas or just -- if we could call it that -- that you would
18 take from the flyer as just an objective reader?  As a
19 reasonable ordinary reader, what would you say are some things
20 that you take away from that flyer that are not spelled out in
21 some many words?
22   A   Okay.  May I take a moment?
23   Q   Sure.  Of course.
24   A   (Reviewing.)  This is a little bit difficult because I
25 am the one who wrote this, of course, so I think --

Page 24

1   Q   And -- and let me just ask --
2   A   -- I know what I'm --
3   Q   Let me give you a preview.  I'm going to ask you the
4 way you read it --
5   A   Uh-huh.
6   Q   -- and then I'm going to ask you what you intended to
7 convey.
8   A   Okay.
9   Q   Okay?
10   A   That --
11   Q   So just --
12   A   That makes sense.
13   Q   -- just so you know.
14   A   Thank you.  (Reviewing.)  Okay.  So would you ask me
15 the question again now?
16   Q   Sure.  What would you take away as a main idea or a
17 gist from the flyer about Dr. Hubbard?  I mean, we know that it
18 says --
19   A   About -- specifically about Dr. Hubbard?
20   Q   Yes, ma'am --
21   A   Okay.
22   Q   -- or his writings or his teachings.
23   A   Okay.  Yeah.  I believe that one of the -- one of the
24 if not the main idea that I was attempting to express with this
25 flyer was that Dr. Hubbard, through his writings, has put

Page 25

1 pederasty in a good light so much so that -- I -- I -- I'm going
2 to use the word again because this is -- I believe it sums it up
3 well, is that he's advocating for this -- this type of behavior
4 to be legal and to be considered to be moral and that there's
5 not as many downsides as one would think most of the time.
6   Q   Okay.  All right.  So --
7   A   Yeah, and that -- or at least that they have -- they
8 could have a proper place in society, if I may just use the
9 standard definition of proper.
10   Q   Of course.  So one -- one gist from this is,
11 Dr. Hubbard has painted pederasty in a light that makes it
12 appear legal.  I believe that's one of the words you used.
13   A   I -- I don't -- I -- I would disagree with that.
14   Q   Okay.
15   A   What -- the hesitation comes from making it legal.  I
16 don't think I was trying to -- I personally did not absorb from
17 Dr. Hubbard's writing that he was trying to say that this
18 behavior was legal, just that it -- because I don't think it
19 says that it's legal.  I mean, there is some stuff that he says
20 where he talks about the -- changing the age-consent laws, so of
21 course it's implied that that's not legal currently --
22   Q   Right.
23   A   -- to me, yes.
24   Q   Okay.  And if we can just switch over to the Statesman
25 quote --

Sarah Blakemore                                      May 28, 2021

Page 26

1   A   Uh-huh.
2   Q   -- in that quote, you say, Advocating for breaking the
3  law.
4   A   Uh-huh.
5   Q   Yes?
6   A   Yes.
7   Q   So --
8       MR. PRINGLE:  That's -- it actually says
9  promoting.
10 BY MR. SIBLEY (resuming):
11  Q   Promoting breaking the law.
12  A   Oh, sorry, yes.
13      THE WITNESS:  Thank you.
14 BY MR. SIBLEY (resuming):
15  Q   Okay.  Would you say promoting and advocating are
16 synonyms?
17  A   I -- I think for the purposes of this, yeah.
18  Q   Okay.  So if you didn't think that he was promoting
19 people breaking the law, violating current laws as opposed to
20 asking for reform for current laws, why did you say that to the
21 Statesman?
22  A   I was -- I -- I -- I think I need to maybe correct my
23 clarification to make this more -- okay.  So this is currently
24 -- this behavior is currently illegal, the -- the -- some of the
25 behavior that Dr. Hubbard ta ks about in his writings.  So he

Page 27

1  speaks about it in a positive light, says that there are ways in
2  which that this could be okay and truly beneficial to both
3  parties and currently, because this is illegal, it gives people
4  the idea that this positive thing that is illegal, which, to me,
5  is a promotion of breaking the law.
6   Q   I see.  So by painting something that is illegal as
7  potentially having positive benefits, you construe that as
8  promoting, in fact, breaking the law?
9   A   Yes, I would.
10  Q   Even if the person has in the same writings called for
11 an examination of the laws as to whether they may need to be
12 reformed.
13  A   I -- I -- yes, I do believe so.
14  Q   Okay.
15  A   Uh-huh.
16  Q   All right.  Well --
17  A   I think those are -- I think those are two separate
18 matters.  I know that he does speak with a lot of -- in some of
19 his writings about reforming the laws, but that's -- it -- side
20 by side, it's -- it's not -- it doesn't trump the fact that he
21 is saying that this could be a positive thing, and that in -- in
22 places where it is legal --
23  Q   Okay.
24  A   -- it is a positive thing --
25  Q   Got it.

Page 28

1   A   -- and it could be a positive thing in our society.
2   Q   Got it.  Okay.
3   A   Uh-huh.
4   Q   But you would agree -- would you agree with me that
5  the ordinary listener or reader of that might conclude that
6  Dr. Hubbard has expressly encouraged people to go out and engage
7  in illegal relationships?
8       MR. PRINGLE:  Objection, form.
9  BY THE WITNESS (resuming):
10  A   I'm not sure I could speculate on what another person
11 reading this would be, but I could tell you that my -- my
12 comprehension of this -- of his writings were that it was saying
13 that this is a positive thing and that it has a -- it could have
14 a place in our society, and it was a promotion of that activity
15 to me.
16  Q   And that's a separate question that I -- and I said I
17 was going to get to that about what you --
18  A   I'm sorry.
19  Q   -- intended to convey.  It's okay.  I understand
20 you're doing your best to answer the questions.  What I'm asking
21 you is:  Can you understand how someone, not Sarah Blakemore
22 who --
23  A   Uh-huh.
24  Q   -- authored these statements, but someone might review
25 these statements and conclude that there must be some writing

Page 29

1  somewhere where Hubbard essentially tells people that it's a
2  good idea to go out and engage in illegal activity?  Can you
3  understand that?
4       MR. PRINGLE:  Objection, form.
5  BY THE WITNESS (resuming):
6   A   I -- I don't think I'm comfortable speculating.  You
7  know, maybe I could understand that, but that would be purely
8  speculation, and I'm not comfortable doing that.
9   Q   Okay.  Well, let me ask you this:  If someone said,
10 That's how I read it, would that be unreasonable?
11  A   I -- you know, maybe.  I haven't read all of
12 Dr. Hubbard's publications.  If they did a different review than
13 I did and that's what they concluded, I don't think that that
14 would be really correct, but, I mean, people can do anything.
15  Q   No, ma'am.  I'm talking about after reading your
16 statements.
17  A   After reading just my statements --
18  Q   Yes, ma'am.
19  A   -- that they could -- that they could come away
20 with --
21  Q   That whoever wrote this -- these statements,
22 Sarah Blakemore, must have read Dr. Hubbard's writings and found
23 something that actively calls for commission of a crime,
24 violating the law.
25  A   Uh-huh.

Sarah Blakemore                                                    May 28, 2021

Page 30

1   Q   Can you understand how someone might -- would you
2   think that a conclusion along those lines would be unreasonable
3   after reading your statements?
4           MR. PRINGLE:  Objection, form.
5   BY THE WITNESS (resuming):
6   A   Can you repeat the question?
7   Q   Sure.  I read Sarah Blakemore's flyer and her
8   statements in the Statesman.  Okay?
9   A   Uh-huh.
10  Q   I'm a person off the street.  Understand?
11  A   Yes.
12  Q   Okay.  I reach the conclusion there must be something
13  expressly in Dr. Hubbard's writings that calls for or encourages
14  people to go out and engage in illegal activities between adults
15  and underaged boys.
16  A   Uh-huh.
17  Q   Okay?
18      (Nonverbal response.)
19  Q   Would you -- would you say that that's an unreasonable
20  conclusion after reading your statements?
21  A   (Reviewing.)
22  Q   If you're getting a reading-comprehension test and
23  the question is, is this one of the ideas gleaned from
24  Ms. Blakemore's writings, do I fail the test or is that a
25  reasonable reading?

Page 31

1   A   (Reviewing.)  I -- I do not believe a reading of these
2   statements would say that Dr. Hubbard is specifically telling
3   people in so many words that they should go out and do this.
4   Q   Okay.  You would conclude what, then?
5   A   What -- what do you mean?  I would conclude from my
6   own --
7   Q   You are --
8   A   -- my own comprehension of this?
9   Q   Not -- you've read all of the materials; right -- or
10  the materials -- you've read some of the materials; right?
11  A   Yes --
12  Q   Okay.
13  A   -- that's true.
14  Q   But you understand the person listening to or reading
15  these statements has not read Dr. Hubbard's materials.
16  A   That's correct.
17  Q   Okay.  And so they're -- they might be led to a
18  conclusion that whatever is in those materials expressly calls
19  for -- it says it's a good idea to go out and engage in illegal
20  activities.
21  A   I -- I don't think that's correct.  I believe that in
22  a -- well, I mean, I always look for what's not stated and
23  what's expressly stated, of course, in writing, and I think
24  showing that if it's -- if there were damning evidence, it would
25  be here to say that he said, You should go out and have sexual

Page 32

1   relations with minor-aged persons.
2   Q   Okay.
3   A   It would be included here.  I don't think --
4   Q   All right.
5   A   -- that that would be a reasonable conclusion.
6   Q   Don't you think it would have been, in order to convey
7   -- to ensure -- because you want the truth to be conveyed;
8   right?
9   A   Certainly.
10  Q   Okay.  Don't you think it would have been better to
11  properly convey the truth, to expressly put in your flyer or in
12  your statements that Dr. Hubbard has not called for anyone to
13  break the law, but his ideas might encourage someone to break
14  the law just so no one got the wrong idea?
15  A   I -- I halfway want to say that that's not really my
16  obligation to do so.  I -- I don't think I would have added
17  anything.  I mean, in hindsight, I -- I feel terrible that
18  people took my statements even further, but that was not my
19  intention.  I didn't think that that was going to happen.
20  Q   Right.  Well, you said he jeopardized people's safety;
21  right?
22  A   Where?  Where did I say that?
23  Q   Well, I mean, let's look at the -- let's look at the
24  flyer.  Well, first of all, the -- the name of the group is
25  Students For Safety; right?

Page 33

1   A   Uh-huh.
2   Q   Yes?
3   A   Yes --
4   Q   All right.
5   A   -- yes, it is.  Sorry.
6   Q   And so, if I'm an ordinary reader, that's the first I
7   look at is the first line on the page; right?  Is that
8   reasonable?
9   A   I -- I believe that's reasonable.
10  Q   Who is this coming from, for example; right?
11  A   Uh-huh.
12  Q   Yes?
13  A   Yes.
14  Q   Okay.  And so don't you think the ordinary reader is
15  stricken with, Hey, there may be a safety issue here, as soon as
16  they look at this flyer?
17  A   I -- I think that is -- would be a stretch from --
18  coming from just Students For Safety.
19  Q   Well, why did you pick the name Students For Safety?
20  A   I picked the name Students For Safety because we had
21  been having other demonstrations on campus of an unrelated
22  matter, and they were called the Sit-ins For Safety, and so I
23  just kind of created this name that was somewhat similar called
24  Students For Safety.
25  Q   Did Students For Safety do anything else other than

Sarah Blakemore                                      May 28, 2021

Page 34

1 with respect to Dr. Hubbard?

2    A    No.

3    Q    Okay.  So this was a special-purpose name created for

4 the purpose of Dr. Hubbard; right?

5    A    Yes.

6    Q    Okay.  All right.

7    A    That wasn't the intention behind it, if that's what

8 you're asking --

9    Q    Okay.

10    A    -- to say that there was a safety issue around this

11 specific issue.

12    Q    Okay.  Well --

13    A    It was mostly just kind of a piggyback situation since

14 there had already been this kind of thing that I was involved

15 in.

16    Q    All right.  Well, let's look at the -- I guess it's

17 the second paragraph, third sentence.

18    A    (Reviewing.)  It is clear to us that the University of

19 Texas does not have its students' safety, health and welfare in

20 mind.

21    Q    Yes.

22    A    Uh-huh.

23    Q    It's -- and you wouldn't read this -- if you were --

24 you don't think it's a reasonable reading to read this and say,

25 People -- you know, Students' safety are at risk from potential

Page 35

1 violent crime?

2    A    No, I don't -- I don't think that that's what's

3 expressed here.

4    Q    Well, what did you mean when you said that the

5 university doesn't have its students' safety, health and welfare

6 in mind?

7    A    What I was meaning is that they don't -- I, of course,

8 was having some qualms with the university here.  I -- I don't

9 think they really try to protect our -- our mental health,

10 protect our -- the way we are able to -- you know, yeah, to

11 protect our mental health, really.

12    Q    Okay.  What about safety?

13    A    Safety?

14    Q    Yeah.

15    A    I mean feeling safe.  That's part of being -- that's

16 part of safety.

17    Q    Like, physically safe; right?

18    A    I -- I mean, I wouldn't say that physical safety is

19 always involved in feeling safe.  You can --

20    Q    Well, what did you mean?

21    A    (Reviewing.)

22    Q    What kind of safety did you have in mind when you

23 wrote this?

24    A    The feeling of safety and having our mental health be

25 protected.

Page 36

1    Q    Okay.  Was that specifically with respect to

2 Dr. Hubbard?

3    A    I -- I believe that the fact that the university has

4 -- knows about this kind of scholarship and -- and has it

5 continue is an indication that, yeah, they don't have that much

6 care for the way we feel and how we get to engage with, like,

7 academic learning.

8    Q    Okay.

9    A    Uh-huh.

10    Q    The sentence immediately preceding the sentence that

11 -- that begins with, It is clear -- are you with me?

12    A    (Reviewing.)  Hubbard's is where we're starting?

13    Q    No.  You --

14    A    Hubbard's misconduct, immediately preceding?

15    Q    Immediately preceding, like, before the sentence.

16    A    Oh, excuse me.  Sorry.

17    Q    It's okay.

18    A    An individual who advocates.

19    Q    Right.

20    A    Okay.

21    Q    Just go ahead and read the sentence aloud.

22    A    An individual who advocates for violent crime against

23 teen boys has no business teaching the leaders of tomorrow.

24    Q    And then you have the sentence about safety; right?

25    A    It is clear to us that the University of Texas does

Page 37

1 not have the students' safety, health and welfare in mind, yes.

2    Q    Okay.  And then what's the next sentence?

3    A    Hubbard's misconduct has been brought to the

4 administration before to no avail.

5    Q    Okay.  So you don't read those three sentences -- or

6 you don't think it's reasonable to read those three sentences to

7 conclude that Dr. Hubbard is posing a safety risk as to violent

8 crime --

9    A    To students in the classroom?  Sorry.

10    Q    -- as to violent crime?

11         MR. PRINGLE:  Objection, form.

12 BY THE WITNESS (resuming):

13    A    Would you say that again?  That is --

14    Q    Yeah.

15    A    -- that he's saying that we should be -- or what this

16 could -- what you're trying to say to me is that this

17 communicates that we should be afraid for our safety because --

18 in the presence of Dr. Hubbard?

19    Q    Well, when the sentence preceding the safety sentence

20 says, Advocates for violent crime, and the sentence after the

21 safety sentence says, Dr. Hubbard has committed misconduct -- do

22 you see that?

23    A    Yes.

24    Q    You don't think it's a reasonable reading to conclude

25 that there -- there must be some physical safety risk, like,

Sarah Blakemore                                                          May 28, 2021

Page 38

1 from violent crime, based on Dr. Hubbard's misconduct --
2    A   No.
3    Q   -- that's at issue here?
4    A   I believe advocating makes it clear that there's no --
5 there's no physical safety risk.
6    Q   Well, you -- you said misconduct, though, too; right?
7    A   Yes.
8    Q   All right.  What kind of misconduct did we -- did you
9 have in mind?
10   A   I was thinking about his -- the way he treats students
11 and the other people around him.
12   Q   Well, what -- what's that?  What do you mean by that?
13   A   I mean, to me, Dr. Hubbard does -- doesn't act with
14 the -- the amount of compassion that I usually see from my other
15 professors in empathy, and he has had problems in the
16 administration with -- and with his colleagues.  Like, we heard
17 just on Tuesday that they don't consider his behavior to be what
18 a professor should be.  That's what I was referring to.
19   Q   And you knew about that at the time?
20   A   No, no, I didn't.
21   Q   Well, so, then that wasn't what you were referring to
22 because you didn't find out about that until you did an
23 open-records request after the flyer; right?
24   A   I had heard that Hubbard was not well liked in his
25 department.

Page 39

1    Q   Okay.  But when you just told me that you were
2 referring to things like what we heard in Dr. Hubbard's
3 deposition --
4    A   Uh-huh.
5    Q   -- that's not true; right?
6    A   Right.
7    Q   Okay.  So what you're referring to are things that you
8 had heard about Dr. Hubbard in the way he treated students;
9 right?
10   A   Including my experiences, yeah.
11   Q   Well, what -- tell me about -- and I may be getting
12 this incorrect, but weren't you a freshman in his class, or were
13 you a sophomore?
14   A   I was -- that was my -- that was my first semester at
15 the University of Texas, but I did transfer from Texas A&M, so
16 that was my sophomore year.
17   Q   Oh, you started at Texas A&M.
18   A   Uh-huh, that would be my -- so it was my -- my third
19 semester in the university.
20   Q   I see.  Okay.
21   A   Uh-huh.
22   Q   Gotcha.  All right.  So what was your -- go ahead and
23 tell me about your experience with -- well -- well, let's just
24 back up, I guess.  And what made you decide to take
25 Dr. Hubbard's class that semester?

Page 40

1    A   I believe it was part of -- I knew it was one of the
2 required credits that I had to get for my -- I guess they call
3 it core curriculum.  It was in one of the categories.  I don't
4 exactly remember which one.  It might have been called like
5 C-Hat (ph) -- or VAPA.
6    Q   Okay.  Did you do any research on Dr. Hubbard or his
7 class before you enrolled in it?
8    A   I enrolled in -- I believe it was CC 303, but I had a
9 -- a TBD professor.  I had not -- I didn't know who my professor
10 was going to be.  I didn't do any research.  Sorry.  That's the
11 answer to the question.
12   Q   Okay.
13   A   I didn't know.
14   Q   Well, tell me about your experience in Dr. Hubbard's
15 class when you -- for the time that you were in it.
16   A   Yeah.  Honestly, on the first day that I came into
17 Dr. Hubbard's class, I just -- I had a negative feeling about
18 Dr. Hubbard.  I -- I raised my hand in the class for a while on
19 the first day and my -- my question wasn't answered.  He wasn't
20 taking very many questions, but the only -- to me, the only
21 questions that he was taking were from male students.  And so I
22 -- I had to wait until the end of my -- until the end of the
23 class period to ask the question.  And it was -- I asked the
24 question, he answered it, but it made me very uncomfortable and
25 it -- and it made me think that -- I mean, coming from Texas

Page 41

1 A&M, which is experiences that I had already had in -- at the
2 university, I had -- I've had some sexist experiences with my
3 professors --
4    Q   Well, I was going to say --
5    A   -- and that was the same --
6    Q   -- Texas A&M is notorious for being a feminist campus,
7 so...
8    A   Really?
9    Q   I'm -- I'm being facetious.
10   A   Oh, okay.  Yeah, I was about to say that's -- wasn't
11 my experience.  But, to me, Dr. Hubbard was displaying kind of
12 this maybe pompousness and it came off as -- as sexist to me.
13   Q   How many people were in the class?
14   A   I don't exactly remember.  It was a -- it was a fairly
15 large lecture hall, and I would say it was covered with
16 students, so maybe there were 50 people in the class.
17   Q   Okay.  So this is one of the largest sort of --
18   A   This is -- this is one of my smaller classes that year
19 because this is my freshman -- this is not my freshman year.
20 I'm still going through core classes.
21   Q   Gotcha.  All right.  Well, you understand it's
22 difficult sometimes to take questions from students when there's
23 so many people in a class; right?
24   A   Certainly, I do, yes.
25   Q   All right.  But you perceived very early on that you

Sarah Blakemore                                      May 28, 2021

Page 42

1 felt like Dr. Hubbard had a bias toward male students.
2    A    Yeah, uh-huh.
3    Q    Okay.  Did you know that Dr. Hubbard was gay at the
4 time?
5    A    No, no, I did not.
6    Q    Okay.  When did you find out he was gay?
7    A    Gosh, I don't -- I don't think I could specifically
8 put a point on it.  I -- I -- I don't know.  I'm sorry.
9    Q    That's okay.  If you don't remember, you don't
10 remember.  But today -- sitting here today, you know that;
11 right?
12    A    Yes, I do, yes.
13    Q    All right.  All right.  So it started with some --
14 some issues that you had with respect to feeling -- feeling like
15 he was pompous; right?
16    A    (Nonverbal response.)
17    Q    Yes?
18    A    Yes.  Sorry.
19    Q    And you perceived that as a sexist attribute; correct?
20    A    Uh-huh, yes, I did.
21    Q    All right.  Well, what happened next that, I guess,
22 upset you or disturbed you about the class?
23    A    Just that there weren't -- the subject of
24 Dr. Hubbard's class is mythology, which has a lot of stories
25 with sexual misconduct in them, sexual coercion all the way up

Page 43

1 to forcible sexual assault, and he -- there weren't many -- he
2 mentioned at the beginning of class on the first day that there
3 would -- there would be content that could be triggering to some
4 people, and -- but I didn't see a great amount of concern dealt
5 with -- or given to this content, that it could be triggering to
6 students.  I -- I took the class again.  This is past fact, but
7 I -- I took the class again and I -- and I had a very different
8 experience with the way they -- they dealt with content with
9 sexual assault in it.
10    Q    Who was the professor of the other class?
11    A    The next class, Anna Papile, I believe was her name.
12    Q    Okay.  All right.  So what -- what concerned you was
13 the discussions of sexual assault in mythology that you felt
14 like were done in a -- in an insensitive way.  Is that fair?
15    A    Yes --
16    Q    All right.
17    A    -- insensitive would be a good word.
18    Q    All right.  And I -- I'm pretty sure we can -- we can
19 discuss it more later, but I'm pretty sure that I've seen in
20 either answers to discovery or correspondence that you are a
21 sexual-assault survivor; is that correct?
22    A    This is true, yes.
23    Q    All right.  When did that occur?
24    A    I have -- I've been sexually assaulted multiple times,
25 and the first time was in 2015, I believe.

Page 44

1    Q    Okay.  I'm very sorry to hear that.  And -- and you
2 understand that one of the issues that will be looked at in this
3 case is your state of mind at the time you made the statements,
4 and part of that, I think it's fair to you, is that as someone
5 who was a sexual-assault survivor, someone should be able to
6 kind of step into your shoes if -- to the extent that's possible
7 and understand how some of these things that were in
8 Dr. Hubbard's writings or teachings may have triggered some
9 things for you.  Okay?  Is that fair?
10    A    Could you hand me a tissue?
11    Q    Of course.
12    A    I'm going to need you to repeat that question.
13    Q    That's okay.  Do -- do you need to take a break?  You
14 can take a break --
15    A    That would be nice, yes.
16    Q    Okay.  Sure.
17         VIDEOGRAPHER:  We are off the record at 10:54.
18         (A recess is taken.)
19         VIDEOGRAPHER:  We are back on the record at
20 10:58.
21 BY MR. SIBLEY (resuming):
22    Q    Okay.  Ms. Blakemore, I'm just going to ask you some
23 very high-level questions about these attacks, because I don't
24 want to go into details that would be, you know, too disturbing
25 for you to answer --

Page 45

1    A    Uh-huh.
2    Q    -- but I want to ask you the dates of the events.  I
3 think you told me the first attack happened in 2015.
4    A    I -- I -- I think that is the case.
5    Q    Okay.
6    A    I -- I mean, I could, like -- you could give me a
7 calendar and we could go back, but it was when I was 15 years
8 old, so I'm -- I was born in '99, so...
9    Q    Okay.  So the 2015 timeframe.
10    A    Yes.
11    Q    All right.  And then how many -- how many times after
12 that?
13    A    I was sexually assaulted once more in 2017, and I do
14 know that that was actually 2017.
15    Q    All right.  And any other times?
16    A    Huh-uh.
17    Q    Okay.  Was it just two events or was it multiple
18 events in a period of time in those years?
19    A    What -- what do you mean?
20    Q    Like, were there multiple attacks within --
21    A    Oh, no, it was -- it was singular attacks.
22    Q    I see.  And were those reported to the authorities?
23    A    No, they were not.
24    Q    Okay.  Okay.  I was trying to think of where we were
25 before.  Oh, we were talking about your experiences in

Sarah Blakemore                                                    May 28, 2021

Page 46

1  Dr. Hubbard's class --
2      A   Uh-huh.
3      Q   -- and that's how we got on this issue because one of
4  the reasons you found is, I guess, a demeanor or the way that he
5  described rape in mythology -- in classical mythology was
6  insensitive.  Fair?
7      A   Yes.
8      Q   All right.  And because of your history, that was
9  particularly an issue for yourself.
10     A   Yes.  It caused me to -- to take a disability Q-drop
11 from the class, yeah.
12     Q   Okay.  And I'm not sure if I remember this correctly
13 or not --
14     A   Uh-huh.
15     Q   -- but I thought I saw something in some of the
16 materials that you actually suffered from PTSD as a result of
17 the assaults --
18     A   Yes --
19     Q   -- is that correct?
20     A   -- I do have a diagnosis of PTSD.
21     Q   Okay.  And that was present at the time of
22 Dr. Hubbard's class?
23     A   Yes.
24     Q   Okay.  Did you consider -- I mean, did you consider
25 that -- is that something you consider before you enroll in

Page 47

1  classes as to whether the subject matter and content might be
2  inappropriate for you given the fact that things with PTSD tend
3  to trigger memories; right?
4      A   Right.  I have not -- I have not previously thought
5  about the subject of classes that -- that would be particularly
6  triggering.  It's -- it's more like I have smaller more
7  incidental triggers, like -- like a man yelling or something
8  like that.
9      Q   I see.
10     A   So it's -- it's broader than just subject matter.
11     Q   I see.
12     A   Uh-huh.
13     Q   Well, did you -- did you talk to anyone about the fact
14 that -- that you were having these issues in Dr. Hubbard's
15 class?  Any friends, any other faculty or people at the
16 university?
17     A   I believe I spoke to my disability advisor when I --
18 when I was asking and -- about and filing the paperwork to be
19 able to take a disability Q-drop, yeah.
20     Q   Okay.  And -- and just so I'm clear, I just want to
21 make sure I'm -- I've got this right --
22     A   Uh-huh.
23     Q   -- but you not only -- you didn't report the incidents
24 of the attacks at the time they occurred, and to this day, you
25 still have not reported those; right?

Page 48

1      A   That is correct.
2      Q   Okay.  Because you understand that nowadays we have a
3  lot of -- a lot of reporting because oftentimes women are afraid
4  for various reasons to speak up about things and we sort of have
5  a -- a more open society about the fact that these things occur
6  and that people need to report them even if it's years after the
7  fact; right?
8      A   Neither of the incidents has happened in the United
9  States.  I don't -- I don't know anything about the laws in
10 those countries and I didn't want to find out.
11     Q   Oh, okay.  I see.  Well, where did they occur?
12     A   The first one was in Coasta Rica and the second was in
13 Paris.
14     Q   Were you there on school or something or was it a
15 family trip?
16     A   I was in Costa Rica on a trip with friends and then I
17 was working when I was in Paris.
18     Q   The '15 -- 2015 was Costa Rica?
19     A   Yes, 2015 was Costa Rica; 2017 was Paris.
20     Q   You got to go to Costa Rica by yourself as a
21 15-year-old?
22     A   With my friends.
23     Q   Oh, well --
24     A   With my friends and their parents.
25     Q   Oh, I see.

Page 49

1      A   Yes.
2      Q   Okay.  I was going to say that's -- that's a --
3      A   Yeah.
4      Q   -- spring break sure kicked in, because Costa Rica is
5  -- wow.
6      A   Yeah.
7      Q   And then the same thing with 2017?  Was that a trip --
8  what -- what did you say about the trip?
9      A   I was working at the time.  I was -- I was working in
10 Paris.
11     Q   You were -- was it as a model?
12     A   Yes.
13     Q   Okay.  All right.  Did you think that maybe you should
14 talk to Dr. Hubbard about these issues?
15     A   I -- I would have been uncomfortable to do so, no, I
16 didn't.  I didn't think about that.
17     Q   Why would you have been uncomfortable?
18     A   His -- his demeanor made me uncomfortable from the
19 first day we were in class.
20     Q   Okay.  Did you talk to any -- you talked to your
21 disability advisor.  Is that what you said?
22     A   Yes.
23     Q   All right.  Did you talk to any friends about, Hey,
24 you know, this guy -- has anyone else had problems with him, do
25 you know anyone else that has problems with him, anything like

Sarah Blakemore                                                    May 28, 2021

Page 50

1 that?
2    A   I -- actually, my roommate had taken the same course
3 online, and so I said that I thought the content was -- was
4 triggering and she said -- and she agreed.  She was just -- she
5 wasn't taking it from Dr. Hubbard, we didn't speak about him,
6 but we spoke about the content.
7    Q   Did she raise complains about the -- I mean,
8 insensitivities along the lines that you had complaints?
9    A   No.  She said that her -- that her professor was --
10 was very understanding and -- and was happy to give alternative
11 assignments, and that's what they had said at --
12    Q   How many --
13    A   -- the beginning of the year.
14    Q   How many classes have you taken in the classics
15 department?
16    A   I think that's the only one.
17    Q   Okay.  Okay.
18    A   The CC-303, because I, of course, completed it later
19 on.
20    Q   Did you take any at A&M?
21    A   No, no, I don't think I did.
22    Q   Okay.  All right.  So what happened next as far as,
23 like, talking to people, reaching out to people about issues
24 that you were having with Dr. Hubbard's class?
25    A   Well, I just -- I just realized that, you know, maybe

Page 51

1 the content was -- or maybe the way the content was taught was
2 not the way that I wanted or that would have been most adhesive
3 with me, and I -- I observed from my roommate that I could just
4 take the class again and I would have -- I could have a
5 different professor and that professor would be different about
6 teaching the content, so that's just what I decided to do.
7    Q   Okay.
8    A   There was nothing else, just spoke to my disability
9 advisor and -- and dropped the class.
10    Q   Your -- do you remember any of the grades that you got
11 in the class?
12    A   No, no, I don't think I ever completed any
13 assignments.
14    Q   You didn't take a midterm?
15    A   I did take a midterm.  I -- I didn't complete the
16 test, I don't think.
17    Q   What -- why not?
18    A   Because there was a question on the test that was
19 particularly triggering to me, so I just -- I -- I think I left.
20    Q   What was the question?  If you recall.
21    A   It was something along the lines of explaining why
22 sexual assault was justified to the Greeks, maybe.
23    Q   Sexual assault by gods or by other people?
24    A   By -- I don't exactly remember.  I think, from what I
25 recall, it was maybe gods.  It was explaining why it would -- it

Page 52

1 would be justified to the -- to the Grecian people why gods
2 sexually assaulted people, but I don't exactly remember.
3    Q   All right.  Well, you -- you understand that there's a
4 concept in Greek mythology that the gods are above good and
5 evil?
6    A   Yes, I -- I can imagine that.
7    Q   Okay.  Well, do you have any reason to believe that
8 your grade in the class was not very good given what you've told
9 me about Dr. Hubbard?
10    A   Certainly.  If I had continued the class without --
11 without doing well in that midterm exam, it would have been hard
12 to pass it.
13    Q   And I'm -- you don't strike me as a person who's in
14 college to pass; you strike me as a person in college to do
15 well.  Is that fair?
16    A   That's certainly true.
17    Q   Okay.  And I'm assuming your -- your grades in other
18 classes and historically have been pretty good given that you've
19 gotten into good schools.  Is that fair?
20    A   Uh-huh.
21    Q   Yes?
22    A   Yes, sir.
23    Q   Okay.  Have you had any problems with -- with any
24 other classes at either A&M or UT that you've had to drop for
25 any of those reasons?

Page 53

1    A   What do you mean by, like, problems?  Like, for the
2 same -- like, taking a disability Q-drop?
3    Q   Yeah, maybe.  So you're calling it a disability
4 Q-drop?
5    A   Yes.  It doesn't -- there's -- within -- within SSD,
6 you have the -- you have the ability to -- if you have the
7 certain accommodation, which I do, that I'm allowed to, I guess,
8 reduce my course load in the middle of the semester if things
9 change.  And so, because I -- I do have disability for having
10 PTSD, and so I'm -- I was allowed to take a Q-drop without
11 expending one of the Q-drops that's given to me by the school,
12 because it's for medical reasons instead of, like, personal
13 reasons.
14    Q   I see.  Okay.  Was that done at the time or was that
15 something that happened after the fact?
16    A   The disability Q?
17    Q   Yes.
18    A   That was done at the time.
19    Q   Okay.  So --
20    A   That was done before I wrote this.
21    Q   So you go to your disability advisor and you say --
22 you explain the reasons that you've talked about with me and
23 they give you a, what you say, disability Q-drop?
24    A   Yes.
25    Q   Okay.  Have you had -- have you dropped any other

Sarah Blakemore                                                    May 28, 2021

Page 54

1  classes on Q-drops or any other drops since you've been in
2  college?
3      A   I did have to -- the semester -- the semester that
4  this actually happened, so fall of 2019, I had to medically
5  withdraw from the university entirely due to my disability
6  status.  I -- for -- I -- I guess I'll just go into this.  I
7  have endometriosis.
8      Q   Okay.
9      A   It's a -- yeah, I don't need to explain.
10     Q   I mean, I -- I generally know what it is, but go
11 ahead.
12     A   Okay.  So I have endometriosis, I -- and I required
13 surgery for my condition and I was taking a -- a medication that
14 was supposed to deal -- help me deal with the endometriosis that
15 had been newly approved by the FDA and it -- it caused me to
16 have significant memory loss, and so I got a medical withdrawal
17 from the university due to that memory loss.
18     Q   So you didn't -- you weren't in school in the spring
19 of 20 -- or -- yeah, spring 2020?
20     A   No, I was in school in the spring of 2020.  I just did
21 -- I medically dropped -- withdrew from school for this fall
22 semester --
23     Q   I see.
24     A   -- so none of my -- all of my courses were dropped.  I
25 had -- I had already taken a disability Q because, I mean, I was

Page 55

1  experiencing memory loss.  I didn't know what the cause was, but
2  I was still trying to power through my classes, and then once I
3  knew that I -- the reason I was experiencing memory loss,
4  and I was still not doing so hot in my classes because I
5  couldn't remember things, and so I took the whole medical
6  withdrawal.  And also I reduced my course load in -- it would be
7  the fall semester of 2020 because I was having significant
8  problems with chronic pain.
9      Q   I see.
10     A   Uh-huh.
11     Q   So you Q-dropped Dr. Hubbard's class and then later,
12 in December, dropped for all of them; right?
13     A   Right.  The last -- the last day that you could
14 medically withdraw from the school is the day that I medically
15 withdrawed.
16     Q   What day was that?
17     A   I -- if I had to guess off the top of my head, I think
18 it's like December 3rd or something.  It's --
19     Q   So --
20     A   It's very late.
21     Q   So it was after the flyer was put out.
22     A   Yes, I think so.
23     Q   All right.  How long before the flyer was put out did
24 you drop Dr. Hubbard's class?  If you recall.
25     A   I don't exactly recall.

Page 56

1      Q   All right.  All right.  So I'm just trying to go
2  through the chronology here.
3      A   Right, I understand.
4      Q   We medic -- disability Q-dropped Dr. Hubbard's class;
5  right?
6      A   Uh-huh.
7      Q   Yes?
8      A   Yes.  Sorry.
9      Q   Okay.  I'm -- I'm -- I just want to make sure the
10 record's clean.
11     A   Right, I understand.
12     Q   Once you were out of the class, why -- I mean,
13 obviously something happened to where you wanted to pursue some
14 of the issues that you had with Dr. Hubbard's writings and
15 teachings.
16     A   Uh-huh.
17     Q   I mean, that seems obvious now; right?
18     A   Uh-huh, yes.
19     Q   What caused that to happen?
20     A   I -- I was particularly disturbed when I saw his name
21 on the NAMBLA Wikipedia page, and I -- I figured that that was
22 -- it brought me back into it, so -- for sure.
23     Q   All right.  But did you see his name on the NAMBLA
24 page before or after you dropped the class?
25     A   After.

Page 57

1      Q   What caused you to even, like, look into it or Google
2  it or whatever?
3      A   I -- for moot court, I -- we have to turn in our
4  schedules to the university so we can -- so the dean can write
5  us letters of excuse when we have tournaments, and another
6  student in my organization had seen my schedule and said to me,
7  Oh, you have Professor Hubbard as a teacher, he is on this
8  Wikipedia page, and that's when I saw it.
9      Q   Who was it?
10     A   Her name is Shelby Hobohm.
11     Q   How do you spell her name?
12     A   S-h-e-l-b-y H --
13     Q   Wait, wait.  S-h?
14     A   Yes, Shelby.
15     Q   Oh, right.  I -- I was thinking last name.  All right.
16 Shelby, and the last name is?
17     A   Uh-huh, Hobohm, H-o-b-o-h-m.  Like hobo and then hmm.
18     Q   Okay.  Got it.  So someone on your moot-court team,
19 Hey, I saw you were in this guy's class.  Did you know this
20 about him?
21     A   Yes.
22     Q   All right.  And then tell me what happened next.
23     A   Well, I saw -- I saw that Dr. Hubbard was written
24 on this list of associated individuals, and I was particularly
25 shaken.  I -- I took a walk at that point before I was able to

Sarah Blakemore                                          May 28, 2021

Page 58

1 even return to moot-court practice.
2    Q    All right.  And what happened next?
3    A    I -- I couldn't say with certainty, but I -- I started
4 reading his publications after that.  I don't know if it was --
5 what order it was in or if I read other things first and/or
6 checked out Greek Love Reconsidered from the library, but I
7 did --
8    Q    Okay.  Well --
9    A    -- read and check out Greek Love Reconsidered from the
10 library.
11    Q    And this would've been circa October 2019?
12    A    I -- I think so, yes, or maybe more like November.
13    Q    Well, about how long before the flyer came out did
14 this revelation concerning NAMBLA on the Wikipedia page happen?
15    A    I don't think I can really pinpoint it for you.
16    Q    Well, I mean, I'm not asking you to give me an exact
17 number of days --
18    A    Okay.
19    Q    -- but was it a month, was it a week?  Can you -- can
20 you estimate the time?
21    A    Maybe -- I -- I really can't.  I'm sorry.
22    Q    All right.  Was it more than a month?
23    A    No, I don't think so.
24    Q    All right.  So it was less than a month, but it was
25 also not less than a week.  Is that fair?

Page 59

1    A    Right, uh-huh.
2    Q    All right.
3    A    That's true.
4    Q    I don't think you would have been able to read all of
5 these things in a week; right?
6    A    Right.
7    Q    Because you had other stuff going on like the school
8 and moot court; right?
9    A    Uh-huh.
10    Q    Yes?
11    A    Yes -- sorry -- I did have other things I had to do at
12 the time.
13    Q    But you were still disturbed by finding out that
14 Dr. Hubbard was on the Wikipedia NAMBLA page that you decided to
15 investigate his writings; is that right?
16    A    Yes.
17    Q    All right.  And do you -- do you remember the first
18 writing that you reviewed?
19    A    I -- I -- if -- I believe it was Greek Love
20 Reconsidered.
21    Q    All right.  All right.  Now, did you -- how did you
22 find out about that writing?  How'd you even find out
23 it existed, I guess?
24    A    Well, Dr. Hubbard was listed on the Wikipedia page for
25 writing one of the NAMBLA topics, and that was the NAMBLA

Page 60

1 topic --
2    Q    Okay.
3    A    -- was Greek Love Reconsidered.  That was the -- that
4 was directly the writing that the -- that the Wikipedia page was
5 referencing.
6    Q    Okay.  How'd you get a copy of that?
7    A    It was at the library at the University of Texas, the
8 PCL.
9    Q    All right.  Okay.  So you read it?
10    A    Yes.
11    Q    You read the whole thing?
12    A    No.  There were other writings.  I think it was a
13 compilation, so I read -- I read the introduction that
14 Dr. Hubbard wrote, and I think there was something -- there was
15 a piece of poetry he maybe wrote about it, and there, too, I
16 didn't read that.
17    Q    Did you check it out or did you just, like, sit in one
18 of those little cubicles at the library and read it?
19    A    I -- I -- I believe I took it home with me.
20    Q    So you actually -- there's a record of you checking
21 this out from PCL.
22    A    Either me or Ms. Kaya Epstein, yes, there's a record
23 of one of us checking it out.
24    Q    Why would Kaya Epstein have checked it out?
25    A    Because I -- I -- Kaya Epstein was reading it with me.

Page 61

1    Q    Well, did you go to the library together to get the
2 book?
3    A    I think so, yes.
4    Q    Okay.
5    A    Uh-huh.
6    Q    And so you and Kaya Epstein both went to the PCL;
7 right?
8    A    Yes.
9    Q    And for jurors who may not know about the PCL, the PCL
10 is a pretty big library; right?
11    A    Yes, it's a huge library.
12    Q    It's like, I don't know, 10 floors or something;
13 right?
14    A    Yes, yes.
15    Q    Okay.  And it's even -- I mean, I'm sure the
16 technology is updated now, but when I was there, it was
17 difficult to even find out where books were located.
18    A    It is very difficult to find, yes.
19    Q    All right.  So how did you find out even where the
20 book was located in the library?
21    A    I -- I think I did a -- you can search the library
22 catalog online, and I -- I'm familiar with the Dewey decimal
23 system, and that's the way the books are categorized in the
24 university library, I think.  So I just found the code number
25 that it was, went to whatever stack it was and found it.

Sarah Blakemore                                                    May 28, 2021

Page 62

1   Q   All right.  So you and Kaya Epstein would have -- was
2   it just you two?
3   A   Yes, it would have been just us.
4   Q   All right.  So you told her about these issues once
5   you found out from your -- from Ms. Hobohm; right?
6   A   Yes.
7   Q   And what did she say about it?
8   A   I don't exactly remember.  I think I'm -- I think the
9   characterization would be that she was concerned and wanted to
10  learn more as well.
11  Q   All right.  So y'all, with joint concern, went to the
12  PCL to retrieve this Greek Love Reconsidered book, which you-all
13  did, and either you or Ms. Epstein checked the book out;
14  correct?
15  A   Yes.
16  Q   Okay.  And did you take turns reading it, or how --
17  how did that work?
18  A   I believe I took the book with me on a trip I went to
19  in New York and then I gave it to her after that.
20  Q   All right.  And what did you take away from the
21  passages that you read in Greek Love Reconsidered?
22          MR. PRINGLE:  Objection, form.
23  BY THE WITNESS (resuming):
24  A   I believe my -- my takeaway was what I printed here in
25  the flyer, that I found that there was some positive discussion

Page 63

1   of pederasty and there was not many -- there was not negative
2   discussion that jumped out to me, and to me that was, I think,
3   advocacy.
4   Q   Okay.  How do you define pederasty?
5   A   I would, I guess, define it as having a -- a
6   relationship with a person who's not yet the age of consent.
7   Q   Okay.  And to be --
8   A   Mostly for, like, the elevation of the other person,
9   kind of intellectual elevation, maybe.
10  Q   The elevation of the younger --
11  A   The younger person, yes, uh-huh.
12  Q   Okay.  Is that within the context of ancient Greece?
13  You're referring to that elevation of --
14  A   That -- yeah, that's the context that -- in which I
15  most readily understand it --
16  Q   Okay.  But --
17  A   -- since --
18  Q   -- to -- to be fair, you did also parenthetically put
19  the word pedophilia in the flyer; right?
20  A   Yes, yes, I did put the -- that word in there.
21  Q   Okay.  Do you think there's a difference between
22  pederasty and pedophilia?
23  A   Yes, I do think there's a difference.
24  Q   Okay.  And, I mean, I know this is not the most --
25  this is not the most comfortable topics of conversation --

Page 64

1   A   Right, I understand.
2   Q   -- but I think we can agree -- do you know who
3   Matt Gates is?
4   A   No, sir, I do not.
5   Q   He's the Florida congressman who's been accused of
6   having relations with underaged girls.  Have you heard about
7   this?  No?
8   A   Oh, more recently?
9   Q   Yes.
10  A   Yes --
11  Q   Okay.
12  A   -- yes, I have heard this.
13  Q   Okay.  And I don't know if you follow the news, but
14  apparently there's allegations that one of the girls that he had
15  a liaison with was, I think, 17, and maybe the age of consent
16  for federal law is 18, something like that.  Do you recall that?
17  A   Not exactly.  Not the details specifically, but --
18  Q   Well, let -- let's just say the federal --
19  A   -- I -- I understand that the federal age of consent
20  is 18.
21  Q   Okay.  Right.  And so there could be some problem with
22  transporting a girl across state lines who's 17 and not 18, even
23  if it might be legal in the state where the girl resides, for
24  any kind of sexual activity; right?
25  A   Yes --

Page 65

1   Q   You understand that.
2   A   -- I would understand that that would be a problem.
3   Q   Okay.  I haven't seen -- maybe you have -- but I
4   haven't seen anyone refer to Matt Gates as a pedophile or a
5   pederast.  I've seen the terms like underage girls used.
6   A   Okay.
7   Q   Is that your -- is that your experience with reading
8   these stories?
9   A   I haven't read any stories about him, but I haven't
10  heard --
11  Q   Okay.
12  A   -- the word pederast or pedophilia used to --
13  Q   If somebody says --
14  A   -- refer to him.
15  Q   If somebody says, John Doe has had involvement with
16  underaged girls --
17  A   Uh-huh.
18  Q   Okay?  -- what -- what kind of ages come to mind when
19  someone says underaged girls?  Is it five-year-olds or is it,
20  like, 16- or 17-year-old girls?
21  A   I guess it would be -- I wouldn't say 16- or
22  17-year-olds, a little bit younger, but definitely not as young
23  as five is not usually what I consider.
24  Q   Right.  And -- and you understand that there's a
25  difference between someone who is of adult age being attracted

Sarah Blakemore                                                    May 28, 2021

Page 66

1 to a young woman who may be a teenager and underaged and
2 sexually developed and being attracted to a toddler.  Can you
3 understand there's a difference there?
4       A    Yes, I can understand that.
5       Q    Okay.  I mean, we live in Texas.  There's a lot of
6 football games on Friday nights, aren't there?
7       A    There are.
8       Q    And there's high school cheerleaders that perform at
9 those games, aren't there?
10      A    Yes.
11      Q    Okay.  And those girls are generally under the legal
12 age of consent in Texas; would you agree?
13      A    Yes.
14      Q    Okay.  Do you think there's anything wrong with some
15 of the men that are grown men in the stands finding the girls
16 that are cheerleaders that are -- have reached sexual maturity
17 and, you know, look like women, do you think there's anything
18 wrong with finding them attractive?
19      A    I -- it does give me pause for sure.
20      Q    Okay.
21      A    I -- I think that would be kind of disturbing.
22      Q    Do you remember Brittany Spears when she was young?
23      A    I was born in 1999 --
24      Q    That's true.
25      A    -- so I -- I do remember Brittany Spears when I was

Page 67

1 young, not when she was young.
2       Q    Okay.  Well, and what -- what I'm getting at is
3 there's a difference between finding someone physically
4 attractive and actually seeking out the person and trying to
5 engage in a relationship with them.  Would you agree with me on
6 that?
7       A    The -- yeah, there is a difference.
8       Q    Okay.  And so, oftentimes, if you see a girl on the
9 street and you're a guy, or maybe you're a -- a girl on the
10 street and you see a woman or a guy or whoever --
11      A    Uh-huh.
12      Q    -- and you find them attractive -- physically
13 attractive, you may not even know what their age is.  Is that
14 fair?
15      A    That is fair, yes.
16      Q    Okay.  Because some 16-year-olds may look like
17 21-year-olds.  Is that fair?
18      A    That's true, yes.
19      Q    Okay.  So you can't blame someone for -- if -- if
20 someone has reached sexual maturity, like, they have the
21 development of -- that women have generally when they reach
22 sexual maturity, someone being attracted to that is not
23 necessarily bad, is it?
24           MR. PRINGLE:  Objection, form.
25 BY THE WITNESS (resuming):

Page 68

1       A    I -- I don't know -- quite know what you mean by bad.
2       Q    Well --
3       A    Like a moral --
4       Q    -- the --
5       A    -- or a legal --
6       Q    -- the hypothetical I just gave you.  I see someone on
7 the street, they look like a 21-year-old fully mature woman, I
8 think they're attractive.  Okay?  Are you with me?
9       A    Right.
10      Q    All right.  It turns out she's 16.
11      A    Uh-huh.
12      Q    Have I done something wrong?  Is there something wrong
13 with me that I thought she was attractive?
14      A    No, no, you -- I don't think you've done anything
15 wrong.  I mean, it -- you should probably not think that again
16 if you see that person or at least --
17      Q    Now that I know; right?
18      A    Cognizantly [sic] know that's a child, yeah.
19      Q    Right, right.  This is -- you know, maybe they're a --
20 it's a good-looking young woman, but it's not someone that's
21 appropriate to have a relationship with; right?
22      A    Correct.
23      Q    Okay.  Okay.  So how would -- what -- you understand
24 that there's different ages in different jurisdictions for what
25 is considered illegal sexual activity with, quote/unquote,

Page 69

1 underaged people; right?
2       A    Yes.
3       Q    Okay.  You understand that in Texas it's 17; right?
4       A    Yes.
5       Q    All right.  There's some states in this country where
6 it's 16; right?
7       A    Uh-huh.
8       Q    Yes?
9       A    Yes.
10      Q    Okay.  I believe, and we'd have to look at it, but I
11 believe there was even a lower age of consent if someone wants
12 to get married and their parents consent.  Have you done any
13 research on that?
14      A    I did know that there's a -- there's a marital thing.
15 I think you can get married at the age of 14 in the state of
16 Texas.
17      Q    I wouldn't be surprised if that's -- if that's right.
18 And living in Texas, I'm sure you are familiar with Hispanic
19 culture here; right?
20      A    Yes, like --
21      Q    It's kind of -- it's kind of hard to be a Texan and
22 not be familiar with Hispanic culture; right?
23      A    Right.
24      Q    All right.  And part of -- one of the traditions in
25 Hispanic culture is something called a quinceanera.

Sarah Blakemore                                          May 28, 2021

Page 70

1   A   Uh-huh.
2   Q   Right?
3   A   Yes.
4   Q   That's when a girl turns 15.
5   A   Yes.
6   Q   And, in Hispanic tradition, that's when a girl becomes
7   a woman --
8   A   Yes.
9   Q   -- right?
10  A   Uh-huh.
11  Q   And I think even in Jewish traditions it's around the
12  same age that there's a bat mitzvah or bar mitzvah where --
13  A   Yeah, that's 13.
14  Q   Is it?  It's even younger; right?
15  A   Uh-huh.
16  Q   And you're -- you understand that throughout history,
17  beyond the last 40 or 50 years, it was very common for teenage
18  girls that were 14 years old, 15 years old to get married to
19  older men.
20  A   Yes.
21  Q   Okay.  Would you consider that violent rape?
22  A   Consider marriage?
23  Q   Well, sure.  Would you consider it rape for a, say,
24  25-year-old man to have sex with a 14-year-old wife?
25  A   I -- I think -- I certainly would consider that rape,

Page 71

1   yeah.
2   Q   Okay.  So it's based on your -- well, what do you
3   think the age of consent should be?
4   A   (Nonverbal response.)
5   Q   When is it -- when is it okay to have sex with whoever
6   you want, I guess?
7   A   I -- I agree with the 18 age of consent.
8   Q   Okay.  So you think it's 18.
9   A   Yes.
10  Q   Would you say that states that have a lower age of
11  consent are promoting pedophilia or pederasty?
12  A   I don't -- they could.  I don't believe that that
13  would be their expressed interest in having a lower age-consent
14  law.
15  Q   Well, whether something is pederasty is a question of
16  when a -- an adolescent becomes able to consent; right?
17  A   I don't think I understand.
18  Q   Okay.
19  A   It's...
20  Q   If I'm someone who thinks that no one should be able
21  to consent until they're 21 --
22  A   Uh-huh.
23  Q   -- I don't think a girl is -- is fully able to make
24  decisions to consent to sexual activity until they're 21, am I --
25  am I justified in thinking that everyone who -- who agrees for

Page 72

1   -- with a girl having sex below 21 is promoting pederasty?
2   A   No, yeah.
3   Q   It just means we have a difference of opinion about
4   what the age of consent should be; right?
5   A   Yes, I could say that.
6   Q   Okay.  And so if some states in this country have an
7   opinion that it should be 18 -- like California; right?
8   A   Right.
9   Q   And some states like Texas have an opinion it should
10  be 17; right?
11  A   Yes.
12  Q   And there's even some states that say 16; right?
13  A   Yes.
14  Q   Okay.  Do you think it's fair for California to call
15  Texas a pedophile state?
16  A   Probably not.
17  Q   Okay.  Or for Texas to call maybe Ohio or Georgia a
18  pedophile state because their age of consent is 16?
19  A   Right, that wouldn't make a lot of sense.
20  Q   And you may have read it or you may have heard it in
21  Dr. Hubbard's deposition, but apparently in many countries in
22  what we would consider the developed world, like in Europe --
23  A   Uh-huh.
24  Q   -- the age of consent for boys is 14.
25  A   Okay.

Page 73

1   Q   Do you consider that too young?
2   A   Yes, I do.
3   Q   Okay.  Would you -- would you consider a country like
4   Germany that had -- well, you were in -- you were in France;
5   right?
6   A   Yes.
7   Q   Okay.  Would you consider a country like France to be
8   a nation that promotes pedophilia for having a -- an age of
9   consent -- and just go with me on the hypothetical that it is 14
10  for boys, would you consider that country promoting pedophilia
11  for having an age of consent for boys that's only 14?
12  A   Maybe the culture, for sure, could promote kind of a
13  class or, you know, power-unequal relationships.  Yeah, I would
14  consider that.
15  Q   Okay.  So at what point --
16  A   When we get down -- when we get down to 14, it -- it
17  does become a bit iffy to me.
18  Q   Okay.  So that's what I'm trying to get at, is:  At
19  what point does it become just a difference of an opinion about
20  what the age of consent can be to where there's no -- there is
21  no legitimate basis for disagreement that a person this young
22  should not be having sex under any circumstances?  At what age
23  is that?
24  A   I don't think I could put a specific number on it, but
25  I will say that, to me, 17 is -- is -- is too young and 14 is

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900    San Antonio, Texas 78232
210-697-3400                                                  210-697-3408

Sarah Blakemore                                                    May 28, 2021

Page 74

1  also too young, but 14 seems a lot more problematic and could be
2  a lot more dangerous for that young person.  You have -- like,
3  obviously it's a sliding scale of cognitive ability and autonomy
4  for young people, but I think 14 for almost all people would be
5  too young.
6      Q   Okay.  But 16, you can understand how a state in this
7  country might believe that that's an acceptable age of consent.
8      A   Not really.  I think all of this is -- is -- it's
9  somewhat arbitrary.  You can't really, like, tack (ph) --
10  especially when there's different ages -- when there's different
11  levels of intellectual capacity between men and women when
12  they're -- when our brains are developing.  I think that, you
13  know, the -- yeah, I think -- I think 15 is too young, I think
14  17 is too young.  I could say 18 is too young.  I mean, from --
15     Q   Some people might say 20's too young even.
16     A   I think that -- I think that's where we start to cross
17  into the threshold of people who have -- at least have a concept
18  of far time and they can make better decisions for themselves.
19     Q   Except drinking and gambling, I guess.
20     A   Right, yeah, exactly.
21     Q   Okay.
22     A   But, I mean, when -- when you're -- if you have a
23  guardian with you, like, say, in the state of Texas, you can
24  drink alcohol when you're 18 or -- yeah.
25     Q   Well, that wouldn't be a law that promotes alcoholism,

Page 75

1  would it?
2      A   No, I don't believe so.
3      Q   Okay.  So if I'm someone that -- well, let's -- let's
4  suppose I want to launch a political campaign in Texas --
5      A   Uh-huh.
6      Q   -- and my campaign is based on, I want the age of
7  consent in Texas to match that of other states in the country
8  where the age of consent is 16.
9      A   Uh-huh.
10     Q   Okay?  Are you with me?
11     A   Yes.
12     Q   All right.  Am I promoting the violent rape of boys by
13  advocating for that change in the law?
14     A   I would certainly question the motives of coming out
15  -- of that being a platform of someone's campaign.
16     Q   Well, what if I have some studies that show that
17  there's no evidence of harm for adolescents that are 16 years
18  old as compared to 17-year-olds and there's no real reason to
19  have the law -- the age of consent at 17 instead of 16?  Does
20  that --
21         MR. PRINGLE:  Objection, form.
22  BY MR. SIBLEY (resuming):
23     Q   Does that mean I'm promoting -- promoting pederasty at
24  that point?
25         MR. PRINGLE:  Objection, form.

Page 76

1  BY THE WITNESS (resuming):
2      A   I think that if you had statistics that I would be
3  able to agree with -- I mean, with -- with sexual assault,
4  there's problems with people not wanting to report, especially
5  boys.  If -- if you had objective evidence to say that it's not
6  problematic, I wouldn't consider that to be promoting
7  pedophilia.
8      Q   Okay.  So it depends on the quality of the evidence;
9  right?
10     A   I wouldn't -- I wouldn't say that it specifically
11  depends on the quality of the evidence, but in this particular
12  thought experiment --
13     Q   Sure.
14     A   -- I -- I -- that's what my mind mostly goes to, is --
15     Q   What about 14?
16     A   -- what kind of evidence.
17     Q   What if I have objective evidence that -- let's just
18  even go lower.  Let's say 12.
19     A   Okay.
20     Q   Let's say I have objective evidence that 12-year-olds
21  having sex with, you know, whoever they want, older, is not
22  necessarily harmful.  Are you okay with lowering the age of
23  consent if I'm advocating for that based on evidence, is that
24  promoting pederasty?
25     A   I -- I --

Page 77

1      Q   Or hebephilia, whatever --
2      A   It could --
3      Q   -- it's called.
4      A   It could act as promoting pederasty, for sure, and I
5  -- I would certainly question 12.  I'm -- I mean, that makes me
6  uncomfortable, so I just -- you know.
7      Q   Right.  There -- there's some age where, I don't care
8  what your evidence says, this is just wrong; right?
9      A   Yeah, I -- I agree.
10     Q   Okay.  And there's some gray area where I'd have to
11  see the evidence to know whether you have a legitimate basis to
12  want to lower the age of consent or whether maybe you're just
13  promoting pederasty --
14     A   Uh-huh.
15     Q   -- right?
16     A   Right.
17     Q   Okay.  So if you don't think that the evidence is, as
18  you say, objective, then you think it's a fair inference to say
19  that the person advocating for a change in lowering the
20  age-of-consent laws could be promoting pederasty.
21     A   They could be, yes.
22     Q   Okay.  And you think it's -- you think you can draw
23  that inference just from the fact that they're pointing out the
24  positives of it and limited downside, kind of like Dr. Hubbard;
25  right?

Sarah Blakemore                                              May 28, 2021

Page 78

1    A   It would have to depend on the rhetoric of it all, but
2  I -- it certainly could be aimed at promoting pederasty.
3    Q   Uh-huh, right, and that would be violent crime against
4  boys or girls; right?
5    A   Yes.
6    Q   Okay.  All right.  Let's go back to the next phase in
7  your sort of --
8    A   Before we move whole phases, may I use the restroom?
9    Q   Yeah, of course.
10   A   Thank you.
11      VIDEOGRAPHER:  We are off the record at 11:35.
12      (A recess is taken.)
13      VIDEOGRAPHER:  We are back on the record at
14  11:42.
15  BY MR. SIBLEY (resuming):
16   Q   All right.  We had talked about you and Ms. Epstein
17  retrieving from the PCL and reading the Greek law -- or Greek
18  Love Reconsidered publication; correct?
19   A   Yes.
20   Q   All right.  After that publication -- well, let me ask
21  you this:  Was that publication sufficient to conform the views
22  that you expressed in the flyer and to the Austin
23  American-Statesman that we talked about in Exhibits 1 and 2?
24   A   To form them, but not fully to be confident about --
25  it certainly got my mind moving.

Page 79

1    Q   All right.  So what did you do to become, as you say,
2  confident after that?
3    A   I -- I read other publications, one of those being
4  Boys' Sexuality and Age of Consent and I -- I believe that's
5  when I became confident in my opinion.
6    Q   All right.  So after -- where did you get that
7  publication from?
8    A   I was -- I assumed that I'm getting these from the --
9  the library catalog.  If there's an available PDF on the
10  Internet, that might have been it, but I would have gotten it
11  from the library catalog.  They have -- you can -- have they
12  open-access PDFs.
13   Q   Gotcha.  At the -- at the library?
14   A   The University of Texas --
15   Q   So --
16   A   -- library online.
17   Q   Oh, so you can go online.  Why didn't -- why couldn't
18  you do that with Greek Love?
19   A   Because it was a -- it was a printed book.
20   Q   I see.
21   A   Uh-huh.
22   Q   So this -- the -- what was the other publication you
23  mentioned?  I'm sorry.
24   A   Boys' Sexuality and Age of Consent.
25   Q   By the way, I don't know if I heard this right, but it

Page 80

1  sounded almost as though you agree at least in principle with
2  Dr. Hubbard that there should be a different age of consent for
3  boys and girls, or did I misunderstand that?
4    A   No, I didn't.  I just said that there is a difference
5  in -- I don't think that in a policy way it would make any sense
6  to differentiate between the two.
7    Q   Okay.  I thought you -- I thought you said something
8  about the differences in cognitive --
9    A   There -- there certainly are, yes.
10   Q   Okay.  All right.  So the Boys' Sexuality publication,
11  you believe you may have gotten from a PDF through the PCL;
12  correct?
13   A   Yes.
14   Q   Do you review it -- you can review it on your
15  computer?
16   A   Yes.
17   Q   All right.  So you read that.  How long after reading
18  Greek Love Reconsidered did you read that publication?
19   A   I -- I don't know.  I'm sorry.
20   Q   Was it fairly close in time?
21   A   Yes, that would be my assumption.
22   Q   All right.  And did you read anything else?
23   A   I believe I read other things.  I don't -- I don't
24  think it was numerous other things and I also don't remember the
25  names specifically.

Page 81

1    Q   Were they Dr. Hubbard's publications?
2    A   Yes.
3    Q   But you don't remember the names.
4    A   No.
5    Q   Okay.  How many do you think you've read?
6    A   Definitely less than 10.  It was probably maybe less
7  than five.
8    Q   Would you have gotten these from the library?
9    A   All of them, yes, I would have gotten them from the
10  library.
11   Q   Would these have been hard copy or PDF materials?
12   A   I think the only hardcopy material I got was the Greek
13  Love Reconsidered.
14   Q   Okay.
15   A   So they would have been PDFs online.
16   Q   Were you -- and were you discussing these with anyone
17  else at the time you were reading these publications besides
18  Ms. Epstein on the first one?
19   A   I might have discussed them with Ms. Brittany
20  Blackshear or -- but I don't believe I discussed them with
21  -- yeah, I -- I think that would be it.
22   Q   Okay.  Was Brittany Blackshear, was she one of the
23  members of Students For Safety, or no?
24   A   Yes, senior members, yeah.
25   Q   All right.  When you say members of Students For

Sarah Blakemore                                                          May 28, 2021

Page 82

1 Safety, it's not an official membership; right?
2   A   Right, yeah, exactly.
3   Q   It's a -- it's just a name of a -- of an informal
4 group.  Is that fair to say?
5   A   Yes.
6   Q   Okay.
7   A   Yeah.
8   Q   All right.  So at what point did you decide that --
9 and let's back up a little bit.
10   A   Uh-huh.
11   Q   There were some issues going on with some other
12 professors at the university that had, in fact, as I understand
13 it, engaged in inappropriate sexual either conduct or
14 inappropriate sexual advances with students at the university;
15 is that right?
16   A   Yes.
17   Q   One of those was, I think, Professor Sarkar.
18   A   Sahorta Sarkar, yes.
19   Q   Okay.
20   A   Uh-huh.
21   Q   What did he do again?
22   A   I -- I couldn't say exactly there.  I believe there
23 were like six of them who are on, like, the double-secret
24 probation when we were -- it might have been that -- this was
25 either him or Coleman Hutchison that he was making -- he was

Page 83

1 asking his graduate students for nude pictures, I believe.
2   Q   Okay.  How did y'all find out about this, as you say,
3 double-secret probation?
4   A   I found out about it from Shelby Hobohm when I went to
5 -- she invited me to the Sit In For Safety.  I think I started
6 going at Sit In For Safety 2, and that's where I found out about
7 it, was at the Sit In For Safety.
8   Q   Okay.  All right.  So how did -- how did you connect
9 -- I mean, these were -- but these were professors that had
10 actually done inappropriate misconduct with respect to students;
11 right?
12   A   Yes.
13   Q   This -- these weren't just they had ideas that you
14 found to be dangerous; right?
15   A   That's correct.
16   Q   So --
17   A   They had actually been found to have done bad things
18 to students.
19   Q   All right.  And so would you agree with me it's not
20 fair to lump in Dr. Hubbard with those professors because, if
21 Dr. Hubbard has done anything wrong, it would be with respect to
22 his advocacy, as you say, of ideas and not any actual conduct.
23 Is that fair?
24   A   Right.  That was -- that was a -- a concern of ours,
25 was hoping that -- was trying to differentiate between the

Page 84

1 groups, which is why we came up with Students For Safety so that
2 no one would -- people could find some delineation between the
3 movements.
4   Q   All right.  But you would agree with me that around
5 the time that you put out the flyer, there was somewhat of a
6 controversy at the university about the conduct of some of the
7 faculty, sexual misconduct with -- with students?
8   A   Certainly.
9   Q   Okay.  And can you understand that given that you
10 published the flyer at the same timeframe as that controversy
11 was going on, by stating that Dr. Hubbard had engaged in
12 misconduct, some people might take that to believe that he had
13 in fact engaged in some kind of physical misconduct or something
14 that the university had reprimanded him for like Professor
15 Sarkar or Hutchison.
16          MR. PRINGLE:  Objection, form.
17 BY THE WITNESS (resuming):
18   A   I see that they're -- are both at the same timeframe,
19 but I don't believe a reasonable person would say that -- would
20 think that Dr. Hubbard had committed misconduct when we were
21 saying that other people had committed misconduct.
22   Q   Okay.  So you think the -- despite the fact that at
23 the time that you put out the flyer, there were allegations of
24 physical sexual harassment and otherwise at the university, that
25 someone is going to read misconduct as you used it in the flyer

Page 85

1 to mean advocating for ideas that you find objectionable?
2   A   I'm sorry.  I -- I don't really understand the
3 question.
4   Q   Okay.  What -- how do you -- what do you think is the
5 reasonable reading when you use misconduct in the flyer?  How do
6 you think the -- what do you think the right way to read that
7 is?  What kind of misconduct?
8   A   I think misconduct is very broad, just doing things
9 that are not quite savory.  I don't think it would indicate that
10 he's -- I don't think misconduct itself indicates that
11 Dr. Hubbard has committed sexual misconduct against students.
12   Q   You don't think that would be an inference someone
13 might draw from the context of the flyer?
14   A   I would consider it to be an incorrect inference.
15   Q   Can you see how someone might draw that inference,
16 though?
17          MR. PRINGLE:  Objection, form.
18 BY THE WITNESS (resuming):
19   A   No, I -- I don't think I could speculate on that.
20   Q   Okay.  You think it would be unreasonable to draw that
21 inference.
22   A   Yes, I do think it would be unreasonable.
23   Q   Okay.  Well, it says, Misconduct has been brought to
24 the -- to administration before to no avail.
25   A   Yes.

Sarah Blakemore                                                    May 28, 2021

Page 86

1   Q   Is that factually true?
2   A   I believed that Dr. Hubbard had -- that Dr. Hubbard's
3   scholarship and things like that had been addressed with the
4   university administration and they had not found any reason to
5   terminate him.
6   Q   What -- what information did you have available to you
7   at the time that you wrote that that led you to believe that
8   what you considered to be misconduct had been brought to the
9   administration?
10  A   I believe it would have been from the Mythologies of
11  Rape course.  There was some information about that on the
12  Internet from Rebecca Futo Kennedy.
13  Q   Okay.
14  A   -- that it had been brought -- that it had been a
15  topic of discussion with the administration and nothing had
16  happened.
17  Q   Okay.  So we hadn't got to that yet --
18  A   Right.
19  Q   -- but we were talking about all of the writings that
20  you reviewed of Dr. Hubbard.  Let's talk about writings you
21  reviewed that were not of Dr. Hubbard.
22  A   Okay.
23  Q   You had talked about the Wikipedia NAMBLA page; right?
24  A   Yes, I did review that.
25  Q   And then we know about the Futo Kennedy paper; right?

Page 87

1   A   Yes.
2   Q   What else from non -- other than writings from
3   Dr. Hubbard, what else had you reviewed from other parties?
4   A   I -- I believe I reviewed -- there was a -- like a --
5   it was called Boy Wiki and it had something -- I had looked up
6   the -- the publisher, the -- the Wallace Hamilton Press, and it
7   -- and it came up on this -- on this Boy Wiki.  I did see that,
8   and I -- I did look at a court case that was on -- that was --
9   that was mentioned on the NAMBLA Wikipedia page.  I -- I think
10  we -- it was one of the ones that was mentioned in -- in the
11  deposition on Tuesday.
12  Q   Okay.  But that had nothing to do with Dr. Hubbard,
13  did it?
14  A   No, no.
15  Q   Okay.  Anything else?
16  A   I don't believe so, not that I can pull from my head.
17  Q   All right.  So basically you relied on what Rebecca
18  Futo Kennedy had said in her paper for the belief that
19  misconduct by Dr. Hubbard had been brought to the university's
20  -- the administration at the university's attention before;
21  correct?
22  A   That's probable, yes.
23  Q   Okay.
24  A   I'm -- I'm having a hard time putting my finger on
25  exactly what that was.  I don't think I wrote it with no basis,

Page 88

1   though.
2   Q   Do you know, sitting here today, whether that's true?
3   A   That if -- that it's been brought to the -- the -- to
4   the university?
5   Q   Before you published the flyer that allegations of
6   misconduct with respect to the Mythologies of Rape course were
7   brought to the university's attention?
8   A   Yes, I think I do.
9   Q   Okay.  What -- what's -- what happened?  What is your
10  understanding of what happened that -- that make that statement
11  true?
12  A   I believe Mr. Davis told me -- Jim Davis told me that
13  the university had heard about complaints and had fielded
14  complaints about Dr. Hubbard and they did not act on them.
15  Q   About the Mythologies of Rape course?
16  A   I -- it might have been that, but I think it was a
17  more broad statement.
18  Q   Okay.  Like that stuff that we talked about with the
19  -- in Dr. Hubbard's deposition, which you were here for --
20  A   Uh-huh.
21  Q   -- there were some discussions about some
22  inter-faculty disputes; right?
23  A   Right, yes.
24  Q   But that had nothing to do with pederasty or
25  Mythologies of Rape; right?

Page 89

1   A   What had nothing to do -- oh, the discussions I had
2   with Mr. Davis?
3   Q   No, ma'am.  The discussion that Dr. Hubbard had in his
4   deposition?
5   A   Uh-huh.
6   Q   -- where we were looking at some correspondence from
7   the 2009-2010 frame -- timeframe about Dr. Hubbard allegedly
8   being disruptive in the department.
9   A   Right.
10  Q   Do you recall that?
11  A   Yes, I do.
12  Q   That had nothing to do with pederasty or pedophilia,
13  did it?
14  A   No, it did not.
15  Q   Okay.  And it had nothing to do with the course
16  Mythologies of Rape, did it?
17  A   No, it did not.
18  Q   Because that course wasn't even offered until, I
19  think, 2015 or 2016; right?
20  A   Okay.  Yes.
21  Q   Okay.  So what I'm asking you is -- well, I guess you
22  answered it.  Your basis for the understanding that it's true
23  that Dr. Hubbard's misconducts regarding the Mythologies of Rape
24  course had been brought to the administration's attention --
25  A   Uh-huh.

Sarah Blakemore                                      May 28, 2021

Page 90

1    Q   -- was based on statements from Mr. Davis?
2    A   No.  That was -- that was -- I -- I had learned about
3  that after I published the flyer, but I believe that this would
4  have been fueled by Futo Kennedy's blog.
5    Q   I understand that.  What I'm asking you is that -- I
6  know that that's why you believed it was true when you wrote it;
7  right?
8    A   Yes.
9    Q   Okay.  What I'm asking you is:  Sitting here today,
10 based on what you've learned, what evidence do you have that
11 that is in fact true, that misconducts relating -- as
12 Futo Kennedy claimed, misconducts relating to the Mythologies of
13 Rape course was brought to the university's attention to no
14 avail?
15   A   What makes me believe that --
16   Q   That that's true.
17   A   Well, we saw correspondence.  We saw E-mail
18 correspondence between the -- the university, the chair of the
19 classics to the head of the department.
20   Q   But, ma'am, we just talked about the fact that that
21 correspondence you're referring to had nothing to do with the
22 Mythologies of Rape course.
23   A   Right, that's correct.
24   Q   You said that the basis for making that statement was
25 some discussion in Ms. Futo Kennedy's paper --

Page 91

1    A   Uh-huh.
2    Q   -- that there had been complaints lodged against
3  Dr. Hubbard.
4    A   Oh, yes.
5    Q   -- with the university based on the Mythologies of
6  Rape course; correct?
7    A   Yes, that's correct.
8    Q   And that it was supposedly banned; right?
9    A   Right.  Dr. Hubbard said in the -- in the deposition
10 that the school -- that there were many complaints about the
11 class and the school was upset about it.
12   Q   Okay.  So that's your basis for the fact that -- for
13 the truth of this statement sitting here today --
14   A   That --
15   Q   -- is that Dr. Hubbard said that in his deposition?
16   A   I would believe the --
17       MR. PRINGLE:  Objection, form.
18 BY THE WITNESS (resuming):
19   A   -- statement to be true over -- because of that, yes.
20   Q   Okay.  Anything else?
21   A   This is specifically with respect to the Mythologies
22 of Rape course?
23   Q   Right.
24   A   I believe that this might have been -- this might have
25 been cross-given information from Futo Kennedy, but I believe

Page 92

1  that Ms. Hollie Green told me that she knew of a student who was
2  in Dr. Hubbard's Mythologies of Rape course who found it to be
3  very disturbing and made a complaint.
4    Q   Okay.  And that was before you wrote the flyer?
5    A   Yes.
6    Q   Okay.  Have you received any evidence of those
7  complaints from any open-records requests that you've lodged
8  with -- with the university?
9    A   Any evidence of the complaints of Mythologies of Rape?
10   Q   Yeah, people making specific complaints about the
11 course.
12   A   No, I -- I didn't -- I haven't seen any documents like
13 that in the open-records requests that we've made.
14   Q   Okay.  All right.  So back to kind of the timeline
15 here.  You've read the materials you discussed about
16 Dr. Hubbard.
17   A   Yes.
18   Q   -- what there was protests regarding other
19 professors at the university.  What happens next?
20   A   With respect to this flyer?
21   Q   Well, like, what prompted you to -- to create the
22 group, make the flyer?  Like, just tell me what would have went
23 into that.
24   A   I believe -- so I had not -- of course I was new to
25 the university.  I had not met Ms. Epstein or Ms. Blackshear or

Page 93

1  Ms. Green until -- I believe we met at a Students For Bernie
2  Sanders meeting, because this was the -- back before the 2020
3  election, and we -- we had a meeting, I met with them, I told
4  them what I had seen on the Wikipedia page, we all expressed
5  concern, and I said that I wanted to do a -- a -- a flyer
6  really, let people know what was going on with -- with Hubbard's
7  scholarship and what I thought of it, and I asked them if they
8  would like to help me and they -- they said yes.
9    Q   Okay.  Who -- who were these people again?
10   A   This is --
11   Q   Epstein?
12   A   Yes.  So this -- this would be the people who we
13 consider informal members of Students For Safety is
14 Ms. Kaya Epstein, Ms. Brittany Blackshear and Ms. Hollie Green.
15   Q   Okay.  What about Ms. Hobohm?  She didn't get
16 involved?
17   A   No, no.  She was -- yeah, she was not involved.
18   Q   All right.  Did anyone help you write the flyer?
19   A   No, no, I wrote this by myself.
20   Q   Okay.  So what were the other -- what were the roles
21 of the others in the group?
22   A   I believe that they were helping me -- after this
23 flyer came out, I -- of course there was some press coverage.
24 They were helping me with that.  Brittany Blackshear was helping
25 me with social media, and I -- that would be the extent of it.

Page 94

1  We were just trying to kind of organize together or helping me
2  organize.  We were -- of course this does say rally for removal.
3  We were hoping to have a rally and then I -- I got too ill to
4  continue activism, so I just bailed out.
5     Q   Okay.  How -- how did you -- well, did you create the
6  flyer on, like, Microsoft Word?
7     A   Yes.
8     Q   Do you still have the Microsoft Word file?
9     A   I'm sure I do.
10    Q   Okay.  Did you share it with anyone prior to
11 ultimately distributing it?
12    A   Yes, I shared it with two people.
13    Q   Who?
14    A   The first one was my father.  I -- I authored the
15 flyer and then I asked my father if he would join me for
16 breakfast the day that I distributed it and -- well, I wanted to
17 let him know because I -- I had heard that Dr. Hubbard had
18 threatened litigation against other people in the past for
19 speaking out about his scholarship, so I wanted my father to
20 know what I was up to.  So I read him the flyer and I also read
21 the flyer to my roommate at the time when it was printing off
22 the computer because she was asking what I was doing.
23    Q   And I guess your dad said, Okay, he didn't find a
24 problem with it?
25    A   Yeah.

Page 95

1     Q   All right.
2     A   I -- I mean, it wasn't really -- I wasn't really
3  asking his opinion.  I just more wanted to let him know --
4     Q   Okay.
5     A   -- what I was doing.
6     Q   Did he raise any flags for you?
7     A   No, no, he didn't.
8     Q   Well, being a moot-court person, did you do any
9  research about the law of libel in connection with authoring
10 this --
11    A   No, I did --
12    Q   -- flyer?
13    A   -- not.
14    Q   Okay.  All right.  So your dad and your roommate were
15 the only ones that you shared this with before publication.
16    A   Yes.  I think my -- my best friend, Maren, I think she
17 made a grammatical...
18    Q   Okay.
19    A   But I just -- I just texted it to her.  Like, she
20 doesn't live in the state of Texas.
21    Q   What about the other members of Students For Safety?
22 I mean, they didn't want to see it before you put it out?
23    A   No, no, they didn't see it.  I -- I know that seems
24 odd, but they didn't see it.
25    Q   Did you tell them you were doing it?

Page 96

1     A   Yes, I believe so.
2     Q   Did you tell them you were getting ready to go
3  distribute it at Dr. Hubbard's class?
4     A   Yes, I -- I did tell them that.  In fact,
5  Ms. Blackshear joined me when I did that.
6     Q   Okay.  Did Mr. Jim Davis know you were going to do
7  this before you did it?
8     A   No, no.  I -- I had -- I had sent him a message the
9  night before saying that I wanted to speak to him, but he didn't
10 know what about.
11    Q   Okay.
12    A   I already had a -- I already had a meeting set with
13 him for that day.
14    Q   A lunch meeting the next day, the day you distributed
15 the flyer.
16    A   Yes, so I asked if I could -- if we could talk
17 business for a moment, and business --
18    Q   Okay.
19    A   -- if we could talk business for a moment before we
20 went to lunch.
21    Q   Okay.
22    A   But I had already distributed the flyer at that point.
23 I did give him a copy.
24    Q   I see.  Anyone else?
25    A   No, not that I can recall.

Page 97

1          MR. SIBLEY:  All right.  I think this is probably
2  a good place for us to take a lunch break.
3          MR. PRINGLE:  Sure.
4          MR. SIBLEY:  So why don't we come back at about
5  1:35 --
6          MR. PRINGLE:  Okay.
7          MR. SIBLEY:  -- if that's okay.
8          MR. PRINGLE:  Yeah, we'll -- that sounds good.
9          MR. SIBLEY:  All right.
10         VIDEOGRAPHER:  We are off the record at 12:03.
11         (A recess is taken.)
12         VIDEOGRAPHER:  We are back on the record at 1:41.
13 BY MR. SIBLEY (resuming):
14    Q   All right.  Is it fair to say that pretty early on in
15 the process of creating and distributing a flyer that you
16 understood there was some risk of getting sued over this?
17    A   Yes.
18    Q   And I -- I don't want to mischaracterize your
19 testimony, but I believe that was perhaps one of the reasons why
20 you consulted with your father before you distributed the flyer.
21 Is that fair?
22    A   You are correct, absolutely.
23    Q   Okay.  Was that the only person you consulted with on
24 the sort of legality of the issues before you circulated the
25 flyer?

Sarah Blakemore                                                May 28, 2021

Page 98

1    A    Yes.
2    Q    Okay.  And I think pretty quickly after you circulated
3 the flyer, you had some apprehension that there might be a
4 lawsuit.  Is that fair?
5    A    I was not expecting for there to be a lawsuit against
6 me, but I was expecting for there to be threats of one.
7    Q    Okay.  So at least the prospect of litigation; right?
8    A    Yes, sir.
9    Q    Okay.  Why were you not expecting a lawsuit to be
10 filed against you, but yet understood that there was the
11 prospect of it?
12    A    Just lawsuits are, as I'm finding out, incredibly
13 expensive, a lot of work.  I just didn't think that that would
14 be the follow-through.
15    Q    Okay.
16    A    Since I -- I also thought that Dr. Hubbard had not
17 followed through before on other threats of lawsuits.
18    Q    What made you aware of other threats of lawsuits by
19 Dr. Hubbard?
20    A    I believe -- I believe another student told me --
21 another student at the university, I -- I couldn't remember who
22 this person was, told me that maybe Hubbard had threatened
23 lawsuits against people before, and I didn't know if they'd
24 gotten written notices or not, but I'd heard that there had been
25 threats and I -- I looked it up in the, I guess, Travis County,

Page 99

1 like, court system to see if there was any cases and there were
2 none.
3    Q    Was this before or after you distributed the flyer?
4    A    I don't exactly remember.  It could have been after.
5    Q    Okay.  Well, you understand that people's reputations
6 are important.  Would you agree that?
7    A    Yes, I would.
8    Q    And no one wants to have the reputation of being
9 someone that advocates for the rape of children.  Would you
10 agree with me that that's not a good reputation?
11    A    Yes, I can agree that that's not a good reputation.
12    Q    Okay.  How did you feel when you got sued -- when you
13 found out about the lawsuit?
14    A    I was incredibly anxious, I was fearful, I -- yeah, I
15 think that pretty much sums it up.  It wasn't -- it wasn't
16 positive.
17    Q    Okay.  Now, the lawsuit was filed, I believe, in July.
18 I can't even remember the -- the -- I think it was July.
19    A    I think I was served in August.
20    Q    Okay.  How did you -- did you find out about the
21 lawsuit before it was served on you or...
22    A    Yes.
23    Q    Okay.
24    A    Yes.  It had been filed, but it hadn't been given to
25 me.

Page 100

1    Q    Did you find out from, like, news people or something?
2    A    Yes.  Well, the Austin American-Statesman told me.
3    Q    Okay.  And so, you had told me before that you were
4 having some issues in the fall semester of 2019 that caused you
5 to withdraw from the university or -- or drop all of your
6 classes at that time at the university; correct?
7    A    Yes, sir.
8    Q    All right.  And apparently you were able to start
9 classes in the spring of 2020; right?
10    A    Yes, sir.
11    Q    Which I'm sure wasn't the greatest experience given
12 what happened in March of 2020 in that semester; right?
13    A    Right.
14    Q    How was your -- your -- and is it okay if I call it a
15 disability, the -- the PTSD?
16    A    Yes, yeah, absolutely.
17    Q    Okay.
18    A    That's the word for it.
19    Q    How was the disability doing at the time that you
20 found out about the suit?
21    A    I have been -- I have worked very hard to become
22 stable since about 2017, so I've learned a lot of skills to help
23 -- help me through hard emotional situations, so I was -- I was
24 feeling fine with my PTSD.
25    Q    Okay.  Did the lawsuit -- finding out about the

Page 101

1 lawsuit make it worse?
2    A    No.
3    Q    Okay.  Well, you said --
4    A    I certainly had anxiety -- different anxieties to deal
5 with, but it didn't trigger me.
6    Q    Okay.  Okay.
7         MR. SIBLEY:  What are we on now, 3?
8         COURT REPORTER:  3.
9         THE WITNESS:  Yes.
10 BY MR. SIBLEY (resuming):
11    Q    I'll mark this as Exhibit -- oh, sorry.  I didn't -- I
12 didn't write anything on it.  Here, let me write 3 on it.  There
13 you go.
14    A    Thank you.
15    Q    I'm going to mark this as Exhibit 3, and take a minute
16 and tell me if you recognize that document.
17    A    This is one of the discovery documents that we
18 submitted to you?
19    Q    That is correct.  I just wanted to know if you have
20 seen the document or reviewed it before.
21    A    I'm sure I have.  One second.  Is -- are these just
22 the -- yes, I've seen this.
23    Q    Okay.  And I just want to go through this quickly just
24 to make sure we -- you know --
25    A    Wait.

Sarah Blakemore                                                      May 28, 2021

Page 102

1   Q   Obviously there's a lot of --
2   A   I'm -- I'm sorry.  I don't think I've ever seen this.
3   Q   Okay.
4   A   Okay.
5   Q   That's okay.  This isn't something you signed or
6   anything like that, so...
7   A   Okay.
8   Q   I just want to go through.  If you look at the -- the
9   first part, it says the name and if known address and phone
10  number of an individual likely to have discoverable information
11  that the disclosing party, which would be you, may use to
12  support your claims or defenses.
13  A   Uh-huh.
14  Q   Do you see that?
15  A   Yes.
16  Q   All right.  So we have Dr. Hubbard, we have yourself,
17  of course, we have NAMBLA --
18  A   Uh-huh.
19  Q   Yes?
20  A   Yes, sir.
21  Q   Have you -- did you ever make any attempt to reach out
22  to NAMBLA, by the way --
23  A   No.
24  Q   -- in connection with any of this?
25  A   No.

Page 103

1   Q   Do you even know if it's an organization that's still
2   a going concern?
3   A   A -- a -- what's a going concern?
4   Q   Like, a going concern, like a actual -- actual
5   operating entity of sorts.
6   A   They have a working website.  I did see that.
7   Q   Okay.  Did you look at the website before or after you
8   issued the flyer?
9   A   I believe before.
10  Q   Okay.  You've got the Percy Foundation, which we heard
11  about in Dr. Hubbard's deposition.  Did you do any research on
12  the Percy Foundation?
13  A   No.
14  Q   Okay.  Did -- when did you first find out about the
15  Percy Foundation?
16  A   It might have been in connection with this suit or it
17  could have been before.
18  Q   But you didn't know about it before the flyer, I take
19  it; right?
20  A   I don't remember.
21  Q   Okay.  The Austin -- I'm sorry -- the University of
22  Texas --
23  A   Uh-huh.
24  Q   -- I think there's obvious reasons for that; right?
25  A   Yes, sir.

Page 104

1   Q   The Austin Police Department.  Do you see that?
2   A   Yes.
3   Q   What would -- what would the Austin Police Department
4   have knowledge of related to this case?
5   A   I would assume the attack on Dr. Hubbard's home.
6   Q   Okay.  Anything else?
7   A   I don't know.
8   Q   Well, I'm just wondering -- I'm not trying to be
9   tricky here.  I'm just wondering was there a -- was there a
10  complaint filed by -- that you're aware of by anyone against
11  maybe Dr. Hubbard or anything related to, you know --
12  A   Not that I'm aware of.
13  Q   Okay.  And, by the way, you're not aware, sitting here
14  today, of anyone who's been convicted of a crime involving
15  statutory rape or molestation where the person claimed to have
16  been inspired by Dr. Hubbard's writings, are you?
17  A   No.
18  Q   Okay.
19  A   No, I'm not.
20  Q   All right.  And, by the way, I think you said at the
21  beginning of the deposition, and obviously I'm not exact quoting
22  here, but I think you --
23  A   Uh-huh.
24  Q   -- expressed some dismay over the attack on
25  Dr. Hubbard's house; correct?

Page 105

1   A   Yes.
2   Q   That's certainly not something you would endorse;
3   right?
4   A   Right.  That would be very frightening.
5   Q   Okay.  And -- and I just want to give you an
6   opportunity to talk about that.
7   A   Uh-huh.
8   Q   You don't endorse the use of violence or threats of
9   violence in any form of protest.  Is that fair?
10  A   That is very correct, yes.
11  Q   Okay.  All right.  David Armstrong?
12  A   I don't know anything --
13  Q   Do you -- do you --
14  A   -- about --
15  Q   Do you know Professor Armstrong?
16  A   No, I do not.
17  Q   Okay.  Have you ever talked to anyone about
18  Professor Armstrong?
19  A   No.
20  Q   How about Peter Green?
21  A   I don't believe I know this person.
22  Q   All right.  Never spoken with them or E-mailed them
23  that you're aware of?
24  A   No, not that I can think of.
25  Q   Karl Galinski?

Sarah Blakemore                                                    May 28, 2021

Page 106

1    A   I don't know this person either.
2    Q   Okay.  Haven't communicated with him; right?
3    A   No.
4    Q   Cynthia Shelmerdine?
5    A   I do not know this woman.
6    Q   Have you ever communicated with her?
7    A   No.
8    Q   All right.  Hollie Green, we know that you -- you do
9 know and have communicated with; right?
10   A   Yes.
11   Q   All right.  And when did you meet Ms. Green?
12   A   It could have been at Sit In For Safety 2.
13   Q   How many sit-ins for safety were there?
14   A   Maybe four.
15   Q   Really?  Did they -- how many -- what -- what span of
16 time did it occur?  Over like weeks, months?
17   A   I'm really not sure.  I'm also not sure about what I
18 just said, Maybe four.
19   Q   Okay.  I get it.
20   A   Yeah.
21   Q   Well, how many -- did you go to all of the sit-ins for
22 safety?
23   A   No, no, I didn't.
24   Q   How many did you go to?
25   A   I went to 2 and 3.

Page 107

1    Q   All right.
2    A   Uh-huh.
3    Q   And you believe you may have met Ms. Green at one of
4 those sit-ins.
5    A   Yes.
6    Q   Okay.  How did -- what's your first memories of, like,
7 how you met and what you talked about, things like that?
8    A   I really don't have a -- a grasp on that.
9    Q   Okay.
10   A   I'm sorry.
11   Q   And I'm not -- I'm not trying to pick here, but --
12   A   Right.
13   Q   -- you did mention something earlier about you were
14 having some memory issues that occurred in the fall of 2019.  Do
15 you recall that?
16   A   Yes.
17   Q   And I'm not trying to be critical of you here, but is
18 it fair to say that your memory is not a hundred percent
19 accurate during that period?
20   A   Certainly.
21   Q   Okay.
22   A   Yes.
23   Q   All right.  Well, do you recall any of your original
24 conversations with Ms. Green about Professor Hubbard, or what do
25 you recall about those, if any?

Page 108

1    A   I believe -- I believe she already knew about
2 Dr. Hubbard when I met her, and -- and we spoke about that, and
3 that's how she became a part of the Students For Safety thing.
4    Q   Oh, I see.  Okay.  Well, what did she tell you about
5 Dr. Hubbard?  If you recall.
6    A   I don't recall anything specific.  I mean, I -- I
7 mentioned before I thought, like, within the context of the
8 flyer, I thought she had told me that she knew a student that --
9    Q   In the mythologies of --
10   A   -- that had, like, taken -- yeah, taken Mythologies of
11 Rape.
12   Q   Got it.  Okay.  Anything else you recall around that
13 time of November -- October and November of 2019 about your
14 interactions with Ms. Green?
15   A   No.
16       MR. PRINGLE:  Objection, form.
17 BY THE WITNESS (resuming):
18   A   I -- I went to -- I want to CAVA with her.
19   Q   The restaurant?
20   A   Yes.
21   Q   Okay.
22   A   The one near university campus, and I -- I met her
23 partner.  I don't -- I think -- yes, I think Kaya Epstein was
24 there, too.  I don't remember what we talked about really.
25   Q   Was there a timeframe of -- was it post-flyer or

Page 109

1 pre-flyer?
2    A   I think it was post.
3    Q   Okay.  Was she someone that after this -- the events
4 of the fall of 20 -- or -- yeah, the -- the fall of 2019, is she
5 someone that you stayed in contact with?
6    A   Yes.
7    Q   For general purposes or specifically related to the
8 Students For Safety issues?
9    A   Just general purposes, I think.  I -- she's a -- she's
10 also a friend of a friend, so sometimes we connect through that
11 way.
12   Q   I see.  What friend is she -- well, who's your mutual
13 friend, I guess?
14   A   My moot-court partner, Juliana Steward, is friends
15 with Hollie as well.
16   Q   Okay.  Is she someone you consider a -- a good friend?
17   A   Hollie?
18   Q   Yes.
19   A   No.
20   Q   Okay.  All right.
21   A   I do like her.
22   Q   How about Zoe Elise Thomas?  She's someone that you --
23 that you know and have had communications with?
24   A   I -- I would say I'm acquainted with her and I have
25 had communications with her.  I met her after the -- after the

Sarah Blakemore                                          May 28, 2021

Page 110

1 litigation notice letters were sent out.
2    Q    Okay.  So prior to that --
3    A    (Crosstalk.)
4    Q    -- you -- you hadn't had communications with her
5 before that?
6    A    No.
7    Q    Not even, like, E-mail or...
8    A    I had never -- I didn't know that she existed, and
9 that's the only time I saw her.
10   Q    Okay.
11   A    Or -- yes.
12   Q    Okay.  All right.  How about Liv Yarrow?
13   A    I was -- I was sent an E-mail by Ms. Yarrow.  I was --
14 I need to ask about the response to this question because it
15 involves privileged communications, I think.
16        MR. PRINGLE:  With?
17        THE WITNESS:  With Zoe.
18        MR. PRINGLE:  Okay.  Well, you -- what was your
19 question again?  I'm sorry.
20        MR. SIBLEY:  My question was, How did you meet
21 her.  And let's -- let me just ask.
22 BY MR. SIBLEY (resuming):
23   Q    How did you meet Ms. Yarrow?
24   A    Yeah.
25        MR. PRINGLE:  Through an E-mail?

Page 111

1        THE WITNESS:  Yeah.
2        MR. PRINGLE:  You were -- she was introduced.  Go
3 -- tell -- you can tell him how you met her.
4        THE WITNESS:  Oh, yeah.
5 BY THE WITNESS (resuming):
6    A    I was -- I was introduced to Ms. Yarrow by Zoe.
7    Q    I see.
8    A    Yeah, yeah.  Zoe said that someone wanted to speak to
9 me --
10   Q    Okay.
11   A    -- and I gave them -- I gave her my E-mail.
12   Q    All right.  So Zoe Thomas had put y'all in touch, and
13 when did that happen?  If you remember.
14   A    It was in the fall of 2020.  I don't remember exactly
15 when.
16   Q    So after the lawsuit; right?
17   A    Yes, yeah.
18   Q    Okay.  And, tell me, what was the nature of the
19 communications that you had with Ms. Yarrow?
20   A    Ms. Yarrow was upset that she had gotten this
21 correspondence from Hubbard and she wanted to send it to me, and
22 I think my -- and I sent it to my lawyers, yes.  I think -- I
23 know I sent it to my lawyers.
24   Q    Okay.  Anything else other than that?  Have -- do you
25 have an ongoing relationship or a communication with her?

Page 112

1    A    No.  We never spoke again after that.
2    Q    Okay.  All right.  By the way, I didn't know this
3 until this case, but it's -- I didn't realize renter's insurance
4 covered defamation cases.
5    A    I could say I didn't know either.
6        MR. PRINGLE:  Thank goodness.
7        MR. SIBLEY:  I guess so.
8 BY MR. SIBLEY (resuming):
9    Q    Okay.  All right.  Let's --
10   A    Are we done with this one?
11   Q    Yeah.
12   A    Okay.
13   Q    All right.  We'll mark this as Exhibit 4.  Just take a
14 moment and tell me if you recognize the document, ma'am.
15   A    (Reviewing.)  Okay.  Yes, I know this document.
16   Q    Okay.  I want to ask you about -- and -- and I think
17 it's -- it appears maybe in more than one response here, but --
18   A    Uh-huh.
19   Q    -- I want to ask you about the objection and response
20 to Request Number 1.  There's a reference there to your father,
21 Allen Blakemore.  Do you see that?
22   A    Yes.
23   Q    You're claiming, I guess, some kind of expert -- that
24 your father was some kind of expert for you in this case?
25        MR. PRINGLE:  Objection, form.

Page 113

1 BY THE WITNESS (resuming):
2    A    What do you -- like, a -- my media consultant?
3    Q    Well, what it says is, Further, this request seeks
4 information relating to an expert, slash, consultant only --
5 employed only for trial preparation as described in a federal
6 rule.  Do you see that?
7    A    Right.
8    Q    Okay.  So it says, Accordingly you withhold from
9 production any communications between you and your father.  Do
10 you see that?
11   A    Yes.
12   Q    Okay.  When did you retain or engage your father as a
13 trial expert?  At what point did that happen?
14   A    Well, I -- I asked for his advice and his help when I
15 first published this flyer.
16   Q    Okay.  But there was no case pending at that time;
17 right?
18   A    Right.
19   Q    Okay.  So was there a time after the case was filed or
20 after at least when you got the notice of retraction -- remember
21 you received the letter --
22   A    Yes.
23   Q    -- that we sent.  Was there a time after you got that
24 letter asking you to retract or clarify or whatever the magic
25 words were in the letter on -- on the statements, was there a

Sarah Blakemore                                                    May 28, 2021

Page 114

1 time after that you had a specific agreement with your dad that,
2 Dad, I want you to be an expert for me at trial?
3          MR. PRINGLE: Objection, form. You can answer,
4 if you know.
5 BY THE WITNESS (resuming):
6    A   No, I -- I don't -- I don't know. I didn't -- yeah, I
7 didn't make an agreement with him.
8    Q   Okay.
9    A   I just asked for his help when this all began.
10   Q   All right. And, outside of that, have you asked for
11 his help in other ways with this case?
12   A   Well, he's helped me with statements to the media
13 since I've been sued.
14   Q   Okay.
15   A   I have made a statement, yeah, if you saw that.
16   Q   All right. Other than media relations -- that's what
17 he does, isn't it -- or part of what he does?
18   A   Yeah, that is part of what he does.
19   Q   I mean, he's like a public-relations political
20 consulting firm. Am I correct about that?
21   A   It's -- it's political consulting and lobbying, but
22 mostly campaign consulting, not --
23   Q   Right.
24   A   -- specifically media.
25   Q   Well -- well, part of getting elected is --

Page 115

1    A   Yes, yes, yes.
2    Q   -- having a good image with the media. Is that fair?
3    A   Yes.
4    Q   Okay. So that's something he's -- presumably has
5 pretty good expertise in given he's been doing that for quite
6 some time; right?
7    A   Yes.
8    Q   All right. Outside of that, have you -- has your dad
9 -- have you asked your dad for help in any other ways with the
10 case?
11   A   With this case?
12   Q   Yes.
13   A   No. I mean, I -- he is paying for this.
14   Q   Okay. What about the renter's insurance?
15   A   Well, that's paying, too.
16   Q   Okay. All right. Look at Request Number 2, if you
17 don't mind. It's on the next page.
18   A   (Reviewing.) Okay.
19   Q   You don't -- you didn't retain any of the documents
20 from Dr. Hubbard's class?
21   A   We were given a syllabi on the first day of school
22 that was in print --
23   Q   Yeah.
24   A   -- and, that, I recycled at the end of the semester.
25 I recycle everything at the end of the semester.

Page 116

1    Q   Well, you dropped the class, though, midsemester,
2 didn't you?
3    A   Right.
4    Q   But you didn't recycle it until the end of the
5 semester.
6    A   I -- I only recycle once a semester. I just recycle
7 everything together.
8    Q   Really? So you, like, collect all of your papers that
9 you got from all of your classes and have, like, a recycling
10 event where you --
11   A   I -- I, like, stack them up on the -- because I have
12 moot court and it takes up a lot of print paper and -- and I
13 have to keep large amounts of paper, so, yeah, I just stack it.
14   Q   What about notes from the class?
15   A   That's the -- I -- I -- I have -- I use legal pads --
16   Q   Uh-huh.
17   A   -- like -- just like this and I recycle the whole
18 thing.
19   Q   Okay.
20   A   I rip out all of the pages that have been used --
21   Q   And follow --
22   A   -- and recycle them.
23   Q   And following 2019, you said that you believe you
24 Q-dropped on the disability thing in December; right?
25   A   I -- I believe it was before then.

Page 117

1    Q   Not Dr. Hubbard's class, but all of the rest of your
2 classes.
3    A   Oh, a -- a medical withdrawal.
4    Q   Medical withdrawal.
5    A   Yes.
6    Q   My -- my apologies.
7    A   Sorry.
8    Q   That happened in December of 2019.
9    A   Yes.
10   Q   Okay. And so, after that, you would have engaged in
11 the recycling; right?
12   A   Yes.
13   Q   All right. Okay.
14   A   Sorry. I'm chuckling, the recycling.
15   Q   Okay. All right. So -- well, I'll -- there are some
16 documents that we asked for, which were the documents that you
17 considered, reviewed, relied on in -- in drafting the flyer.
18 That's Exhibit 8 of the complaint; right?
19   A   That would've been recycled.
20   Q   Okay.
21   A   Sorry.
22   Q   So you wouldn't have -- you wouldn't have kept those
23 specific materials, but you -- you know -- you remembered which
24 ones they were; right?
25   A   The -- the public -- like, the publications that I

Sarah Blakemore                                                    May 28, 2021

Page 118

1  looked at --
2      Q    Yeah.
3      A    -- when I was drafting the flyer?
4      Q    Yeah.
5      A    That's why I said I don't -- I didn't -- I told you
6  before I didn't exactly remember all of the publications --
7      Q    Okay.
8      A    -- but they would have been recycled along with that.
9      Q    I gotcha.  So when we identify, like, What did you
10 look at, that's from memory; correct?
11     A    Yeah.
12     Q    Okay.  Let me ask you this:  After the flyer was
13 published and after -- yeah, I mean after the flyer was
14 published, did you undertake to do any additional research on
15 Dr. Hubbard's writings?
16     A    I -- I think I had to look more at the -- at the same
17 documents that I had.  I was trying to formulate a response to
18 Hubbard -- Dr. Hubbard's response to this that never got
19 published because I just got too sick.  But I -- I -- there was
20 some -- it was like a point-by-point reputation that Dr. Hubbard
21 had provided.
22     Q    I think we'll look at that --
23     A    All right.
24     Q    -- later.
25     A    Okay.

Page 119

1      Q    I know what you're talking about.  Okay.
2      A    Okay.  Yeah.
3      Q    Okay.  But any -- how about -- how about after that?
4      A    Huh-uh.
5      Q    Like, after you got the letter demanding retraction or
6  after the lawsuit was filed, did you go back and look at any of
7  his publications again?
8      A    No.
9      Q    Okay.  Except maybe in preparation for the deposition;
10 right?  Or, well, did you?  I don't know.
11     A    I -- I didn't.  I didn't, no.
12     Q    Okay.
13     A    Yeah, I didn't look at his publications for -- to
14 prepare for this.
15     Q    Okay.  Now, around December is when you got too sick
16 to complete it and also complete the semester at the university;
17 right?
18     A    Yes, sir.
19     Q    Okay.  Before that, you said that you had been sort of
20 activated by some of the things that happened in Dr. Hubbard's
21 class with respect to discussions of sexual assault.  Do you
22 recall that?
23     A    Sure.  I -- I don't think activated, maybe, is the
24 right word.
25     Q    What word would you use, then?  Disturbed?  I don't

Page 120

1  know.
2      A    More like just made a little bit uncomfortable.
3      Q    Okay.  But did it activate your PTSD?
4      A    Yes, to some degree, but it wasn't anything that would
5  have caused me, like, significant issues.
6      Q    Well, you did get a --
7      A    It was more of --
8      Q    -- disability drop for the class; right?
9      A    Yes.  I -- I wanted to -- I wanted to avoid further
10 suffering, yeah.
11     Q    Did you see any therapists or anything like that in
12 connection with the -- what your -- your experience is with
13 Dr. Hubbard's class?
14     A    I was seeing a therapist at the time, and I don't
15 recall if I talked to them about Dr. Hubbard's class.
16     Q    At any time during that fall -- and when I say fall,
17 I'm talking into December of 2019 --
18     A    Uh-huh.
19     Q    -- did you have to go to increased sessions because of
20 any elevations in the PTSD or put on medication or anything like
21 that?
22     A    No.
23     Q    Okay.  And the reason I'm -- well, when you say yes --
24     A    I --
25     Q    Sorry.  Go ahead.

Page 121

1      A    Sorry.  I'm trying to think.  You said any medications
2  and I'm trying to think.
3      Q    Well, not ones that you were already taking, but any
4  new ones that you may have had to take.
5      A    Right, right, right.  I was just trying to --
6      Q    Yeah.
7      A    It was a while ago.
8      Q    Okay.
9      A    I don't -- I don't think so, yeah.
10     Q    All right.  Well, when you say you got sick, like,
11 what -- what does that mean?  Like, how -- how were you sick?
12 Like, physically?  Like, what happened?
13     A    So I told you that I had been taking a medication that
14 was freshly approved by the FDA for the treatment of my
15 endometriosis.  I -- I found out that it was -- it was causing
16 me memory loss, and so I immediately stopped taking the drug,
17 and the drug had been -- it had been blocking all of the
18 estrogen in my body and basically making it so I had no pain
19 whatsoever, and I have -- I had -- I have chronic pain.  I have
20 pain every single day from when I wake up to when I go to bed,
21 so that pain came back and it's particularly hard to have pain
22 all the time, so that's what I mean when I became sick.  And I
23 was having a lot of nausea because of fluctuating hormones.
24     Q    Okay.  So endometriosis, which is a -- which is a
25 feminine health issue -- is that fair?

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900        San Antonio, Texas 78232
210-697-3400                                                      210-697-3408

Sarah Blakemore                                                    May 28, 2021

Page 122

1    A    Yes, yeah, it only happens to people with uteruses.
2    Q    And that caused you to take medication, which induced
3  memory loss; correct?
4    A    Uh-huh.
5    Q    Yes?
6    A    Yes, sir.
7    Q    When did the endometriosis start again?  Do you
8  remember the specific time in the fall of that year?
9    A    That --
10   Q    Or when you started taking medication for it, I guess.
11   A    That was my third surgery.  It started a long time
12 before.
13   Q    Oh, okay.  I -- I misunderstood then.  I thought it
14 started in the fall of that year.
15   A    No, no, it started when I started menstruating.
16   Q    I see.  Okay.  So this is an ongoing thing you have to
17 deal with.
18   A    Yes, sir.
19   Q    Is that the cause of the pain that you mentioned?  It
20 was, like, you always have pain every day.
21   A    Yes.
22   Q    Okay.  And it seems to me that stress probably would
23 make that worse; right?
24   A    I wouldn't say so.
25   Q    No?  Okay.  So does stress make it better?

Page 123

1    A    No, certainly not, but I --
2    Q    Okay.
3    A    -- I don't think it changes the level of pain I'm in.
4    Q    All right.  All right.  Well, you'll have to forgive
5  me asking, but it seems to me that if someone's dealing with
6  these kind of health issues, probably engaging in a -- you know,
7  a protest where there's potential for confrontation and all of
8  the kind of hoopla that surrounded what happened with the flyer
9  with Dr. Hubbard might not be the best prescription to deal with
10 those issues.  Can you understand why someone might think that?
11       MR. PRINGLE:  Objection, form.
12 BY THE WITNESS (resuming):
13   A    I -- I don't agree, simply because I was living a
14 pain-free life when I engaged in all of this because I was still
15 on that medication, the one that I had to stop taking.
16   Q    Okay.
17   A    So I was -- I -- I wasn't -- I had 10 months of my
18 life where I didn't experience the symptoms that I've had all my
19 life, so...
20   Q    So the flyer was put out on November 21st; right?
21   A    (Nonverbal response.)
22   Q    The classes -- you basically had the medical
23 withdrawal in December; right?
24   A    Yes.  I -- I stopped taking the medication probably in
25 the last week of November.

Page 124

1    Q    Okay.  So this all happened really quick.
2    A    Uh-huh.
3    Q    Yes?
4    A    Yes.
5    Q    Okay.
6    A    Yes, the medication and the flyer, it happened close
7  to each other.
8    Q    Okay.  All right.  Let's move on.
9         MR. SIBLEY:  What are we on, 4?
10        MR. PRINGLE:  5.
11        MR. SIBLEY:  That's 5.
12 BY THE WITNESS (resuming):
13   A    Okay.  (Reviewing.)
14   Q    All right, ma'am, just let me know if you have seen
15 this very brief document.
16   A    Is this the yes or no questions only?
17   Q    The request for admission.  That's more or less a yes
18 or no question; right?
19   A    Okay.  Then, yes, I have seen this, yes.
20   Q    Although people do find creative ways to avoid
21 answering these yes or no --
22   A    Okay.
23   Q    -- believe it or not.  Now, you say that -- I mean,
24 the question was, Admit that you had a failing grade in the --
25 in Dr. Hubbard's course --

Page 125

1    A    Uh-huh.
2    Q    -- at the time you dropped the course; right?
3    A    Yes.
4    Q    Okay.  And you claimed here that you just didn't know
5  one way or the other whether that was true; right?
6    A    Right.
7    Q    Okay.  Well, if you didn't complete the midterm, I
8  mean, isn't that a fair inference that you probably didn't pass
9  the midterm?
10   A    I -- I think it is a fair inference that I probably
11 did not pass the midterm.
12   Q    Okay.  And, prior to that, were there any grades that
13 you had in the class, like quizzes or anything like that?
14   A    Oh, I did have a quiz.  I don't remember what I got.
15 I don't think I, like, did particularly bad.  I don't -- I don't
16 remember anything particular about that quiz.
17   Q    Okay.  What do you -- do you -- I mean, we talked
18 about it kind of in -- generally earlier, like, about the --
19 some of the disturbing imagery of the mythological, you know,
20 rape -- the myths of rape and things like that --
21   A    Uh-huh.
22   Q    -- that were the classic myths, but is there anything
23 -- do you have any specific memories of the class even?  Like,
24 anything you can think of, like, sitting here today of, like a
25 specific memory of something that happened in the class?

Sarah Blakemore                                                      May 28, 2021

Page 126

1       MR. PRINGLE: Objection, form, but you can answer
2 if you want.
3 BY THE WITNESS (resuming):
4     A   No, I don't.
5     Q   You just have a general perception of -- or impression
6 of how you felt about the class, I guess.
7     A   Yes.
8     Q   Okay.
9     A   I remember the chairs. That's odd, but I do.
10    Q   Did you -- did you have any friends in the class?
11    A   No.
12    Q   Is there anyone that you can name that was actually in
13 the class with you?
14    A   I knew people -- I -- I met people later on who were
15 in the same class, but I didn't know that they were in that
16 class when I knew them.
17    Q   I see. What was your attendance like at the class?
18 Did you regularly attend, sometimes attend?
19    A   Sometimes.
20    Q   How many times --
21    A   It was once, maybe.
22    Q   Was it once or twice a week?
23    A   Twice a week.
24    Q   So like a --
25    A   It was a Tuesday, Thursday, I think.

Page 127

1     Q   Okay. I was going to say. Tuesday, Thursday. So
2 about how often would you go to class?
3     A   I don't really remember. Maybe not that much. I -- I
4 didn't -- I didn't like Hubbard's class, so it kind of gave me
5 an excuse.
6     Q   Okay. All right.
7       MR. SIBLEY: We're on 6 now; right?
8       COURT REPORTER: Yes.
9 BY MR. SIBLEY (resuming):
10    Q   We'll mark this as Exhibit 6.
11    A   (Reviewing.)
12    Q   Just take a look at that. You don't have to read
13 through the whole thing right now --
14    A   Okay.
15    Q   -- but just tell me generally whether you recognize
16 the document.
17    A   Is this the seven questions?
18    Q   I believe there are seven questions on that.
19    A   Okay. Then, yes, I remember seeing this.
20    Q   Okay.
21    A   This is the...
22    Q   Okay. All right. Let's look at -- let's look at the
23 first interrogatory again.
24    A   Okay.
25    Q   This is asking for persons that you believe may have

Page 128

1 knowledge of relevant facts. Okay? Do you see that?
2     A   Yes.
3     Q   All right. And it looks like we are pretty much in
4 line with the prior document we looked at, the disclosures, up
5 until we get past Ms. Yarrow. Do you see that?
6     A   Yes.
7     Q   All right. And then we see your dad appears as a
8 person with knowledge. Do you see that?
9     A   Uh-huh.
10    Q   Yes?
11    A   Yes.
12    Q   All right. Other than what you've told me about
13 talking to your dad before the flyer went out and in connection
14 with media statements, what other knowledge would you say that
15 your dad has of the facts relevant to this case?
16      MR. PRINGLE: Objection, form.
17      THE WITNESS: What am I --
18      MR. PRINGLE: Just what -- what does he know
19 about -- he's asking what he knows.
20      THE WITNESS: So there's nothing, like,
21 confidential about this?
22      MR. PRINGLE: I don't think so.
23 BY THE WITNESS (resuming):
24    A   Okay. I've -- I think I've talked to my dad a lot
25 because this has caused me some, of course, higher stress. He

Page 129

1 comforts me sometimes, and I think he just tells me that, you
2 know, his friends have heard about what's happening and they
3 also feel for me and are proud of me, too.
4     Q   Okay. How about -- it looks like your mom is next.
5     A   Uh-huh.
6     Q   What -- what knowledge would -- I haven't heard about
7 your mom yet since we've been talking about this. What
8 knowledge would she have of anything relevant to the case?
9       MR. PRINGLE: Same objection.
10 BY THE WITNESS (resuming):
11    A   Just of my emotional state. My mom and I haven't
12 talked about, like, specific details or, like, my specific
13 contentions against Hubbard.
14    Q   Just your mental state, like, based on what -- what --
15 what do you mean by that? Before the flyer went out or after,
16 or what do you mean?
17    A   Well, I mean both. She's my mom. I tell her
18 everything --
19    Q   Okay.
20    A   -- for all of my life.
21    Q   Okay. And I guess your sister. That's your sister;
22 right?
23    A   Yes.
24    Q   All right. What -- what's -- what knowledge would
25 your sister have? The same as your mom, just someone that you

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900      San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Sarah Blakemore                                                    May 28, 2021

Page 130

1  confide things?
2     A   Yeah, uh-huh.
3     Q   Does your sister live here in Austin?
4     A   She does.
5     Q   Okay.  She's older than you; right?
6     A   She is.
7     Q   All right.  Anything else your sister might have
8  knowledge of that we haven't talked about?
9     A   I can't think of --
10         MR. PRINGLE:  Objection, form.
11 BY THE WITNESS (resuming):
12    A   -- anything specific.
13    Q   Okay.  All right.  Jim Davis -- or James Davis.
14    A   Yes.
15    Q   All right.  How did you ever get to meet Jim Davis?
16    A   I was introduced to Jim Davis by a man named
17 Jeff Norwood.  He -- I had told him about moot court and he said
18 that he knew a good lawyer who was with the University of Texas,
19 which was Jim Davis, and he connected us and I asked him some
20 questions about moot court.  That's how I met him, and his
21 deputy counsel, too.
22    Q   Isn't he the head counsel of the -- of UT?
23    A   Uh-huh.
24    Q   Yes?
25    A   Yes.

Page 131

1     Q   Okay.  Who's Mr. Norwood?
2     A   He is just a friend of my father's.  I met him in
3  connection with my father.  I don't know what he does.
4     Q   Okay.  So he just happened to find out that you were
5  interested in moot court and decided to make the intro to
6  Mr. Davis given that you were going to UT, I guess.
7     A   I -- I was trying to register -- I was trying to do
8  something about the registration of the moot-court team and I
9  needed someone from the administration to help me, and so they
10 connected me with Jim Davis.
11    Q   Did you ever meet former President Fenves?
12    A   Yes, I did.
13    Q   When did -- when was the first time you got a chance
14 to meet him?
15    A   I got to meet Dr. Fenves at -- on election night, like
16 the March 3rd election night at the Bob Bullock Museum.  It was,
17 I think, the Texas Independence Day dinner.  It's, like, a gala
18 for the museum, and a law firm that I work with because of moot
19 court, they -- they help us practice, like do -- they run
20 practice rounds with us.  They invited me and I was able to sit
21 at their table.
22    Q   This was March of what year?
23    A   This was, like, right before the pandemic.  It was in
24 2020.
25    Q   Okay.  Prior to that, you had not met President

Page 132

1  Fenves?
2     A   No.
3     Q   Is that someone your dad knew?
4     A   No -- or at least I don't think so.
5     Q   Okay.  All right.  So tell me about what would have
6  been your other interactions with Mr. Davis.  You -- you made
7  contact with him because of the moot court and then --
8     A   Uh-huh.
9     Q   -- what about after that?
10    A   Well, I, of course, spoke to him about this flyer and
11 -- but I was supposed to meet him that day because his -- his
12 friend had a daughter who was coming of age to go to a
13 university and she was touring at the University of Texas and
14 Jim thought I was a nice girl who went to UT and wanted me to go
15 along with their tour on campus, so I did that.  But, yes, I --
16 I gave him the flyer.
17    Q   Okay.  Why did you want to talk to Mr. Davis about the
18 flyer?  Because I think what you said is you tried to contact
19 him before the flyer went out and then just discuss it the next
20 day at lunch.
21    A   Uh-huh.
22    Q   Right?
23    A   I -- before lunch is what I said, but yes.  Sorry.
24    Q   Okay.  So why did you want to talk to him about it?
25    A   I think I wanted to talk to him about what the

Page 133

1  administration's position was on this matter.
2     Q   Which matter was that?
3     A   The -- on the -- to me, problematic scholarship of
4  Dr. Hubbard.
5     Q   Don't you think it would have been advisable to have
6  that conversation before you published the flyer?
7     A   I don't know what you mean by advisable.  I don't --
8     Q   Well, you made comments about what the administration
9  -- that the administration had been made aware and hadn't done
10 anything -- remember? -- on the flyer.
11    A   Right.
12    Q   So don't you think it would have been perhaps useful
13 to have a conversation with Mr. Davis before you put the flyer
14 out to verify what exactly the administration knew and what
15 exactly the complaints were, if any, and kind of vet that
16 allegation?
17    A   I believed that what I was putting out was both my
18 opinion and truthful.  I didn't think about meeting with
19 Mr. Davis beforehand --
20    Q   All right.
21    A   -- but he did confirm what I said about the
22 administration.
23    Q   That the administration what?
24    A   Had had issues with Hubbard before.
25    Q   Over the Mythologies of Rape class?

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900    San Antonio, Texas 78232
210-697-3400                                                  210-697-3408

Sarah Blakemore                                                    May 28, 2021

Page 134

1    A   No, not with that specifically.
2    Q   Okay.
3    A   I don't specifically remember.
4    Q   Okay.  All right.  Did he tell you that Mister -- or
Dr. Hubbard had committed any misconduct?
6    A   No.
7    Q   Okay.  All right.  So you had lunch with him the day
8 you put -- was it the day you put the flyer out or the day
9 afterwards?
10   A   No, it was the day I put the flyer out.
11   Q   Okay.  And you scheduled that lunch with him how --
12 when -- when had you scheduled that lunch with him?
13   A   He scheduled that lunch with me the week prior.  That
14 was the -- we were taking this -- this girl to lunch at the UT
15 Club and her father was coming and then we were going on a tour
16 around the campus.
17   Q   Okay.  So that was -- you were helping, like, recruit
18 someone, I guess.
19   A   Uh-huh, just being a representative of the
20 university --
21   Q   Okay.
22   A   -- like a -- another kid.
23   Q   I see.  So another person showed up at this lunch with
24 Jim Davis on the day the flyer was put out?
25   A   Oh, it wasn't just us, yes.  We -- there was his

Page 135

1 deputy counsel -- I can't exactly remember her name -- I think
2 it's Danae (ph).  The -- the man, the -- the father of the girl
3 and then the girl.  Her name is Samantha.
4    Q   Okay.  So you talked about this -- the issues with
5 Dr. Hubbard with Mr. Davis before lunch?
6    A   Yes, and we didn't talk about it anymore after that.
7    Q   Okay.  How about after -- after that lunch?  Did you
8 have any more discussions with Mr. Davis about Dr. Hubbard?
9    A   No.
10   Q   Okay.  All right.  Who's Lara Korte?
11   A   I believe she's a reporter for the Statesmen.
12   Q   And that's someone you're -- and the same thing with
13 Katie Hall?
14   A   Yes --
15   Q   Okay.
16   A   -- just the people I've talked about -- talked to when
17 they were trying to quote me or something.
18   Q   Okay.  All right.  I know you've got -- I'm just going
19 to -- I want to try to get through this quick.  So the people
20 that you have media entries under, like, Daily Beast, Daily Texan
21 -- do you see that?
22   A   Uh-huh.
23   Q   They don't have any other knowledge or involvement
24 other than the fact that they were working with a media source;
25 right?

Page 136

1    A   Right.
2        MR. PRINGLE:  Objection, form.
3 BY MR. SIBLEY (resuming):
4    Q   Okay.
5    A   No -- no other knowledge.
6    Q   Okay.  All right.  What's Austin Culture?
7    A   That's like a -- that's like a publication.
8    Q   Okay.
9    A   It's like a -- it's -- I had never seen it, but it was
10 a -- it was a publication that contacted me.
11   Q   All right.
12   A   And I -- yeah.
13   Q   What does Abby Raffle know about these issues?
14   A   Abby Raffle is just my very good friend.  She knows
15 about my, like, mental state.  This has caused me whatever
16 stress.  She knew when I got served.  She became my friend after
17 the publication of this flyer.
18   Q   Okay.  Oh, she became your friend after the flyer.
19   A   Like, yeah, we didn't -- we hadn't met before the
20 flyer was --
21   Q   I see.  You met as a result of the flyer.
22   A   No, no, we just met after --
23   Q   Okay.
24   A   -- that time.
25   Q   Okay.  How about Annerose Metaxas?

Page 137

1    A   I don't recall specifically what she knows.  I'm sure
2 she's on this list because I had some text messages with her.
3    Q   Okay.
4    A   But I don't think she knows any -- she doesn't know
5 anything specific about the case or my contention.
6    Q   Just someone that you may have communicated with
7 regarding the subject matter; right?
8    A   Yeah --
9    Q   All right.
10   A   -- whatever subject matter in the broadest terms.
11   Q   Okay.  Autumn, unknown.  Is that someone that texted
12 you or called you?  You had a number on the flyer; right?
13   A   Yes.
14   Q   Okay.  And you got some responses, I guess, via text.
15   A   Uh-huh.
16   Q   Yes?
17   A   I did, yes.
18   Q   How about calling?  Did people call you?
19   A   No one called me.
20   Q   But no one does that anymore; right?
21   A   Yeah, I would not have answered.
22   Q   Okay.  All right.  So Autumn is someone that texted in
23 response to the flyer; right?
24   A   Well, I don't believe so.
25   Q   Oh.

Sarah Blakemore                                          May 28, 2021

Page 138

1    A   I think that maybe this Autumn refers to a friend of
2  Kaya Epstein's, who is a part of Bernie -- Students For Bernie
3  Sanders.
4    Q   Okay.  And this -- she would have knowledge -- I mean,
5  I -- I --
6    A   (Crosstalk.)
7    Q   -- I want to get through this quick.  I don't want to
8  waste our time here --
9    A   I understand.
10   Q   -- so what I'm going to ask you is, like, other than
11  someone that you spoke to about some of the stuff we've talked
12  about, is there anything else they know?
13   A   No.
14       MR. PRINGLE:  Objection, form.
15  BY MR. SIBLEY: (resuming)
16   Q   That you know -- that you're aware of anyway.
17   A   Yes.
18   Q   Okay.  Ava Floyd?
19   A   She doesn't know anything.
20   Q   Okay.  You're -- you're a sorority -- you're in a
21  sorority, I guess.
22   A   Yes.
23   Q   Which sorority are you in?
24   A   Delta Gamma.
25   Q   Brandon?

Page 139

1    A   I -- I don't even remember who this person is.  They
2  don't know anything --
3    Q   Okay.
4    A   -- I don't think.
5    Q   Brittany Blackshear, that's one of the founding
6  members of Students For Safety; right?
7    A   Sure.  Founding, I -- yeah, she's one of the --
8    Q   Okay.
9    A   -- just the members.
10   Q   All right.  Brooklyn Rodgers?
11   A   She's just a moot-court friend.  She doesn't know
12  specifically anything.
13   Q   All right.  Chelsea Colmer?
14   A   She's just a friend.  She doesn't know anything
15  specific, I don't think.
16   Q   Christopher, unknown?
17   A   Same thing with this kid.
18   Q   Who was the one that actually helped you distribute
19  the flyer in Dr. Hubbard's class on the day of the event?
20   A   Ms. Blackshear.
21   Q   Ms. Blackshear.  Okay.
22   A   Uh-huh.
23   Q   All right.  Christi Walsh?
24   A   Oh, this was a coworker of mine.  I just let her know
25  that I was being sued, and that it -- it -- I mean, it added a

Page 140

1  little bit to my workload.  I was -- because I had to make all
2  of this stuff.
3    Q   Where did you work?
4    A   I was -- I was doing an internship at Johns Hopkins.
5    Q   Like, medical stuff?
6    A   Like medical -- like, university-policy and
7  medical-policy research.
8    Q   Okay.
9    A   Sorry.  We did a report on the hospitals in Texas
10  suing patients, like predatory billing.
11   Q   I -- I understand.  Okay.  All right.  Emi Fukumura?
12   A   She is just a sorority sister of mine.  She doesn't
13  know anything specific.
14   Q   Ethan Glass?
15   A   He's just a friend of mine, doesn't -- nothing
16  specific.
17   Q   Farah Hashim.
18   A   Farah is -- was also a coworker with me with Christie,
19  but she doesn't know anything specific either.
20   Q   Ilana Vines?
21   A   She is my sorority sister, doesn't know anything
22  specific.
23   Q   Isabell Paine?
24   A   She is my friend, and I don't think she knows anything
25  specific.

Page 141

1    Q   Jack Linder?
2    A   He is my friend, and I don't think he knows anything
3  specific.
4    Q   Jan Schuler?
5    A   He is my friend, and he doesn't know anything
6  specific.
7    Q   Jin, unknown?
8    A   If -- if this -- I don't recognize this person.  It's
9  probably one of the people who just texted me in connection with
10  the flyer.
11   Q   Okay.  Josh Durham?
12   A   This is just my friend.  He just -- I had just told
13  him I was distributing the flyer.  He didn't know anything about
14  it.
15   Q   Okay.  Joao Mitchell?
16   A   This is just my very good friend.  He just knows my
17  mental state --
18   Q   Okay.
19   A   -- this whole thing.
20   Q   Juliana Steward?
21   A   This is -- I have already mentioned Ms. Steward.
22  She's my friend who is friends with Hollie as well, but she
23  doesn't -- I don't talk about her --
24   Q   Got it.
25   A   I don't talk to her about this.

Sarah Blakemore                                                    May 28, 2021

Page 142

1   Q   All right.  We know about Kaya Epstein.
2   A   Yes.
3   Q   Kevin O'Connor?
4   A   Just a friend in LA.
5   Q   Leslie, unknown?
6   A   This might have been one of the -- I -- I don't
7   recognize this person, that they don't -- they don't know
8   anything from me, but this might have been one of the people
9   that contacted me on Facebook, maybe.
10  Q   All right.  Lauren Tran?
11  A   I don't -- I don't specifically know who this person
12  is.
13  Q   Lorna Barrall?
14  A   This is just a friend from high school.  She doesn't
15  know anything specific.
16  Q   Lynn, unknown?
17  A   Oh, this woman is -- was part of CASM and she was --
18  she was in a meeting with me once where we talked about
19  Dr. Hubbard, but she doesn't know anything specific about the
20  contentions I have in this case.  The concerns were that
21  Dr. Hubbard was going to start suing people, and that's what
22  they were saying to me.
23  Q   Okay.  Maha Ikram?
24  A   I don't know who this person is, so I -- I assume it's
25  just one of the random people who texted me.

Page 143

1   Q   Manya Shah?
2   A   She's the roommate who asked about the flyer when it
3   was printing off our printer, as I said before.
4   Q   Your roommate; right?
5   A   Yes.
6   Q   Yeah, all right.  Maren Altman?
7   A   Maren is my friend who I said made a grammatical fix.
8   This is my -- this is my best friend.  She doesn't know anything
9   specific about this besides my emotional state.
10  Q   All right.  Mark Schuster?
11  A   I don't really know who this person is, so they don't
12  really know anything specific from me.
13  Q   Marshall Theis?
14  A   This is an old friend of mine.  He doesn't really know
15  anything specific.
16  Q   Matt Terrill?
17  A   Oh, wait, wait, wait.  He was in that meeting with --
18  with Lynn.  He was -- he was just with me that day and he
19  happened to sit in the meeting in the back of the library.
20  Q   This was the one where they said, Hubbard sues
21  people --
22  A   Yes.
23  Q   -- or threatens to sue people; right?
24  A   Yeah.  I believe there was, like, an agenda that was
25  produced to you along with my text messages.

Page 144

1   A   Yep.
2   A   That was the -- that was this meeting.
3   Q   Okay.  Marshall Theis?
4   A   Right.  Marshall Theis is the one who was in the -- in
5   the room when we had the meeting.
6   Q   Oh.  What about Mark Schuster?
7   A   That's the person I don't think I know.
8   Q   Okay.  Matt Terrell?
9   A   This person just doesn't know really much stuff
10  specific besides when I was distributing the flyer.
11  Q   Mei --
12  A   He's a friend of mine.
13  Q   -- Robson?
14  A   I don't know who this person is.  It's probably one of
15  the people who just randomly texted me.
16  Q   Michael, unknown?
17  A   I -- given -- yeah, I think this is one of the people
18  who randomly texted me.
19  Q   Morgan Thompson?
20  A   This is one of my neighbors, and she doesn't know
21  anything specific about this.
22  Q   Muho Choi?
23  A   This is a classmate, and he doesn't really know
24  anything specific.
25  Q   Nathaniel Lawson?

Page 145

1   A   This is a friend who I was actually with when I found
2   out I was being sued, but he doesn't know anything specific.
3   Q   Okay.  Noah Trapolino?
4   A   This is my friend, and he doesn't really know anything
5   specific.
6   Q   Nuvea?
7   A   I don't think I know who this person is, so I assume
8   it's one of the people who texted me.
9   Q   Pallavi?
10  A   I also think I don't know this person, so I --
11  Q   Okay.
12  A   -- I'm going to say the same thing.
13  Q   Patricia, unknown?
14  A   This is the person who was a -- part of Popular
15  Women's Movement, I believe.
16  Q   Okay.  How did you meet Patricia?
17  A   Sit Ins for Safety 2, maybe.
18  Q   Okay.  So how did they -- how did you know that she
19  was with the Popular -- poplar (ph) or Popular, whatever,
20  Women's Movement?
21  A   I think she gave me a publication.  They print, I ke,
22  flyers and stuff that was Popular Women's Movement on it.
23  Q   What did they -- did you keep the flyer?
24  A   No, no, I didn't.
25  Q   Would that have been recycled?

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900      San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Sarah Blakemore                                                    May 28, 2021

Page 146

1   A   I don't know when it was.
2   Q   Would it have been recycled or it would have been
3 something that you didn't even take with you?
4   A   I -- I think it -- I don't remember even having it for
5 long, so I -- I think it would have been discarded before.
6   Q   How'd -- how'd you get her number?
7   A   She gave it to me.  I -- I think I told her that -- I
8 don't exactly remember when I got her number, but I told her
9 that I was going to -- that I had found some stuff that
10 concerned me about Dr. Hubbard's publications and that I was
11 going to distribute a flyer, and she knew I was going to
12 distribute the flyer.  She didn't read it beforehand, but she
13 volunteered to have someone come help me pass them out, but they
14 never showed up.
15  Q   Okay.  What did you know about the organization at
16 that time?
17  A   Not really much besides I thought they were just very
18 far to the left.
19  Q   Okay.  Did you know whether they identified as a
20 Marxist group?
21  A   I know now that they identify as a Marxist group
22 because I -- like, somebody was passing out, like, Marxist
23 newspapers at a coffee shop I was at, and I -- I just like
24 rhetoric and I wanted to read it so I got it, and I -- I asked
25 them if they were in connection with Popular Women's Movement

Page 147

1 and they said yes, so I did know now that they're a Marxist
2 group.
3   Q   When did that happen, the coffee-shop thing?
4   A   Like, maybe in March.
5   Q   Okay.  Okay.  You just knew they were, like, pretty
6 far to the left, as you say; right?
7   A   Uh-huh.
8   Q   Would you consider yourself -- would you consider
9 yourself a Marxist?
10  A   No, no, I wouldn't.
11  Q   Okay.  I believe I saw something that says you would
12 consider yourself a Democrat, I guess; right?
13  A   I -- I vote in Democrat primaries.
14  Q   Okay.  Was there --
15  A   I don't use that word for myself.
16  Q   All right.  Was there a time that you identified, I
17 guess, as, like, a Republican or someone to the right?
18  A   No.  I have actually never done that until more
19 recently as I've been learning more about monetary policy.  I've
20 been feeling a little bit more conservative.
21  Q   Okay.  Well, there's certainly no --
22  A   But I've never voted in the Republican primary.
23  Q   Okay.
24  A   Yeah.
25  Q   Okay.  Gotcha.  Well, there's certainly no --

Page 148

1 certainly no secret that your dad is -- I mean, I guess it's
2 theoretically possible he could be a Democrat or a liberal and
3 assist Republicans to hold office, but chances are -- I mean,
4 it's not -- it's not an unfounded assumption to believe your dad
5 is a pretty red Republican.  Is that fair?
6   A   Yes, he is a pretty red Republican.
7   Q   All right.  Where -- where did we leave off?  Oh,
8 Patricia.  She's the Popular Women's Movement person; right?
9   A   Yes.
10  Q   All right.  Is there anyone else -- any other names
11 you remember with this Popular Women's group?
12  A   No, I didn't really -- I -- I never met with them in
13 person.  I know that there was another person who was taller
14 than Patricia, and I think she was Asian American.  That's the
15 only thing I remember --
16  Q   Okay.
17  A   -- about the group at all.
18  Q   Okay.  Well, do you have any knowledge of whether or
19 not that group or movement or whatever they call themselves had
20 any role in attacking Dr. Hubbard's house?
21  A   I do not know that.  I -- I didn't know that at the
22 time and, yeah, they have -- they have a post on their Instagram
23 that actually has them at Dr. Hubbard's house, but it doesn't --
24 I don't know who was involved.
25  Q   Okay.  Have you heard from anyone that that group or

Page 149

1 that movement was involved in vandalizing Dr. Hubbard's house?
2   A   Have I heard from anyone that -- what?
3   Q   That that group, Popular Women's Movement, was
4 involved in vandalizing Dr. Hubbard's house.
5   A   Did anyone tell me?  No one told me --
6   Q   Okay.
7   A   -- that they did that.
8   Q   Okay.  Have you heard that there's been a suggestion
9 or allegation since then that that group was responsible?
10  A   I -- I saw that in, I think, maybe the -- the document
11 against Zoe Thomas.
12  Q   Okay.
13  A   That was, like, a part of your case.
14  Q   Okay.  When was the last time you had any
15 communication or contact with that group or anyone from that
16 group that you know of?
17  A   Oh, gosh.  Before -- maybe even before I withdrew from
18 the university.  I did not speak to them.  I was not
19 particularly fond.
20  Q   Okay.  All right.  Priscilla Mach?
21  A   That is just my friend.  I -- she doesn't know
22 anything specific.
23  Q   Ricky Aguirre?
24  A   Same thing.
25  Q   Riley Steward?

Sarah Blakemore                                              May 28, 2021

Page 150

1    A   Same thing, too.
2    Q   All right.  Sam Ross --
3    A   Uh-huh.
4    Q   -- we know who that is, but what is your relationship
5  history with Sam Ross?
6    A   Identical to that with Ms. Thomas:  I met him only
7  once when we got the litigation notices, and it was at the same
8  coffee shop where they passed out the Marxist newspaper
9  actually, Cherrywood, but I met them, like, in February when it
10 came out, but I haven't seen them since.
11   Q   Okay.  So you -- you -- you had a meeting with them
12 after the -- after the notices went out --
13   A   Yes.
14   Q   -- y'all had a meeting.
15   A   Uh-huh.
16   Q   And that's when -- the only time you've met them?
17   A   Yes.
18   Q   Okay.
19   A   We -- we had a -- we had a group message -- I think we
20 produced some of that to you --
21   Q   Right.
22   A   -- yeah, but I -- I didn't outside of that group
23 message and that interaction.
24   Q   So that was the same day they passed out the Marxist
25 newspaper at the --

Page 151

1    A   No, no, it was not the same day.
2    Q   Okay.  Okay.  Sam Somogye?
3    A   Just a friend, doesn't really know anything.
4    Q   Samantha Saenz?
5    A   Just -- I actually think this is the girl who was
6  touring the University of Texas that day, but she -- we
7  definitely didn't tell her.  That's why I wanted to talk
8  business beforehand, because I didn't want to ruin this girl's
9  trip to the University of Texas.
10   Q   Well, it looks like she did contact you, though,
11 afterwards and said, Hey, what's going on with this Hubbard guy.
12   A   I don't remember that --
13   Q   Okay.
14   A   -- but, I mean, if it's here, then that's the case.
15   Q   All right.  Sherron Watkins?
16   A   This is just my friend's mother, and she just told me
17 she was proud of me about this case.
18   Q   All right.  Shelby Hobohm.  We talked about her;
19 right?
20   A   Yes.
21   Q   All right.  Simone Harry?
22   A   She is a friend of Lynn's and was in this CASM thing
23 and was also in that meeting.
24   Q   All right.  Sloan Soler?
25   A   This is my neighbor, and she doesn't know anything

Page 152

1  specific.
2    Q   All right.  Will, unknown?
3    A   I don't know who this person is, probably one of the
4  random people who texted me.
5    Q   All right.  And then there's, like, someone unknown
6  person that contacted you, Point you in -- point them in -- to
7  any information about Dr. Hubbard.  Do you see that?
8    A   Oh, yes.  This is one of the random people who texted
9  me, but they -- they said to me that they wanted to get out of
10 Hubbard's class and I think I just told them that they needed to
11 contact student emergency services, because that's who had
12 contacted me when this whole thing began.
13   Q   All right.  So this is someone that was in his class,
14 like, in the fall of 2019?
15   A   Maybe, yeah.
16   Q   Okay.  Yeah, I think this person -- yes, that is the
17 case.  Sorry.
18   Q   All right.  Look at the Interrogatory Number 3 --
19   A   (Reviewing.)  Uh-huh.
20   Q   -- and we ask:  Identify all of the materials or
21 sources that you --
22   A   Uh-huh.
23   Q   -- read, reviewed, relied on in authoring the flyer.
24 Do you see that?
25   A   Yes.

Page 153

1    Q   All right.  Is there anything -- is there anything
2  else that's on this -- that should be on this list that's not on
3  this particular document that you can think of sitting here
4  today?
5    A   No, sir, I cannot think of anything.
6    Q   Okay.  So basically the only publications that it
7  looks like you've reviewed of Dr. Hubbard's are the Greek Love
8  Reconsidered, the Sexual Consent of the Adolescent Male and
9  Boys' Sexuality and the Age of Consent.  Do you see that?
10   A   Those are the ones that I remember, yes.
11   Q   Okay.
12       THE WITNESS:  Can we come to a stopping point
13 soon?  I want to use the restroom and stretch my legs.
14       MR. SIBLEY:  Yeah.  Let's just finish this
15 document --
16       THE WITNESS:  Okay.
17       MR. SIBLEY:  -- we're almost done, and then we
18 can go.  Okay?
19       THE WITNESS:  Okay.  Thank you.
20 BY MR. SIBLEY (resuming):
21   Q   Let's see.  I'm really not trying to be ugly here, but
22 you have a Instagram handle that says Blake whore?
23   A   Yes, sir, I do.
24   Q   Okay.  I mean, what's -- is that -- is that like a
25 joke or what is that?

Sarah Blakemore                                              May 28, 2021

Page 154

1    A   When I was in middle school, like, little mean middle
2  school boys made fun of my last name and said that, and so it's
3  kind of funny.  It's like a little -- my friends know it if they
4  grew up with me.
5    Q   Okay.  Okay.  That's not something you use, I guess,
6  even -- you don't -- do you use it anymore or...
7    A   It's a -- it's a private profile.  Yeah, I do use it.
8    Q   Okay.  Did you -- did you search all of these -- if
9  you look at Interrogatory Number 5, did you search all of these
10  for communications that were requested in this suit?
11    A   Did I search all of these social-media accounts?
12    Q   Yes.
13    A   I -- yes, I did, but I don't use social media to
14  message people.  I don't like the format, and I don't let social
15  media send me notifications --
16    Q   Okay.
17    A   -- so it's hard.
18    Q   All right.  So -- so you -- but did anyone message you
19  on those social-media accounts?
20    A   Someone messaged me on Facebook, but I didn't speak to
21  them about this case.  They were just saying that they were,
22  like, praying for me.  It was odd.
23    Q   Got it, got it.  Okay.  All right.  I think the next
24  thing is just a repeat of everything we had before, so...
25    A   Okay.

Page 155

1    Q   And then --
2        MR. SIBLEY:  All right.  I think we're done with
3  this document, so we can take a break -- restroom break.
4        THE WITNESS:  Okay.  Thank you.
5        VIDEOGRAPHER:  We are off the record at 2:45.
6        (A recess is taken.)
7        VIDEOGRAPHER:  We are back on the record at 3:01.
8  BY MR. SIBLEY (resuming):
9    Q   All right.  We're on Exhibit 7 now, and I just want to
10  look at the very first interrogatory on that one.
11    A   (Reviewing.)
12    Q   Do you see there it's asking about Students For
13  Safety?
14    A   Uh-huh.
15    Q   And you say in the interrogatory --
16    A   I'm sorry.  Yes.
17    Q   I'm sorry?
18    A   Yes.  I said uh-huh.  Sorry.  I was trying to correct
19  myself.
20    Q   It's okay.  You were saying that Students For Safety
21  is basically no longer active.
22    A   Yes, I am.
23    Q   So what exactly did they do?
24    A   Not much.  We had bigger plans, but I had to bow out.
25    Q   What were the plans?

Page 156

1    A   Which was the rally.
2    Q   The rally that going to call for the removal of
3  Dr. Hubbard?
4    A   Yes.
5    Q   When was that supposed to take place?
6    A   We never got a date for it, I don't believe.
7    Q   Okay.  Wasn't there some rally that was planned and
8  like -- I mean, there was nothing, no kind of rally about
9  Dr. Hubbard that anyone went to or held?
10    A   Not that I organized.
11    Q   Maybe I'm mixing --
12    A   I don't think that I made a rally.
13    Q   All right.  So y'all were planning a rally, but never
14  actually held one.
15    A   Yeah, I think they -- I -- they went to Sit In For
16  Safety.  That's maybe what you're thinking of.
17    Q   Okay.  Did any of the other people that were -- you
18  identified as being involved with Students For Safety, what --
19  what did they do?  Like, what was -- what did they do with
20  respect to Dr. Hubbard?
21    A   Brittany helped me make the social media.  She, like,
22  made the Twitter account for me, and I think Kaya just helped --
23  because we were going to do, like, a -- oh.  We were going to do
24  a letter to the -- to the parents, like a letter to the student
25  -- I wrote a letter to the student body.  Did you see that?

Page 157

1    Q   I believe so.
2    A   Okay.  I wrote a letter to the student body and we
3  were going to write a letter for, like, parents to be able to
4  sign to the university, like, make a template.  I know Kaya
5  worked on something like that, and Hollie -- Hollie didn't
6  really do very much either.
7    Q   Okay.
8    A   We had -- we all had the same idea, we just didn't do
9  much.
10    Q   I understand.  Okay.  All right.  Let's move on.
11  Exhibit 8.
12    A   (Reviewing.)  Uh-huh.
13    Q   Just take a look at that and tell me if you recognize
14  the document.
15    A   This, if I'm correct, is when Ms. Yarrow sent me the
16  correspondence that Hubbard sent her.
17    Q   This is -- oh, hang on a second.  I'm on the wrong
18  page.  This is the document Bates Label 215; right?
19    A   Blakemore 215, yes.
20    Q   Yes, that's right.  Okay.  So this was the -- the
21  E-mail introduction to Ms. Yarrow; right?
22    A   Uh-huh.
23    Q   Okay.  All right.  Did you ever have any phone call
24  with Ms. Yarrow?
25    A   No.



Page 158

1 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Page 160

1 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

6    Q   Okay.  All right.  All right.  Let's look at

7  Exhibit 9.  (Provides exhibit.)

8 ▆▆▆▆

21  BY MR. SIBLEY (resuming):

22    Q   That's the letter that Ms. Yarrow sent; right?

23    A   Yes, the one that Dr. Hubbard wrote to her.

24    Q   And did you -- I mean, did you review this letter or

25  is this just something you passed on to your attorney?

Page 161

1    A   I believe I remember reading some of this.

2    Q   Okay.  But this wouldn't have been until around the

3  time of this E-mail, I guess, in --

4    A   Right, of course.  I would not have read this until

5  like -- until Ms. Yarrow contacted me, but you have those

6  E-mails.  I don't know what the date was --

7    Q   Got it.

8    A   -- on that.

9    Q   Got it.  Okay.  All right.  Let's look at Exhibit

10  Number 10.

11    A   (Reviewing.)

12    Q   Refresh me on the Bates label on that, if you don't

13  mind, Ms. Blakemore.

14    A   On the -- what -- what -- is that --

15    Q   The -- the number that's on the bottom of it.

16    A   It's cut off.

17    Q   Oh, is it?  All right.  Well, these are the -- oh,

18  these are the -- these are documents -- or text messages we

19  received.  I can't remember if -- it may not have been from you.

20  It may have been from Mr. Davis.

21        MR. PRINGLE:  Ross, did y'all get the production

22  from Davis and UT?

23        MR. PRINGLE:  I think so, but I'm not sure.

24        MR. SIBLEY:  I think these messages are in other

25  documents you produced, more or less.

Sarah Blakemore                                          May 28, 2021

Page 162

1    THE WITNESS:  Well --
2    MR. SIBLEY:  Sorry.  Go ahead.
3    THE WITNESS:  I'm sorry.  The blue side is --
4 would be me talking.  The blue side would be the person talking,
5 and it's Sarah, this is Jim Davis, so it's them.
6    MR. SIBLEY:  Okay.  So it's -- it's from him.
7 Okay.
8    THE WITNESS:  Yes.
9    MR. SIBLKEY:  Well, I think you guys had
10 produced these communications more or less in some other
11 documents that we -- that we had, so why don't we -- let's just
12 leave that as it is and I'm not going to ask questions on it
13 because I want to make sure that -- I mean, is that a document
14 that you've seen before?  Ross, have you seen this document
15 before?
16    MR. PRINGLE:  Let me look at it.  (Reviewing)
17    THE WITNESS:  I, of course, know it.
18    MR. SIBLEY:  Well, I mean, if she can say that
19 this looks like an accurate representation of the
20 communications, I'm -- I'm assuming we'd be okay with it, but...
21    MR. PRINGLE:  I don't remember seeing these.  Do
22 you?
23    MS. MARSOLAN:  No.  Do you -- do you know what
24 the Bates numbers are for that production?
25    MR. SIBLEY:  Yeah, that's -- that's -- it's

Page 163

1 called Davis -- what's the Bates number -- Davis 000018.
2    MR. PRINGLE:  That's right?
3    MR. SIBLEY:  Yes, that's right.  That's the Bates
4 number.
5    MR. PRINGLE:  Weren't they produced in this kind
6 of multiple-page format?
7    MR. SIBLEY:  Yes.
8    MR. PRINGLE:  Okay.
9    MR. SIBLEY:  Somehow it got cut off.  It's --
10 it's -- the Bates label is at the very, very bottom.
11    MR. PRINGLE:  I see, yeah.
12    MR. SIBLEY:  And it's -- it's also got a FERPA
13 designation on it, so we should probably designate these as
14 confidential under the protective order, so...
15    MR. PRINGLE:  I haven't --
16    MR. SIBLEY:  I'm not really -
17    MR. PRINGLE:  -- really seen the Davis documents
18 yet.  Have I?  Do I have them yet?
19    MR. SIBLEY:  I -- I thought they sent them to all
20 of us, but maybe not, so...
21    MR. PRINGLE:  Okay.
22    MS. MARSOLAN:  Yeah.
23    MR. PRINGLE:  Okay.  We do have them.  Yeah, we
24 have them.
25    MR. SIBLEY:  Okay.  Well, this is a communication

Page 164

1 between these two -- or Ms. Blakemore and Mr. Davis.
2    THE WITNESS:  Uh-huh.
3    MR. SIBLEY:  I think -- like I say, we have
4 communication, text messages, that's produced in a different
5 form.  It's not the screenshots, but I think we have essentially
6 the same thing in another document, but I'm -- let me -- can I
7 just ask her whether this, to her recollection, is an accurate
8 representation of those communications?  It's just an easier way
9 to talk about them rather than the other document that has them
10 kind of, like, on a -- it's just a different format, but...
11    THE WITNESS:  Is that a yes, Ross?
12    MR. PRINGLE:  No, you -- I think he's asking you
13 to look at them and ask [sic] him if it's a accurate
14 representation of your --
15    THE WITNESS:  Yeah, this --
16    MR. PRINGLE:  -- text communications with Davis.
17    THE WITNESS:  This seems like it's it --
18    MR. PRINGLE:  Okay.
19    THE WITNESS:  -- from a cursory glance (ph).
20 BY MR. SIBLEY (resuming):
21    Q    All right.  So it looks like y'all first got put in
22 contact around August of 2019.
23    A    Yes, Jeff Norwood here, like I mentioned before.
24    Q    Right.
25    A    Sorry.

Page 165

1    Q    Right.  Okay.  All right.  And it looks like most of
2 the discussion in August and September really relates to moot
3 court; correct?
4    A    Yes.
5    Q    Okay.  And let's go to -- I'm trying to find the date.
6 These aren't the most -- it's not the most --
7    A    Yeah.
8    Q    -- legible document here, but it looks like on -- it's
9 on the second page.  On -- it's Davis 19 for those of us who can
10 see Bates numbers, but it says:  I'm planning a lunch on
11 Thursday the 21st.  Do you see that?
12    A    Yes.
13    Q    And that's the Meredith --
14    A    Oh, Meredith came, too.
15    Q    That's Mr. Norwood's daughter, I guess.
16    A    Yes.
17    Q    Is she a student at UT?
18    A    Yes, she is.
19    Q    By the way, these Popular Women's group people, are
20 they students at UT?
21    A    I saw them at UT.  I have no idea.
22    Q    Well, I mean, when I was there, there was all sorts of
23 people I saw that roamed around the campus.  I don't know that
24 they were necessarily students, but...
25    A    Right.  I don't know if they were students.

Sarah Blakemore                                        May 28, 2021

Page 166

1    Q   Okay.  Okay.  Do you know anyone that knows them?
2  Like, anyone -- any friends of yours that are mutual friends.
3    A   I think maybe Hollie knew them.  I don't know.
4    Q   Okay.  All right.  So it looks like on November 6th,
5  Mister -- Mr. Davis tells you he's planning a lunch.  Do you see
6  that?
7    A   Uh-huh.
8    Q   He's going to invite Ms. Norwood.  Do you see that?
9    A   Yes, sir.
10   Q   And he's wanting Samantha, which is the young lady you
11 referenced earlier, to -- to join in the lunch; right?
12   A   Yes.
13   Q   Did you plan the distribution of the flyer to coincide
14 with that lunch day?
15   A   No, I did not.  This just --
16   Q   Why --
17   A   -- happened.
18   Q   Why -- why -- I mean, why did you pick that day?
19   A   I think it just worked with my schedule.  I don't
20 think there was anything particular about it.
21   Q   Okay.  Okay.
22   A   I don't remember anything specifically special about
23 it.
24   Q   All right.  It looks like on the next -- no, it's the
25 same page.  It's on the bottom of that page.  There was some --

Page 167

1  a text message on November 19th.  Do you see that?
2    A   The last frame?
3    Q   Yes?
4    A   Yes.
5    Q   And it looks like Mr. Davis says:  Still good for
6  lunch at the UT Club?
7    A   Yes.
8    Q   Okay.  Had you mentioned anything to Mr. Davis -- had
9  you even met Mr. Davis yet?
10   A   Yes, I met him once at -- at the UT Club as well.  I
11 had lunch with him and Danae when I met them about moot court.
12   Q   Okay.  Is this the only way you communicated with them
13 is by text message or did you -- yeah, I think you had E-mails,
14 too, didn't you?
15   A   I -- I might have, yes.
16   Q   Okay.  All right.  So that was on the 19th, and then
17 it looks like you -- you confirm that you will be there at 11:30
18 on the -- on the 21st.  Do you see that?
19   A   (Reviewing.)
20   Q   It's on the third page.
21   A   I'll be at your office at 11:30 -- yes, sir, I do.
22   Q   It sounds like a lovely time; right?
23   A   Yes.
24   Q   All right.  And did you know that at that point you
25 were going to distribute the flyer on the 21st?

Page 168

1    A   Is this -- what day is this?
2    Q   The 19th is what the -- is what it shows to me.
3    A   I really don't know.
4    Q   Well, the next -- if you look at the next frame over,
5  it says, Mr. Davis, would you mind terribly if I came by your
6  office at 11 a.m.  I wanted to talk to you about something
7  before we have lunch.
8    A   Well, then, I -- yeah, that was -- that had to do with
9  the flyer.
10   Q   Okay.  So certainly by November 20th at 9:50-whatever
11 p.m., you knew that; right?
12   A   Yes, sir.
13   Q   All right.  Tell me about the actual distribution of
14 the flyer.  And, you know, we have it a little bit easier here
15 because you were present for Dr. Hubbard's deposition, and did
16 you hear -- did you hear him give the account of his
17 interactions with you on that day?
18   A   Yes, I do remember that.
19   Q   All right.  Is there anything about those interactions
20 that you disagree with or have a different recollection of?
21         MR. PRINGLE:  Objection, form.
22 BY THE WITNESS (resuming):
23   A   I know that I did not have balloons.
24   Q   There were no balloons.
25   A   Right.

Page 169

1    Q   Okay.
2    A   But that seemed about accurate to me.
3    Q   All right.
4    A   He -- I handed him the flyer, he told me it was
5  libelous, I said he could call my attorney or sue me or -- I
6  don't remember the specific detail, and then he asked me if I
7  had a bad grade in his class and insinuated that I would have a
8  bad grade in his class because I was unintelligent.  That was
9  it.
10   Q   Well, he didn't say that you were unintelligent,
11 though, did he?
12   A   No.  I don't think he used the word unintelligent.  I
13 think he -- I mean, I came away from the conversation thinking
14 that he called me stupid, so I -- I don't know specifically.
15   Q   All right.  But he said -- so he asked what your grade
16 in the class was.
17   A   Yes.
18   Q   That -- that was true.
19   A   Yes, that is true.
20   Q   And your response was what?
21   A   I dropped your class.
22   Q   Okay.  And what else -- what did he say after that?
23   A   I don't really have a good recollection of it.  If --
24 have I said that he said it was libelous?
25   Q   Okay.  Where all did you hand out the flyer?  Was it

Sarah Blakemore                                                              May 28, 2021

Page 170

1 just outside of his class?
2    A    Just right in front of the doors.
3    Q    Anywhere else?
4    A    No.
5    Q    How did the media get ahold of this -- of the fact
6 that you had distributed a flyer?
7    A    I sent it to them.
8    Q    How did you have a contact at the Statesman?
9    A    I just sent it to the Austin -- like, Info Austin
10 American-Statesman.
11    Q    Did your --
12    A    I just got the -- their E-mails off their websites,
13 like, you know, the very general contact E-mail.
14    Q    Who else did you send it to besides the Statesman?
15    A    I sent it to the Houston Chronicle, the Austin
16 American-Statesman, the San Antonio Express Times, the Dallas
17 Morning News and the Texas Tribune.
18    Q    Did anyone give you contacts at those media outlets
19 for you to use?
20    A    Maybe my father tried to give me media contacts, but I
21 didn't use them, I don't think. I think I just used the general
22 E-mails.
23    Q    Okay. Did you -- did you identify yourself as -- I
24 mean, how did you identify yourself, I guess, when you sent the
25 E-mails?

Page 171

1    A    I have an E-mail signature that just has my name and
2 my pronouns and says University of Texas.
3    Q    Okay. All right. When was the first you heard from
4 any media outlet after you distributed the flyer?
5    A    I don't really have a clear recollection of that.
6    Q    Okay. All right. So the morning of the flyer
7 distribution, before y'all had lunch --
8    A    Uh-huh.
9    Q    -- you had a meeting with Mr. Davis about, I guess,
10 your complaints about Dr. Hubbard; right?
11    A    Yes.
12    Q    All right. Is that the first time you talked to him
13 about Dr. Hubbard at all?
14    A    Yes, I think so.
15    Q    Okay. What did he tell you about Dr. Hubbard besides
16 what you told me earlier about there had been some issues with
17 him with the faculty or -- or the department or something like
18 that?
19    A    We didn't talk about Dr. Hubbard after that. He just
20 explained to me -- or he tried to explain to me the law of --
21 the regent's rules.
22    Q    Which were what?
23    A    That protect a professor's speech at the University of
24 Texas. There's special rules --
25    Q    Okay.

Page 172

1    A    -- that were, like, made in, like, the 1800s or
2 something.
3    Q    Do you think Dr. Hubbard's speech should be protected,
4 his writings?
5        MR. PRINGLE: Objection, form.
6 BY THE WITNESS (resuming):
7    A    That depends on what writings you say, but I -- I
8 generally think that scholarships should be protected.
9    Q    Well, any of Dr. Hubbard's writings that you've read,
10 do you think they should be illegal or something?
11    A    I think that it would be quite crazy to start banning
12 people's publications. I don't think they should be illegal.
13    Q    Okay. But you think that based on -- I mean, if I'm
14 reading the flyer correctly -- maybe I'm not -- but based on the
15 flyer, it appeared as though you wanted Dr. Hubbard to be
16 removed from the university based on his scholarship; correct?
17    A    Yes. Based on his attitude about it, yeah.
18    Q    Well, what do you mean his attitude about it?
19    A    Just that -- I mean, there's a -- just that he
20 promotes it. That's his attitude to me, and not just talks
21 about pederasty. No one should be kicked out of anything for
22 just exploring a concept.
23    Q    Okay. So it's a combination of you reading his
24 writings and your experience in his class. Is that fair?
25    A    Yes.

Page 173

1    Q    All right. Okay. So it looks like you sent him some
2 -- well, there was a rally. I guess you --
3    A    It was just -- well, I just call it a rally.
4    Q    But you mean the handing out of the flyer?
5    A    Yes, it's about our rhetoric.
6    Q    Okay. And it looks like on -- later on November 21st,
7 I think I'm on Page 4 now, maybe 5 --
8    A    Okay. Would you give me a date?
9    Q    Yeah, it's November 21st at 5-something p.m.
10    A    Yes.
11    Q    It looks like he says, Thanks, the Provost mentioned
12 to me that the protest was well organized and respectful. Your
13 rules of engagement are clearly helpful in getting your voices
14 heard. Do you see that?
15    A    Yes, sir.
16    Q    Is he just talking about handing out the flyer?
17    A    I believe he was talking about one of the sit-ins for
18 safety and not about the flyer, but I couldn't tell you for
19 sure.
20    Q    Did you organize the sit-in for safety?
21    A    No, I did not.
22    Q    Okay. Then why is he talking about that with respect
23 to you, I guess?
24        MR. PRINGLE: Objection, form.
25 BY THE WITNESS (resuming):

Sarah Blakemore                                                            May 28, 2021

Page 174

1    A   I just think he knew I was there and that I was
2  involved. I -- yeah.
3    Q   Okay.
4    A   I don't really remember a lot about this.
5    Q   Okay.  And it looks like on the lower portion of the
6  -- of the screenshots on November 28th --
7    A   Uh-huh.
8    Q   -- Thanksgiving; right?
9    A   Yes.
10   Q   All right.  And you were offered to pop by the
11 president's box at the football game.
12   A   Yes, I was.
13   Q   Was that TCU that we played on that day?
14   A   I think it would have been Texas Tech.
15   Q   Oh.
16   A   I was there with my parents because my dad went to
17 Tech.
18   Q   Okay.  Well, I mean, why is it that -- and I'm just
19 wondering.  I'm not trying to be, you know, condescending, but
20 you seem to have access to people at the university that most
21 people don't have access to.  Is that fair?
22        MR. PRINGLE:  Objection, form.
23 BY THE WITNESS (resuming):
24   A   I don't really -- access, what does that mean?
25   Q   Do you have -- do most people have Jim Davis' cell

Page 175

1  phone they text him on?
2    A   Certainly not.  That's true.
3    Q   Okay.  Do most people get to pop by the president's
4  box at the game?
5    A   I guess not.
6    Q   Okay.  Do you have that access because of your --
7  because of your family's connections, or is there some other
8  reason you have that access?
9    A   I'm sure that my family's connections is a foundation
10 of it, but I believe that Mr. Davis invited me to the
11 president's box because I run the moot-court team and I'm -- do
12 a good job of representing the university.
13   Q   Okay.  We're going to look at some communications in
14 -- in a little bit that appear to suggest that you were not
15 happy with President Fenves' leadership at the university.  Is
16 that fair?
17   A   Yes.
18   Q   Okay.  When did you begin to have problems with
19 President Fenves' leadership?
20   A   Just with the issues around sexual misconduct with
21 professors, them not being removed.
22   Q   Okay.  Well, weren't there -- didn't they make some
23 changes to the -- to the rules at the university about that
24 after -- in the -- in the wake of those events?
25   A   They did.  I didn't find them to be very satisfactory.

Page 176

1    Q   Okay.  Did you ever express yours concerns directly to
2  Dr. Fenves?
3    A   No, I did not.
4    Q   And it looks like -- well, it looks like there was
5  also a lunch at the Austin Club in December.
6    A   I don't think we ever had that lunch.  I don't
7  remember ever seeing Mr. Davis again after that.
8    Q   Have you seen him since then?
9    A   No, I have not.
10   Q   Okay.  You didn't --
11   A   I haven't seen him since the day of the flyer.
12   Q   Really?  You have not had any -- he wasn't at the
13 event you saw President Fenves?
14   A   I didn't go to the president's box that day.
15   Q   No, I'm talking about in March around the -- right
16 around the time the pandemic hit.  You said you had met
17 President --
18   A   I saw Fenves, Mr. Davis was not there.
19   Q   Okay.  What is the Austin Club?
20   A   It's a -- it's a club.  It's on the street over there.
21   Q   I don't know.  I'm not a member.  I just didn't know
22 what kind of club it was.
23   A   Oh.  It is a membership club.
24   Q   Okay.  You have to -- it's a members-only club?
25   A   Yes.

Page 177

1    Q   What do you have to do to be a member?
2    A   I guess have a membership.
3    Q   But, like, if I want to get a membership, can I just,
4  like, go online and sign up, or how do I get a membership?
5    A   I have no idea.
6    Q   Well, how did you get your membership?
7    A   I have it through my country club in Houston, I think.
8    Q   Okay.
9    A   My parents have a membership at a country club in
10 Houston and I think it transfers.
11   Q   Got it.  Okay.  All right.  And then the last
12 communication we see is from November 3rd on the last page;
13 right?
14   A   Yes.
15   Q   Okay.
16        MR. PRINGLE:  You said November, but you mean
17 December --
18 BY THE WITNESS (resuming):
19   A   Not November, December 3rd.
20   Q   December 3rd -- my bad -- 2019; right?
21   A   Yes.
22   Q   Okay.  Do you know whether you had communications with
23 him over text since that date?
24   A   We haven't texted, huh-uh.
25   Q   Okay.  Now, there was some E-mail correspondence --

Sarah Blakemore                                                                May 28, 2021

Page 178

1    A    I --
2    Q    -- that -- sorry.  Go ahead.
3    A    Yes, the E-mails.  I -- I E-mailed him with respect to
4  the student-conduct board application process, and he didn't
5  (ph) help me.  We didn't talk about this case, though.
6    Q    Well, wasn't there also some discussion about a
7  ambushing of President Fenves' lunch by the Marxist Popular
8  Women's Movement?
9    A    This is true.
10   Q    Okay.  How did you even come to find out about that?
11   A    Someone texted me, and it might have been Hollie or it
12  might have been Kaya saying that they were thinking about doing
13  something that I would consider sketchy at President Fenves'
14  lunch, and I didn't think that was appropriate, and so I told
15  Mr. Davis.
16   Q    What -- I mean, what was your understanding of what
17  they were going to do?
18   A    My understanding was that they were going to do one of
19  their -- I had seen their demonstrations before, a video.
20  There's -- I think there's one on YouTube of them going into
21  Sarkar's class, and they're yelling and being incredibly
22  disruptive, and I think they were going to do something similar
23  to that or more at the lunch with Fenves.
24   Q    Like what?  What more would they do besides going and
25  just yell and disrupt things?

Page 179

1    A    I have no idea.
2    Q    Okay.  All right.  So you tipped off Mr. Davis.
3    A    Tipped off, yeah, sure.
4    Q    Okay.  Did -- did anyone from that group find out that
5  you had done that?
6    A    I don't believe so.  I -- I know that Patricia texted
7  me saying that she knew that someone had done that, but she
8  didn't think it was me.
9    Q    How did -- how did they -- did they, like, show up and
10  try to do something and there was, like, security there?  I
11  mean, what happened?
12   A    I -- I have no idea.
13   Q    Okay.  But somehow she knew that -- that the
14  university knew that they were planning it.
15   A    I think that someone -- I think that Hollie told her
16  after I told Hollie that I was going to tell Jim Davis what was
17  happening, or Hollie told the group.
18   Q    Well, then, she would know it was you; right?  You
19  said Patricia didn't think it was you that told, but...
20   A    There is a possibility that Hollie told them and kept
21  my name out of it.  I don't know how she did that, but Patricia
22  didn't seem to know.  I can't really speculate what she knows.
23   Q    Did you ever talk to your dad about being involved
24  with this group or associated with them?
25   A    Popular Women's Movement?

Page 180

1    Q    Yeah.
2    A    No.  I'm not associated with them.
3    Q    Well, that you were -- I mean, there were
4  communications that you had, and I'm assuming you -- you became
5  uncomfortable when you found out about some of the things they
6  were planning on doing at President Fenves' lunch; right?
7         MR. PRINGLE:  Objection, form.
8  BY THE WITNESS (resuming):
9    A    What -- what -- yeah, can you break that down?  Sorry.
10   Q    Well --
11   A    I didn't understand.
12   Q    -- you found out they were going to show up at
13  President Fenves' lunch; right?
14   A    Yes, I did.
15   Q    You weren't comfortable with that, were you; right?
16   A    Right.  I was not
17   Q    Okay.  I'm just wondering if you ever talked to your
18  dad about, Hey, I've -- you know, I'm talking to people in this
19  group.  Y'all had a group chat, didn't you?
20   A    The -- there was a group chat, I believe.  I don't
21  actually know.  I wasn't in it.  Somebody just told me that
22  that's what they were saying in the group chat.
23   Q    Okay.  Did they ask you to participate in it?
24   A    The what?
25   Q    The -- President Fenves' lunch --

Page 181

1    A    No, no, they didn't.
2    Q    -- protest or whatever?
3    A    Yeah.  And I didn't -- I didn't talk to my father.  I
4  know that was one of the questions.
5    Q    All right.  And that doesn't sound like something he
6  would likely approve of.
7    A    I don't think he -- I don't ask for his approval.
8    Q    That's fair enough.  I'm just -- I'm just wondering
9  if --
10   A    I -- I -- I --
11   Q    -- since you -- since you checked with him --
12   A    I didn't ask for it, so I don't know what his approval
13  would be.
14   Q    Okay.  Well, I mean, since you checked with him about
15  the flyer, I didn't know if you had talked to him about, Hey,
16  there's this group and -- and planning these kind of activities,
17  what do you think, Dad.  I mean something like that.
18   A    No, sir, I think I did not.
19   Q    Okay.  All right.  Let's look at Exhibit 11.
20   A    (Reviewing.)  Uh-huh.
21   Q    Just let me know when you --
22   A    When I recognize it?
23   Q    Yeah.
24   A    I recognize it.
25   Q    Okay.  And what's that document?

Sarah Blakemore                                          May 28, 2021

Page 182

1    A   This is an E-mail I sent to my old English teacher and
2  her response.
3    Q   Okay.  And what was the -- I mean, what was the --
4  what was the reason for that?  It's Ms. Pinto?
5    A   Yes, Ms. Pinto.
6    Q   Okay.
7    A   I was asking her about the American Literatures CLEP.
8  She's an American Literature teacher.  I just wanted to know how
9  to -- know how to study for the CLEP, and I mentioned that I was
10  being sued by Hubbard.
11   Q   Okay.  And then you kind of closed that with -- you
12  say -- it's on the second page of that E-mail.  On Bates Number
13  213, you say, When we live for justice, nothing unjust can
14  befall us; right?
15   A   Yes.
16   Q   All right.  Well, let me ask you this:  Do you think
17  what happened to Dr. Hubbard was just?
18   A   It depends --
19        MR. PRINGLE:  Objection, form.
20  BY THE WITNESS (resuming):
21   A   -- on what you're saying, what happened to him.
22   Q   Well, do you think anything unjust happened to him?
23  Let me ask you that.
24   A   I certainly think it's unjust that people called him a
25  pedophile and showed up at his house and made him feel unsafe in

Page 183

1  his home and vandalized his home, vandalized the surrounding
2  area.
3    Q   Do you think that -- or is it -- do you find it unjust
4  that some people -- and I know you think it's not a reasonable
5  reading, but some people have read your flyer and your
6  communications to reach the conclusion that Dr. Hubbard was a
7  pedophile.
8        MR. PRINGLE:  Objection, form.
9  BY THE WITNESS (resuming):
10   A   I'm not really sure what that has to do with justice,
11  people just reading something wrong, but it's certainly
12  unfortunate.
13   Q   Right, but, I mean, that's not the intention you
14  wanted to convey -- or the impression you wanted to convey;
15  right?
16   A   No, I wanted -- I did not want to convey that
17  Dr. Hubbard was a pedophile or that he was a physical threat to
18  anyone.
19   Q   Okay.  Why do you think the Popular Women's Movement
20  -- I mean, don't you find it strange that you had communications
21  with these people, you told them about Dr. Hubbard and they
22  later involved with, at minimum, a quote/unquote, Protest at his
23  home?
24        MR. PRINGLE:  Objection, form.
25  BY THE WITNESS (resuming):

Page 184

1    A   I don't.  I mean, I -- I don't know what's weird and
2  what's not weird to Popular Women's Movement.  I certainly
3  didn't know that they were going to do that and would not have
4  helped them do it.
5    Q   Okay.  When you -- when did -- when did you find out
6  about the attack on Dr. Hubbard's home?
7    A   I think that someone texted me a YouTube video of it
8  and asked if it was -- I had -- they knew that I had spoken out
9  against Dr. Hubbard.  They sent me a text message with the
10  YouTube video of this happening to Dr. Hubbard's house, and they
11  -- I -- I realized then that something had happened to his
12  house, and they asked me had I done this and I said no.
13   Q   Did you talk to anyone about maybe disclosing to the
14  police or anyone else that someone from the Popular Women's
15  Movement may have been involved in this attack?
16   A   I certainly did not think about disclosing anything to
17  the police.  I didn't have any personal knowledge of the whole
18  thing.
19   Q   Well, sure, but you knew the Popular Women's Movement
20  was there; right?
21   A   How would I know that?
22   Q   Well --
23   A   I mean, I found out much later on when they posted it
24  on their Instagram, but I didn't know before then.
25   Q   Well, after you found out about them posting on the

Page 185

1  Instagram, did you put two and two together and say, I talked to
2  them about Dr. Hubbard, I know they were planning on engaging in
3  something that could be along the lines of violence at President
4  Fenves' lunch; maybe I should give this information to the
5  authority so they can investigate this group as potential -- you
6  know, someone who might have been potentially involved?
7        MR. PRINGLE:  Objection, form.
8  BY THE WITNESS (resuming):
9    A   At this point in time, you -- you-all had submitted a
10  document to sue, I think, Zoe Thomas and it said that Popular
11  Women's Movement was involved.  That was --
12   Q   That's the first time you found out about it?
13   A   No.  That was just about the time in which I saw the
14  Instagram video.
15   Q   So you had no knowledge that Popular Women's Movement
16  was involved in any attack on Dr. Hubbard's house or any
17  protest, whatever we want to call it, prior to the lawsuit being
18  field?
19   A   I did not -- no, no.  I had seen that YouTube video,
20  but I did not know that it was Popular Women's movement.
21   Q   When did you find out that Popular Women's Movement
22  had anything to do with any protest at Dr. Hubbard's house?
23   A   When I saw it on their Instagram.
24   Q   And when was that?
25   A   Maybe like March or April.  I don't really know the

Sarah Blakemore                                                          May 28, 2021

Page 186

1 timeframe.
2     Q   So not until months after the event did you realize
3 it.  Is that what you're telling me?
4     A   Yes.
5     Q   Okay.
6     A   Yeah, I -- I definitely didn't have any personal
7 knowledge of Popular Women's Movement doing that, or even if
8 they did.
9     Q   Okay.  Do you think any of the people -- well, let me
10 -- let me just put it this way:  If someone were to tell you
11 that they were inspired by your flyer to perform that attack on
12 Dr. Hubbard's house, how would that make you feel?
13     A   I would be really horrified and I would try to correct
14 their misjudgment of my facts.
15     Q   Do you think your flyer and your statements to the
16 press after the flyer had anything to do with the attack on
17 Dr. Hubbard's house?
18         MR. PRINGLE:  Objection, form.
19 BY THE WITNESS (resuming):
20     A   I mean, I can't speculate.  I certainly understand
21 that there were -- that I played a role in popularizing
22 criticism against Dr. Hubbard, but I definitely don't think that
23 I caused it.
24     Q   Okay.
25     A   I didn't -- I didn't talk to them about Dr. Hubbard

Page 187

1 and I also didn't, like, encourage them on their path.
2     Q   Wait.  I thought you told me earlier you had talked to
3 Patricia about Dr. Hubbard when you met her.
4     A   I did, yes, but I didn't -- once I wrote the flyer, I
5 didn't talk to them about any of my contingents.
6     Q   But I thought you told them you were planning on
7 writing a flyer and distributing it.
8     A   Yes, I did say that.
9     Q   And they would have found out about that -- I mean,
10 you're telling me you didn't talk to them about it after the
11 fact -- after November 21st?
12     A   No, I don't think I did.  I think -- maybe Patricia
13 had texted me later on.  I think she invited me to some meeting
14 they were going to have, but I didn't want to attend so I did
15 not --
16     Q   Okay.
17     A   -- and I didn't speak to her after that.  They did ask
18 me -- someone from Popular Women's Movement asked me if they
19 want -- if they could make me a GoFundMe and I refused.
20     Q   For, like, legal fees?
21     A   Yes.
22     Q   Okay.  All right.  Let's look at Exhibit 2 -- or sorry
23 -- 12.
24         THE WITNESS:  What's the time?
25         MR. SIBLEY:  3:43.

Page 188

1         MR. PRINGLE:  Do you need a break?
2         THE WITNESS:  Yeah.  Let's do that.
3         MR. SIBLEY:  A break time?
4         THE WITNESS:  Can we take a break?
5         MR. SIBLEY:  Yeah.
6         THE WITNESS:  Is it okay?
7         MR. SIBLEY:  Yeah.
8         VIDEOGRAPHER:  We are off the record at 3:43.
9         (A recess is taken.)
10        VIDEOGRAPHER:  We are back on the record at 3:51.
11 BY MR. SIBLEY (resuming):
12     Q   All right.  We're on Exhibit 12; right?
13     A   Yes.
14     Q   Okay.  Who's -- whose Clark Patterson?
15     A   He is a fashion photographer, and he lives here in
16 Austin.
17     Q   Okay.  Did you know -- is that a -- is that a male or
18 a female?
19     A   Well, that is a male.
20     Q   Okay.  Did you know him before -- before he sent the
21 message?
22     A   This -- this E-mail?
23     Q   Yes.
24     A   Yes, I did.
25     Q   Okay.  And I guess he's sort of -- I mean, is he just

Page 189

1 kind of generally giving his legal advice to you here?  What is
2 this?
3     A   I -- he was at the Sit In 2.  That's where I met him,
4 and he got my contact information that way, and I -- I had seen
5 him on the street and he said he saw me being sued.  This --
6 this man kind of talks too much to me.  I have to get away from
7 him.  He just catches me while I'm on runs in west campus and I
8 don't want to talk to anybody.
9     Q   Okay.
10     A   And I, of course, have no reason to talk about this.
11 He did send me this E-mail.  I don't think I responded.  I
12 didn't really read it.
13     Q   Well, maybe he'll file an amicus brief in the case at
14 some point.
15     A   Maybe he will.
16     Q   Okay.  All right.  Let's look at Exhibit 13.  What's
17 the Bates number on that document again?
18     A   It says Blakemore 211.
19     Q   All right.  Yeah, that's right.  Okay.  What -- what
20 is this?
21     A   This is a -- I requested a scan of Dr. Hubbard's book,
22 and it was during the pandemic, because I wanted to see it and
23 they sent it to me in scanned form.
24     Q   That was July 31st, 2020?
25     A   Yes.

Sarah Blakemore                                                          May 28, 2021

Page 190

1   Q   So that was right after the suit was filed; right?
2   A   I guess, yes.
3   Q   Okay.  Okay.  So you did -- you did seek to read some
4  of Dr. Hubbard's materials after getting sued; right?
5   A   I didn't actually seek this document out to read it.
6  I sought it out to get it to my attorneys.
7   Q   All right.  Well, did you read it once you got it?
8   A   Well, I didn't read it again this time.
9   Q   Okay.  So this was just to collect information for
10 your attorneys; right?
11  A   Yes.
12  Q   All right.  Do you have any document like this showing
13 a request for the document back in the October-November 2019
14 timeframe?
15  A   They -- no, I do not.  They would not have sent
16 something like this.  The -- the Get A Scan service came around
17 -- or at least I had never used it until the pandemic happened.
18 They were trying to -- because you couldn't go to the library to
19 get books.
20  Q   Okay.  But was it a service that was available at the
21 time in October-November of 2019?
22  A   The flyer -- the time around the flyer?
23  Q   Yeah.
24  A   No.  I -- I didn't -- I didn't know it existed then --
25  Q   Okay.

Page 191

1   A   -- if it did.
2   Q   Okay.
3   A   I don't think it did.  I think it was only a pandemic
4  thing.
5   Q   All right.  All right.  Let's look at Exhibit 14.
6   A   Okay.
7   Q   All right.  I think you've mentioned this before.
8  This is an agenda; right?
9   A   Yes, I did.
10  Q   The people -- the names/housekeeping.  Do you see
11 that?
12  A   Yes.
13  Q   I take it that doesn't mean like actual housecleaning;
14 right?
15  A   You're correct.
16  Q   Okay.  This is just, like, who's involved with this
17 agenda; right?
18  A   Yes.
19  Q   All right.  What was the purpose of this again?
20  A   This was a CASM meeting.  This was about -- I -- there
21 was going to be a -- a meeting with -- a meeting of the
22 university -- like a university townhall.  There we go.  That's
23 what they called it.  There was going to be a townhall with CASM
24 and Fenves was going to be there when we came back to school in
25 January.  And we did speak about Hubbard threatening legal

Page 192

1  action.  They asked me not to use the name CASM under anything
2  that had to do with Dr. Hubbard because, of course, they did not
3  want to be sued.  That was the whole point of them mentioning
4  that.
5   Q   Okay.  Are any of the people listed under the
6  names/housekeeping, are those members or people affiliated with
7  the Popular Women's Movement?
8   A   I don't know who's affiliated with the Popular Women's
9  Movement besides Patricia, and Patricia wasn't here.
10  Q   Okay.  If you look down a little bit below, it says,
11 Secure communication.  Do you see that?
12  A   Yes.
13  Q   It says Signal; right?
14  A   Uh-huh.
15  Q   ProtonMail; yes?
16  A   Yes.  Where is this?  I'm sorry.  Where is this?
17  Q   It's under Student Allies and Secure Communications.
18  A   Oh, oh, it's right there, yes.
19  Q   So it talks about using Signal and ProtonMail; right?
20  A   Yes.
21  Q   Why is -- why does it want to -- or why is there
22 discussion about that?
23  A   I believe we were using Signal, which you saw that we
24 were using Signal, just because it's encrypted communications
25 and they can't be -- there's no stored communications, so they

Page 193

1  couldn't be taken in a -- like, a criminal proceeding --
2   Q   Right, because --
3   A   -- and without a warrant.
4   Q   Were you-all contemplating the commission of crimes?
5   A   No, we were not.
6   Q   Then why the concern about the security-encrypted
7  messages?
8   A   This -- this may seem odd, but we had a moot-court
9  case about the third-party doctrine and it made me wise to
10 Internet security, and now I use Signal myself and I try to use
11 Signal with everything, and we were having group communications
12 and we wanted to use Signal.
13  Q   What's the third-party doctrine?
14  A   The third-party doctrine is anything you give to a
15 third party can be taken from you without a warrant from the
16 government.  Like, if you were to give your DNA to 23andMe, the
17 government could ask 23andMe or some sort of police force could
18 ask 23andMe to give up your DNA information.
19  Q   And they couldn't -- they can't do that on Signal?
20  A   There's no stored communications on Signal --
21  Q   Okay.
22  A   -- so the Signal company doesn't have anything.  It's
23 only stored on the device.
24  Q   You mean if a third party has sort of a reservoir of
25 communications, they can be subpoenaed by the government or by

Sarah Blakemore                                                    May 28, 2021

Page 194

1 some third party; right?
2    A    Yes.
3    Q    Okay.
4    A    And the same with the ProtonMail.  I know that some
5 people had been, like, reaching out to Hollie on her DMs and we
6 wanted to make sure there was a secure way for people to reach
7 out if they wanted to because, at this point, Dr. Hubbard had, I
8 think, said something on Wikipedia.  I -- I don't remember
9 reading it, but I think somebody told me he was saying that he
10 might docs someone.
11    Q    Okay.  It says, Hubbard threatening action, lawyered
12 up.
13    A    Uh-huh.
14    Q    Yes?
15    A    Yes, sir, it does --
16    Q    Why --
17    A    -- say that.
18    Q    Why did you think he had lawyered up?
19    A    I don't think it was -- I don't really remember why
20 that was the case.
21    Q    Okay.
22    A    I didn't type this.
23    Q    Who -- who typed this?
24    A    Someone else at the meeting.  I don't know who it was.
25    Q    Was it E-mailed to you?

Page 195

1    A    It certainly wasn't Kaya or Brittany or Hollie.
2    Q    Was this E-mailed to you?
3    A    I think it was maybe somebody texted it to me.
4    Q    Okay.  But it was in, like, a Word form; right?
5    A    Like, a -- it was in, I ke, a Google Doc.
6    Q    Okay.
7    A    Anyone could have written on it.
8    Q    Gotcha.  Well, you have something in here -- I don't
9 know if -- I don't know if this is supposed to be part of the
10 same document, but if you look at the very end, it looks like a
11 response to Hubbard, or is it not in there?
12    A    The Hubbard's message?
13    Q    Right.  You -- you typed up the response to it; right
14 -- or drafted a response to it, I guess?
15    A    Where does it --
16    Q    You know what?  I don't think it's in that document.
17    A    Oh, no, no, no, no.  There's more pages.  I'm sorry.
18 (Reviewing)
19    Q    Okay.  Maybe it is in the document.
20    A    This -- this overwhelming-support thing?
21    Q    Yeah, yeah.
22    A    Uh-huh.
23    Q    All right.  That's -- you wrote that?
24    A    I think this was the letter to the student body that I
25 released on the day that I released the flyer.

Page 196

1    Q    Okay.
2    A    Yes, because it had the -- the open-records request on
3 it.
4    Q    All right.  And so, Release all records of misconduct
5 against Hutchison, Sarkar, Hubbard and Elise; right?
6    A    Yes.
7    Q    Did you find -- you find evidence of misconduct
8 against Hutchinson?
9    A    I didn't get them on -- I didn't fill this request.
10 It was too much money requested from me.
11    Q    To file the information request?
12    A    I filed the request and they sent me back --
13    Q    A bill for the documents?
14    A    -- that they said -- yes.  The -- like, you know how
15 they approve --
16    Q    Right.
17    A    -- before -- they want you to approve the price before
18 they print all of this stuff, and it was like $1200 or
19 something.
20    Q    I got it.
21    A    I didn't fill it.  It was later on filled by -- with
22 my counsel.
23    Q    I gotcha.  Okay.
24    A    Not this whole thing, just for Hubbard's personnel
25 file.

Page 197

1    Q    Understood.  That was 13; right?
2         COURT REPORTER:  14.
3 BY THE WITNESS (resuming):
4    A    14.
5    Q    Oh, that was 14.  Okay.  All righty.  Let me show you
6 what we're going to mark as Exhibit 15.
7    A    Whew.
8    Q    Yes, I'm sorry.  It's a lengthy document, and it
9 begins with Bates number Blakemore -- let's see.
10    A    191-A is what I have.
11    Q    That is correct, 191-A.  Okay.  And I guess this is
12 like a -- a printout that you did from your phone or something
13 that has, like, text messages; right?
14    A    Yes, sir.
15    Q    Okay.  And so we have a text from Leslie here.  This
16 is one of the people that just responded to you in response to
17 the flyer, I guess.
18    A    Yes.
19    Q    The very first one.  Okay.  All right.  I'm going to
20 go to some select passages here.
21    A    Okay.
22    Q    All right.  Let's look at -- yeah, you should probably
23 take the clip off so you can --
24    A    Okay.  Okay.
25    Q    Yeah, it'll be easier.

Sarah Blakemore                                          May 28, 2021

Page 198

1   A   (Complies with request.)
2   Q   Let's look at Page 193-A, Bates number we're talking
3  here.
4   A   Okay. I'm here.
5   Q   All right. So Sarah -- this is Nuvea, you see at the
6  top?
7   A   Yes.
8   Q   I'm a current student in Thomas Hubbard's classical-
9  mythology course. I am a social-work major, and I would love to
10  work with you and help you not only get Hubbard removed, but
11  also have the names of the other pedophiles released to the
12  public. Do you see that?
13   A   Yes.
14   Q   Okay. Would you agree with me that Ms. Nuvea has
15  interpreted your flyer to mean that Dr. Hubbard is a pedophile?
16   A   I don't think it expressly says that. I don't --
17   Q   Okay.
18   A   I don't know.
19   Q   It says other; right?
20   A   Pedophiles. It does, yes, but I don't know this
21  woman, though.
22   Q   Okay. But given what you told me earlier about how it
23  wasn't your intent to create the impression that Dr. Hubbard was
24  a pedophile --
25   A   Uh-huh.

Page 199

1   Q   -- did you do anything to respond to say, Let me be
2  clear, I'm not accusing him of being a pedophile, or anything
3  along those lines?
4   A   Clearly I did not respond then, but I don't think I
5  read this whole text. I was getting a lot of texts on that
6  day --
7   Q   Right. You were excited about them.
8   A   -- from random people.
9   Q   You were excited about them; right?
10   A   (Reading) I'm so excited by -- by the responses. Yes.
11   Q   Okay. All right. Let's look at Page 208-A.
12   A   (Complies with request.) Got it.
13   Q   All right. It says -- who is the Honorable -- does
14  that say Honorable Charlotte Blakemore?
15   A   Yes, it does.
16   Q   Is that like a -- does she actually hold an office?
17   A   My sister did hold an office, yes.
18   Q   What -- what was she?
19   A   I believe she was a -- like an election judge or a
20  precinct chairman.
21   Q   Okay. Is that like an elected position?
22   A   It is an elected position.
23   Q   And --
24   A   She ran.
25   Q   -- in Austin?

Page 200

1   A   In Houston.
2   Q   Oh, okay. Did she run as a Republican?
3   A   I assume that that was the case, yeah.
4   Q   Okay. I was going to say she wouldn't be getting
5  elected here if she were on that ticket.
6   A   I don't think I was old enough to vote when she ran.
7   Q   Okay. Okay. All right. You say, on November 20th,
8  2019, Before the flyer was put out -- right?
9   A   Yes.
10   Q   -- my professor is a legit member of NAMBLA.
11   A   Yes, I did say that.
12   Q   Okay. Was that true?
13   A   Well, I didn't -- this is not true. I did not think
14  it was true at the time --
15   Q   Then why --
16   A   I didn't know it was true at the time.
17   Q   Then why'd you say he's a legit member of NAMBLA?
18   A   Because legit is -- I know this sounds
19  counterintuitive, but it's a signal of maybe hyperbole to the
20  young people.
21   Q   Really?
22   A   Yeah, if that makes sense.
23   Q   Is that what they're teaching in English now over at
24  UT, that legit means --
25   A   No, it's a slang.

Page 201

1   Q   Okay. But I thought legit means like for real.
2   A   Yes, something like that, but I can also mean
3  hyperbolic.
4   Q   Okay.
5   A   To me. I mean, that statement's not correct. We
6  found out later on that it is [sic].
7   Q   Okay. But you also said, and -- and I -- I think this
8  is kind of where I'm going with this: You also said in the
9  flyer that -- and you can look back at it if you want. It's
10  Exhibit 1. You might want to -- yeah, it might not be a bad
11  idea for you just to have that off to the side, because...
12   A   This -- this whole stack?
13   Q   Keep the stack where it is. I'm just saying the --
14  yes, the first exhibit, the one probably at the very bottom.
15   A   Okay.
16   Q   You can just put it off to the side, that way you can
17  have it handy.
18   A   (Complies with request.)
19   Q   You said it was -- you said NAMBLA was a -- the
20  world's largest pedophile activist group; right?
21   A   Yes.
22   Q   So if he's a member of NAMBLA, wouldn't that make him
23  a pedophile?
24   A   I couldn't say. I don't think that that would
25  specifically make you a pedophile.

Sarah Blakemore                                                    May 28, 2021

Page 202

1  Q  So if I'm a member of the world's largest pedophile
2  activist group, that doesn't necessarily make me a pedophile.
3  A  Well, no, I don't think that necessarily makes you a
4  pedophile.
5  Q  Okay.
6  A  You could be in a Black Lives Matter group and not be
7  African-American.
8  Q  Okay.  But that would also mean that you're most
9  likely advocating for the things that Black Lives Matter
10 advocates for; right?
11 A  Yes.
12 Q  Otherwise why are you in the group.
13 A  Right.
14 Q  So you said NAMBLA is advocating for pedophilia;
15 correct?
16 A  Yes.
17 Q  Do you know anyone other than pedophiles that advocate
18 for pedophilia?
19 A  Well, my assumption is that Dr. Hubbard is not a
20 pedophile and he advocates for pederasty.
21 Q  Okay.  Well, you've put pederasty and pedophilia kind
22 of in the same sentence here, though; right?
23 A  I -- I have put them in the same sentence.
24 Q  Okay.  Because they're -- they're basically the same
25 thing to you; right?

Page 203

1  A  Not quite.  I believe that pedophilia is a good
2  describing term of pederasty to a normal person.
3  Q  Why would someone be a part of an organization that
4  advocates for pedophilia if they're not a pedophile?
5  A  I do not know.
6  Q  Okay.  I mean, that just seems, like, implausible to
7  me.
8  A  I do not know why Dr. Hubbard is --
9  Q  I don't do this stuff, but I am definitely in favor of
10 other people doing it.  Everyone go out there and rape kids.
11 A  Well, I -- people have their choices.
12 Q  Okay.
13 A  I don't know why.
14 Q  All right.  Okay.  And then you go on to say -- let's
15 look back at 208-A.
16 A  Uh-huh.
17 Q  Hell yeah, the press is totally helping me the fuck
18 out.
19 A  Yes.
20 Q  Okay.  So you feel like the press was on your side for
21 this one.
22 A  I think by helping me out, I meant they were giving me
23 time to speak on their airwaves.
24 Q  Did anyone with any news -- news organization ask,
25 Hey, are you the daughter of the famous political consultant

Page 204

1  Allen Blakemore?
2  A  No, no --
3  Q  Okay.
4  A  -- no one asked that.
5  Q  All right.  All right.  Let's look at Page 210-A.
6  A  I am here.
7  Q  All right.  Look at the -- looks like there's someone
8  named Jan Schuler that you're corresponding with at the bottom
9  of that page.
10 A  Yes.
11 Q  And it looks like this is after you received the
12 retraction letter; right?
13 A  I suspect so.
14 Q  Okay.  And, by the way, did you -- did you ever
15 consider retracting or clarifying or anything the statements
16 that were complained of?
17 A  No, I did not.
18 Q  Okay.  And here at 1:15 p.m. on February 20th --
19 A  Uh-huh.
20 Q  -- you say, He should really be suing all of the
21 people who showed up at his house; right?
22 A  (Nonverbal response.)
23 Q  Yes?
24 A  Yes.
25 Q  Okay.  We did not do that shit.  I literally made all

Page 205

1  of my people promise, Do not call him a pedophile on the record.
2  A  Yeah, we did speak about that.  We did say that no one
3  should call Dr. Hubbard a pedophile.  That would be defamation.
4  Q  On the record; right?
5  A  Oh, that was not the kind of -- that wasn't the
6  punchline of it, on the record.
7  Q  Well, I mean, if it's not on the record, it can't
8  really be defamatory; right?  If I talk in my sleep and call
9  Dr. Hubbard a pedophile, it's not really defamatory because I
10 haven't published it to anyone else.
11 A  I don't think that's true.  I think if I -- if -- if I
12 called Dr. Hubbard a pedophile to you-all in this room, it could
13 be defamation.
14 Q  Technically, it'd be slander, but I understand --
15 A  Okay.  I'm sorry.
16 Q  -- what you're saying.
17 A  Yes
18 Q  I'm just saying that if I don't communicate it to
19 someone else, if I just keep it amongst my -- amongst myself, it
20 may not be -- I guess what you're saying is --
21 A  I was --
22 Q  -- privately communicating with one another, you don't
23 even want to call him a pedophile, then; right?
24 A  No.  It wasn't that, We don't want to call him a
25 pedophile and have someone overhear it, we didn't want to call

Page 206

1 him a pedophile at all.

2    Q    Because you didn't believe he was a pedophile.

3    A    That is true.

4    Q    All right.  Who are the people that you -- who are,

5 quote/unquote, your people -- or it says, My people, that you

6 made promise not to call him a pedophile on the record?

7    A    That would be Ms. Epstein, Ms. Blackshear and

8 Ms. Green.

9    Q    So those are the Students For Safety people.

10   A    Yes.

11   Q    Did anyone ever call Dr. Hubbard a pedophile in your

12 presence or in messages and you correct them and say, I don't

13 believe he's a pedophile, or, I don't think that's justified?

14 Any -- anything like that?

15   A    I have -- I recall correcting people.  I couldn't

16 bring up specific circumstances.

17   Q    Okay.  But that would be like orally; right?  That

18 wouldn't be in communications at least that --

19   A    Yes, I've -- I've corrected people who I'm speaking

20 to --

21   Q    Okay.

22   A    -- who have said that.

23   Q    All right.  And let's see.  221-A, let's go to that

24 one.

25   A    Yes.

Page 207

1    Q    Manya Shah?

2    A    Yes, this is my roommate.

3    Q    And it looks like it's -- I mean, I don't know.  It's

4 -- begins strangely.  She says, Oh, no, and then you say, There

5 is, though, my friend called him a pedophile.

6    A    For defamation... (reviewing.)  You're right.  This

7 doesn't really make a lot of sense.  I don't know what's going

8 on here.

9    Q    Well, what friend are you referring to that called

10 Dr. Hubbard a pedophile?

11   A    I don't -- I can't recall somebody -- yeah, I don't

12 know what this is in reference to.

13   Q    Okay.  You don't know of any of your friends, sitting

14 here today, that have called Dr. Hubbard a pedophile.

15   A    If they have, it was only in spoken conversation and

16 they were corrected.

17   Q    Okay.  All right.  And then you refer to him as one.

18   A    Yes.

19   Q    Okay.  All right.  Let's go to Page 229-A.  Let me

20 know when you're there.

21   A    (Reviewing.)  Got it.

22   Q    Okay.  Ricky Aguirre.

23   A    Yes.

24   Q    How is everything going in school?  You see that?

25   A    Uh-huh.

Page 208

1    Q    Who's Ricky Aguirre?

2    A    This is a friend of mine from high school.

3    Q    Okay.  So he's just checking in with you.  I see

4 you're putting a pedophile on the hot seat; yes?

5    A    Yes, he does say that.

6    Q    Okay.  I'm assuming he would have seen that from the

7 news story that had been published in one of the publications

8 that you mentioned, the Austin American-Statesman or someone --

9    A    That's false, though.

10   Q    -- else that covered --

11   A    I didn't tell him.

12        MR. PRINGLE:  Objection, form.

13 BY MR. SIBLEY (resuming):

14   Q    Well, if she saw it, it would have been in -- is there

15 any other way he would have saw it outside of the news that

16 you're aware of?

17        MR. PRINGLE:  Objection, form.

18 BY THE WITNESS (resuming):

19   A    No, not that I'm aware of.

20   Q    Okay.  Did you respond to him and say, No, he's not a

21 pedophile.  That's not what I intended by my flyer?

22   A    No, I didn't respond to him at all.  I actually don't

23 speak to this person anymore because they make me uncomfortable.

24   Q    Okay.  All right.  Let's look at page 230-A.

25   A    Yes.

Page 209

1    Q    Look at the very top of the page, I guess.  You don't

2 want anyone to think you're Republican.

3    A    Yes.

4    Q    Okay.  And then you go on to say -- oh, I guess you're

5 talking about getting sued eventually; right?  7/22/20.  You see

6 that?

7    A    Yes.

8    Q    Okay.  And then you go on to say -- this

9 Riley Steward, who's that?

10   A    That is my friend who goes to UT.

11   Q    Okay.  I says, Oh, shit, this is Baltimore.  What does

12 that mean?

13   A    It's the article that was written about me by Avi Idra

14 (ph), the Baltimore OUTloud --

15   Q    Oh, okay.

16   A    -- was the publication.  That was it.

17   Q    Okay.  And then he says, It is a mark of strength to

18 be sued by a pedophile; right?

19   A    Where does he say that?

20   Q    12:53 p.m. on 7/22.

21   A    Yes, he does.

22   Q    Uh-huh.  And he says, Wear that shit with pride;

23 right?

24   A    Yes, he does.

25   Q    Okay.  And then you say, I fucking hope this turns out

Sarah Blakemore                                          May 28, 2021

Page 210

1  with me beating a pedophile, otherwise my rep is fucked; right?
2      A   Yes.
3      Q   Okay.  So contrary to what you've been telling me for
4  pretty much all deposition, you didn't respond to him with, He's
5  not a pedophile, that's not what I said.  Instead you say you
6  hope it turns out with you beating a pedophile; right?
7      A   Yes, I did say that.
8      Q   Okay.  Well, how do you explain that given your prior
9  testimony?
10     A   Well, I have -- I didn't specifically remember this.
11 It has been my intention to always correct people when I am not
12 -- when I have my wits about me.  I don't believe I really had
13 my wits about me in this scenario, probably was not the most
14 good thing to say, but I was very heated that I got sued that
15 day.  I'm sorry.
16     Q   Okay.  And so you were okay with calling Dr. Hubbard a
17 pedophile on that day; right?
18     A   I'm certainly not okay with calling Dr. Hubbard a
19 pedophile on that day or any one, which is why I --
20     Q   All right.
21     A   -- think this is not appropriate.
22     Q   Well, would you like to apologize to Dr. Hubbard for
23 calling him a pedophile on this day?
24     A   Would I like to right now?
25     Q   Yes.

Page 211

1      A   Sure.  I'm sorry that I called you a pedophile on the
2  22nd.
3      Q   Okay.  Okay.  Let's see.  All right.  Did you -- did
4  you keep your family members, I guess, kind of apprised as to
5  what's going on?  It sounded like earlier, you told me you kind
6  of shared everything with them; right?
7      A   Yes.  Yeah, I -- I think they're generally apprised
8  about most things in my life.
9      Q   Okay.  And so you kept them abreast of, like, what was
10 happening with the whole -- and there were a lot of things going
11 on in November-December of 2019.  One was the flyer coming out,
12 there were the other protests at UT, there was you -- your
13 health issues that were going on; right?
14     A   Yes.
15     Q   All of those things.  And also, then -- then, of
16 course, there was the attack on Dr. Hubbard's house on -- I
17 believe it was December 9th.
18     A   Yes.
19     Q   Do you recall -- you recall us talking about that;
20 right?
21     A   Yes, I do.
22     Q   All right.  All right.  Let's look at Page 200-A.
23         MR. PRINGLE:  200 what?
24         MR. SIBLEY:  200-A.
25         MR. PRINGLE:  200-A.

Page 212

1          MR. SIBLEY:  All of these are the A.  This is
2  like the re-bated thing.
3  BY THE WITNESS (resuming):
4      A   Got it.
5      Q   Okay.  All right.  Let's look at -- hang on one
6  second.  Let's look at the exchanges that began at -- on
7  November -- I'm sorry -- December 18th, 2019.
8      A   With who?
9      Q   Are there multiple ones on there?
10     A   On 200-A?
11     Q   Yeah.
12     A   Yes, there are.
13     Q   Okay.  Charlotte, Elizabeth and Allen.
14     A   Perfect.  I'm there.
15     Q   That looks like a family group text chain, I guess.
16     A   Yes.
17     Q   All right.  And it looks like Charlotte sends a text
18 about -- it says, UT students -- although, as you've mentioned,
19 we don't necessarily know whether they were students or not, but
20 it says they -- Protest professor's house over his writings.  Do
21 you see that?
22     A   Yes.
23     Q   All right.  Would you really call the -- the violence
24 that occurred at Dr. Hubbard's house a protest?  Do you think
25 that's a fair characterization?

Page 213

1          MR. PRINGLE:  Objection, form.
2  BY THE WITNESS (resuming):
3      A   There -- there is debate on this term in general in
4  the pop culture between protest and riots.  I'm sure there were
5  some people there to protest, but some people definitely
6  committed violence against Dr. Hubbard's home.
7      Q   Okay.  Why did your mom respond, Great?
8      A   I don't know.
9          MR. PRINGLE:  Objection, form.
10 BY MR. SIBLEY (resuming):
11     Q   I mean, that just seems like a strange reaction when a
12 disclosure of an attack on someone's house has been revealed.
13     A   It could have been in reference to something above,
14 but it could have been in reference to that, too.
15     Q   I mean, I -- I just -- I mean, I find it strange that
16 -- well, have you talked to your parents about what happened at
17 Dr. Hubbard's house at all?
18     A   They do know.
19     Q   What was their reaction, or what did they say about
20 it?
21     A   I don't recall.
22     Q   I mean, they just don't strike me as the kind of
23 people that would be applauding violence, I guess.
24     A   I would say that about my parents, too.
25     Q   And so I'm just puzzled by why -- what -- you know,

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900    San Antonio, Texas 78232
210-697-3400                                                  210-697-3408

Sarah Blakemore                                                    May 28, 2021

Page 214

1  why someone would respond with a -- I mean, that sounds like she
2  thought it was good.
3      A    I don't know what she thought.  I don't know why she
4  said that or if that was even about that text specifically.  I
5  don't know.
6      Q    Okay.  And then you go on to say -- there's some -- it
7  looks like there's some pictures that were sent.
8      A    Uh-huh.
9      Q    Do you know what those were?
10     A    No.
11     Q    Okay.  And you say, I really gave the woman many
12 better taglines like, You can't separate the man from the
13 morals; right?
14     A    Right.
15     Q    Actually, that looks like a -- I mean, it looks like
16 it's on December 5th, but I'm not really sure why they're
17 jumbled together, but...
18     A    Right.  Yes, that is on December 5th.  I believe that
19 was in reference to some quote that was made of me with respect
20 to this matter, probably by the Statesman or one of the other
21 publications.
22     Q    Gotcha.  Was this -- where was this -- was this a
23 text-chain communication or what was this?
24     A    I -- yes, I think this is a text chain.
25     Q    But is it on, like, iMessages or is it --

Page 215

1      A    It was on -- it should be on iMessage, yes.
2      Q    So y'all weren't -- you didn't use Signal with your --
3      A    Family.
4      Q    -- family; right?
5      A    I tried to get them to use it and they did not want --
6      Q    They're just not quite --
7      A    It's --
8      Q    -- up to speed on Signal; right?
9      A    Yeah.
10     Q    I gotcha.  Okay.  And you know what?  I just noticed
11 something.  I just want to be fair here.  The way this appears,
12 it looks like the 12/18/19 article was -- was sent -- I mean, it
13 looks like the, Great, message was in response to the -- to
14 the article being sent because it's dated 12/10/19 and the other
15 one is dated 12/18/19.
16     A    Ah, this is true.
17     Q    So I -- I --
18     A    It was not in reference --
19     Q    I wasn't paying attention to the dates.  I thought
20 this was sequential in time and it appears, though, it's not, so
21 it's not clear exactly what's -- it's not exact -- clear exactly
22 what the response is to, so...
23     A    Right.  It's just not about --
24     Q    So --
25     A    -- that article.

Page 216

1      Q    I mean, yeah.  Well, you still have the images; right?
2  Whatever those images are.
3      A    I -- I may.
4      Q    Okay.
5      A    I haven't destroyed anything.
6      Q    What did you -- what did you use -- what kind of
7  program did you use to get these texts off?
8      A    There was an employee at my father's office that just
9  downloaded all of my text messages for me.  I don't know how he
10 did this.
11     Q    I gotcha.  Okay.  Fair enough.
12          MR. SIBLEY:  All right.  All right.  Ross, can we
13 take about a 10-minute break?
14          MR. PRINGLE:  Sure.
15          MR. SIBLEY:  I just want to use the restroom and
16 stuff.
17          VIDEOGRAPHER:  We are off the record at 4:24.
18          (A recess is taken.)
19          VIDEOGRAPHER:  We are back on the record at 4:50.
20 BY MR. SIBLEY (resuming):
21     Q    All right.  Ms. Blakemore, let's look at Page 215-A of
22 -- what's the exhibit number again?  Is it --
23     A    It starts at 191-A.
24     Q    No, the exhibit number, or the yellow sticker.
25     A    Oh, I'm sorry.  15.

Page 217

1      Q    Yeah, all right.  Exhibit 15, Page 215-A.
2      A    Okay.  (Reviewing.)  Yes, I am here.
3      Q    Okay.  It says you're having a meeting with the woman
4  who wrote the -- the very top line -- A meeting with the woman
5  who wrote the blog about Hubbard --
6      A    Yes.
7      Q    -- on November 23rd, 2019.  Do you see that?
8      A    Yes, it does.
9      Q    Who are you referring to?
10     A    I am pretty sure I'm referring to Hollie, because I
11 had a meeting with Hollie at CAVA and the blog is Futo Kennedy.
12 I never met Futo Kennedy.  I think I just misspoke in this and
13 it's Hollie.
14     Q    I see.  Okay.
15     A    Because I -- I had the -- I saw Hollie and her partner
16 at CAVA --
17     Q    Gotcha.
18     A    -- talked about earlier, yeah.
19     Q    Okay.  All right.  Let's look at the prior page.
20     A    14?
21     Q    214, correct.
22     A    Yeah.
23     Q    All right.  It's from Juliana Steward.
24     A    Yes.
25     Q    Who -- who is that again?

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900      San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Sarah Blakemore                                          May 28, 2021

Page 218

1   A   That is my moot-court partner, one of my friends.
2   Q   Okay.  What is -- what is the discussion about?  You
3   say, My statements were outside of the statute of limitations.
4   Do you see that?
5   A   Would you give me a timestamp?  Oh, sorry.
6   Q   10:14 p.m.
7   A   10:14?
8   Q   Right.
9   A   Ah, yes.  I had been advised by counsel that we were
10  outside of the statute of limitations -- not this counsel.
11          MR. PRINGLE:  Don't talk about your discussions
12  with your lawyers --
13          THE WITNESS:  Oh, right.  Okay.  Sorry.
14          MR. PRINGLE:  -- even anybody.
15  BY THE WITNESS (resuming):
16  A   I -- somebody told me that, and that it was false --
17  Q   Okay.
18  A   -- that you guys -- well, obviously it's false because
19  I'm still being sued.
20  Q   Right.  Well, it's a year, just since you're a
21  moot-court person.  It's almost always a year in every
22  jurisdiction for defamation, but...
23  A   Thank you.
24  Q   Okay.  Yeah, I just didn't know -- I wasn't sure what
25  you were referring to here, but okay.  If you look right above

Page 219

1   that --
2   A   Uh-huh.
3   Q   -- it says, I'm about to sex myself up and go sit in
4   for the professor who assaulted students.  What does that mean?
5   A   (Reading)  I'm about to sit in for the professor who
6   assaulted students.  This is me talking to -- who?  -- Joelle.
7   (Reviewing.)  I don't know what that means.
8   Q   Well, did you sex yourself up and go sit in with
9   professors?
10  A   I don't think I did that.
11  Q   Okay.  All right.
12  A   I can't -- I can't recall.
13  Q   All right.  Who's the -- do you know what professor
14  you're referring to that assaulted students?
15  A   No, no, I have no idea.
16  Q   All right.
17  A   I didn't go to any classes that weren't mine.
18  Q   Gotcha.  All right.  Let's look at 226-A.
19  A   (Complies with request.)  Arrived.
20  Q   All right.  Very top line, you say, President -- and,
21  by the way, obviously I'm not going to spend -- you know, we're
22  not going to go through this entire document, there may be other
23  things that come up later.  I just want to make sure that
24  anywhere this says, Me, in this document, that's you; right?
25  A   I think that's -- yes, that should be the case.

Page 220

1   Q   Okay.  I just don't want there to be some issue that
2   comes up later with me may mean someone else if we decide to use
3   this -- other pages of this document that I don't explicitly
4   discuss with you, so...
5   A   Okay.
6   Q   It says, President Fenves texted my press release to
7   the General Counsel, Jim Davis, of the university while I was at
8   lunch with him.  Do you see that?
9   A   Yes.
10  Q   Fenves is currently in Singapore.
11  A   Yes.
12  Q   All right.  What's that about?
13  A   I -- I did not remember this when I testified to the
14  lunch.  At -- at one point Jim -- Mr. Davis' phone was -- was
15  vibrating a lot when we were at lunch and he leaned to me and he
16  said that Fenves -- I noticed that his phone was vibrating, he
17  noticed that I noticed.  He leaned over to me and he said that
18  Fenves had seen my -- my press release and he was currently
19  visiting Singapore.
20  Q   How would have Fenves have seen it at 2:36 on the day
21  you put it out?
22  A   Because it had already been -- I -- I think people
23  reposted on maybe Reddit.  I think that's what somebody told me
24  that randomly texted me.
25  Q   Fenves monitors Reddit?

Page 221

1   A   Well, I don't know how he had seen it, but that's what
2   was told to me.
3   Q   Okay.  Well, tell me the timeline of, like, how you
4   put -- you handed it out about what time on --
5   A   I --
6   Q   Sorry.
7   A   Oh, sorry.  I -- I handed it out at the beginning of
8   Dr. Hubbard's class, which I think was at, like, 9:30.
9   Q   Was that the same class that you had dropped?
10  A   Yes.
11  Q   Okay.
12  A   Uh-huh.
13  Q   So you handed it out at the beginning of the class
14  around 9:30.
15  A   Yes, and -- but I had -- I had handed president -- I
16  mean I had handed Jim Davis the -- the flyer personally at this
17  point.
18  Q   At 9:30 a.m.
19  A   No, no, no, no --
20  Q   Oh.
21  A   -- before the lunch when we talked business --
22  Q   Right.
23  A   -- and then we went to lunch and he said just said
24  this to me at lunch.
25  Q   Okay.  So you had given it to him, but you gave it to

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900     San Antonio, Texas 78232
210-697-3400                                                   210-697-3408

Sarah Blakemore                                                May 28, 2021

                                                                Page 222
1 him in paper form; right?
2    A   Yes, I did.
3    Q   Okay. Do you know if he took a picture of it or
4 anything like that?
5    A   I couldn't tell you. I'm sorry.
6    Q   Okay. So you don't know how -- well, did you -- had
7 you made contact with media outlets yet?
8    A   Yes, I had.
9    Q   Do you know whether this -- any story had been
10 published in any news outlets as of 2:36 p.m. on November 21st,
11 2019?
12   A   I do not know.
13   Q   Okay. So I guess at that point it would have had --
14 President Fenves would have either had to got -- had to have
15 gotten it from -- let's just assume there's no news story with
16 it out about it yet. Okay? We can verify that by --
17   A   Okay.
18   Q   -- looking at the news stories. But assuming there's
19 no news story, you would have either had to have gotten it from,
20 A, Jim Davis because you gave him a copy; right?
21   A   I -- I -- I did give Jim Davis a copy, yes.
22   Q   So it's possible Jim Davis took a picture and sent it
23 to Fenves; right?
24   A   I wouldn't speculate as to that, but that -- yeah,
25 that is fully possible.

                                                                Page 223
1    Q   Well, that's what possibility means. It's a -- you
2 can't speculate about things that are impossible. I mean, I
3 guess you can.
4    A   Yeah.
5    Q   Some people, you know...
6        (Inaudible.)
7    Q   That's true. But, yeah, I mean a possibility is that
8 he got it from Jim Davis; right? It's possible.
9    A   Yes, sir, that is possible.
10   Q   It's also possible that he got it from, I guess,
11 Reddit.
12   A   Yes, that is possible.
13   Q   Was it on any other social media at that point?
14   A   I did not personally see it on Reddit, so I don't know
15 if it was truly on Reddit or any other social media. That is
16 just what people had told me when they texted me, I think.
17   Q   Okay.
18   A   I don't know where I really got Reddit. Maybe, Kaya
19 had told me that it ended up on Reddit.
20   Q   Okay. All right. And you say -- you conclude this
21 statement to Noah with, You better be at the protest; right?
22   A   Yes.
23   Q   What protest are you talking about again?
24   A   I don't know what protest I'm talking about.
25   Q   Okay. All right. Let's look at 228-A.

                                                                Page 224
1    A   Got it.
2    Q   Now, first of all, this is a text chain with Patricia;
3 right?
4    A   Yes.
5    Q   Okay. That's Patricia of Popular Women's Movement;
6 right?
7    A   Yes.
8    Q   All right. So you're telling her -- I mean, look.
9 You can look at the preceding page and look at the text chain,
10 but would you agree with me that you had put her on notice at
11 least that you had planned a protest of Dr. Hubbard and were
12 planning on distributing a flyer? Take as much time as you need
13 to look at that just so I don't have to go through each
14 individual statement with you.
15   A   Right. I did tell her that and she said that there
16 would be -- that people might help me pass out the flyers, but
17 they never showed up.
18   Q   I gotcha. Okay.
19   A   Right.
20   Q   You also say at 7:06 p.m. that you have a meeting on
21 Thursday -- which I'm assuming is the 21st; right? --
22   A   Uh-huh.
23   Q   -- with -- with -- it's Jim Davis. That's who you're
24 talking about; right?
25   A   Would you give me a timestamp?

                                                                Page 225
1    Q   7:06 p.m.
2    A   On what, 28th or on 27? Sorry.
3    Q   The --
4    A   We were looking at both.
5    Q   The 18th.
6        MR. PRINGLE: It's Page 228-A.
7        THE WITNESS: Okay.
8 BY THE WITNESS (resuming):
9    A   (Reading.) I have a meeting with the general counsel
10 for the university. Yes, that is Mr. Davis.
11   Q   All right. And you have a meeting with someone from
12 the Texas Tribune on Wednesday. Do you see that?
13   A   Yes.
14   Q   Did that meeting happen?
15   A   I don't recall. It could have been a phone meeting.
16 I don't really remember.
17   Q   All right. Look at that preceding sentence where
18 Patricia says that their first action is to disrupt one of the
19 professor's classes Thursday around 11 a.m.
20   A   I'm sorry. I'm now lost again.
21   Q   It's -- it's the one right above, 6:48 p.m. from
22 Patricia.
23   A   Okay. Yes. Our first action is to disrupt one of the
24 professor's classes. Yes.
25   Q   Did that happen?

Sarah Blakemore                                           May 28, 2021

Page 226

1    A    That did.
2    Q    Was that Sarkar's class?
3    A    I think that was -- yes, that was the YouTube video
4    that I said I saw.
5    Q    And you weren't involved in that; right?
6    A    No, no, I was not.
7    Q    Okay.
8    A    Just I saw them beforehand because I -- Patricia had
9    told me they were going to be at the mall, but I had just walked
10   out of Hubbard's class --
11   Q    Right.
12   A    -- so I did see them, but I didn't participate.
13   Q    Well, they were actually doing their -- their
14   disruption at the same time you did your protest of
15   Dr. Hubbard's class; right, Thursday at 11 a.m. -- or shortly
16   after your protest of Dr. Hubbard's class; right?
17   A    Yes, I was at 9:30 and they were at 11 a.m.
18   Q    Now, had you not had that lunch meeting with
19   Jim Davis, would you have participated in the protest of Doctor
20   -- or Professor Sarkar?
21   A    No, no, not with Popular Women's Movement.
22   Q    Okay.  I think they had a rehearsal for this on
23   Wednesday at 6 p.m.
24   A    Where does it say that?
25   Q    Right above the 11/18/19, 7:06.

Page 227

1    A    (Reading.)  We have a rehearsal on Wednesday.  So
2    what's the -- what -- what day is the 18th?  Is this, like, a --
3    is this the Wednesday of the week, so the day before the flyer
4    or is this later on?  I mean, they say that.  Yes, this is true.
5    Q    Well, you -- you said --
6    A    Sorry.  I'm just not sure what it's about.
7    Q    I think Thursday's the 21st because that's the date
8    you had the meeting with -- or lunch meeting with Jim Davis.
9    A    Yes, but what day is the 18th?
10   Q    Well, that would be the Monday of that week.
11   A    Perfect.  Thank you.  Then I guess they had a
12   rehearsal.  I -- I don't know.  I wasn't there.
13   Q    All right.  You go on to talk about -- let's -- I'm
14   looking at the 11/18/19, 7:06 --
15   A    I could have been -- sorry.  I could have been making
16   something about the Texas Tribune thing on Wednesday because I
17   didn't want to --
18   Q    I see.
19   A    -- talk to Patricia.
20   Q    I see.  I believe our best chance at removing Fenves
21   is by making the Lieutenant Governor very aware of what's going
22   on.
23   A    Uh-huh.
24   Q    That's Dan Patrick; right?
25   A    Yes.

Page 228

1    Q    All right.  And you have access to Dan Patrick, do you
2    not?
3    A    Sure.
4    Q    Do you -- do you text with him?
5    A    No, I do not.
6    Q    Okay.  But if you wanted to contact him, you could;
7    right?
8    A    I would have to ask for his contact information, but I
9    think I could.
10   Q    Okay.  Well, if your father wanted to contact him, he
11   would know how to do that; right?
12   A    My -- if my father knew how to contact Dan -- my
13   father -- you're asking if my father knows how to contact
14   Dan Patrick?
15   Q    I'm assuming he does; right?
16   A    Yes, yes.
17   Q    All right.  So why is it that you thought you had a
18   chance to use Dan Patrick to get Fenves removed?
19   A    I don't really know what I was specifically talking
20   about here, but I assume that it was that the legislator has not
21   been happy with the University of Texas recently, I think.
22   Q    Okay.  All right.  Let's look at Page 200-A.
23   A    Oh, gosh.  I think I mixed this all up.
24   Q    Perfect.
25   A    Okay.  Here we go.

Page 229

1    Q    That's why I'm trying to refer to the page numbers.
2    It's just in case that happens.
3    A    Yeah, it's perfect.  Okay.
4    Q    Okay.  Are you at 200-A?
5    A    Yes, I'm at 200-A.
6    Q    All right.  Brooklyn Rodger.  Do you see that entry?
7    A    Yes, I do.
8    Q    All right.  Girl, that is wild.  Didn't know you were
9    getting sued and I can't believe Fenves knew who you were.
10   A    Yes.
11   Q    All right.  Is this that election, I guess, primary
12   event that you had where you met Fenves?
13   A    Yes, it was.
14   Q    All right.  And you had told him apparently about the
15   retraction letter you received from us regarding Dr. Hubbard;
16   right?
17   A    What -- I had told Fenves?
18   Q    Well, you -- if you look at the next line, it says:
19   He was, like, Jim Davis has told me so many good things.  He
20   proceeded to tell me I shouldn't worry about Hubbard suing me.
21   A    He already knew.
22   Q    How -- how did he know that?
23   A    I have no idea.
24   Q    Okay.
25   A    He knew when I spoke to him.  That's why it says

Sarah Blakemore                                    May 28, 2021

Page 230

1 before -- like, I was surprised about -- that he knows.  I can't
2 believe he knows.
3    Q   Okay.  Okay.  Let's see.  All right.  On that document
4 that we're looking at, does that refer to -- when you say, He
5 knows, are you referring to Jim Davis or Fenves?
6    A   When I say I can't believe he knows?
7    Q   Yeah.
8    A   I am talking about Fenves.
9    Q   Okay.  It sounds like he'd had a conversation with
10 Jim Davis about you potentially getting sued.
11    A   I don't -- I don't know if that's the case.  I think
12 he had definitely had a conversation with Jim Davis about me and
13 that I'm good.  I don't think it has to necessarily be that they
14 had a conversation about this matter.
15    Q   Okay.  All right.  All right.  Let's look at Page 20
16 -- actually, let's look at 213-A.
17    A   (Reviewing.)  Okay.
18    Q   Okay.  2/25/20 at 9:12 p.m.
19    A   With Joao Mitchell?
20    Q   Yes.
21    A   Yes.
22    Q   It says, Sounds good, and then you say, I just met
23 with all of the other students being sued by Hubbard.  He loves
24 the shit out of me.  Do you see that?
25    A   I just meant -- yes.

Page 231

1    Q   And that would have been Green, Thomas and Ross;
2 right?
3    A   (Nonverbal response.)
4    Q   The meet -- students you met with, I'm assuming.
5    A   Oh, yes.
6    Q   All right.
7    A   Yeah, that seems about the timeframe.
8    Q   Okay.  And it says your dad hired -- a few lines down,
9 your dad hired a researcher for the case.
10    A   Yes.
11    Q   Is that, like, a lawyer, I guess?
12    A   No, someone who is not a lawyer.
13    Q   What kind of research do they do?
14    A   They went through, like, Hubbard's personnel file and
15 his publications and wrote a summary.  They just didn't want me
16 to have to read Dr. Hubbard's publications.
17    Q   Gotcha.  Okay.  All right.  Let's look at 207-A.
18    A   I'm here.
19    Q   Okay.  If you look at -- it's -- it's kind of strange,
20 honestly, because these texts, like Hollie Green it looks like
21 -- that's Hollie Green; right, where it says Hollie?
22    A   Yes.
23    Q   Okay.  It has, like, 3/29/20 and then it has 2/27/20,
24 and it looks like reverse chronology, I guess, sometimes; right?
25         MR. PRINGLE:  I think we can see -- because you

Page 232

1 see a day and then on that day it's in chronological order --
2         MR. SIBLEY:  Okay.
3         MR. PRINGLE:  -- but the days are in reverse
4 chronological order.
5         MR. SIBLEY:  I gotcha.  The days are reverse
6 order --
7         MR. PRINGLE:  Yeah.
8         MR. SIBLEY:  -- the -- the day of is in
9 chronological order.  Okay.
10         MR. PRINGLE:  That's what it looks like to me.
11         MR. SIBLEY:  You're probably right.
12 BY MR. SIBLEY:  (resuming)
13    Q   All right.  It looks like you're having a conversation
14 with Ms. Hollie Green about -- I'm assuming that y'all had both
15 gotten letters asking you to retract your statements about
16 Dr. Hubbard.  Is that fair?  Take a minute and read it if you
17 need to.
18    A   That's my assumption.
19    Q   Well --
20    A   Oh, I talked to legal aid.  Yes, yeah.
21    Q   Yeah.  If you look at 2/18/20, at 6:29 p.m., it says,
22 I've already -- Hollie says, I've already started a draft to the
23 retraction.
24    A   (Reading)  We can finish it together... Yes.
25    Q   Okay.  And then you say, Then we can actually do edits

Page 233

1 and shit with the attorney; right?
2    A   Yes --
3         MR. PRINGLE:  Objection, form.
4 BY THE WITNESS:  (resuming)
5    A   -- I do say that.
6    Q   So I had asked you earlier if you had actually
7 considered a retraction, a correction or clarification and I
8 think you told me no.
9    A   Right, I think she may be talking about the response
10 that we were going to make to the retraction because I did not
11 think about retracting and I also told Hollie not to think about
12 retracting.
13    Q   Okay.  Well, I mean, she says, I've started a draft of
14 the retraction, and --
15    A   Right.  I understand that.  I just -- I did not ever
16 think I was going to retract and I don't remember her thinking
17 that either.
18    Q   All right.  So your understanding is this was just
19 discussing generically a response to the letter.
20    A   That could be the case.  I don't exactly know.  I
21 don't think we wrote a retraction.  I certainly don't remember
22 seeing one that she wrote.
23    Q   Okay.  Look at line -- where it says 11:09 a.m. with
24 Hollie.
25    A   You are my queen?

Sarah Blakemore                                           May 28, 2021

Page 234

1   Q   After that?
2   A   Okay.  (Reviewing.)
3   Q   I'm just want -- I'm just wanting to know if I have to
4   take -- if I have to just take down the tweets/doc or if he is
5   also asking me to publicly recant what I said.
6   A   Right.
7   Q   Okay.  So it looks like she's at least considering
8   taking it down; right?
9   A   Yes, that's what it looks like.
10  Q   All right.  And you say you're reading and then she
11  says, I had to make a new account, but hopefully it got to you.
12  I'd love to hear what you think about that.
13          MR. PRINGLE:  You're reading those in the wrong
14  order, though.  Those are reverse chronological order.  Look at
15  the time.
16          THE WITNESS:  Yeah.
17          MR. SIBLEY:  Oh, you're right.
18  BY MR. SIBLEY (resuming):
19  Q   All right.  Well, anyway.  What is she talking about
20  when she says make a new account?  Do you know?
21  A   No, I don't remember.  I don't -- yeah, I don't
22  remember anything about an account or social -- I'm assuming
23  it's talking about a social-media account.  I don't remember
24  anything like that with Hollie.
25  Q   Gotcha.  All right.  Let's look at the next page.

Page 235

1   It's 208-A.  Yes.
2           MR. PRINGLE:  208-A.
3   BY THE WITNESS (resuming):
4   A   Yes, I see this.
5   Q   Let's see.  Yeah, 11:09 -- all right.  I'm sorry.
6   Wait.  It's -- it's 11-0 -- I'm sorry -- 207.
7   A   Back to this page we were just on?
8   Q   Yeah, sorry.  It's hard because the -- the
9   chronology's a little bit -- all right.  At 11:09 a.m. on 2/17?
10  A   Yes.
11  Q   Okay.  You say, You will have to make a statement
12  unfortunately if we can't argue these points.
13  A   11:09?
14  Q   Yeah.
15  A   (Reading)  You will have to make a statement
16  unfortunately if we can't...  Okay.
17  Q   And that's in response to, I guess -- or, no, she
18  says, Action has to be taken by March 12th; right?
19  A   (Reviewing.)
20  Q   Before you made that statement.
21  A   Yeah, this is all jumping around.  Goodness.  I don't
22  really know, because it -- there's 11:09 down here and up here,
23  too.  I don't really know what I'm saying that in reference to,
24  but I assume it's about the retraction.
25  Q   All right.  So, I mean, it looks like you thought

Page 236

1   there might -- that at least she might have to actually make a
2   retraction.
3           MR. PRINGLE:  Objection, form.
4   BY THE WITNESS (resuming):
5   A   I don't really remember that, but, yeah, that's what
6   it -- it does look like that.
7   Q   Okay.  All right.  Let's look at -- let's look at
8   222-A, if we could.
9   A   (Complies with request.)  Got it.
10  Q   All right.  So you talk about the -- on 7/22/20 at
11  11:12 a.m.
12  A   7/22?  Is this with Maren Allman?
13  Q   I'm sorry?
14  A   Is this with Maren Allman?
15  Q   Yes.
16  A   Okay.  Yes, I'm here.
17  Q   All right.  11:12 a.m. on 07/22, you say, Me and John
18  Does.  Do you see that?
19  A   Yes.
20  Q   And then you say, They know I'm the only one that can
21  pay the over 75,000 they are suing for; right?
22  A   Yes.
23  Q   All right.  So did you know who -- I mean, who did you
24  think the John Does were when you got sued?
25  A   I -- it was my -- it was my thought that you -- that

Page 237

1   you-all believed that I was in some sort of conspiracy with
2   Popular Women's Movement and that by suing me you could expose
3   them.  That was my --
4   Q   Okay.
5   A   -- assumption was that the John Does were the people
6   -- the people of Popular Women's Movement who made the assault
7   on Dr. Hubbard's house.
8   Q   All right.  Well, you knew at least who one of those
9   persons was, didn't you --
10  A   Patricia.
11  Q   -- Patricia?
12  A   Yes.
13  Q   Okay.
14  A   But I don't know that they made the assault on
15  Hubbard's house.  I know that Patricia is in Popular Women's
16  Movement.
17  Q   Right.  Okay.  So you thought the John Does were the
18  people who attacked the house?
19  A   Yes, that's what I thought.
20  Q   Not people who were involved in publishing the
21  statements with you, like the -- the Students For Safety people.
22  A   Right.  I didn't -- I didn't think that because nobody
23  worked on the flyer with me.
24  Q   Okay.  Well, let's look on Page 225-A.
25  A   Okay.  (Reviewing.)

Sarah Blakemore                                                    May 28, 2021

Page 238

1   Q   7/22/20 at 11:03 a.m. with Nathaniel Lawson.

2   A   Okay.

3   Q   I bet that feels shitty.  Do you see that?

4   A   (Reading)  I bet that feels shitty.  What are John

5   Does 1 through 10 --

6   Q   Right.

7   A   -- question mark?

8   Q   Right.  And then how do you respond?

9   A   I say my friends who helped me.  He knows who they

10  are, but is not suing them directly because they don't have

11  money to pay out.

12  Q   Okay.  So that's not consistent with what you just

13  told me, is it?

14  A   Right, that is correct.  I -- I -- I definitely

15  thought at one point that it was also the -- the Students For

16  Safety group is what you are trying to say was John Doe 1

17  through 10 as well.

18  Q   Okay.  In fact, you thought that as soon as you got

19  served with the suit on 7/22/20; right?

20  A   Yes.

21  Q   So that was your initial thought, was that John Does

22  are the people that helped you, which was Students For Safety;

23  right?

24  A   Helped me, they didn't help me publish the flyer, but

25  were in the same group as me, yes.

Page 239

1   Q   Well, they helped with, like, social media you said;

2   right?

3   A   Right, yes.

4   Q   Okay.  All right.  In fact, 232-A, if you'll look at

5   that.

6   A   (Complies with request.)

7   Q   The very --

8   A   Got it.

9   Q   The very last line.

10  A   (Reviewing.)  The -- me contacting the ACLU, I'm

11  talking to Shelby Hobohm.

12  Q   That's what it looks like.

13  A   Okay.

14  Q   And you say you're going to contact them, ask if

15  they'll defend yourself and the John Does; right?

16  A   Yes.

17  Q   Okay.  And that's -- you're thinking Students For

18  Safety; right?

19  A   Yes, I guess that's what's happening.

20  Q   Okay.

21  A   At this time, I don't -- I didn't understand

22  defamation law --

23  Q   Okay.

24  A   -- that it was just me if I wrote it.

25  Q   All right.  And then let's look at 202-A.

Page 240

1           MR. PRINGLE:  202-A.

2   BY MR. SIBLEY (resuming):

3   Q   7/22/20 at 6:01.

4   A   7/22/20, 6:01.  Okay.  Let me ask.  One of the John

5   Does may want to speak with you.

6   Q   Okay.  Who are you talking about?

7   A   This is Hollie.  This is when I'm thinking that this

8   is all going to be -- like, they're going to be in this suit.

9   You're going to get me in discovery --

10  Q   Right.

11  A   -- to reveal all these people.

12  Q   So you thought Hollie was a John Doe at that point?

13  A   Yes, this is what I believed.  It was Hollie.

14  Q   Okay.  All right.  So you may not have known who all

15  of the John Does were because they were -- it said 1 through 10;

16  right?

17  A   Well, I -- I just thought that was like a placeholder

18  number.

19  Q   That's probably right, but, I mean, there weren't --

20  there weren't even 10 people in Students For Safety, where

21  there?

22  A   Right, yeah.

23  Q   Okay.  So you thought it might be the people who were

24  in Students For Safety and, if they were different people, the

25  people who might have been involved in the attack on the house.

Page 241

1   Is that fair?

2   A   Separate theories, because there's no one -- I -- I

3   think I know enough about the Students For Safety people to say

4   that I don't think they're in PWM.  I never saw them with PWM,

5   so two separate things.  I -- it was either to me the Students

6   For Safety women or it was PWM.

7   Q   Okay.  Well, the only -- the only cause of action was

8   for defamation, though; right?

9   A   Yes.

10  Q   So the -- the violent people didn't commit defamation

11  when they attacked Dr. Hubbard's house, did they?

12  A   Didn't they have a poster that said that Dr. Hubbard

13  was a pedophile?  I believe that's defamation.

14  Q   So you think the complaint about the house was

15  painting something on his house and the speech, not the actual

16  violent attack.

17          MR. PRINGLE:  Objection, form.

18  BY THE WITNESS (resuming):

19  A   I'm sorry.  Can you say that again?

20  Q   So you think what was -- Dr. Hubbard's problem with

21  the people that came to his house was the truth of something

22  they painted on a wall and not the actual attack on the house.

23  A   I don't think I ever -- I -- I really don't

24  understand.

25  Q   Okay.  But you knew at least that -- you knew it could

Sarah Blakemore                                    May 28, 2021

Page 242

1 be one or both; right?  Like, the Students For Safety or the
2 people who were involved in the attack on the house.  Is that
3 fair?
4     A   It wouldn't be --
5         MR. PRINGLE:  Objection, form.
6 BY THE WITNESS (resuming):
7     A   It wouldn't be both.  It would be one or the other --
8     Q   Well, what if --
9     A   -- because there's no overlap.
10    Q   Well, how -- you don't know that, though, do you?
11    A   Well, I was confident when I was making the
12 speculations.
13    Q   Right.  You don't know with epistemic certainty
14 that --
15    A   This is true.  I do not.
16    Q   -- a member of the --
17    A   I do not.
18    Q   -- Students For Safety was not also involved in the
19 attack on the house.
20    A   But I believe -- yeah, I never -- you're right.  I
21 just feel that I don't -- that they weren't involved.  That's
22 only a feeling, yes.
23    Q   And you said Hollie was potentially in contact with
24 them; right?
25    A   Yes.  I think Hollie was the one who told me that they

Page 243

1 were saying weird stuff in their group chat, and that's what
2 caused me to talk to Mr. Davis.  I think that was Hollie who
3 told me that.
4     Q   Okay.  All right.  203-A.
5     A   (Reviewing.)  Yes.
6     Q   All right.  7/23/20, 3:16 p.m.
7     A   7/23/20, 6:20 -- 30 p.m.?
8     Q   Now, it's 3:16 p.m.
9     A   3:16 p.m.?  Perfect.  I got that.
10    Q   All right.  This is the day after the lawsuit is
11 filed, and you're talking to Chloe Roman; right?
12    A   Yes.
13    Q   All right.  And you say, I have also advised the John
14 Does not to speak to Hubbard's lawyer, indicated he does not yet
15 know their identities; right?
16    A   (Reviewing.)  Yes.
17    Q   All right.  So it's fair to say at this point you had
18 formed a belief about who you believed the John Does were and
19 told them not to speak since Hubbard's lawyer, which I guess
20 would be the --
21    A   Yes.
22    Q   -- did not know their identity; right?
23    A   This would be the -- the Students For Safety girls,
24 yes.
25    Q   Right.  So you advised them to stay quiet about it so

Page 244

1 that -- because at that point, we didn't know who they were;
2 right?
3     A   Not speak to the -- the Daily Texan, yes.
4     Q   Right.
5     A   Not stay quiet.  I --
6     Q   Okay.
7     A   -- just not speak to the Daily Texan.  That's what I
8 was referring to.
9     Q   Don't call up the newspaper and say, Hey, I'm John Doe
10 3; right?
11    A   Yes.
12    Q   Okay.  Because then they might actually be named in
13 the suit; right?
14    A   Well, I found out later that they couldn't be named in
15 the suit because they weren't the ones -- I was the only one who
16 wrote this.
17    Q   Oh, okay.  Well, there's some discussion about a
18 conspiracy and an agreement to do some things, isn't there, in
19 the lawsuit?
20    A   Conspiracy -- oh, in my lawsuit?
21    Q   The lawsuit against you, right.
22    A   Yes.  Yeah -- yes, there is some contentions about
23 conspiracy, which are untrue.  It was just --
24    Q   Okay.
25    A   It was just me.

Page 245

1     Q   Oh, but they helped you, though, didn't they?
2         MR. PRINGLE:  Objection, form.
3 BY THE WITNESS (resuming):
4     A   They -- I mean, they were my friends.  They -- we had
5 both -- they helped me with social media, they didn't write
6 this, and I think Brittany Blackshear helped me distribute it --
7     Q   Right.  Okay.  So someone --
8     A   -- but nobody --
9     Q   -- at least helped you physically hand it out; right?
10    A   Yes.
11    Q   Okay.  All right.  All right.  Sorry.  Just give me
12 one second.  All right.  Let's look at -- I'm sorry.  There's
13 just -- that's a lot here.  We aren't trying to -- I don't want
14 to go through everything with you, but I'm -- I'm almost done
15 with the document.  I think this may be our last question --
16    A   Okay.
17    Q   -- on this document.  197-A, there's some exchanges
18 with Brandon.
19    A   (Reviewing.)  This is the -- the person who sent me
20 the video that I told you earlier about.
21    Q   Okay.  It's a image.  It says image, I guess.  Does
22 that -- is that what it says?
23    A   I -- it's my -- this is my assumption, but, yes, I
24 think that's the video.
25    Q   All right.  Of the -- of the attack on Dr. Hubbard's

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900      San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Sarah Blakemore                                        May 28, 2021

Page 246

1 house?
2    A   Yeah.
3    Q   And he says it's PWM; right?
4    A   Who does?
5    Q   Or you say it's PWM.  My bad.
6    A   Yes, I do.
7    Q   So you knew in December of 2019 that it was PWM that
8 was responsible for the attack.
9    A   No.  That was purely speculation.
10   Q   Well, you didn't say, I think it's PWM; you said, It
11 is PWM; right?
12   A   That's correct, and I was speculating.
13   Q   Okay.  But you told me before that the first
14 indication you had that they had anything to do with it was not
15 until we filed the suit in the summer of 2020.
16   A   Well, I didn't have any personal knowledge of any
17 indication that they had done that until I saw a video on their
18 Instagram.
19   Q   Well, why did you think it was them here?  Why was
20 that the first thing that came out of your text mouth in this
21 exchange is, It's PWM?
22   A   It seemed like something they could -- would do.
23   Q   All right.  So you heard your attorney cross-examining
24 Dr. Hubbard yesterday and asking him that he wasn't really sure
25 that it was PWM, but you certainly thought it was PWM as soon as

Page 247

1 you saw the attack; right?
2    A   That was my --
3        MR. PRINGLE:  Objection, form.
4 BY THE WITNESS (resuming):
5    A   -- speculation, yes.
6    Q   Okay.  And it was a well-informed -- I mean, you say
7 speculation, but it was an inference that you drew based on the
8 -- the fact that they're capable of that kind of conduct; right?
9    A   I don't know what they're capable of.  I had never
10 seen them in action.  I just --
11   Q   What do you mean you've never seen them in action?
12 You just told me that you saw a video of what they did in
13 Professor Sarkar's class.
14   A   This is correct.  I have never seen them with my own
15 eyes in -- in action, and if -- I'm sorry.  I'm getting
16 distracted.  Will you tell me the question again?
17   Q   Yes.  I mean, you clearly knew that they were capable
18 of this.  That's why -- you just told me that's why you said you
19 thought it was them at that time.
20   A   I did not clearly know that they were capable of this.
21 I -- that was my speculation.  It -- I had formed a negative
22 judgment of them, which is why I told the university that I
23 thought they were going to do something bad at lunch for Fenves,
24 and so, you know, they -- they were previously, to my knowledge,
25 going to do something bad.  It wasn't wHollie -- I had no

Page 248

1 information about this incident, and so I made a speculation.
2    Q   And but you saw the Instagram account the next summer;
3 right?
4    A   Yes.
5    Q   And you knew -- then you knew that it probably was
6 them; right?
7    A   Well, at that point, they posted it on their own
8 Instagram.
9    Q   Right.  So in the summer of 2020 after you were sued,
10 you knew the John Does had to be either Students For Safety or
11 PWM; right?
12   A   Well, at that point, I knew that there were no --
13 there shouldn't be any John Does because it was just me on the
14 flyer.
15        MR. SIBLEY:  Objection, nonresponsive.
16 BY MR. SIBLEY (resuming):
17   Q   That's not what I asked you.
18   A   Okay.
19   Q   You knew whoever the John Does were alleged to be,
20 whether or not they should be in the case, were either Students
21 For Safety or PWM; right?
22        MR. PRINGLE:  Objection, form.
23 BY THE WITNESS (resuming):
24   A   I -- I speculated that those were the two options that
25 I had --

Page 249

1    Q   Okay.  What do you mean when you say speculate?
2 Because you keep using that word now.
3    A   A guess.
4    Q   What does that mean?
5    A   Guess.
6    Q   Okay.  What -- what is -- what's the difference
7 between a guess and knowing something?
8    A   Well, not -- I wouldn't say much.  Maybe some sort of,
9 like, verification.  That could be subjective or objective, to
10 make it knowledge.
11   Q   Okay.  Well, you had firsthand knowledge that certain
12 people in Students For Safety helped you with the flyer; right?
13 That's personal knowledge, isn't it?
14        MR. PRINGLE:  Objection, form.
15 BY THE WITNESS (resuming):
16   A   No one helped me with the flyer.  They helped me pass
17 it out.  I wrote it myself.
18   Q   Okay.  They helped you distribute the flyer, didn't
19 they?
20   A   One of them did, yes.
21   Q   One of them helped you on social media, didn't they?
22   A   Yes, same one.
23   Q   Okay.  You also knew, based on review of video
24 evidence and interactions with the Popular Women's Movement,
25 that they were capable of violent conduct, didn't you?

Page 250

1    A    I did not know that.  That was my guess.

2    Q    Why was it a guess?  You just told me you saw the

3    video.

4    A    I did, yeah.  I don't know what anyone can do at any

5    particular time.  I don't know if they were occupied on the day

6    that this happened.  It --

7    Q    But you had some --

8    A    -- doesn't say I can objectively know that they would

9    have done this.

10   Q    Okay.  But you had some reason to believe in December,

11   the day after the attack, that it was that group; right?

12   A    Yeah, just based off my subjective experience with

13   them.

14   Q    Isn't everything based on subjective experience?

15   Isn't that how we know everything?

16   A    Not quite.

17   Q    Really?  How do we know anything else, then?

18   A    I -- is this relevant?  How do --

19   Q    Well, it is --

20   A    -- you know things?

21   Q    -- because you keep saying you're speculating.  I want

22   to know what that means.  How -- how is that different than

23   anything else?  You're speculating man's been to the moon

24   because you've seen video evidence, but you weren't there and it

25   could be fake; right?  That's the whole conspiracy theory about

Page 251

1    the moon landing; right?

2    A    Yes, but I wouldn't call that speculation --

3    Q    Oh.

4    A    -- because, to me, there's more verifiable evidence --

5    Q    Okay.

6    A    -- than there is -- I mean, there is no evidence to

7    show me that PW -- that was what PWM did.

8    Q    There was enough evidence for you to say that it was

9    them, wasn't it?

10   A    There was a -- there was a guess in my mind, that I

11   saw that image --

12   Q    Okay.

13   A    -- and that was the first thing that came to my mind.

14   Q    Turns out you were right, though; right?

15   A    Well, I -- if that is what you're asserting and that's

16   what you found proof of, then --

17   Q    You just told me you saw their vide on Instagram.

18   A    I did see their video on Instagram.

19   Q    Well, it turns out you were right.

20   A    I don't know who, you know, did what.  I know that PWM

21   was at Hubbard's house at some point.

22   Q    Okay.  All right.

23   A    I don't know who -- there was -- I think there was,

24   like, a brick thrown, I don't know who did that; I don't know

25   who did the spray painting.  I don't know anything.

Page 252

1    Q    You said that you -- you met them at -- or met

2    Patricia at one of the sit-ins; right?

3    A    Yes, I think so.

4    Q    Did they chant, Abusive creeps deserve to die?

5    A    Oh, my goodness.  I do not believe so.

6    Q    Okay.  You don't remember hearing that at any of the

7    sit-ins?

8    A    I cannot say I ever heard that.

9    Q    Okay.

10   A    Can we take a break?

11   Q    Let me -- let me finish this line and then we will.

12   A    Okay.

13   Q    Just -- just a few minutes.  All right.  So if it were

14   reported in the Daily Texan that the PWM chanted, Abusive creeps

15   deserve to die, would you have any reason to dispute that having

16   been someone that was at some of these sit-ins?

17        MR. PRINGLE:  Objection, form.

18   BY THE WITNESS (resuming):

19   A    Well, I didn't see it, so I think I could have every

20   reason to dispute it.  I don't know.

21   Q    Okay.  Well, you -- you were having some memory issues

22   at that time, so maybe you forgot; right?

23   A    I don't think I forgot.

24   Q    Well, if we forget things, we generally don't --

25   A    Well, this is true.

Page 253

1    Q    -- know we forget them; right?

2    A    Yes.  I don't think I forgot.  I think that would have

3    been very shocking to me to say that people would die.  That

4    could possibly even be triggering.  That's something I would

5    remember.

6    Q    All right.  Well, last question before we take a

7    break.  When -- what was it that caused you to form the belief

8    that the Popular Women's Movement was capable of violent

9    conduct?  At what point did that happen where you wanted to

10   distance yourself from them?

11   A    When did I believe that they were capable of violent

12   conduct?

13   Q    Yeah.

14   A    I don't know exactly which one was first, but when

15   they disrupted Sarkar's class, I didn't like the way they did

16   it.  They were disruptive, they were yelling things, and that

17   would've been personally triggering to me if somebody came into

18   my classroom, like, yelling all of this crazy stuff about sexual

19   misconduct, and that would have been traumatic, so I didn't like

20   that they did that.  To me, that was disruptive and that was

21   enough for me not to want to associate with them with this

22   endeavor.

23   Q    What about the attempt to invade the lunch of

24   President Fenves?

25   A    I think that was after.  I don't know which one was

Page 254

1 first.  Sorry I started with that.  I didn't get to the -- yes,
2 invading the lunch with Fenves would have been a trigger to me
3 if it had been first.
4      Q    That's certainly evidence that they are capable and --
5 and willing to engage in, at -- at best, highly confrontational
6 conduct.  Would you agree with me?
7      A    Well, maybe the -- maybe the class storming, but not
8 -- they never did anything at Fenves' lunch, so I couldn't say
9 that that would be evidence of them --
10      Q    Well, there was --
11      A    -- being capable of something.
12      Q    There was an informant that tipped off the
13 administration that it was going to happen, though, wasn't
14 there?
15      A    Yes, that was me.
16      Q    Okay.  So we don't know what might have happened had
17 you not tipped off the administration that this was planned;
18 right?
19      A    That's correct.  That's why I don't know that they
20 would've been capable of this kind of stuff.
21           MR. SIBLEY:  Okay.  All right.  Let's take a
22 break.
23           VIDEOGRAPHER:  We are off the record at 5:36.
24           (A recess is taken.)
25           VIDEOGRAPHER:  We are back on the record at 4:49

Page 255

1 -- 5:49.
2           MR. SIBLEY:  Yeah.  I think there's -- how much
3 is left on the -- how much are we -- time are we down?
4           VIDEOGRAPHER:  4 hours and 46 minutes.
5           MR. SIBLEY:  I'm not going to be too much longer,
6 but -- unless you've got questions, Ross.  I don't know, but we
7 shouldn't be here too much longer.
8 BY MR. SIBLEY (resuming):
9      Q    Okay.  So the lunch that President Fenves was going to
10 have that the Popular Women's Movement was going to protest, was
11 that a lunch that you wound up going to?
12      A    No, I did not attend.  I think it was -- they have,
13 like, a monthly president's lunch with students.  It's part of
14 the president being able to interact with people.
15      Q    Is that something open to the general public?  Like,
16 if I wanted to show up and have lunch with President Fenves,
17 could I do it?
18      A    You -- you submit an application.  It's, like, on --
19 whatever UT qualtrics (ph).
20      Q    Okay.
21      A    Yeah, you have to apply to go say why you would want
22 to speak to Fenves or why --
23      Q    All right.  So --
24      A    -- you would want to meet him and then it's
25 selected from there.

Page 256

1      Q    So if I just showed up and was like, Hey, I want to
2 get in and, you know, sit at -- on somebody's lap on the table
3 of the lunch people, I can't -- I can't do that; right?
4      A    No, I don't think you could.
5      Q    All right.  Let's look at Exhibit 16.  It
6 looks like an E-mail between you and Jim Davis; right?
7      A    Yes.
8      Q    Is that the E-mail where you more or less tipped off
9 the -- what's about to happen with the --
10      A    Yes.
11      Q    -- President Fenves lunch, or your understanding of
12 what's going to happen; right?
13      A    Right.
14      Q    All right.  It says they're going to sneak in; right?
15      A    Sneak into/sabotage, so both of those things being on
16 the same, I guess, or basis.
17      Q    All right.  But it would be trespassing to go into the
18 lunch, as you described it, when only select people were
19 invited; right?
20      A    Sorry.  I don't really know the definition of
21 trespassing.  It seems vague to me.
22      Q    Really?
23      A    Well, I don't know a legal definition of trespassing,
24 no, I don't.
25      Q    Well, I can't just show up at you and your folks'

Page 257

1 house and said, I'm going to come in for dinner, can I?
2      A    Right.
3      Q    Unless you invite me in.
4      A    Right.
5      Q    Okay.  So you at least had an understanding that they
6 were willing to -- although it's trespassing, I don't know what
7 level misdemeanor that might be, you understood that they were
8 willing to potentially break the law to engage in their protest;
9 right?
10      A    Well, I didn't know exactly what they were planning on
11 doing.  I assumed that it was not okay.  I didn't think that it
12 would be a trespassing if they were students on campus, but --
13      Q    But I thought you said you --
14      A    -- I guess that's --
15      Q    -- didn't know if they were students.
16      A    Well, I said if they were students on campus.
17      Q    But you didn't know that; right?
18      A    Right, yeah, I didn't know.  I never had a class with
19 anybody or saw anybody like that.
20      Q    And even if they were students, they had to get
21 special permission to go to the lunch; right?
22      A    Yes.
23      Q    Otherwise it's just a free-for-all; right?
24      A    That would be correct.
25      Q    All right.  All right.  Let's look at -- and I promise

Sarah Blakemore                                                    May 28, 2021

Page 258

1 you we're not going to go through that many pages in this
2 document, but I'm just going to introduce it.
3    A    (Nonverbal response.)
4         MR. PRINGLE:  Yikes.
5         MR. SIBLEY:  I don't have a clip for this, Ross,
6 so --
7         MR. PRINGLE:  Okay.  I can get you one.
8         MR. SIBLEY:  -- I'm just going to have it like
9 that.  And that's -- that's your copy, but I'm going to give --
10 I'm going to give her the one with the company.
11         MR. PRINGLE:  Okay.
12         THE WITNESS:  Oh, thank you.
13 BY MR. SIBLEY (resuming):
14    Q    So this will be Exhibit 17.  That's --
15    A    Yes, you got the clip.  Okay.
16    Q    That's the production we received, which I believe is
17 your Signal communications that you produced in this case; is
18 that right?
19    A    Yes, it is.
20    Q    All right.  And can you just read off the beginning
21 and ending Bates numbers so we have that?
22    A    This is Blakemore 067, and it's Exhibit Number 17.
23    Q    And it ends at what page?
24    A    It ends at Blakemore 204.
25    Q    Okay.  And the -- the other document, just so -- just

Page 259

1 so the record's clear was beginning at Blakemore -- this is
2 Exhibit 15 I'm talking about -- was beginning at Blakemore
3 191-A --
4    A    Yes.
5    Q    -- and concluding at Blakemore 235-A; correct?
6 Exhibit 15.
7    A    I do have 235-A as my end.
8    Q    Okay.  Perfect.  Let's look at Page Blakemore 092 of
9 that Exhibit 17 I just gave you.
10    A    (Reviewing.)  Got it.
11    Q    Actually, I've gone a little too far, and if you would
12 go with me to 087.  It's a few pages prior.  Just let me know
13 when you're there.
14    A    Okay.
15    Q    All right.
16    A    Okay.
17    Q    This is from Kaya Epstein?
18    A    Yes.
19    Q    Right?  It looks like it's on November 26, 2019;
20 right?
21    A    Yes.
22    Q    All right.  And that's five days after the flyer was
23 distributed; correct?
24    A    If it was distributed on the 21st, then yes.
25    Q    All right.  And she says, I just found a blog by a

Page 260

1 professor basically describing Hubbard's philosophy -- do you
2 see that?
3    A    Yes.
4    Q    Okay.  -- talks he's given and his historical defense
5 of rape.  It's critical and it's written from a perspective of
6 an academic disgusted by someone in her field.  Do you see that?
7    A    Yes.
8    Q    And you said, Oh, yeah, send me that link.
9    A    And then I sent her a link.
10    Q    Okay.  And that's -- what's the link that you sent?
11    A    That's the -- the link to the blog from Rebecca
12 Futo Kennedy, I think.  It says RFK Classics.
13    Q    Okay.  But isn't Kaya Epstein talking about
14 Futo Kennedy?
15    A    I would assume she's talking about Futo Kennedy.
16    Q    Okay.  And then she says, I screenshotted it and I'll
17 finish reading it tonight; right?
18    A    Right.
19    Q    And then you say, Is it this guy?
20    A    I think it has -- so these are all sent in the same
21 minute.  I think I was trying to say -- she had said that she
22 found this blog and it was my assumption that that was the blog
23 she was talking about, was Rebecca Futo Kennedy.
24    Q    But that's not a guy, is it?
25    A    No.  I'm just using, you know, guys, you guys, is it

Page 261

1 this guy.
2    Q    So you're referring to Professor Kennedy as a guy.
3    A    Yeah.
4    Q    Okay.  Well, then she says --
5    A    Or maybe.  I -- I -- I don't know why --
6    Q    Well, let's look at the next page.
7    A    Okay.
8         MR. PRINGLE:  Hang on.  Were you done?  Were you
9 done with your answer?
10         THE WITNESS:  Oh, I -- yes, I am done with my
11 answer.  I think that's -- I'm talking about Rebecca.
12 BY MR. SIBLEY (resuming):
13    Q    Well, you say Rebecca -- or she says -- Kaya says,
14 Rebecca something, on the next page; right?
15    A    Yeah.
16    Q    And then you say, I haven't read it yet; right?
17    A    Right.
18    Q    So as of November 26, 2019, at 5:40 p.m., you had not
19 actually read Futo Kennedy's paper.
20    A    This statement doesn't reflect the truth on here.  I
21 -- I had read Kennedy's blog.  I don't know why I said that, I
22 don't know why I said guy, but I had read the blog at that
23 point.
24    Q    Uh-huh.  So it -- I mean, it looks like to me, if I'm
25 reconstructing this based on people telling the truth based on

Sarah Blakemore                                              May 28, 2021

Page 262

1  what they're saying in the moment is you did a Google search
2  after you got the text on November 26, 2019, and then you sent
3  the link and said, Is it this guy.
4        MR. PRINGLE:  Objection, form.
5  BY THE WITNESS (resuming):
6     A   I don't think that's correct.
7     Q   Okay.  So you're lying to yourself when you say you
8  haven't read it yet on November 26th.
9     A   I'm lying to myself on November 26th or I'm lying to
10  myself now?
11    Q   Well, it says you haven't read it yet on November
12  26th.
13    A   Right.  That's untrue.  I would -- I don't think --
14  think I'm lying to myself.
15    Q   Well, you told -- you've -- it's been your position
16  that you relied on Futo Kennedy's paper in connection with the
17  flyer; correct?
18    A   Yes, that is my contention.
19    Q   So if you hadn't read it yet, you couldn't have relied
20  on it in connection with the flyer; right?
21    A   Right, but I did read it.  I -- I was -- just
22  misspoke.  I wouldn't call that lying to myself.  That was the
23  thing that I was -- distinction that I was making.
24    Q   Well, you -- you sent the link and it looked like you
25  had clicked on it.

Page 263

1     A   I had seen the blog at this point, yes, because I -- I
2  used it to write some of my flyer.
3     Q   But you said you hadn't read it.  Why would you say
4  you hadn't read it yet if you used it in the flyer?
5        MR. PRINGLE:  Objection, form.
6  BY THE WITNESS (resuming):
7     A   I don't know why I would have said I hadn't read it
8  yet.  I had.
9     Q   Why wouldn't you say, Oh, yeah, that's part of what I
10  relied on when I came up with the flyer --
11    A   Well, it's --
12    Q   -- Student for Safety member?
13    A   It's possible that I didn't read the whole blog or,
14  you know, what was going on that -- when I looked at the link
15  that I sent to this one, I didn't recognize it, but I had read
16  it previously.  That's --
17    Q   Okay.
18    A   I can only speculate, and I would say maybe I didn't
19  recognize it or maybe I just plainly misspoke, but I had read it
20  at the -- that point.
21    Q   Okay.  Why didn't you actually refer to it in the
22  flyer?
23    A   Because --
24    Q   Why didn't you refer to, Esteemed scholar
25  Rebecca Futo Kennedy agrees with my conclusions?

Page 264

1     A   I didn't feel the need to.  I didn't consider it.
2     Q   Okay.  Well, let's keep moving on in this Signal
3  communications.
4     A   Okay.
5     Q   She says, Yeah, that's my plan for tonight, meaning
6  pull quotes.  At a glance, I can see some good stuff.  And then
7  we start getting some screenshots with highlighting.
8     A   (Reviewing.)  Okay.  So this is the next day?
9     Q   Yeah.
10    A   Okay.  Yes, I see these.
11    Q   Okay.  And what are these things that you're getting?
12    A   (Reviewing.)
13    Q   What are these screenshots?
14    A   Abstract -- I don't exactly know what this is, yeah,
15  and -- but if I had to speculate, I would say that it's
16  something -- one of the flyers that Popular Women's Movement
17  handed out.  The one that I said that I would have thrown away.
18    Q   Okay.  But this is talking about Hubbard.
19    A   Yeah.
20    Q   Popular Women's Movement handed out flyers about
21  Hubbard?
22    A   If -- if I'm correct that this is a flyer by them,
23  then, yes, they did.
24    Q   Okay.  All right.  You go on to say at Page 92, Wow,
25  that article was a sobering end to the night.

Page 265

1     A   Uh-huh.
2     Q   That's what you say; right?
3     A   Uh-huh.
4     Q   Are you talking about Futo Kennedy or are you talking
5  about this other stuff that you got screenshots of here?
6     A   I -- I don't know.
7     Q   Okay.
8     A   I mean -- yeah, I don't know.  Sorry.
9     Q   All right.  And then later on on Page 92, I guess this
10  is Kaya.  It says, Let's veto talking about pedos for the
11  holiday; right?
12    A   Yes.
13    Q   And it's -- that's referring to Dr. Hubbard; right?
14    A   I --
15        MR. PRINGLE:  Objection, form.
16  BY THE WITNESS (resuming):
17    A   -- don't think so.  I don't know.
18    Q   Okay.
19    A   It may have been.
20    Q   All right.  Well, let's go to Page 109.
21    A   (Reviewing.)  Here we go.
22    Q   Okay.  You say -- or Hollie says, Childhood SA, like,
23  ruined my life, and to be able to hopefully ruin the life of at
24  least one pedophile means so much; right?
25    A   She does say that.

Sarah Blakemore                                                                     May 28, 2021

Page 266

1    Q   Okay.  And that's not referring to Dr. Hubbard --
2          MR. PRINGLE:  Objection, form.
3  BY MR. SIBLEY (resuming):
4    Q   -- on November 23rd?
5          MR. PRINGLE:  Objection, form.
6  BY THE WITNESS (resuming):
7    A   (Reviewing.)  It could be referring to him.  I don't
8  know what --
9    Q   Okay.
10   A   -- it would be.
11   Q   Have you tried to ruin any other pedophile's life at
12 this time --
13   A   Personally --
14   Q   -- than Dr. Hubbard?
15   A   -- I've never tried to ruin a pedophile's life.
16   Q   Okay.  Well, anyone else that could be accused of
17 being a pedophile at that time.
18   A   Have I tried to ruin someone's life?
19   Q   Well, have you protested anyone else on November 23rd
20 of 2019?  Is there anyone else that you specifically protested
21 that has been accused of being a pedophile?
22   A   There is no one else that I protested.
23   Q   Okay.  So this can only really be referring to
24 Dr. Hubbard; right?
25   A   Well --

Page 267

1          MR. PRINGLE:  Objection, form.
2  BY THE WITNESS (resuming):
3    A   -- if -- no, I don't think it could only be referring
4  to Dr. Hubbard.  I -- I am the only one -- Dr. Hubbard is the
5  only one that I have protested against.  I don't know what
6  Hollie is doing.  It would be speculating.  And, you know, it
7  could be Dr. Hubbard, but that's -- I don't know.
8    Q   All right.  Well, let's go to Page 112.  It's also on
9  November 26th, so it's a few days later.
10   A   Uh-huh.
11   Q   Hollie says, Also, starting tonight at 5, I'm free
12 from school.  Do you see that?
13   A   Yes, So I can be more helpful, eyes.
14   Q   Right.  Okay.  And if you go -- actually, if you go to
15 the preceding page, you're talking about a FOIA request -- or
16 Hollie's talking about a FOIA request on Page 111.
17   A   (Reading)  Send me the FOIA request, or are those
18 accessible somewhere?
19   Q   And then you say, I can look into any civil cases
20 filed in his name; right?
21   A   That's correct.
22   Q   Is that when you refer to -- you did a search, like,
23 on Travis County to see if Dr. Hubbard had been involved in
24 litigation?
25   A   Yes, I think I did Travis County or we searched Texas,

Page 268

1  something like that.
2    Q   Okay.  And then let's go back to that page we were on
3  before, 112.
4    A   We are back on 112.
5    Q   Okay.  You say, While we like a pedophile, we really
6  love one who thinks he can beat us in court; right?
7    A   Yes.
8    Q   That idiot is going down; right?
9    A   Yes.
10   Q   That's Dr. Hubbard; right?
11   A   I am referring to Dr. Hubbard right there.
12   Q   Okay.  So this is another instance we have of you
13 referring to him as a pedophile, isn't it?
14   A   Yes --
15   Q   And this is --
16   A   -- this is another incidence.
17   Q   -- about five days after the flyer.
18   A   Yes.
19   Q   All right.  So we can't really blame this on, You got
20 served with a lawsuit and you were a little, you know,
21 emotional; right?
22   A   I -- I certainly couldn't blame it on being emotional.
23 I mean, I certainly couldn't blame it on being sued because I
24 wasn't sued yet.
25   Q   Right.

Page 269

1    A   I'm sure I was emotional.  It -- it was inappropriate
2  to say that.
3    Q   Okay.  All right.  Give me a second.  I need to go
4  into some of this document.
5    A   Okay.
6    Q   By the way, do you believe -- forget about whether --
7  I know we have a legal dispute about whether your statements
8  were defamatory; right?
9    A   Uh-huh.
10   Q   And you contend they're not defamatory; correct?
11   A   Forgetting about what?  Sorry.
12   Q   Your statements.  It's your contention they're not
13 defamatory; right?
14         MR. PRINGLE:  Objection, form.
15 BY THE WITNESS (resuming):
16   A   It's my contention that the -- the statements I made
17 in the flyer are not defamatory?
18   Q   Right.  You're not -- I mean, surely you're not
19 admitting that they're defamatory; right?
20   A   That is correct --
21   Q   All right.
22   A   -- I am not admitting that they are defamatory.
23   Q   All right.  Well, putting that aside, would you agree
24 with me that the statements have been damaging to Dr. Hubbard's
25 reputation?

Sarah Blakemore                                           May 28, 2021

Page 270

1    A   I mean, I'm not sure.  I -- there had already been
2  criticism of him on the Internet that I had previously found,
3  like Dr. Futo Kennedy.
4    Q   Okay.  But no one had come to his house and vandalized
5  it after Dr. Futo Kennedy's -- whatever she -- publication;
6  right?
7          MR. PRINGLE:  Objection, form.
8  BY THE WITNESS (resuming):
9    A   Not that I know of.
10   Q   Okay.  There were no major news outlets that picked up
11  Futo Kennedy's paper, were there?
12   A   I don't know that.
13   Q   Well, do you know whether there were?
14   A   I didn't see any.
15   Q   Okay.
16   A   That doesn't mean that there were not.
17   Q   Okay.  There were no statements released by the
18  university about Dr. Hubbard in response to something
19  Futo Kennedy authored, were there?
20   A   I don't know if there were.  I don't think so.  I
21  didn't see any.
22   Q   Okay.  But there were after your flyer; right?
23   A   That is correct.  I mean, in the same time span, so,
24  yes, after my flyer or maybe after --
25   Q   Well --

Page 271

1    A   -- the news stories.
2    Q   -- immediately after the flyer; right?
3    A   I -- I don't know when the university came out with a
4  statement.
5    Q   Well, there were news stories about your flyer pretty
6  quickly afterwards; right?
7    A   That's a fair -- yeah.
8    Q   Okay.  Within less -- less than a month, Dr. Hubbard's
9  house is vandalized; right?
10   A   Less than a month from?
11   A   After the flyer.
12   A   After the flyer?
13   A   Yep.
14   A   That's correct.
15   Q   Okay.  And President Fenves issued a statement about
16  Dr. Hubbard within about a month after your flyer; right?
17   A   I don't remember that, but if you say that he did,
18  then I would agree.
19   Q   Okay.
20   A   I -- I know that he released some statement I think
21  with a newspaper maybe --
22   Q   All right.  Well --
23   A   -- or wrote a letter to the editor.
24   Q   You don't know anything about President Fenves getting
25  -- or having a text with Futo Kennedy's paper on it like your

Page 272

1  flyer, do you?
2    A   Right, just like I don't know that he had the text
3  from my flyer.  Jim Davis just told me that.
4    Q   All right.  So that's just speculating; right?
5    A   (Nonverbal response.)
6    Q   Jim Davis could just be lying to you.
7    A   That is very possible, yes.
8    Q   Okay.  All right.  Let's look at 113.  I think that
9  was the --
10   A   It's the immediate next page.
11   Q   Yeah.  All right.  What -- what is Hollie talking
12  about on, Update on year?  They don't know the year, but they
13  said they're actively trying to find out for us.  Classics grad
14  student and we are welcome to drop [sic] the grad-student lounge
15  if we need coffee to meet in person, whatever.
16   A   I'm sorry.  What are you asking about it?
17   Q   Well, do you know what she's talking about?
18   A   The -- the -- I don't know, I don't.
19   Q   Well, you say earlier, When you get that year, let me
20  know.
21   A   Right, I don't -- I don't remember what year this is
22  talking about.
23   Q   Okay.  It's not talking about maybe the year that
24  someone had complaints about supposedly like Dr. Hubbard's
25  Mythologies of Rape class?

Page 273

1    A   I don't know.  Wasn't there -- there was a DM
2  previously.
3    Q   Right.  Who --
4    A   Yeah, I -- I don't know what that's really referring
5  to.  It -- it could be referring to that.  I don't know.
6    Q   Okay.  Did you ever meet with anyone that was in the
7  class -- supposedly in Dr. Hubbard's Mythologies of Rape class?
8          MR. PRINGLE:  Objection, form.
9  BY THE WITNESS (resuming):
10   A   Did I ever meet with someone face to face?
11   Q   The -- yeah, the person that's being talked about in
12  the -- in the Signal chain.
13   A   The grad student that they're talking about?
14   Q   Yeah.
15   A   No, no, I never met anyone like that.
16   Q   You don't remember, sitting here today, who it was?
17   A   I never went to Wag 13.  I met Zoe eventually, but
18  that's -- I don't think that's the grad student of this -- this
19  one.  That's the only grad student in the classics department I
20  think I know.
21   Q   Okay.  All right.  Just a few more and we're almost
22  done.
23          MR. SIBLEY:  All right.  What number are we on
24  now?  I forget.
25          THE WITNESS:  Are we done with this?

Page 274

1       MR. SIBLEY:  Yeah.  All right.  Exhibit 18.
2       MR. PRINGLE:  Thanks.
3       THE WITNESS:  Thank you.
4  BY MR. SIBLEY (resuming):
5    Q   All right.  Have you seen this document before?
6    A   Joint Discovery Case -- I -- no, I don't think I've
7  seen this.
8    Q   Well, you were -- weren't you on a call when we had
9  the first 26(f) conference with your dad?
10   A   Is that the -- the scheduling conference?
11   Q   Sort of, yeah.
12   A   Okay.  Yeah, I was on that call, yes.
13   Q   Okay.  Look at Page 2, Item 6.
14   A   (Reading) List anticipated additional parties that
15  should be included.  Okay.  So I see Item 6.
16   Q   Yeah.  So it says, List anticipated additional parties
17  that should be included.  Do you see that?
18   A   Yes.
19   Q   Okay.  And it says, Plaintiff has named 10 John Does
20  in addition to defendant who are accused of acting in concert
21  with plaintiff; right?
22   A   Plaintiff has named 10 John Does in addition to the
23  defendant (reading unintelligibly) -- who are accused of acting
24  in concert with Dr. Hubbard?
25   Q   Well, Dr. Hubbard's the plaintiff, isn't he?

Page 275

1    A   Right.  Who would act in concert with Dr. Hubbard.
2    Q   Oh, that's -- yeah, totally.  That's a misprint,
3  misstate.  Plaintiff intends to conduct initial discovery and
4  determine whether the John Does can be identified and properly
5  joined.
6    A   What?  Oh, you want --
7    Q   Can you read?
8    A   -- me to keep reading?
9    Q   Yeah, or can you -- you're reading that; right?
10   A   The -- I -- I don't -- sorry.  I don't see properly
11  joined.
12   Q   All right.  Well, you understand that --
13   A   Oh, properly joined.  I see this, yes.
14   Q   All right.  You understand there was a complaint filed
15  against you and John Does for committing in concert -- conduct
16  that was in concert with one another; right?
17   A   Right, what I call a conspiracy.
18   Q   Something like that.
19   A   Uh-huh.
20   Q   Okay.  All right.  And it says, As you knew in the
21  summer of 2020 that plaintiff does not know who they are, but
22  wants to conduct discovery to find out who they are, basically
23  is what that says; right?
24   A   What -- what -- what are you saying basically that
25  that says?  Where it starts with, Defendant denies?

Page 276

1    Q   No.  Plaintiff intends to conduct initial discovery.
2    A   Okay.  You guys.  Yes, you-all are doing --
3    Q   Okay.
4    A   -- initial discovery.
5    Q   And then it says, Defendant denies any association
6  with these individuals and will aver that she does not even know
7  the identity of these John Does.  Do you see that?
8    A   Yes, I do see that.
9    Q   That wasn't true, was it?
10   A   I don't --
11       MR. PRINGLE:  Objection, form.
12  BY THE WITNESS (resuming):
13   A   When was this?  I don't think that that's not true.
14  I --
15   Q   Well, you can look at the top of the page --
16   A   -- probably knew at this point that --
17       MR. PRINGLE:  Let her finish.
18  BY THE WITNESS (resuming):
19   A   I probably knew at this point that there couldn't be
20  anybody else named in the lawsuit besides me because I was the
21  only one who did the flyer.
22   Q   Okay.  So your position was because you thought no one
23  else could be liable, you didn't have to tell anyone who the
24  John Does were; right?
25   A   Well, I didn't know who the John Does were.  I just

Page 277

1  thought they were people who were -- there was some alleged plot
2  of me being in a conspiracy and there was no one in a conspiracy
3  with me.  I just wrote the flyer on my own, and at that point I
4  understood that this lawsuit was about the flyer.
5    Q   Okay.  So what you're saying here is that even though
6  you said in the summer you knew who the John Does were, which
7  were the Students For Safety; right?
8    A   Right.  My speculation of I knew that -- me
9  speculating I knew who the John Does were.
10   Q   You can use the word speculation, but that's not the
11  word you used in your statements, which we already have; right?
12  You said you knew who they were and you'd been in contact with
13  them; right?
14   A   I think you'd have to refer me back.
15   Q   Okay.  Well, it says what it says.
16   A   Okay.
17   Q   You also said earlier that you knew it was either
18  Students for Safety or, which you discovered later, certainly by
19  the summer of 2020, the Popular Women's Movement; right?
20   A   Those were my speculations, yes.
21   Q   Oh, okay.  Well, you said it had to be one or the
22  other, though.  It had to be either the people who helped you
23  with the flyer, which was at least someone who helped you pass
24  it out; right?
25   A   It could have been the people who -- who -- I was

Sarah Blakemore                                                          May 28, 2021

Page 278

1 thinking that it was -- yeah, I've explained this before. I was
2 thinking that it was either Popular Women's Movement or Students
3 For Safety, but no one helped me in Students For Safety besides
4 just passing it out.
5    Q   Okay. So, like, distributing defamatory material,
6 that's got nothing to do with spreading defamation according to
7 you; right?
8    A   I mean, I don't remember the specific contentions of
9 the thing. I just thought --
10   Q   Why didn't --
11   A   -- that there was no other John Does because I had no
12 -- I had not --
13   Q   Why didn't you say that then?
14       MR. PRINGLE: (Crosstalk.)
15 BY MR. SIBLEY (resuming):
16   Q   Why didn't you say there's no other --
17       MR. PRINGLE: Let her finish --
18 BY MR. SIBLEY (resuming):
19   Q   -- John Does?
20       MR. PRINGLE: Let her finish her answer.
21 BY THE WITNESS (resuming):
22   A   I had not worked on this flyer with anyone but myself.
23 I had just done it myself. Someone had helped me pass out a
24 finished product, but it was my product.
25   Q   Okay. Then why didn't you say, There are no other

Page 279

1 John Does because I did everything by myself. Even though you
2 said you weren't sure if we were complaining about the house
3 attack, someone else did that; right? That wasn't you, was it?
4       MR. PRINGLE: Objection, form.
5 BY THE WITNESS (resuming):
6    A   Are you -- are you just asking me if I did the attack
7 on Dr. Hubbard's house?
8    Q   You told me earlier that you thought perhaps
9 Dr. Hubbard was complaining about the attack on his house and
10 whoever spray-painted the word, remember?
11   A   My original assumption before I read the whole thing
12 was, yes, that maybe it could be referring to the people who
13 vandalized Hubbard's home.
14   Q   And that wasn't you, was it?
15   A   The people who vandalized Hubbard's home?
16   Q   Right.
17   A   No, I was not --
18   Q   Of course.
19   A   -- a part of that and I was not a party to that.
20   Q   Okay. So you didn't say, I don't think anyone else
21 can be liable and I'm not going to tell you who you think is
22 liable. You just said, You don't know who they are; right?
23 That's what you said.
24       MR. PRINGLE: Objection, form.
25 BY THE WITNESS (resuming):

Page 280

1    A   I said that where? Here?
2    Q   It's right here. You said you do not even know the
3 identity of these John Does. You didn't say there are no other
4 John Does; you said you don't know who they are.
5    A   Well, I didn't know who you were seeking.
6    Q   You just told me earlier you knew it had to be the
7 people who helped you with the flyer or the people who attacked
8 the house, did you not?
9    A   Those were my two --
10       MR. PRINGLE: Objection, form.
11 BY THE WITNESS (resuming):
12   A   Those were my two speculations.
13   Q   Okay.
14   A   I'm sure it could be something more.
15   Q   Who else could it be? What else -- what other person
16 could possibly be someone acting in concert with you?
17   A   I don't know because no one did. Maybe --
18   Q   What conduct was complained of in the complaint?
19   A   I don't remember specifics. Clearly the flyer.
20   Q   Okay. Isn't it true you just wanted to make sure you
21 covered for your friends so that they didn't get sued?
22   A   No, no, cover for my friends?
23   Q   Yeah.
24   A   I couldn't cover for anyone. This suit is about the
25 flyer and I wrote the flyer myself.

Page 281

1    Q   Right, but you wanted to make sure that none of the
2 John Does who you then, in the summer of 2020, claimed to know
3 who they were, you wanted to make sure they didn't speak to the
4 press because you didn't want us to find out who they were;
5 right?
6       MR. PRINGLE: Objection, form.
7 BY THE WITNESS (resuming):
8    A   Could you ask that again?
9    Q   You knew in the summer of 2020 -- or you believed that
10 we might be after the people who helped you distribute the
11 flyer; correct?
12   A   Yes, I did -- I did believe that maybe that was one of
13 the options of the John Does, was the people --
14   Q   You didn't want us to know who they were; right?
15   A   No. I would've freely admitted, as I did in
16 discovery. You asked who I was -- who was with me on that
17 day --
18   Q   All right.
19   A   -- and I said yes.
20   Q   After limitations had ran; right? Which you already
21 knew about limitations.
22   A   Limitations?
23   Q   Yeah, the statute of limitations, the thing we talked
24 about earlier, and you thought you knew earlier in the year had
25 ran.

Sarah Blakemore                                                    May 28, 2021

Page 282

1   A   (Reviewing.)  Additional parties.  I don't -- I don't
2   see how this indicates -- if we're talking about Ms. Blackshear,
3   I don't see how this question indicates Ms. Blackshear.  I don't
4   know who you were seeking.
5   Q   Okay.
6   A   There was no one else who helped me with the flyer.
7   Q   Okay.  Except pass it out.
8   A   Except pass it out, yes.
9   Q   Right.  And you --
10  A   And -- and my friend made that grammatical fix.
11  Q   Right.  And you made the decision, Sarah Blakemore,
12  that someone helping pass out a flyer has nothing to do with
13  defamation; right?  And so, therefore, I don't have to tell them
14  who that is.
15          MR. PRINGLE:  Objection, form.
16  BY THE WITNESS (resuming):
17  A   I don't think I made that decision.  I think that may
18  have been told to me by counsel.  I don't know.
19  Q   Okay.
20  A   That they were not part of it.
21  Q   Well --
22  A   That Brittany would not be part of it.
23  Q   Okay.
24  A   I didn't attempt to hide the truth.
25  Q   Well, you certainly didn't volunteer it either, did

Page 283

1   you?
2   A   Well, I wasn't asked to volunteer anything specific.
3   It says additional parties.
4   Q   Well, but you --
5   A   I didn't know who you were seeking.
6   Q   Well, you took the position --
7          MR. PRINGLE:  Let her finish.  Let her finish her
8   answer.
9   BY THE WITNESS (resuming):
10  A   You didn't write in the lawsuit who the John Does
11  would've been.
12  Q   That's why they're John Does.
13  A   I know, but you could have said that they were people
14  who helped me write the flyer, then, in which case, I would have
15  said that there was no one --
16  Q   Oh --
17  A   -- who helped me write the flyer.
18  Q   -- okay.  So we needed to be more descriptive about
19  the John Does; right?
20  A   Well, I didn't -- I was only speculating about who I
21  believed the John Does to be.
22  Q   Right.  The day you got served, you knew who they were
23  but then you forgot when you did your 26(f) report a few months
24  later; right?
25          MR. PRINGLE:  Objection, form.

Page 284

1   BY THE WITNESS (resuming):
2   A   No.  The day I got served, I speculated on who I
3   thought it would be and then after getting advice of counsel, I
4   realized that this suit was only against me because I didn't act
5   in concert with anyone else.
6   Q   Oh, okay.  Except passing it out; right?
7   A   Yes.
8   Q   Okay.  And social-media posts; right?
9   A   She helped make the accounts, yes.
10  Q   She being?
11  A   Brittany Blackshear.  Excuse me.
12          MR. SIBLEY:  Okay.  All right.  Why don't you
13  give us about five minutes or so and I think I'm about wrapped
14  up.
15          MR. PRINGLE:  Okay.
16          VIDEOGRAPHER:  We are off the record at 6:22.
17          (A recess is taken.)
18          VIDEOGRAPHER:  We are back on the record at 6:32.
19  BY MR. SIBLEY (resuming):
20  Q   Okay.  Just a few more questions, Ms. Blakemore.  When
21  you authored the flyer, had you done any research into
22  age-of-consent laws?
23  A   I -- I think I might have looked it up, yes.
24  Q   Do you have a recollection of what your impressions
25  were about that research?

Page 285

1   A   Not specifically.  I don't remember anything.
2   Q   Okay.  All right.  Who told you about Sportula as a
3   place to post a flyer?
4   A   Sportula?
5   Q   Yeah.
6   A   Is that the -- the only time I had ever heard that was
7   at the -- Dr. Hubbard's deposition.
8   Q   Okay.  You're not familiar with Sportula?
9   A   No, I didn't post the flyer on it.  And I'm not
10  familiar with it and I did not post the flyer on it.
11  Q   Do you know who did?
12  A   No, I do not.
13  Q   Okay.  All right.  We're going to look at Exhibit 15
14  just for a couple more things real quick, if you can just pull
15  it out.  And look at page --
16  A   Which one is that?  Sorry.
17  Q   It's the one with all of the text messages.
18  A   Oh, okay.
19  Q   But not the big fat one with the pictures on Signal.
20  A   Right.
21  Q   It's just the normal --
22  A   Sorry.
23  Q   -- text message -- text messages.
24  A   I had 16 on top of it.  Okay.  I have it.
25  Q   All right.  So let's look at Page 210-A quickly.

Sarah Blakemore                                          May 28, 2021

Page 286

1    A   Okay.
2    Q   All right.  Go to 7/30/20, 10:53 a.m.
3    A   Is this with Isabelle Paine?
4    Q   Yes.
5    A   Okay.
6    Q   It says, The school wants me to win so fucking bad
7  because then they can fire him.
8    A   Uh-huh.
9    Q   Yes?
10   A   Yes, I see that.
11   Q   Well, what -- what made you make that statement?  What
12  did you know about the school wanting you to win or firing
13  Dr. Hubbard?
14   A   I didn't know anything about the school.  That was
15  just my speculation.
16   Q   Okay.  So no one had told you anything about the
17  school wanting you to win or --
18   A   No.  No one at the university has talked to me about
19  this case since it's been filed.
20   Q   Okay.  Did anyone else --
21   A   I think Fenves said something to me, but...
22   Q   Right.  Did anyone else tell you anything about the
23  case that was not with the university about the university
24  wanting you to win or fire Dr. Hubbard?
25   A   No, no, no one told me that.

Page 287

1    Q   All right.  So this was just speculation.
2    A   Yes, it was --
3    Q   All right.
4    A   -- just speculation.
5    Q   Okay.  So you just assumed that this was true.
6    A   Yes.
7    Q   Why did you assume it was true?
8    A   Well, I think -- I think maybe based on the thing that
9  Dr. Fenves wrote that I understood that the school did not
10  really want to have Dr. Hubbard reflecting on their record the
11  way he was.
12   Q   Which publication is this?  Or which -- what are you
13  talking about?
14   A   Didn't President Fenves write a letter to the editor
15  of some publication --
16   Q   Ah.
17   A   -- about this?
18   Q   You -- we mentioned it earlier, but I didn't think you
19  had recollection of what that was, but sorry.  Go ahead.
20   A   Yes.  I do recall that.  I don't recall anything
21  specific about it, but I'm -- it's my understanding that from
22  that, the school did -- wasn't happy with what Dr. Hubbard was
23  doing.
24   Q   Okay.  223-A.
25   A   (Reviewing.)

Page 288

1    Q   Just let me know when you're there.
2    A   Okay.  Now I'm here.
3    Q   All right.  There was a conversation with
4  Mark Schuster --
5    A   Uh-huh.
6    Q   -- and he says, This guy sounds like a monster.  Do
7  you see that?
8    A   I was about to say that, LOL.  Uh-huh.
9    Q   Yeah.  Okay.  Go a little bit further down, and you
10  say, I have been talking to the press all day.  Do you see that
11  at 4:55 p.m.?
12   A   Yes.
13   Q   All right.  I got a call saying the president read my
14  press release.
15   A   Uh-huh.
16   Q   Yes?
17   A   Yes.
18   Q   Who called you?
19   A   I don't think I remember anyone calling me on the
20  21st.  This might have been referring to me -- to what Jim Davis
21  told me, that President Fenves read my press release.
22   Q   Okay.  But why didn't you just say, you know, Someone
23  told me that he read the press release.  Why would you say you
24  got a call?
25   A   I don't know, I don't know.  I don't know what call

Page 289

1  I'm talking about.  I don't think I got a call.
2    Q   Well, you said the man is in Singapore.  It's 4 a.m.
3  there; right?
4    A   Yes, I did say that.
5    Q   But it's -- it wasn't 4 a.m. when you found out that
6  he had read it at the lunch with Jim Davis; right?
7    A   I believe it would have been in the morning.  I don't
8  know.
9    Q   Okay.  But Singapore is about 12 hours -- it's pretty
10  much opposite of our time, isn't it?
11   A   Okay.
12   Q   It's basically on the exact other side of the world.
13   A   Okay.
14   Q   So, I mean, you seem to have known that when you made
15  the statement; right?
16   A   Uh-huh.
17   Q   Yes?
18   A   I seemed to have known that it was 12 hours in
19  Singapore?
20   Q   Well, you said it's 4 a.m. there, so I'm assuming you
21  had some familiarity with the sort of Greenwich Mean Time table?
22   A   I don't really know what I was talking about.  I could
23  have been --
24   Q   Okay.
25   A   -- misusing the time zone.

Sarah Blakemore                                                    May 28, 2021

Page 290

1   Q   It's almost as though you're trying to make it sound
2   like President Fenves thought your flyer was so important that
3   he sent out a message at 4 a.m. in Singapore.
4       A   I -- I don't know what I was trying to say.
5           MR. SIBLEY:  Okay.  All right.  I pass the
6   witness.
7           MR. PRINGLE:  We will reserve our questions --
8           MR. SIBLEY:  All right.
9           MR. PRINGLE:  -- until the time of trial.
10          MR. SIBLEY:  All right.
11          VIDEOGRAPHER:  We are off the record at 6:38.
12
13
14
15
16
17
18
19
20
21
22
23
24
25          (Whereupon, the proceedings were concluded.)

Page 291

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DR. THOMAS HUBBARD, PhD,        )
                                )
        Plaintiff,              )
                                )
VS.                             )
                                ) CASE NO. 1:20-cv-767
SARAH ALLEN BLAKEMORE and       )
JOHN DOES 1-10,                 )
                                )
        Defendants.             )

REPORTER'S CERTIFICATE
ORAL & VIDEO DEPOSITION OF SARAH ALLEN BLAKEMORE
MAY 28, 2021

    I, Patrick A. Stephens, Certified National Court Reporter,
hereby certify to the following:

    That the witness, SARAH ALLEN BLAKEMORE, was duly sworn and
that the transcript of the deposition is a true record of the
testimony given by the witness;

    That pursuant to FCRP Rule 30(f)(1), request to review the
transcript was not made by either deponent or party before the
deposition was completed.

    That pursuant to information given to the deposition
officer at the time said testimony was taken, the following
includes all parties of record and the amount of time used by
each party at the time of the deposition:

Page 292

Mr. Joseph D. Sibley (5hr 53m)

        Attorney for Plaintiff

Mr. B. Ross Pringle (0m)

        Attorney for Defendant

    I further certify that I am neither counsel for, related
to, nor employed by any of the parties in the action in which
this proceeding was taken, and further that I am not financially
or otherwise interested in the outcome of this action.

    Certified to by me on this 29th day of June, 2021.

                            *

                            *

                            *

                            *

                            *

                            *

                            *

                    PATRICK A. STEPHENS, CCR, CVR

                    GA CERT. NO. 4672-1141-4562-4064

                                        NVRA NO. 5462

# EXHIBIT

# A-4



**Sherrard (Butch) Hayes**
shayes@wshllp.com
direct 512.652.5783

December 10, 2020

<u>*VIA EMAIL & PORTAL*</u>: **roy.roscoe@eeoc.gov**
Roy Roscoe
Equal Employment Opportunity Commission ("EEOC")
San Antonio Field Office
5410 Fredericksburg Rd, Ste 200
San Antonio, TX 78229

> Re:    **Charge No. 451-2020-03555; Response by Charging Party, Dr. Thomas K. Hubbard, to Respondent, The University of Texas at Austin's Position Statement.**

Dear Mr. Roscoe:

On behalf of our client, Dr. Thomas K. Hubbard, we wish to address the questions and comments raised in your November 9, 2020 letter, respond to The University of Texas's Position Statement, and provide additional evidence. Dr. Hubbard offers this response with the understanding that it is submitted as part of the process designed to resolve disputes and, as such, should remain confidential and inadmissible.

To address the elephant in the living room: An employer may be responsible under Title VII for harassment of its employee by third parties. This is an unassailable conclusion. "*Claims of sexual harassment typically involve the behavior of fellow employees. But not always.*" *Gardner v. CLC of Pascagoula LLC*, 915 F. 3d 320 (5th Cir. 2019). Where the harasser is not a supervisor, the claimant needs to show that the employer knew of the harassment and allowed it to persist. *Id.* That is exactly what happened to Dr. Hubbard. "*An employer may . . . be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action.*" *See* 29 C.F.R. § 1604.11(e). The law is very clear that employers can be held responsible under this theory for actions of customers and even patients/residents of nursing homes. *See Gardiner* 915 F.3d at 322, 327. For UT to argue that it cannot be held responsible for the actions of its "customers," its students, ignores a long history of jurisprudence to the contrary.

Here Dr. Hubbard alleges that the harassment he experienced has come from multiple sources, including students over whom UT has some degree of control, and whom it may hold responsible. It has also come from employees of the University, as described below. UT not only failed to take reasonable measures to stop the harassment (by enforcing its own standards of conduct, investigating the crimes against Dr. Hubbard, and making some reasonable attempt to hold students responsible for their actions), but publicly encouraged it.



December 10, 2020
Page 2

Consider this scenario: *A female employee of a restaurant makes good faith complaints about matters related to how the restaurant treats one gender. The manager responsible for the conditions about which the female employee complains sits quietly and waits for a subtle opportunity to get rid of her. She is considered a "problem." A customer who frequents a restaurant five days a week harasses the female employee. The employer knows about it but does nothing to stop the conduct. The customer goes to the female employee's home and stands on her front porch lobbing threats of harm or salacious sex-based allegations at her. The manager knows all about it. All of the customers know all about it. The manager, instead of stopping the conduct, posts a message on the restaurant door stating that he "understands" the customer's feelings about the female employee and shares the feelings of the customer. The manager does nothing to investigate or restrict the customer's conduct but expects the female employee to return to the restaurant anyway with no restriction on the customer. At any moment the customer could come into the restaurant and continue the conduct. During this episode, and for months thereafter, the community learns of the harassment and the female starts to receive daily threats of harm from anonymous sources via email or social media. The restaurant continues to force the female employee to return to work when everyone knows the likelihood of repeated harassment.*

If Dr. Hubbard were a female, or straight, or both would UT allow its students to falsely slander him about inherently and criminally sexual matters? Would it encourage slander in the way that UT's administration has? If fraternity boys showed up at the classroom and home of a women's studies professor who is critical of fraternity culture and violently and falsely accused her of deviant and criminal sexual behaviors would UT ignore the conduct? Should students be given a pass? Isn't publicly but falsely deriding a person as promoting pedophilia or being a pedophile sexual harassment of a sexual nature? Why should the former UT President's public support of those students be ignored? Why should UT be allowed to ignore its own standards of student conduct (specifically Institutional Rules on Student Services and Activities, Chapter 11-404, #1, 3, 11, 18, as well as the general University Code of Conduct) and refuse to properly address what began as salacious sexual allegations that have caused extreme distress, even hospitalization, and bloomed into outright death threats? For UT to wash its hands of any responsibility because its "employees" are not involved is both factually and legally flawed.

Dr. Hubbard brought the above-referenced Charge of Discrimination for employment discrimination/harassment and retaliation based on his sex (male, sexual orientation).[1] The attached exhibits show that Dr. Hubbard was subjected to a hostile work environment because he is male and/or gay. The University also discriminated against Dr. Hubbard in retaliation for his 2017 letters complaining about the CLASE Report's discriminatory effects as well as Dr. Hubbard's 2012 discrimination claims.

Rather than respond to Dr. Hubbard's legitimate claims of employment discrimination and retaliation in violation of Title VII, UT has attempted to shift blame to Dr. Hubbard. In doing so, it

---

[1] Dr. Hubbard's Charge was timely filed. The University's Position Statement incorrectly alleges that Dr. Hubbard's Charge was not timely filed based on an incorrect reading of Fifth Circuit law. Although Section 2000e-5(e)(1) provides that the 300 day deadline applies where "the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice," under Fifth Circuit law "whether the complaint was timely filed with the [THRC] has no effect on the 300-day filing period for the EEOC charge." *Melgar v. T.B. Butler Publ'g Co.*, 931 F.3d 375, 380 n.4 (5th Cir. 2019) (citing *Griffin v. City of Dallas*, 26 F.3d 610 (5th Cir. 1994)); 42 USCS § 2000e-5.



December 10, 2020
Page 3

ignores UT's duties to Dr. Hubbard as his employer and the fundamental protection afforded to him against sex discrimination on the basis of his gender and sexual orientation. In its position statement, the University summarizes the "crux" of the discrimination claims against it as a complaint that "the [U]niversity did not do more to shield [Dr. Hubbard] from the repercussions of his controversial and provocative area of research, specifically pederasty, which involves the attraction of adult males to adolescent males, and lowering age-of consent laws for sexual activity." This is inaccurate and provides a preview to the inconsistencies throughout the position statement: 1) UT did not just "fail to shield" Dr. Hubbard, it actively fueled and supported the discrimination through its public statements and actions taken against Dr. Hubbard; 2) the statement implies that employers are not required to take steps to prevent and address discrimination and overt harassment, including threats of physical harm; and 3) UT knowingly or recklessly made false statements – attributing falsely to Dr. Hubbard advocacy for pedophilia or even pederasty. UT attempts to dismiss the specifics of the writing at issue: a decade-old paper that simply raised the question of whether U.S. age of consent laws should differentiate between male and female adolescents, as they did prior to the late 1970s, and citing historical and criminal justice context for doing so. UT, its administration, and the radical students who have gone unpunished have refused to understand this message. Had it been from a female, or heterosexual male, Dr. Hubbard believes UT and its community would have treated him much differently.

**OIE's conflicting interests**

The University of Texas has tasked its Office for Inclusion and Equality ("OIE") with opposing Dr. Hubbard's charge of discrimination. OIE drafted and submitted UT's position statement to the EEOC. UT's position statement includes—in addition to mischaracterizations of Dr. Hubbard's contentions and unquestionably settled law—one glaring omission that cannot be coincidental. Noticeably absent from UT's position statement is any acknowledgement that, in the weeks after Dr. Hubbard submitted his charge, OIE, the department responding to his EEOC charge, confronted Dr. Hubbard with a request to informally resolve multiple baseless allegations of sexual misconduct including one allegation supposedly brought by a UT staff member on behalf of a student whom Dr. Hubbard does not even know. All such charges against Dr. Hubbard have been dismissed out of hand because they have been meritless. The campaign against Dr. Hubbard continues, and OIE is being used as a tool in that campaign.

**Discrepancies and inaccuracies in the University's position statement**

The University's position statement is filled with factual and legal inaccuracies. In one such example, the University inaccurately paraphrases the violent and defamatory events of the last year, glossing over the University's *own* discriminatory and sexually harassing actions and downplaying the attacks against Dr. Hubbard.



December 10, 2020
Page 4

For example, two women disrupting and completely halting Dr. Hubbard's class to distribute defamatory flyers (which were later posted on the internet) that promoted a rally to demand that UT terminate Dr. Hubbard based on completely unfounded and libelous accusations that he promotes "pedophilia and advocate[s] for violent crime against teen boys" is characterized by UT in the position statement as *"two individuals posted flyers outside Complainant's classroom and spoke with local media about Complainant's research topics."*



Truly, the first paragraph of UT's section "a. Hostile Work Environment" is replete with incorrect portrayals of the events at issue and intentionally and blatantly ignores the relevant facts. Rather than rely on UT's unconvincing synopses, we ask that the EEOC carefully review the underlying sworn statements of Dr. Hubbard.

**UT's mischaracterization:** *"after a local news story was published on Dec. 4, 2019, Complainant received allegedly obscene phone messages and emails on his publicly-available university email and phone extension (paragraph 9)"*

**What actually happened:** Immediately following UT spokeswoman Shilpa Bakre's statements "condemn[ing] ideas or world views that exploit or harm individuals" published in an Austin American Statesman article condemning Dr. Hubbard, he received obscene and abusive calls and emails, which included death threats like those attached as Exhibit H.

**UT's mischaracterization:** *"on the evening of Dec. 5, 2019, someone went to Complainant's house and knocked on his front door repeatedly (paragraph 9)"*

**What actually happened:** Fearing for his safety, Dr. Hubbard was forced to call the police when an unidentified man continuously and loudly banged on Dr. Hubbard's front door the night immediately following UT's statements were published in the Austin American Statesman.

**UT's mischaracterization:** *"on Dec. 8, 2019, Complainant's house was vandalized (paragraph 10)"*



December 10, 2020
Page 5

---

***What actually happened:*** UT student protestors threw a cinderblock through Dr. Hubbard's window, spray painted **"CHILD RAPIST"** across the entire front wall of his home, spray painted a communist hammer and sickle on his driveway and window. The protestors spread defamatory and threatening graffiti throughout the neighborhood.





***UT's mischaracterization:*** *"on Dec. 9, 2019, protestors rallied around Complainant's house (paragraph 11)"*

***What actually happened:*** Masked individuals associated with Fire the Abusers ("FTA"), a group describing itself as a "student-led, student-powered movement,"[2] violently rioted outside of Dr. Hubbard's home. Austin Police had to escort Dr. Hubbard to safety.

---

[2] *See* Ex. D, Fire the Abusers Twitter posts.



December 10, 2020
Page 6









The masked students passed "NEIGHBORHOOD PERVERT ALERT!"s around Dr. Hubbard's neighborhood. FTA is a "student-led" organization and the rioters are UT students. The UT students posted a video of the riot to the FTA Twitter account, which has since been suspended by Twitter after FTA was found to be in violation of Twitter's rules.[3] A transcript of the video is attached as part of Exhibit D, and partial video is available here and here.

*UT's mischaracterization:* "on Dec. 18, 2019, the Dallas Morning News published an editorial about Complainant that was subsequently corrected (paragraph 14)."

*What actually happened:* The *Dallas Morning News* published a defamatory article about Dr. Hubbard, which was later corrected, and, more importantly, the President of the University, Dr. Fenves, submitted a letter to the editor for publication praising the defamatory article. In his response praising the incorrect *DMN* article,[4] the University's President publicly stated, "Students, UT Austin

---

[3] https://twitter.com/FireTheAbusers/status/1221956213174341632.
[4] The *DMN* noted the following correction to Dr. Fenves's incendiary letter to the editor:



December 10, 2020
Page 7

---

community members and others are disturbed by Hubbard's writings about sexual relations between teenagers and adults," that he understood the concerns about Dr. Hubbard's ideas, and that he found Dr. Hubbard's ideas outrageous.

**The University is liable for discrimination/harassment against Dr. Hubbard by its students.**

The University erroneously claims that it could not have violated Title VII because the "majority of the actions cited by [Dr. Hubbard] … were taken by individuals who were not *agents* of the [U]niversity." But it is well-established law that no agency relationship is necessary for an employer to be responsible for remedying unlawful harassment of its employee where the conduct is perpetrated by third parties. Employers are liable in circumstances such as those presented. Additionally, the discrimination and harassment that Dr. Hubbard has been (and continues to be) subjected to is not limited to actions of "non-University agents" but also includes UT's defamatory statements and actions taken against Dr. Hubbard

The University's contentions regarding "non-university agents" are both factually and legally incorrect. The University is factually incorrect in dividing the harm into two sources: unidentified students and the *Dallas Morning News*. The subject of Dr. Hubbard's EEOC claim is the University's discrimination/retaliation. **The University is the source of harm.** Dr. Hubbard has addressed his claims against specific students and the *Dallas Morning News* in separate actions. UT's choice to describe the students as "unidentified" is curious given that it has not taken reasonable measures to "identify" them as part of its own policies.

Citing authority that does not support its position, the University claims that it can only be held "liable for the actions of its *agents* and, in very narrow circumstances, the *actions of certain third parties* to which an employer repeatedly subjects an employee." *See* Position Statement at n.5 (citing 42 U.S.C. § 2000e(b)).[5] The University then contends that student rioters and the *Dallas Morning News* are not agents of the University, as if this contention, if true, would dispose of Dr. Hubbard's hostile-work

---

Correction published in the print edition May 2, 2020: In an editorial originally published online on Dec. 18, 2019 regarding scholarship by Dr. Thomas Hubbard, a professor at the University of Texas at Austin, we referred to student protests and said his scholarship would lead to an unraveling of age-of-consent laws. Hubbard was not the cause of any substantial campus protest over his views. His research covers sexual relationships between men and males who have undergone puberty but are under the current age of consent. He does not advocate for pedophilia but researches pederasty, the attraction of adult males to adolescent boys. Hubbard has called for changing age-of-consent laws but not repealing them.

[5] The University claims that Title VII's definition of "employer" limits "employer liability to actions of the employer itself as well as its agents." It does not. Employer is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person…" 42 U.S.C. § 2000e(b). The University immediately contradicts its purported agency requirement with its citation to *Gardner v. CLC of Pascagoula, LLC*, 915 F.3d 320 (5th Cir. 2019) as "giving an overview of when third parties may create liability for an employer under Title VII."



December 10, 2020
Page 8

environment claims.[6] Even under its own incorrect statement of the law, UT fails to address the actual issue it cites about whether the University can be liable where actions of third parties create a hostile-work environment that the University failed to take appropriate corrective action to remediate.

Employers may be held liable under Title VII for the acts of non-employees, including students, with respect to sexual harassment "where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action." 29 CFR 1604.11(e).

Multiple Circuits have recognized that a student's sexual harassment of a teacher or other educational employee may impose liability on the employer. *See Campbell v. State Dep't of Educ.*, 892 F.3d 1005, 1017-19 (9th Cir. 2018); *Plaza-Torres v. Rey*, 376 F. Supp. 2d 171, 183 (D.P.R. 2005) ("it is clear that the term 'non-employee,' as defined in the EEOC Guidelines, does not exclude students, especially if the Court finds that a school has control and legal responsibility over student misconduct"); *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 755-56 (9th Cir. 1997); *Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 491 F. Supp. 2d 467, 477 (D. Del. 2007); *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 732 (7th Cir. 2009) (school acted reasonably by suspending students who harassed teacher); *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 997 (7th Cir. 2002) (school responded reasonably to complaints of harassment in hallways by posting hall monitors to find and discipline responsible students); *see also Gardner v. CLC of Pascagoula, LLC*, 915 F.3d 320 (5th Cir. 2019) (recognizing Title VII claims against third parties and applying EEOC Guidance, 29 CFR 1604.11(e)).

The EEOC's regulations specifically task the Commission to "consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees" in reviewing harassing conduct of third parties. *Id.* Universities exert control over their students, including through disciplinary procedures.

Employers—like The University of Texas—may be held liable for the students' harassing conduct to the extent that it fails to reasonably to respond to the conduct or to the extent that it ratified or acquiesced in it. *Campbell v. State Dep't of Educ.*, 892 F.3d 1005, 1017-19 (9th Cir. 2018). Here, the University ratified and acquiesced to the sexual harassment of its students by making public statements in support of the protests. Further, the University failed to reasonably respond to the harassment of the students against Dr. Hubbard, even failing to implement its own policies that prohibit the harassing conduct. The University's Institutional Rules on Student Services and Activities, Chapter 11-404, #1, 3, 11, 18, as well as the general University Code of Conduct, prohibit the conduct inflicted on Dr. Hubbard by its students, specifically when a student:

1. **Local, State, or Federal Law Violations** - engages in conduct that may violate any provision of federal, state, or local laws, whether or not the violation occurs on University property or in connection with any University-oriented activity.

---

[6] Dr. Hubbard has never claimed the *Dallas Morning News* held an agency relationship with the University and Dr. Hubbard does not refute the "obvious" claim that the *Dallas Morning News* is not an agent *per se* of the University.



December 10, 2020
Page 9

3. **Harmful Behavior -** behaves in a manner that threatens or endangers the health or safety of any student or employee of the University, or of visitors to the campus.

11. **Other Harassment under Subsection 13-204 of the Institutional Rules (Speech, Expression, and Assembly) or HOP 3-3020** - engages in harassment

18. **Disruptive Conduct**
    A. otherwise engages in the following acts of inappropriate conduct that have the potential to interfere or disrupt the student learning or teaching function of the University: pranks, repeated contact of a harassing nature through a personal or electronic medium, and berating or otherwise abusive behavior; or,
    B. attempts to commit any violation of University rules or regulations, or to assist another person or persons in committing any violation of University rules or regulations; or,
    C. behaves in a manner that impedes, interferes with, or disrupts any University teaching, research, administrative, disciplinary, public service, learning, or other authorized activity

*See* Exhibit I, Institutional Rules on Student Services and Activities, Chapter 11-404.

The University refused to follow its own policies and "failed to take prompt corrective measures that were reasonably calculated to end the harassment" and therefore must be held accountable for the sexual harassment of its employees by its students. The harassment continues. The University took no action against students known to have harassed and threatened Dr. Hubbard and, instead of investigating the identities of the other students, investigated baseless claims against Dr. Hubbard. The University's public statements in support of students' violent actions and defamatory statements, critical of Dr. Hubbard and his research may establish that UT did not take measures to end the harassment but, instead, incited and supported it. The University's inaction has caused extraordinary harm to Dr. Hubbard, a harm that reasonably could have been predicted under the circumstances.

**The University was negligent in preventing harassment by its students and student employees.**

The University incorrectly states that unidentified students (and potentially even non-students), not the University, harassed Dr. Hubbard. But, the University knew the identities of at least three students involved and even *employed* these students. The University is responsible for harassment by non-supervisory employees when it is "negligent in failing to prevent harassment from taking place." *See Vance v. Ball State University*, 133 S. Ct. 2434 (2013). Failing to respond to complaints is evidence of negligence. *Id.* Moreover, because the University has failed to adequately investigate the violence directed at Dr. Hubbard by masked assailants, it cannot say with any confidence that



December 10, 2020
Page 10

none of them were University employees.  By sticking its head in the sand the University makes an attempt at plausible deniability, but in doing so makes Dr. Hubbard's case for him.

Three of the four students responsible for the spread of false allegations about Dr. Hubbard prior to the attacks on his home were in fact employed by the University at the time: Hollie Green was employed by the Athletic Department, and Samuel Joseph Ross and Zoe Elise Thomas were employed by Dr. Hubbard's own department, the Department of Classics. Zoe Elise Thomas, employed as a graduate Teaching Assistant, even made her statements specifically citing her employment as an "educator" at UT as a reason why she felt compelled to speak out against Dr. Hubbard.  UT has failed, perhaps intentionally, at identifying the perpetrators of the violence and harm directed at Dr. Hubbard.  That failure is itself evidence of UT's retaliatory intent.

**The University actively contributed to the hostile-work environment at issue.**

Moreover, multiple high-level administrators, including President Fenves and his communications staff, made a number of public statements on behalf of the University that reinforced and lent credibility to the libelous disinformation being circulated by these student-employees and others.

In the December 4, 2019 article published by the *Austin American Statesman* ([https://www.statesman.com/news/20191204/austin-students-want-professor-fired-for-writings-on-age-of-consent-ut-says-itrsquos-protected-speech](https://www.statesman.com/news/20191204/austin-students-want-professor-fired-for-writings-on-age-of-consent-ut-says-itrsquos-protected-speech)), the University's official Spokesperson, Shilpa Bakre, issued a statement on behalf of the University linking Dr. Hubbard with "ideas or world views that exploit or harm individuals." Then she stated that the students seeking to have Dr. Hubbard fired were exercising their first-amendment right "to strongly disagree with and draw attention to those ideas." Libel is, of course, not protected by the First Amendment, and the "ideas" these students were attributing to Dr. Hubbard were not in fact his or even close to his published ideas.

It was only four days after the publication of the University Spokesperson's remarks that a mob of masked students vandalized Dr. Hubbard's house, threw a cinder block through the front window, and surrounded it for over an hour chanting defamatory slogans, until the police escorted Dr. Hubbard to safety. This attack was causally related to the University's conscious and deliberate refusal to respond appropriately to a concerted campaign of disinformation against one of their faculty.

President Fenves himself, advised by his communications director Gary Susswein, continued to further the University's endorsement of defamation against Dr. Hubbard with his December 19, 2019 letter to the editor of the *Dallas Morning News*, published in the newspaper the following day. President Fenves praised a *DMN* editorial, which falsely accused Dr. Hubbard of advocating pedophilia, for "shedding light" on a "heated debate" about Dr. Hubbard's scholarship on the UT campus. Fenves stated that he found Dr. Hubbard's views "outrageous." Fenves gave comfort and encouragement to those who misrepresented his work, defamed him as a pedophile, and attacked his



December 10, 2020
Page 11

home. Fenves never criticized the attack on Dr. Hubbard's home, and his letter, even expressed "understanding for their concerns." (Had male students attacked the home of a female professor in protest over her writings about feminism would UT have fueled that fire or sat on its hands? Would it at least enforce the student code of conduct?)

Fenves further publicly announced an investigation into Dr. Hubbard based on non-existent complaints against him. His letter announced an investigation into whether Dr. Hubbard "introduced into . . . teaching controversial matter which has no relation to [the] subject." He goes on to assert, "But we are aware of the concerns and complaints about those classes this semester. We have been and are reviewing them and will take appropriate action…" As his open records request (UT Austin ORR #152385) revealed, Fenves' office was in possession of no complaints about his "classes" that semester, and the only letter it had from a student expressed concern over the rumors she had heard about his scholarship and "associations," not the class itself, much less any introduction of material irrelevant to the subject. Subsequent open records requests revealed that neither the Provost's nor Dean's office were in possession of such complaints. No finding of wrongdoing by Dr. Hubbard resulted, despite Fenves' suggestion to the contrary.

Fenves' announcement of this investigation, triggered by no solid evidence of anything, was in every way irregular and unprecedented. The University of Texas cannot cite a single other case in the entire history of the University where a President has announced an investigation of a faculty member in the public press before informing the faculty member of the charges against him. Nor can it document a case where a special committee was appointed to investigate a faculty member's teaching based on one or two student letters, which did not even mention the content of that faculty member's teaching, but only cited vague and inaccurate rumors about other matters. Ordering such an investigation based on so little evidence appears to have been a fishing expedition in a pre-judged attempt to dig up some dirt, somewhere. An open records request (PIR 000248-062220) revealed that the only time previously in his presidency that Fenves had commented on any public controversy involving a faculty member was in the case of Prof. Ari Pedahzur, for whom he published a strong statement of support. Dr. Hubbard's is the first and only case where he has made negative statements about a faculty member to the public press.

The investigation turned out to find Dr. Hubbard guilty of nothing. Contrary to Fenves' statement that it was already underway on December 19, 2019 (when his letter was sent), Vice Provost Dukerich told Dr. Hubbard on December 21 that it would begin in the Spring semester, as it indeed did. Neither the committee nor the Dean of Liberal Arts were ever given actual copies of the alleged "complaints and concerns" about his Fall classes; the committee merely reviewed his written course evaluations and found no evidence of any complaints that Dr. Hubbard had introduced "controversial matter that has no relation to the subject." It was in May 2020 revealed to Dr. Hubbard by the Office for Inclusion and Equity that their office was the only one in possession of the supposed complaints about his classes, that the complaints were all anonymous, that many of them had been received **after** Fenves' December 19, 2019 letter, and that OIE did not, under its regular standards, regard them as worthy of formal investigation. If OIE did not deem such anonymous complaints worthy of formal investigation, why did President Fenves feel an urgency to announce an investigation to a newspaper?



December 10, 2020
Page 12

Finally, on July 23, 2020, University Communications Director Gary Susswein commented to the *Austin American Statesman* ([https://www.statesman.com/news/20200723/ut-professor-accused-of-promoting-pedophilia-sues-student-for-libel](https://www.statesman.com/news/20200723/ut-professor-accused-of-promoting-pedophilia-sues-student-for-libel)) and *The Daily Texan* ([https://thedailytexan.com/2020/07/23/classics-professor-accused-of-advocating-for-pedophilia-sues-student-others-for-libel](https://thedailytexan.com/2020/07/23/classics-professor-accused-of-advocating-for-pedophilia-sues-student-others-for-libel)) concerning Dr. Hubbard's filing of a federal suit for libel and defamation against the daughter of a prominent right-wing political operative: "It is highly unusual for a professor to sue a student. We support robust discussion and debate about the merits and results of academic research, and believe those should happen on campus and not in the federal courts." This statement misrepresents the assertions this student made as being legitimate "debate about the merits and results" of his research, when the whole purpose of his suit is to show that the statements are not "debate" or opinion, but assertions of fact that are false and defamatory, based on no serious examination of his published work. For the University's chief communications officer to assert that these statements were merely "debate" was to take a position on the lawsuit, which the University has no business doing to the detriment of one of its long-serving employees. Moreover, Susswein's statement implies that the University had offered Dr. Hubbard a forum for serious debate of the issues raised by this and other students' false allegations; it never did, even though Dr. Hubbard had made no fewer than three proposals to do so to the Provost's Office, with no response.

It is Dr. Hubbard's position that these were all conscious actions of the University's highest executive officer and his communications staff, who were unquestionably acting as "agents of the University." Their hasty statements lent unjustified credibility to libelous assertions that left students convinced of the truth of those accusations, such that they boycotted his classes and thereby changed the material conditions of his employment, depriving Dr. Hubbard of a normal teaching schedule and leading to further harassment from parties both within and outside the University. The violent attack on his house and the violent threats against Dr. Hubbard spray-painted on a nearby business can easily lead a reasonable person to conclude that they were caused by these libelous assertions that were circulated and given unjustified credibility by agents of the University. The University has therefore also changed the material conditions of his employment by encouraging a threatening and unsafe environment for Dr. Hubbard in the City of Austin, such that Dr. Hubbard can no longer safely live anywhere near Austin.

**Dr. Hubbard was sexually harassed and subjected to a hostile-work environment because of his homosexuality.**

The unusual actions of the university employees and students detailed above are certainly "unwelcome harassment." The conduct described arose from a misunderstanding of writings by a gay professor about sex-based topics. This conduct is clearly a result of sex stereotypes and certain individuals' discomfort with any public discussion about sex between males. For years gay men have been unfairly stereotyped as "child molesters" by large segments of society. This stereotype weaponizes bigotry, and the twisting of the narrative about Dr. Hubbard's writings gives certain people cover to discriminate while disclaiming that motive. Dr. Hubbard has never "promoted pedophilia"



December 10, 2020
Page 13

_____

and has never advocated for anyone to violate U.S. age of consent laws.  Never.  But what UT does in its response is very similar to what others have done in the University's hallways, back alleys around campus, and the front porch of Dr. Hubbard: distort the facts to provide a "safer" way to discriminate or retaliate against Dr. Hubbard.

We are hopeful that the EEOC will review this information and find ample evidence to support a finding of discrimination and retaliation.  If the EEOC requires additional information, please let us know.

Thank you.

Sincerely,

Sherrard (Butch) Hayes

Enclosures

# EXHIBIT A



**DEPARTMENT OF CLASSICS**
THE UNIVERSITY OF TEXAS AT AUSTIN

*2210 Speedway, C3400 · Waggener Hall 123 · Austin, Texas 78712-1738 · (512) 471-5742 · FAX (512) 471-4111*
*www.utexas.edu/cola/depts/classics*

November 13, 2017

President Gregory Fenves
University of Texas, Austin

Dear President Fenves:

I write to you with serious concern about the CLASE report commissioned by the Board of Regents and the grave harm it has done to our institution's reputation and ability to recruit talented female students. This report, which I have now finally had enough time to read and evaluate, along with its attached Research Methods Report and some of the supporting data, is a deeply flawed and misleading study that does not conform with best practice standards for social science surveys in the area of sexuality. I recognize that Chancellor McRaven and the Regents had good intentions in commissioning this study, because they wanted to show that UT cares about this issue and takes it seriously. However, by publicizing this particular report last March without any serious peer review and treating it as if it were something to be proud of, the University lent it a degree of credibility it does not deserve and thereby seriously embarrassed itself with damaging media stories about an alleged 15% rate of rape victimization among female undergraduates. When one probes the survey methods and the tendentious phrasing of the questionnaire, any unbiased observer with even the slightest degree of experience in sexual survey research can see that it proves no such thing. Its conclusions are not merely inaccurate, but give a grossly distorted view of student sexuality. The eventual published attacks from scholars debunking such victimological junk science will be almost as humiliating for the University of Texas as the exaggerated claims concerning rape prevalence have already been.

Before I explain in detail the fundamental flaws in this report, let me first review the extent of the bad publicity it engendered: articles in national or even international news outlets like *USA Today, The Wall Street Journal, Fox News, New York Times,* and *The Guardian.* The *Huffington Post* headline screamed "An Alarming Percentage of Women at UT Austin Reported Being Raped." Even worse, the story became an immediate hit with publications read by the kind of teenage girls who might otherwise consider coming to UT Austin: *Cosmopolitan, Teen Vogue, Jezebel, Glamour,* and *Elle.* Hello Giggles, a news and fashion website popular with younger teen girls, printed the following headline, accompanied by a photo of the UT Tower lit orange and #1: "A New Study Revealed a Shocking Number of Women Report Sexual Assault at This University." The inference an unexperienced teenager is left to make is that we are #1 in rape. Why on earth would a teen girl who sees this story later want to apply to UT? How can this possibly enhance our ability to recruit the best and brightest of both genders?

Of course you and I both know that the results of this study are not radically different from what the AAU report showed at comparable universities. In this regard, UT's self-study did not break any new ground, since it shared many of the same methodological flaws as the AAU and some other campus surveys. However, the teen girls and families who read the recent headlines do not necessarily know it. If they were otherwise considering UT-Austin, they might probe a little further and learn that the system's branch campuses all had much lower rape rates according to CLASE, in the range of 7-9% rather than Austin's 15%. Families might decide that it would be safer to have their daughters enroll at UT-Arlington or UTSA instead of Austin, or even at Texas A&M. Or perhaps they will be so frightened by all the news about rampant drunkenness, promiscuity, and rape on all UT campuses that they will decide it is safer at Dallas Baptist or Abilene Christian University, as now even Baylor is suspect. Or maybe no university at all (which would be sad, as Lynn Addington & Callie Rennison's study of the much more rigorous and scientific National Crime Victimization Survey [1995-2011] proved that non-college students in the same age demographic are actually at much higher risk of rape than college students).

Again, you and I know that the obvious reason for this variation among campuses is that most of the branch campuses are essentially "commuter schools" whose student bodies may include a higher proportion of older, married students or young students who still live at home. Both groups are likely to have lower rates of rape. However, families and girls who are debating where to attend college do not know enough to factor such details into their analysis. Nor will they learn about those details from the CLASE report, which makes no reference to these demographic factors. That is a shame, as the students frightened away from us will miss out on the superior education our world-class faculty can uniquely offer among our in-state competitors.

Let me now turn to a brief overview of the most serious methodological flaws that render the figures in the CLASE report worse than useless:

**(1). Low Response Rate**

17.1% is an embarrassingly low response rate, although not atypical for broadly distributed "campus-climate" surveys. This is one of the reasons that campus surveys so consistently overestimate the actual incidence of sexual misconduct. Intimate sexual details are not something that an entire population is equally willing to be surveyed about, even in the context of an anonymous online setting. Competent sexual researchers know that obtaining a truly representative sample depends on reaching the sexually reticent or uninterested, which in many cases requires extraordinary efforts in follow-up of non-participants, offering graduated cash rewards for participation. Using such methods, Laumann et al.'s 1994 National Health and Social Life Survey achieved a 78% response rate. Similarly, the National Crime Victimization Survey (Sinozich & Langton 2014) had a 88% response rate from a sample of 217,976 college students, which makes it infinitely more reliable than the campus surveys. Kinsey's diligence utilized a 100% sampling technique, which is why his work remains the gold standard in the field of sexuality research. The CLASE report's authors appear to be completely ignorant of this approach and its necessity when asking

2

about such delicate matters. Their offer of participation in a lottery provided busy students little incentive to spend time on a 90-page survey.

## (2). Solicitation and Volunteer Bias

Another serious problem in survey work is ensuring that the population who ultimately participates reflects the overall population. The CLASE report itself admits that it had to "weight" its sample because it was not demographically representative, but unlike the AAU report, it never discloses details about just how it weighted which factors. One issue that can never be weighted is whether the announced subject matter of a survey interests a participant population different from the overall population. The lower the response rate and the more sensitive the subject matter, the greater the possibility of volunteer bias. This is why the letter of solicitation and the consent forms are so critical: will the announced nature of the survey interest some people with certain types of experiences more than others with different experiences? It does not take a genius to see that a survey on sexual violence or victimization will be of more interest to people who have experienced it or who know friends who have suffered from it. The result is an overly high count for the incidence of whatever is being surveyed. Even the AAU report recognized that its own sample bias tended to over-estimate the prevalence of rape on campus (see Appendix 4 of Cantor et al. 2014). However attempts to quantify the bias (e.g. by noting the lower incidence of reported rape among those who respond only after follow-up reminders or those offered cash rewards) are at best imprecise. There are ways that administrators can alleviate such sample bias by disguising the true agenda of a survey or covering a broader agenda (like both the NHSLS and NCVS), but that did not occur in this case, perhaps due to the University's archaic and procrustean Human Subjects Research requirements. The published CLASE report seems oblivious to the problem, as if the authors had not even bothered to read Appendix 4 of the AAU report.

One of the most ethically disturbing aspects of the CLASE report is its blatant misrepresentation of the nature of the solicitation that took place, perhaps conscious of likely objections about sample bias. Page 31 of the ancillary Research Methods Report (and p. 16 of the CLASE report itself) claims that the survey was not promoted as a "victimization" study, but as a study of "health, well-being, prevalence and perceptions of violence." However, examination of the actual solicitation letter and consent forms in Appendices B & C proves the opposite. Already in the third sentence of the e-mail recruiting students to participate in the survey, we hear: "Sexual violence, sexual harassment, stalking, and intimate partner violence can interfere with a student's academic performance and emotional and physical well-being." The next paragraph makes it clear that this is the true subject of the present survey: "The overall goal of the survey is to provide [**Institution**] with important information about campus intimate and interpersonal violence prevalence and responses." We nowhere find the term "health" anywhere in the e-mail, and "well-being" is only used in the sentence quoted, where it is specifically predicated on how sexual violence affects well-being. The Consent Form that all student participants had to sign is even more explicit: "The purpose of this survey is to understand the experiences and perspectives of students in relation to sexual assault, dating violence, sexual harassment, and stalking." With this focus so clearly announced to

3

all student participants, it should hardly surprise us if many students who have never experienced problems with these four issues or known anyone who has would be uninterested in wasting 30-35 minutes of their time filling out an uncompensated survey about problems of which they know little. Those who have had these problems, on the other hand, may see an anonymous survey like this one as an opportunity to get it off their chest without personal embarrassment. The result is serious sample bias.

## (3). Overly Broad Definition of Rape

This study goes much further than most in labelling as "rape" acts which neither fit any legal definition of sexual assault nor people's common-sense understanding of the term. In contrast, the AAU questionnaire was much more careful in its definition of "nonconsensual sexual contact by coercion," limiting it to cases of blackmail (threatening to spread defamatory information) or sexual harassment by a professor or employment supervisor (affecting grades or promotions), and found that it was quite rare (0.4% for females, 0.3% for males).  One finds the operative definitions and questions CLASE used on pp. 90-92 of the report. For example, did someone perform a given act "without your consent" by "telling lies, threatening to end the relationship, threatening to spread rumors about you, making promises you knew were untrue, or continually verbally pressuring you after you said you didn't want to." Or by "showing displeasure, criticizing your sexuality or attractiveness, getting angry but not using physical force, after you said you didn't want to." The wording of the questions is on its face problematic: how can someone compel a partner to have sex "without consent" by "threatening to end the relationship?" If that partner decides, despite initial reluctance, to accede to their more aggressive partner's wishes because continuing the relationship is of greater value to them than keeping the relationship non-sexual, that is the conscious choice of a free agent, unless the relationship is one of dependency or supervision. It is certainly not rape. If a person who is busy or not in the mood goes ahead and has sex with their partner merely because the partner "shows displeasure," how can it be "without consent"? The logical contortions become even more problematic when this wording is applied to attempted rape: how can it be "without consent" if the sex sought by lies, verbal pressure, and the like ("but not using physical force") did not in fact take place? Doesn't this imply that an expression of non-consent was eventually respected? How is it then "attempted rape"? Telling lies and making false promises are not gentlemanly behavior, but if we were to imprison for rape or attempted rape every lover or would-be seducer who embellishes their life-story or promises marriage without really intending it, it would require "mass incarceration" on a scale hitherto unknown outside of the worst totalitarian regimes.

By inviting student participants, many of them scarcely 18, into imagining some of these scenarios as non-consensual and therefore rape or attempted rape, the CLASE survey encourages as normative a self-conception of girls as so weak-willed and easily manipulated that they are unable to make conscious ethical choices, but instead wither into catatonia at the presence of a randy male (on the lack of scientific basis for this commonly accepted canard, see Yoffe 2017). The values we should be instilling in young women (and men) are the opposite of these: that they are able to stand up for themselves and take responsibility for the ethical decisions they make with the new-found sexual freedom of

adulthood, rather than labelling their partner a "rapist" for "pressuring" them.

Given the capaciousness of what is defined as rape in this study, and considering the almost complete lack of comprehensive sexuality and relationship education at the secondary level in Texas, as well as the general naiveté of 18 year-olds living away from home for the first time, it frankly surprises me that the rate of "rape" this study produced is not considerably higher than 15%. 18 and 19 year-olds (whom multiple studies have shown to be the peak age cohorts for both victims and perpetrators) are prone to awkward and ungentlemanly or unladylike behavior and are trying many things for the first time, including alcohol. It does a grave disservice to encourage students of this age to start conceptualizing as rape every relationship in which a former intimate partner lied to them, failed to deliver on promises, got angry, or showed displeasure. Can the University ever hire enough Title IX investigators to stick their nose into every relationship where this has happened?

## (4). Memory Distortion and the Power of Suggestion

Such suggestive and tendentious questions highlight another critical weakness of this study, which is that it relies entirely on one person's memory of an incident. Lisak et al. (2010) had a research team carefully review campus police records at Northeastern University, and found that among the cases where a formal rape complaint could be determined to be either true or false (excluding the many uncertain cases), one-seventh were provably false. As CLASE itself documents (p. 57), 69% of the victims in unwanted sexual contacts admitted that they were under the influence of alcohol or drugs. The work of witness memory specialists (Villalobos, Davis, & Leo 2016) demonstrates that even slight intoxication with these substances seriously erodes one's ability to remember details or sequences of actions accurately. It is very common for subjects to remember retrospectively that an intoxicated sexual act they later regret had been "unwanted" or "without consent" when in fact they had actively collaborated. What may have been mild importuning or a typical relationship-argument can be honestly misremembered as "verbal pressure" or "getting angry," particularly when leading questions invite such confusion. We all know from the child day-care sexual panics of the 1980s that social workers' leading questions can implant memories of horrific acts that never happened, even among children who had never consumed alcohol or drugs (see Sommers 2014 for the parallels).

## (5). Failure to Assess Resistance or Expressed Non-consent

The survey instrument completely fails to ask questions regarding the factors critical in criminal law adjudication, namely whether there was any physical or verbal resistance, mixed signals, consent to some acts and not others, change of mind mid-stream, etc. This information could allow evaluation of the extent that our campus has a problem with what everyone would agree is rape, and what most members of the public reading the negative news stories about us understand by the term. It could also have advanced legislative debates over imposing "Affirmative Consent" laws like those in California and New York.

## (6). Failure to Distinguish Among Different Forms and Degrees

5

The study only tabulates data for three types of physical misconduct: unwanted touching, attempted rape, and rape. Since the researchers are refusing to disclose the raw data from the survey, we do not know how many of the "rapes" they counted were merely cases of someone submitting because their partner "showed displeasure" or the like and how many were cases of physical force or threat of force. By failing to give a break-down of these responses, the researchers seem determined to maximize the rape percentage they come up with.

The study does admit that among the victims of the "unwanted sexual contact" incidents, 68% had never disclosed the incident to another human being, not even their closest friend. This is dramatically at odds with the AAU report, where between 50% and 85% (depending on the institution) of those raped had told someone about it; this discrepancy suggests that the CLASE report is recording as "rape" many rather minor interactions that would not fit the more rigorous criteria of the AAU survey. CLASE acknowledges that only 9% of the victims needed to take time off from school, 3% from work; only 4% needed medical care, and 2% needed to relocate housing. 80% of the victims reported no subsequent depression or PTSD, and 81% still feel safe on campus. This data strongly suggests that most of these incidents were non-traumatic, hardly to be equated with "rape" or "attempted rape" as defined by criminal law and common sense. The study is clearly lumping together too many varieties of regretted sexual experience, thereby confusing the policy responses legislators and administrators are called upon to make.

* * * * * * *

The goal of this letter is to be constructive. As I write, federal guidelines with regard to Title IX implementation are changing, and you as President, along with the Chancellor and Regents, may be asked to consider whether UT will continue to devote massive financial resources (no one seems to know how much) to handling sexual assault allegations in the same way as before. I am sure that you are aware of the spate of lawsuits from accused students who failed to receive due process in institutional investigations, many of which have gone against the colleges that expelled them. Panics created by media headlines citing half-baked studies utilizing outdated or biased survey methods should not set the context for such serious deliberations. Policy makers need accurate data, not ideologically infected pseudo-science promoting a one-sided victimological agenda.

The CLASE study has already been cited in legislative debates. Someone involved with the CLASE project slipped an advance copy of the report to Sen. Joan Huffman (R-Houston), who used it as an argument supporting her truly pernicious bill (SB 576) to fire and convict faculty and staff who fail to inform the authorities of sexual misconduct a student might confidentially discuss with them. This bill and the University's new policy making us all "mandatory reporters" can only have the effect of silencing student victims, who might otherwise want to be able to discuss in confidence a troubling situation with an older mentor whose judgment they trust. When I taught an undergraduate honors seminar on rape in Spring 2016, as this new policy was first being promulgated, the students, who were unanimous on very few things, all opposed the new policy, fearing that it would erode student-faculty trust and rob them of the chance to share personal problems confidentially

with someone old enough and knowledgeable enough to help them weigh their options. As a scholar of gender and sexuality, I have had many students, both male and female, share such matters with me, and I have tried to help them as best I could. I would rather be fired than betray their confidence. I feel so strongly about this issue that it was the subject of a paper I delivered to the International Network for Sexual Ethics and Politics in Luxemburg last Fall; everyone in the audience agreed that such mandatory reporting policies do more harm than good. Nor does the threat stop with SB 576: our own Sen. Kirk Watson (D-Austin) wants Texas to adopt "affirmative verbal consent" requirements for university students similar to those now mandated in California and New York. Far more study of these laws' impact in the states that have tried them is needed before we support bringing to Texas the added regulatory and administrative burdens such a law would place on the university's surveillance of students' sex lives. Even Gov. Jerry Brown (D-California) recently vetoed further state legislation on campus sex, saying it was "time to take a pause on this issue." Media hysteria created by extravagant claims of rape prevalence on campus is what fuels the demand for such legal intrusions into private matters.

I am unsure whether the University's recent reversal of its long-standing and quite rational policy concerning consensual relationships between faculty/staff and undergraduates was motivated by the same atmosphere of sexual panic, or simply by old-fashioned moral judgments about age difference equalling power difference and exploitation. Here, the CLASE report actually provides some useful perspective: it found that 0% of the cases of "unwanted sexual contact" were perpetrated by faculty or staff, and that it was female graduate students, rather than undergraduates, who faced more sexual harassment. A complete ban on relationships between faculty/staff and undergraduates is a draconian solution in search of a problem. It also ignores the present-day realities of undergraduates who come back to college later in life and romantic relations that develop through use of anonymous social media rather than daily contact in the classroom. I cannot for the life of me see why the University should interfere with the private relations of a 30-year old Engineering professor and a 25-year old Nursing student who meet on social media and have never seen each other in their daily lives at the University. What the University should regulate, but still fails to address, are relationships between faculty and graduate students in the same department. Even if the graduate student is no longer under the direct supervision of their faculty partner, considerable social pressure is exerted on faculty colleagues to grant special favors to that graduate student as a matter of "departmental collegiality." If anyone objects, they are accused of being "disruptive" or having a personal animus. I have seen it happen too many times in my own small department, even to the extent of faculty being pressured to change the results of a failed doctoral exam.

I recommend that you, or the Regents at a system-wide level, appoint a special committee to review the serious flaws I have pointed out in the CLASE study and allow it, rather than CLASE itself, to issue the final report that is due in 2019, appropriately contextualizing the preliminary data of the March 2017 report in light of the survey's severe methodological limitations. It may even prove necessary to commission a more focused survey of a smaller random sample using the more rigorous methods of Kinsey and Laumann to ensure a high response rate and guard against participation bias. I further recommend that all future funding of CLASE's work should be halted until such a review has taken place, and that

CLASE should be compelled to release to the public the raw survey data, so that other researchers across the country can analyze it and do what CLASE refused to do, which is to separate out the cases of criminal sexual assault from the cases of having sex because a partner "showed displeasure" etc. The committee should also be asked to investigate the premature leak of the CLASE report to Sen. Huffman in a blatant attempt to promote legislation that is harmful to the University's interests. Any such committee should include scholars from all sides of the recent academic and legal debates surrounding the now-defunct Obama-era Title IX regulations and other legislative or administrative initiatives inspired by perceptions of a "campus rape epidemic." It should include civil libertarians along with scholars of gender and sexuality, a balance of men and women, gays as well as straights. If such a committee already exists and is in the process of vetting the CLASE study, I would respectfully ask that you forward this letter to them.

I further recommend that the University take a position in strong opposition to SB 576, and work with Sen. Watson (a friend of the University in most matters) to delay any consideration of an "affirmative verbal consent" bill until more scholarly study of such laws has been published. The University should also re-consider its own regulations concerning mandatory reporting (which was not actually required even by the Obama Department of Education) and consensual faculty/staff relationships with students.

You may ask who I am to speak on these questions. I have been at this University for 30 years. In addition to holding a named professorship in a Liberal Arts department, I am the University's only recipient of the John Simon Guggenheim Memorial Fellowship this year (one of only two in the state of Texas). I am a specialist in the history of sexuality, masculinity, and particularly the history of sex panics and regulation of sexual "outsiders." It is for this work that I have been awarded the Guggenheim. I am also the President (unpaid) of a small foundation that finances social science research on sexual victimization, and have consulted with some of our statistical survey experts in preparing this letter. I have organized two major interdisciplinary conferences at the University, one a 3-day international conference on sexuality law, co-sponsored by the Center for European Studies, the Rapoport Center, and the Center for Women's and Gender Studies (I am affiliated with all three), the other specifically on the theme of campus rape and the theory of consent (covered by an article in *The Chronicle of Higher Education* [Mangan 2016] as well as local media). Some of the scholars whose work I have cited in this letter spoke at the conference, as well as legal activists on both sides of the debate. The CLASE authors were invited to speak about their work, but refused, and no UT administrator bothered to attend except for the Title IX Coordinator, who came to deliver her own invited presentation and then immediately left, having no interest in hearing what any of the other speakers had to contribute on the subject. The result of this intellectual disengagement with alternative points of view is the naïve survey methodology reflected in the CLASE report and its uncritical acceptance by the sub-administrators advising you and the Chancellor, who should have been able to see through its obvious flaws before recommending this study and then allowing public release to the media and legislators.

The actual rate of rape of college students nationally is 0.61% (over a six-month time span) according to the far more scientific and reliable National Crime Victimization Survey

(Sinozich & Langton 2014), with its 88% response rate (vs. 17.1% for CLASE); even if one multiplies this figure by a factor of five, to equal the average time in college of students filling out the CLASE survey instrument, one still gets only about 3%, not 15%. Let us be clear: 3% is too many, and the University should show compassion for victims and punish perpetrators when the situation is criminal or serious enough to constitute a "pervasive hostile environment" (which the majority of the incidents included in the phoney 15% CLASE figure were not). Anyone who thinks a university can "eliminate" off-campus rape is not being serious; we can innovate with effective, low-cost programs like Voices Against Violence and raise consciousness, but we are never going to reduce it to zero, even if we crack down on underage drinking among students, which is the chief source of the problem.

I am very concerned that the University's failure to disown an ill-conceived and misleading study that exaggerates the incidence of rape, thereby creating an environment of public panic, could itself become a liability in future litigation, either by accused students or fraternities who feel they have been treated unfairly or by a Title IX complaint alleging a "pervasive hostile environment" for male students, who are a steadily diminishing minority among undergraduates (45.8% in the current freshman class). By pandering to popular stereotypes of the privileged male as a ubiquitously manipulative sexual predator, the negative publicity engendered by this study contributes to a situation where many male students may also decide that the state's flagship university is not a comfortable place for them. My warning about the biases and unreliability of the CLASE study, once received by your office, is a matter of public record that any clever attorney can discover.

I thank you for considering my point of view and encourage you to pass my letter along to other sub-administrators responsible for University and System policy in these areas. I will be more than happy to work with those sub-administrators to achieve results that will help rehabilitate the University's seriously tarnished reputation.

Sincerely yours,

Thomas K. Hubbard
James R. Dougherty, Jr. Centennial
Professor of Classics

Cc: Chancellor William McRaven
Regent Ernest Aliseda
Regent David J. Beck
Regent Kevin P. Eltife
Regent Paul L. Foster
Regent R. Steven Hicks
Regent Jeffery D. Hildebrand
Regent Janiece Longoria
Regent Sara Martinez Tucker

## A Brief Bibliography of Relevant Scholarship Not Cited in CLASE

Addington, L., & Rennison, C. 2014. "Violence Against College Women: A Review to Identify Limitations in Defining the Problem and Inform Future Research." *Trauma, Violence, and Abuse* 15.3: 159-69.

Cantor, D., et al. 2015. *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct.* Westat.

Laumann, E. O., Gagnon, J. H., Michael, R. T., & Michaels, S. 1994. *The Social Organization of Sexuality: Sexual Practices in the United States.* Chicago: University of Chicago Press.

Lisak, D., Gardinier, L., Nicksa, S. C., & Cote, A. M. 2010. "False Allegations of Sexual Assault: An Analysis of Ten Years of Reported Cases." *Violence Against Women* 16.12: 1318-34.

Mangan, K. 2016. "As Consent Rules Change, Big Questions Come to the Surface." *Chronicle of Higher Education* (May 18, 2016). Retrieved Nov. 13, 2017 at www.chronicle.com/article/As-Consent-Rules-Change-Big/236507?cid=cp39

Sinozich, S., & Langton, L. 2014. *Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013.* US Dept. of Justice, Bureau of Justice Statistics.

Sommers, C. H. 2014. "Rape Culture is a 'Panic Where Paranoia, Censorship, and False Accusations Flourish." Retrieved Nov. 13, 2017 at time.com/100091/campus-sexual-assault-christina-hoff-sommers/

Villalobos, J. G., Davis, D., & Leo, R. A. 2016. "His Story, Her Story: Sexual Miscommunication, Motivated Remembering, and Intoxication as Pathways to Honest False Testimony Regarding Sexual Consent." In R. Burnett (ed.), *Wrongful Allegations of Sexual and Child Abuse.* Oxford: Oxford University Press.

Yoffe, E. 2017. "The Bad Science Behind Campus Response to Sexual Assault." *The Atlantic* (Sept. 8, 2017). Retrieved Nov. 13, 2017 at www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/

Zimring, F. 2004. *An American Travesty: Legal Responses to Adolescent Sexual Offending.* Chicago: University of Chicago Press.

**Carlos E Martinez**

| | |
|---|---|
| **From:** | Carlos E Martinez |
| **Sent:** | Monday, November 27, 2017 10:43 PM |
| **To:** | Fenves, Gregory L |
| **Cc:** | Susswein, Gary J |
| **Subject:** | FW: CLASE study: Professor Thomas K. Hubbard and Professor James R. Dougherty, Jr. |

Greg,

Noel is engaging directly with McRaven to address the questions raised by Hubbard on the CLASE methodology.

Carlos

**From:** McRaven, William [mailto:wmcraven@utsystem.edu]
**Sent:** Monday, November 27, 2017 2:52 PM
**To:** Busch-Armendariz, Noel B
**Cc:** Sulley, Caitlin; Carlos E Martinez; Sulley, Caitlin; Mercer, Wanda; Leslie, Steven; Daniel, David
**Subject:** RE: CLASE study: Professor Thomas K. Hubbard and Professor James R. Dougherty, Jr.

Noel, thanks. I assumed you were addressing Professor Hubbard's concerns. Glad you are! We will need to do so if we expect to get the additional funding in December.

I think it would be helpful, not only to address his issues in writing, but to sit down with Hubbard and discuss his concerns. It's clear there is a disconnect and we need to make sure he feels we responded appropriately. Thanks, Bill

**From:** Busch-Armendariz, Noel B [mailto:nbusch@austin.utexas.edu]
**Sent:** Monday, November 27, 2017 1:39 PM
**To:** McRaven, William <wmcraven@utsystem.edu>
**Cc:** Sulley, Caitlin <csulley@austin.utexas.edu>; Martinez, Carlos - UT Austin <carlos.martinez@austin.utexas.edu>;
Sulley, Caitlin <csulley@austin.utexas.edu>; Busch-Armendariz, Noel B <nbusch@austin.utexas.edu>
**Subject:** CLASE study: Professor Thomas K. Hubbard and Professor James R. Dougherty, Jr.
**Importance:** High

Dear Chancellor—

I hope that you had a relaxing Thanksgiving holiday.

I know that you received a copy of a letter of concern from a fellow UT Austin colleague over the holiday, Professor Thomas Hubbard. Carlos Martinez, President Fenves' Chief of Staff, passed it on to me to prepare a response. I'm always grateful for more champions against sexual assault—Professor Hubbard and I have interacted over the years and the research team and I responded to each query he had about the CLASE study over the last several months.

Given your close involvement with and our continuous reporting to you about the findings, and its external review, you may agree that Professor Hubbard may benefit from a better understanding of the CLASE methodology. His limitations are understandable since Professor Hubbard is trained as a professor in classics, not a social scientist. Nonetheless, I will correct Professor Hubbard's errors and respond fully to his additional queries. As you know, I always welcome intellectual and practical examinations on these issues because ultimately these discussions promote better student safety and well-being. I will work with Wanda and Caitlin, and the President Fenves' Office to respond in a timely manner. I'm glad to have your feedback.

**Carlos E Martinez**

| | |
|---|---|
| **From:** | Fenves, Gregory L |
| **Sent:** | Monday, December 18, 2017 2:30 PM |
| **To:** | Carlos E Martinez |
| **Subject:** | Fwd: CLASE study documents |

Begin forwarded message:

**From:** "Fenves, Gregory L" <fenves@utexas.edu>
**Subject: Re: CLASE study documents**
**Date:** December 18, 2017 at 2:29:39 PM CST
**To:** Steven W Leslie <sleslie@utsystem.edu>
**Cc:** Maurie McInnis <mcinnis@austin.utexas.edu>

Steve,

Lel's add this to the agenda for Thursday's breakfast meeting (8 am)

Greg

> On Dec 18, 2017, at 1:03 PM, Leslie, Steven <sleslie@utsystem.edu> wrote:
>
> Maurie, Greg,
>
> Could I get your guidance on how we should handle the email below from Professor
> Hubbard?  I wanted to make sure you are in the loop with email exchanges about
> CLASE.  I've asked Wanda not to engage Professor Hubbard until I know how you prefer
> we handle his requests.
>
> Steve
>
> ———
> **STEVE LESLIE | Executive Vice Chancellor for Academic Affairs**
> *The Office of Academic Affairs*
> The University of Texas System
> *Please note our new mailing/street address (effective 8/5):*
> 210 West 7th Street
> Austin, TX 78701
> Office 512.499.4237 | Fax 512-499-4240
> www.utsystem.edu
>
> **From:** Mercer, Wanda
> **Sent:** Monday, December 18, 2017 11:48 AM
> **To:** Leslie, Steven <sleslie@utsystem.edu>
> **Subject:** FW: CLASE study documents

1

Help!  As you suggest, I do not want to engage with Professor Hubbard on this topic.
W

**From:** Thomas K Hubbard [mailto:tkh@utexas.edu]
**Sent:** Sunday, December 17, 2017 11:32 PM
**To:** Mercer, Wanda <wmercer@utsystem.edu>
**Subject:** CLASE study documents

**\* External Mail \***
Dear Wanda:
Many thanks for overseeing the conversation about the flaws in the CLASE report. There are obviously imperfections to having a discussion over the telephone, in that one cannot see the other parties and people thus talk at the same time. I look forward to Noel's more detailed written response. I have requested from her some of the base data for review. We'll see whether she cooperates.

I did find the External Reviewers' report on her Institute's website and will review it as well as looking into the background of these reviewers.

I think it is an evasion to argue, as Noel did, that we should be focused on the "solutions" rather than the actual prevalence rate. Male misbehavior around women is a problem that is as old as the human race itself, and there are no easy solutions. Some solutions, such as educational programs involving student volunteers, may be cost-effective; others, like mandatory reporter rules, banning consensual relationships among persons with no academic interaction, and expansion of Title IX bureaucracies, are expensive and intrusive in ways that raise serious personal privacy and civil liberties concerns.

However, before we evaluate the cost-effectiveness of "solutions," we need to have an accurate assessment of the prevalence of the problem supposedly being solved. There are many pressing problems in the world: poverty, hunger, disease, pollution, overpopulation, drug abuse, political corruption, religious intolerance, terror, and war. How high campus rape falls on this list and to what extent it should be prioritized in the allocation of always scarce public resources depends on accurate statistics about prevalence and severity. It does a great disservice to this assessment to conflate, as the CLASE study does, manipulative relationships (the first two questions in that section of the questionnaire) with "sexual violence." Something can be a debatable Title IX violation (an area hotly contested among legal academics) without being "sexual violence." Both should be measured, but they should not be lumped together.

I would like to have some other documents that are not on any website, namely the contract that UT System signed with the Institute for Domestic Violence and Sexual Abuse, and any budgetary documents that were part of the proposal by IDVSA or have been required by UT System as part of its auditing of IDVSA. I want to have a measure of the resources that have been devoted to this flawed study, so that I can estimate  the cost of a corrective study that employs the more scientific methods of the Kinsey Institute and a more rigorously worded questionnaire. I could of course obtain these documents through a Freedom of Information Act request, but that will involve extra bureaucracy and paperwork (and therefore cost) for the UT System. Given that this study was so widely advertised and touted by both the Chancellor and UT Austin President, UT System should not feel a need to hide this information from UT faculty. A cover-up will only make things look worse. Full transparency will make UT System look better.



**DEPARTMENT OF CLASSICS**
THE UNIVERSITY OF TEXAS AT AUSTIN

*2210 Speedway, C3400 · Waggener Hall 123 · Austin, Texas 78712-1738 · (512) 471-5742 · FAX (512) 471-4111*
*www.utexas.edu/cola/depts/classics*

July 25, 2018

Board of Regents
University of Texas System

Dear Regents:

This communication follows up on my letter of November 13, 2017, addressed to UT-Austin President Fenves and cc'd to Chancellor McRaven and the Board, concerning the shoddy research methods employed in the $1.7 million CLASE (Cultivating Learning and Safe Environments) study approved by the Regents at their July 2015 meeting, and the resulting reputational damage to UT-Austin in particular, due to the publicity it engendered over exaggerated claims of a 15% incidence of sexual assault among female undergraduates. As the record of internal UT System e-mail correspondence (which I have seen pursuant to an Open Records request) establishes, this initiative was very much the brain-child of the former Chancellor and was encouraged by former Vice Chancellor for Academic Affairs Pedro Reyes and Associate Vice Chancellor Wanda Mercer, and was conceived despite their knowledge that another recent survey by the AAU, administered at much lower cost (slightly over $80,000 for each campus), already covered the same ground. The current Chancellor and Board of Regents have a responsibility to remove obstacles to proper scholarly review and evaluation of this deeply misleading and ideologically tendentious study.

As my original letter stated (and has also been pointed out by other critics – see https://www.city-journal.org/html/blue-texas-15081.html ), this study overestimates the rate of "sexual assault" by counting incidents that involved no force, threat of force, or blackmail, ~~with~~ cases where a student merely felt verbal pressure to do something they later felt they didn't really want to do. Although such incidents may be regrettable, they are not "sexual assault" and should not be publicized as such. Proper evaluation of the CLASE study requires that these different phenomena should be disaggregated. However, the study's lead author refuses to share the data voluntarily (presumably because she knows it would undercut her sensationalistic claims), and UT System's Legal department refuses to release it under Open Records, based on a wholly spurious contention that the raw data has "commercial value." I subsequently placed another Open Records request to see whether anyone had ever offered financial compensation for such de-identified survey data collected by the Institute on Domestic Violence and Sexual Assault (IDVSA, which conducted the CLASE study), and the response came back that UT has no documentation of such offers ever having been made. Moreover, far larger repositories of sexual survey data, such as the Kinsey Institute and the University of Chicago's National Opinion Research Center (NORC), routinely make their data freely available to researchers at no charge, belying UT System Legal's unsupported contention that the comparatively tiny data set of

IDVSA has "commercial value." An Austin attorney who specializes in Open Records law agrees with my view that UT System is misusing that exemption to engage in a cover-up of material that has no "commercial value" whatever and believes we would prevail in court, but also says it would cost $30,000 to $50,000 to litigate. As much as I want to see the truth about the actual rate of sexual assault on my campus revealed, I am not willing to spend that much out of personal funds to do it. As the governing authority over UT System, the Board of Regents does have the power to direct its Legal department to cease frivolous obstructionism in defense of this shoddy and misleading study. Taxpayer funds were used to finance it, supposedly in furtherance of the public interest in maintaining a strong university system. The public therefore has a right to know what the actual tabulated data shows: how many of the alleged 15% were labelled as victims of "sexual assault" in virtue of actual sexual assault and how many were only reluctant partners who felt verbal or emotional pressure?

At the behest of President Fenves and former Chancellor McRaven, the head of the Institute on Domestic Violence and Sexual Assault and her well-funded research team prepared a 20-page memorandum (dated December 19, 2017) in response to my November 13 letter, after which Associate Vice Chancellor Wanda Mercer declared the matter closed from their standpoint. This letter is not the place to respond in detail to all of IDVSA's flimsy assertions; that will occur in subsequent scholarly publications. What I will note here is that IDVSA has no answer to my detailed criticism of their low response rate and the selection bias other than to say that their response rate was comparable to the AAU Campus Climate survey and other campus-level surveys. Why spend $1.7 million to replicate the same flawed methods that have already been used time after time? Before my letter, IDVSA's head had never even heard of Laumann's methods and those of the Kinsey Institute which produce much higher and more representative results; it is appalling that a major university system would lavish funds and delegate such responsibilities to a research team so unfamiliar with the basics of how to do truly scientific sexual survey work.

With regard to my criticism of CLASE's tendentiously worded survey instrument and overly capacious definition of sexual assault, they again defended themselves by appealing to other equally dubious campus surveys whose questions they unimaginatively mimicked. IDVSA admits that their definition of "sexual assault" did not limit itself to the parameters of criminal law, but also included what "Title IX experts" advised them might be hypothetical violations of Title IX (hence the questions about verbal and emotional pressure). I would only point out that so-called "Title IX experts" are not a neutral constituency, but are an interest group heavily invested in an expansive reading of Title IX; a more minimalist reading of that law, as the current Department of Education's Office of Civil Rights has adopted, will inevitably result in fewer jobs for "Title IX experts" and the expensive consulting firms that mushroomed after 2013 to offer universities Title IX training. Title IX is properly at issue only in cases of a pervasive hostile environment based on gender; that may be triggered by a partner's repeated requests for sexual intimacy, but not necessarily or in most cases. Potential Title IX violations are in any event not the same as actual sexual assault, and should not be conflated with it, as the CLASE statistics do.

The CLASE report is not the only case in which IDVSA has been criticized for pandering to media sensationalism with exaggerated statistical claims about rates of victimization. This institute also released an incredible report in 2016 that claimed 313,000 Texas residents were victims of "human trafficking" (i.e. over 1% of the state's population). This number was merely an extrapolation based on responses from various social service agencies about the percentage of their clients who had claimed victimization, multiplied to assume that a similar percentage of the same ethnic, occupational, and gender groups in the general population had also experienced similar levels of victimization. This methodology of course violates a cardinal principle of social science research, which is that one cannot use clinical samples (troubled people seeking help in desperate circumstances) to estimate prevalence of a social problem in the general population. IDVSA has been sharply attacked for this unscientific method by more credible researchers in the field of human trafficking: see http://humantraffickingcenter.org/jumping-conclusions-unpacking-human-trafficking-numbers-methodology/ . Responsible social scientists do not allow activist zealotry to infect data analysis. The mistakes IDVSA has made both in the CLASE survey and in its human trafficking study are so fundamental as to be scandalous. This group should have never been approached to conduct a $1.7 million study for UT System on such a serious and politically charged topic as campus rape.

From the standpoint of many of us at UT-Austin, the UT System bureaucracy is little more than a bottomless money pit that yields little or nothing of value to our campus. That so much was wasted on an amateurish, unscientific study that did nothing but bring discredit to our campus is strong evidence that UT System, and particularly its Office of Academic Affairs, should be put onto a strict budgetary diet. I hope the next Chancellor will be more careful in expenditure of public resources than his predecessor, and that the Board of Regents will not rubber-stamp any new requests for spending public funds on more system-wide studies that are derivative, duplicative, and politically motivated.

Sincerely yours,

Thomas K. Hubbard
James R. Dougherty, Jr. Centennial
    Professor of Classics
John Simon Guggenheim Memorial
    Fellow, 2017-18

Cc: President Gregory Fenves
Chancellor *ad interim* Larry R. Faulkner

# EXHIBIT B

Students for Safety

FOR IMMEDIATE RELEASE:                                    Contact: Sarah Blakemore
Thursday, November 21, 2019                                        713-851-4247

**Rally for the Removal of Dr. Thomas Hubbard**

AUSTIN, TX - Dr. Thomas K. Hubbard has been advocating for pederasty (pedophilia) for as long as he has taught at the University of Texas. Since 2000, Dr. Hubbard has used his position to further a community of individuals hoping to prey on underage boys. In his academic writing, Hubbard describes physical relationships between men and young boys as "proper learning experiences." Works like "Boys' Sexuality and Age of Consent" encourage these illicit acts. His course "Mythology of Rape" was banned at UT after only one semester.  Furthermore, Hubbard is heavily associated with the North American Man/Boy Love Association (NAMbLA), formerly the world's largest pedophile activist group. He is even on the list of associated individuals on the NAMbLA Wikipedia page.

We are calling for Dr. Thomas K. Hubbard's immediate removal from his position as a professor of the classics department at the University of Texas at Austin. An individual who advocates for violent crime against teen boys had no business teaching the leaders of tomorrow. It is clear to us that the University of Texas does not have its student's safety, health, and welfare in mind. Hubbard's misconduct has been brought to administration before to no avail. We refuse to stand by while this man uses his status to promote pedophilia.

It is our goal to make students aware of Hubbard's disgusting ideals even if the University of Texas protects him. It should be a student's choice whether to learn from a man with Hubbard's record.

###

# EXHIBIT C



# Statesman

# Austin students want professor fired for writings on age of consent; UT says it's protected speech

**By Lara Korte**
Posted Dec 4, 2019 at 5:37 PM

For weeks, University of Texas students have been protesting against and asking school leaders to fire professors with histories of sexual misconduct.

Now, a group of students is calling for the removal of another faculty member they say is promoting harmful ideas about the age of consent and sexual relations with minors.

Thomas K. Hubbard, a professor of classics in UT's College of Liberal Arts, has written extensively on relationships between adolescent boys and adult men, often using classic literature's depictions of homosexual relationships to suggest changing age of consent laws and challenging modern norms about youth sexuality.

But some students say he has used his position as a UT professor to further a culture that hurts young boys.

In his academic writing, Hubbard describes physical relationships between men and young boys in ancient times as "proper learning experiences." In one 2010 article published in the peer-reviewed journal, Thymos: Boyhood Studies, Hubbard examines sexual consent among adolescent males in antiquity, asking, "What can we learn from the Greeks?"

"Contemporary American legislation premised on children's incapacity to 'consent' to sexual relations stems from outmoded gender constructions and ideological preoccupations of the late Victorian and Progressive Era," Hubbard writes. "We should consider a different 'age of consent' for boys and girls."

In the same publication, Hubbard called age of consent laws a "sad by-product" of a "naive and self-righteous era" and compared them to prohibition.

Hubbard rebukes the idea he writes about pedophilia. Instead, he says, he discusses the phenomenon of "pederasty," which he described as the romantic courtship of adolescent males, usually 14 years or older with older men.

"How teen sexuality should be regulated and how legal violations should be punished are legitimate areas of research and debate among scholars and public policy professionals. Historical and cross-cultural evidence have a place in such discussions," he said in an emailed statement.

READ: Hubbard's Q&A on the issue.

Hubbard said the concerns are from a "small handful of students," and "are not based on any careful examination of the full spectrum of my writings on the subject."

Hubbard said he believes very strongly in informed consent.

"I have written many hundreds of pages on such topics, which you really need to examine carefully if you want to do responsible reporting," he said. "You should not merely accept it on faith if some naive undergraduate student quotes something to you from an article they may not have even read fully or have the intellectual sophistication to understand."

While the American-Statesman has not reviewed the entirety of Hubbard's academic writings, it has read the article in question, in which Hubbard explores adolescent sexuality in ancient Greek and the origins of age of consent laws.

Some experts say many scholars who work on the history of sexuality in the ancient world do not subscribe to, condone or promote the practices they write about. Hubbard's writings, while offensive to some students, do not violate any campus policy, according to the university, and therefore do not warrant any disciplinary action.

"The university condemns ideas or world views that exploit or harm individuals," UT spokeswoman Shilpa Bakre said. "However, the study of controversial and even offensive ideas is protected by the First Amendment — as

is the right of others to strongly disagree with and draw attention to those ideas. If someone is alleged to violate university policy or takes actions that threaten the safety of the campus community, the university will respond swiftly, investigating allegations thoroughly and imposing sanctions as warranted."

Hubbard's work is promoted in online communities that support and promote relationships between men and minor boys, such as the North American Man/Boy Love Association, or NAMbLA, a pedophile advocacy group. The organization published Hubbard's book, "Greek Love Reconsidered," in 2000 simultaneously with Wallace Hamilton Press.

Up until recently, Hubbard was listed as an associated individual on NAMbLA's Wikipedia page. As of Tuesday, his name had been removed.

Hubbard told the Statesman his works were not "influenced by or sympathetic to NAMBLA's radical position," nor does he "endorse NAMBLA's idiosyncratic approach to legal reform and do not share the sexual orientation of its members."

One post on the site BoyChat.org, a website that describes itself as a forum for people who have "a particular affinity for pubescent and/or prepubescent boys," describes Hubbard as "a great man — fearless on speaking out against today's phobic persecution of boylove."

Sarah Blakemore, one of the students calling for Hubbard's removal, took his classical mythology class this semester before learning about his writings on pederasty and dropping the course.

"I understand everyone has their own academic license, but I don't think it's appropriate for teachers at a public university to be promoting breaking the law," Blakemore said. "Personally, if the world's largest pedophile advocacy group endorsed my book, I would reconsider my life."

Dr. Roy Lubit is a New York-based forensic child psychiatrist who has studied and treated child sexual abuse cases across the country. Lubit said children and adolescents are not able to consent.

"Serotonin levels drop during teen years and dopamine goes up, so now you have someone whose desires are magnified and whose self-control is down," Lubit said. "And this is part of why teenagers tend to have tumultuous teenage years;

they need adult guidance and adult protection from themselves, from their decisions."

Hubbard's expertise in classical texts does not make him an expert in child psychology, Lubit said: "I have evaluated and treated many, many people who have suffered child sexual abuse and the fact that it occurred in Greece 2,000 years ago doesn't mean that it's not harmful."

Universities often don't have any jurisdiction over worldviews. Recently at Indiana University, business professor Eric Rasmusen was found to have used his social media accounts to disparage women, people of color and gay men.

An Indiana University leader called Rasmusen's posts "vile and stupid" but said the school was forbidden under the First Amendment from firing him.

Jodie Shipper, a California-based higher education consultant, said free speech and academic freedom rules are critical at public universities.

"If we tightly control someone and what they can say in the classroom, we have to be prepared to think about the ramifications of all the other speech we might control and what that might look like," Shipper said.

But just because a university can't impose sanctions on a professor, doesn't mean students or the general public can't, Shipper said.

"Maybe the university isn't firing him. But at some point, if no one is taking his classes, it may be that he is in a position where, due to attrition, there's nothing for him to do," Shipper said.

The students calling for Hubbard's dismissal say they have joined other students protesting professors' sexual misconduct and call themselves The Coalition Against Sexual Misconduct. The group is holding its fourth rally of the semester at 10 a.m. Friday at the UT Tower.

# EXHIBIT D

**Fire the Abusers - Protest for Student Safety No. 2 (11.8k viewers) – 12/09/2019 – Twitter Broadcast**

| 1 | **00:00:00** | [Beginning of Recorded Material] |
|---|---|---|
| 2 | Student 1: | Thomas Hubbard come outside. |
| 3 | Crowd: | Pedophile you can't hide [Chanting] |
| 4 | **00:02:38** | |
| 5 | Filming Student: | Fire the Abusers is at Thomas Hubbard's house right now. He's guilty of trying |
| 6 | | to lower the age of consent, he's a known supporter of NAMBLA, the North |
| 7 | | American Man-Boy Love Association, he's published work to argue that |
| 8 | | statutory rape and age of consent laws are a burden. He teaches a class called |
| 9 | | "Mythologies of Rape" and although UT got rid of that class because of a high |
| 10 | | volume of complaints, he's still teaching there and he's still forcing his class to |
| 11 | | regurgitate his vile views in their papers and works or he threatens to fail them. |
| 12 | **00:02:40** | |
| 13 | Student 1: | Thomas Hubbard come outside [Chanting] |
| 14 | Student 1: | Thomas Hubbard is a creep |
| 15 | Crowd: | Keep an eye out when you sleep [chanting] |
| 16 | **00:03:58** | |
| 17 | Unknown student: | Come out! |
| 18 | **00:04:11** | |
| 19 | Student: | We're not done yet Thomas! |
| 20 | **00:04:26** | |
| 21 | Student 3: | Thomas Hubbard. Every single one of your neighbors should know what kind of |
| 22 | | disgusting person you are. For supporting pedophilia. He supports lowering the |
| 23 | | age of consent. Thomas's rhetoric actively harms children. He has supporters that |
| 24 | | [garbled] a hero for defending pedophilia |
| 25 | **00:04:50** | |
| 26 | Police Officer: | Get off the property. |
| 27 | Student: | The pigs are here. |
| 28 | Student 3: | Thomas Hubbard come outside |

| 29 | Crowd: | Pedophile you can't hide |
| 30 | **00:05:28** | |
| 31 | Student: | Let's get that fucking pedophile (slightly garbled) |
| 32 | **00:06:11** | |

33 Student 3:      Thomas Hubbard. He's supports pedophilia. He's a professor at UT who uses his
34               rhetoric that harms children. The kind of culture he's creating is harmful towards
35               children and towards his students who have to take his classes. He's tried using
36               ancient pederasty to promote and justify pedophilia. I learned that Hubbard locks
37               his classroom because he thought we would pay him a visit. Instead we decided
38               to pay him a visit at his home. I'm glad to hear that you're worried about us
39               confronting you.

40 **00:06:48**

41 Background Student:   You're not safe anywhere Hubbard!

42 Student 3:      You should be! I'm glad to hear that you're worried about us confronting you.
43               You should be by the way, which is why I think you decided to take the
44               precaution. You knew you were next given how you are so public about
45               defending pedophilia. Right after we came for Sarkar you knew you were next,
46               you piece of shit

47 Background student:   The pigs can't save you!
48

49 **00:07:22**      He sent cops which is not surprising because over 40% of cops are domestic
50               abusers. Just a couple of weeks ago, Dustin Lee a lieutenant in downtown Austin
51               was found guilty of raping his own daughter for 15 years and is in court. We
52               know that the cops don't protect us, they protect those in power, and that's why
53               Fire the Abusers is out here making Hubbard know that we're taking matters into
54               our own hands. He's going to be afraid to teach, he's going to be afraid to be in
55               Austin, he's going to be afraid to be a pedophile.

56 **00:07:59**

57 Student 3:      Who supports pedophiles?

58 Crowd (chanting):   Pigs do pigs do.

59 **00:08:34**

60 Student 4 (yelling):

61 (White/pink hat, green army jacket, yellow bandana)

| 62 | | Thomas Hubbard. You cannot hide from the things that you've done and things |
| 63 | | that you've said. You have dedicated your life's work to advocating for |
| 64 | | pedophilia. <mark>You are disgusting and irredeemable and we're not going to let you</mark> |
| 65 | | <mark>get away with it</mark>. You've claimed that boys who are groomed by pedophiles |
| 66 | | actually have more power than the adults who are abusing them. You have been |
| 67 | | published by NAMBLA, which is the North American Man-Boys Love |
| 68 | | Association, which is an organization that advocates for the sexual abuse of |
| 69 | | young boys by grown men. |

70   You've opposed affirmative verbal consent laws in an effort to make it even
71   harder for women who just unfortunately endured sexual violence, to prove their
72   rape in criminal court.

73   <mark>We're here to let you know that if the University of Texas doesn't do anything</mark>
74   <mark>about you we shall fucking care. We know that all UT cares about is money. But</mark>
75   <mark>unfortunately for you, we can take care of you ourselves. Pedophilia apologists</mark>
76   <mark>like you deserve to be confronted and feel afraid. We will make you scared to</mark>
77   <mark>teach, scared to exist in your home. Scared to even exist in the city of Austin.</mark>
78   <mark>And you know what? Word on the street is is that we were making you afraid</mark>
79   <mark>even before we got the chance to roll up on you.</mark>

80   Filing Student:   He's been locking his classroom doors he knows, <mark>he knows we're coming after</mark>
81                    <mark>him.</mark>

82

**83   00:0009:51**

84   Student 4   …The pigs are not going to stop us. Thomas! <mark>We're going to make you face the</mark>
85                <mark>wrath of the people, and will do this do this in service of every young child and</mark>
86                <mark>woman who's been sexually violated.</mark> To Thomas Hubbard's neighbors, this man
87                is dangerous. He believes that there's nothing wrong with pedophiles… in fact he
88                seems to think that people like him here… you do not want this pedophile near
89                your children, and I can definitely tell you don't want him living in your
90                goddamn neighborhood. <mark>If you value the safety of young children and women,</mark>
91                <mark>join us in running this pedophile out of Austin. .. The people like him can never</mark>
92                <mark>feel safe or welcome in our community. When women and children are under</mark>
93                <mark>attack</mark>

94   Crowd:   Stand up fight back (chanting, repeating)

95   Student 4:   When women and children are under attack what do we do?

96   Crowd:   Stand up fight back (etc.)

**97   00:11:16**

3

| 98 | Student 4: | We can tell you're scared because you sent the pigs on us, but we need to know |
| 99 | | that we have the facts(?)… but it won't fucking matter. ==You need to know you== |
| 100 | | ==are not safe here, you are not safe in Austin.== |

| 101 | Filming Student: | Just a list of some of the things he's done, tried to lower the age of consent.. ==303== |
| 102 | | ==Brentwood Street Austin, TX.== |

| 103 | Student 4: | ==We will do whatever it takes to make you afraid to ever go back to UT, afraid to== |
| 104 | | ==come back to this house, we will make sure that this follows you for the rest of== |
| 105 | | ==your life,== I'll reckon that's done once you leave. |

| 106 | **00:11:54** | |

| 107 | Police Officer: | Hey guys can I have your attention for a minute? |

| 108 | Students: | No absolutely not! |

| 109 | Student 4: | Who protects pedophiles? |

| 110 | Crowd: | Pigs do, pigs do [repeating] |

| 111 | Police Officer: | Can I explain something? |

| 112 | Student 4: | Hubbard teaches rape of children |

| 113 | Crowd: | Time to isolate this villain [repeating] |

| 114 | Filming Student: | How many cop cars are there, there's one right there? Two three? We're out |
| 115 | | here… |

| 116 | **00:14:29** | |

| 117 | Filming Student: | A fourth cop car just showed up. How much money is the City of Austin |
| 118 | | spending to protect a pedophile? |

| 119 | **00:14:34** | |

| 120 | Student 4: | ==Vile, vile pedphile, we're make sure he's exiled!== |

| 121 | Crowd: | (chanting, repeating) |

| 122 | **00:15:16** | |

| 123 | Student 2; | Thomas Hubbard, you can't hide from us! We're going to continue confronting |
| 124 | | you every step of the way. You and your rhetoric of pedophilia, it will not stand |
| 125 | | and we're going to continue confronting you every day if that's what it takes. |
| 126 | | The cops cannot protect you. The UT administration cannot protect you. They |
| 127 | | won't hold you accountable but we will because we're sick and done with you |
| 128 | | not being held accountable for your rhetoric that actively harms children every |

| 129 | | day. .. Intimate supporters who see you as a hero is unacceptable. You also and |
|---|---|---|
| 130 | | tell rhetoric that is harmful towards women, you sexist pig. |

| 131 | **00:16:02** | |

| 132 | Student: | Fuck you Hubbard! |

| 133 | Student 4: | Come on out Thomas we just want to talk! (laughter) You didn't expect us did |
| 134 | | you? … Classroom disruptions, but know if we keep doing the same thing you're |
| 135 | | going to be able to expect us. We have the element of surprise on our side and I |
| 136 | | guarantee, next time we come up on you, won't see it coming. You better be |
| 137 | | afraid. We are doing this for children, we are doing this for women, we are doing |
| 138 | | this for the working class we will not take this anymore. And you better know, |
| 139 | | that you will not be safe here. So you might as well leave now cause if I ever |
| 140 | | (hurt you?) [garbled] If you want to keep going with this shit, if you want to keep |
| 141 | | living in fear? Then, yeah, go ahead and stay in Austin. But at some point you're |
| 142 | | going to get sick and tired of this and you're going to have to leave. So I don't |
| 143 | | know, maybe you can do it right now, but we'll still keep coming until you get |
| 144 | | the fuck out of this city. When women and children are under attack, what do we |
| 145 | | do?. |

| 146 | Crowd: | Stand up fight back(repeating) |

| 147 | **00:18:02** | |

| 148 | Student 5(?): | Attention Thomas Hubbard. You cannot hide any longer. Students will not stand |
| 149 | | for your (garbled) of men and underage boys. Your use of ___ to promote child |
| 150 | | abuse and rape is disgusting. How wants to get away with the age of consent |
| 151 | | laws? You want to lessen punishment for those who sexually assault women |
| 152 | | under the age of 6. You think that rape statistics are overblown but that rape… |
| 153 | | You're a danger to Austin and to everyone in the community. You think that you |
| 154 | | have free rape to push your humble rhetoric unsuspecting? [garbled] promoting |
| 155 | | pedophilia and the culture of rape. We will make sure you can never will fight |
| 156 | | against you with everything we have. You should be afraid. No matter where you |
| 157 | | go, know that students everywhere are actively working on running you out. You |
| 158 | | are not safe from our anger anywhere. Not at work, not at home, not anywhere in |
| 159 | | Austin. How dare you force your students to write about their experiences of |
| 160 | | being sexually assaulted, and to deny that their experiences were actually rape? |
| 161 | | How dare you promote horrible things and abuse? Apparently being called a |
| 162 | | pedophile is not enough to keep get you removed from campus.. anger and |
| 163 | | disgust… know that UT has a history of supporting people like you… You are a |
| 164 | | chicken[garbled?] and a disgrace and deserve to be ostracized. To neighbors of |
| 165 | | Thomas Hubbard, we call on you to join us in our fight… you are living with |
| 166 | | someone who advocates for pedophilia and rape should not be allowed to work |
| 167 | | or  live in our community any longer. |

| | | |
|---|---|---|
| 168 | **00:21:30** | |
| 169 | Student 5: | <mark>Pedophile you can't run</mark> |
| 170 | Crowd: | We fight back you sexist scum (repeating) |
| 171 | **00:23:50** | |
| 172 | Student: | Who protects pedophiles? |
| 173 | Crowd: | Pigs do, pigs do |
| 174 | **00:24:20** | |
| 175 | Filming Student: | Women at UT are angry. They're tired. We don't want any more transparency it |
| 176 | | doesn't matter. If UT won't fire these professors, we'll make them leave |
| 177 | | ourselves. |
| 178 | Student: | Fuck you Hubbard! |
| 179 | Student 5: | [Garbled] from shit like you.. They can't protect you forever, you better believe |
| 180 | | that. You can't hide from us. We see you in there Hubbard. |
| 181 | Filming Student: | We see you pedo. We're out here for little kids like that in the neighborhood that |
| 182 | | didn't now they're living next to a pedophile. |
| 183 | **00:26:30** | |
| 184 | Student 5: | Bet you feel we're making you feel real small right now, but it's the least you |
| 185 | | deserve. Because you advocate for the rape of children. <mark>It's not over for you,</mark> |
| 186 | | <mark>we're going to keep fighting until you're out of this city. You are not safe here.</mark> |
| 187 | | <mark>You're not safe in your home. You're not safe at UT. No, we've already gonna</mark> |
| 188 | | <mark>figure out the places you frequent in the city but you are not safe.</mark> |
| 189 | Filming Student: | We're going to find your local Starbucks you go to Hubbard. |
| 190 | **00:26:58** | |
| 191 | Student 6(?): | Thomas K. Hubbard wrote in 2010 that boy's sexuality is regulated with an… |
| 192 | | confusing legal regime than in any point in human history. He believes that |
| 193 | | children of any age should be able to participate in a sexual act with someone |
| 194 | | else of any age. What sick vile person would think this? … Hubbard promotes |
| 195 | | sexual violence against children. <mark>You as students of the University of Texas will</mark> |
| 196 | | <mark>not allow any man who advocates for pedophile to continue to live comfortably</mark> |
| 197 | | <mark>and without fear of the consequences of their actions. We will not stand by, we</mark> |
| 198 | | <mark>will not back down, and we will not be quiet.</mark> It is our responsibility to let |
| 199 | | Thomas Hubbard know that the victims of the crimes he views as acceptable |
| 200 | | [garbled]. The lies he tells children will not be tolerated… |

6

201   **00:28:33**

202   Student:                         The police won't save you!

203   00:29:34

204   Filming Student:                              He's getting a pig escort. Oh my gosh he's finally out.

205   Student:                         Who protects pedophiles?

206   Crowd:                           Pigs do, etc.

207   [Prof. Hubbard walks to vehicle and leaves Officers are shouted down.]

208   Filming Student:                              What a fucking coward

209   **00:31:21**

210   Student 2 (posted online):

211                         Hey y'all. So I want to start off by commending every single student who has
212                         participated in militant actions against abusive professors so far. The militant
213                         student struggle against the culture of abuse that thrives on UT's campus is a
214                         powerful one, and it is intrinsically linked to the class struggle against sexist and
215                         racist cops! UT PD helped threaten students with arrest at the numerous sit-ins at
216                         the tower, and that's because the pigs, whether they work for the university or the
217                         city, don't exist to protect the people! They exist to protect private property and
218                         the culture of abuse and exploitation that kills women!

219                         APD police lieutenant Dustin Lee has been charged with three felonies of sexual
220                         assault of a minor, one of which involves his own daughter, and he is still getting
221                         paid by APD. We're not surprised about this fact, given that APD protects and
222                         promotes abusers just like him to positions of power. Even though he has a
223                         history of documented sexual harassment, he's still been able to rise to the ranks
224                         of lieutenant. Another APD police officer named Jason Dusterhoft was fired for
225                         strangling a woman he met on tinder and for assaulting strippers at a nightclub.
226                         Men like Thomas Hubbard want to amplify the very abuse that thrives in the
227                         ranks of APD. Under capitalism, children's rights are far and few between, so it
228                         makes sense that this capitalist system would protect scum like Hubbard. (Crowd
229                         boos)

230                         Both of these pigs were hired by the former police chief Art Acevedo, who once
231                         slept with a lower ranking female officer and showed her nudes to their
232                         coworkers and has also been complicit in the systematic ignoring of rape kits of
233                         thousands of women. These cops are not just "bad apples" or representative of
234                         isolated instances of abuse. The cops are the enemies of the people who protect
235                         private property, which is the root of women's oppression. Working class women
236                         everywhere are not surprised when one after another cop is charged with battery,

| 237 | | assault, or homicide of their partners or people they claim to serve and protect. |
| 238 | | We know that these abusive pigs do not protect us and they only serve the ruling |
| 239 | | class. |

| 240 | | We cannot achieve liberation under a capitalist system; voting for reforms or |
| 241 | | trying to hold "discourse" with these pigs is not the solution to our root issue. |
| 242 | | Non-profits act as a band-aid within the capitalist system, and they are oftentimes |
| 243 | | underfunded by the government, as we've seen happen recently in Austin with |
| 244 | | Planned Parenthood getting their funds pulled. The job of the police is to defend |
| 245 | | private property and maintain the capitalist order. Even when cops aren't busy |
| 246 | | abusing women or molesting their own children, they ignore abused women's |
| 247 | | pleas for help. We saw this play out in the tragic murder of Veneranda Martinez-|
| 248 | | Gutierrez, a woman who was killed by her abusive husband in front of her |
| 249 | | children at a gas station in Riverside. While her husband was stalking her before |
| 250 | | her murder, she filed several complaints and the Austin Police Department did |
| 251 | | nothing! The pigs have her blood on her hands! |

| 252 | | The only way to change the system and improve the conditions of working-class |
| 253 | | women is a proletarian revolution. The only way to achieve women's liberation |
| 254 | | from abuse and exploitation under a capitalist system is by forcibly taking the |
| 255 | | power from the ruling class. Only then will the working class be liberated from |
| 256 | | the chains of oppression and defeat once and for all abusers like Dustin Lee and |
| 257 | | Justin Dusterhoft who have systematically been protected and reward by APD. |
| 258 | | Only then will student women be free from the tyranny of abuse and sexual |
| 259 | | violence that looms over them every single day. We say no more, we will not sit |
| 260 | | by idly and hope one day things will change under this exploitative capitalist |
| 261 | | system. We will organize the working class together and confront our abusers |
| 262 | | until we reach liberation through revolution! |

| 263 | | |

| 264 | **00:36:30** | |

| 265 | Student 7: | Hey y'all, so we're out here because Thomas Hubbard just got a police escort out |
| 266 | | of his house by these guys right here… |

| 267 | **00:40:25** | |

| 268 | Student 2: | You know, isn't it interesting that we as a group are more likely to get arrested |
| 269 | | for not leaving his private property than he was for advocating for the rape of |
| 270 | | kids. How do you live with yourself? How do you sleep at night?.. These people |
| 271 | | hate you so much. I hope it makes it hard for you to sleep at night. And even if it |
| 272 | | doesn't, it doesn't matter, because we won't stop. |

| 273 | **00:44:27** | |

8

| | |
|---|---|
| 274 | All the neighbors, if you don't know what's going on right now. The police |
| 275 | escorted a pedophile out of the neighborhood. Professor Thomas Hubbard he |
| 276 | cannot hide any longer. Students will not stand for his history of promoting |
| 277 | relationships between men and underage boys. He uses classical texts to promote |
| 278 | child abuse and rape. That's disgusting. He wants to lessen age of consent laws, |
| 279 | etc… He's a danger to all students and to everyone in the community… we will |
| 280 | make sure he never promotes pedophilia and the culture of rape. We will fight |
| 281 | against you with everything we have. The pigs should be afraid. He is not safe |
| 282 | from our anger anywhere, not at work, not at home, and not in Austin… |
| | |
| 283 | |
| | |
| 284 | **00:50:39 [Video Ends]** |

9



**Home**

**Explore**

**Notifications**

**Messages**

**Bookmarks**

**Lists**

**Profile**

**More**

Tweet

← **Tweet**

🔍 Search Twitter

📌 Pinned Tweet

**Fire The Abusers**
@FireTheAbusers

Today, Fire The Abusers confronted known pedophile and UT professor Thomas Hubbard at his own home. Watch him run away, escorted by cops!



**Fire The Abusers** @FireTheAbusers · Dec 9, 2019
twitter.com/i/broadcasts/1...

50:32   11.6K viewers

7:27 PM · Dec 9, 2019 · Twitter for iPhone

**66** Retweets   **234** Likes

💬              🔁              ♡              ⬆️

**Espen Bjerke** @colher23 · Dec 10, 2019
Replying to @FireTheAbusers
pitchforks
💬              🔁              ♡ 1              ⬆️

**Nathan** @LabelsAreLazy · Dec 10, 2019
Replying to @FireTheAbusers
"you can't hide!" shout the masked children.
💬 1            🔁 1            ♡ 56            ⬆️

**Fire The Abusers** @FireTheAbusers · Dec 10, 2019
1. We are adult women.
2. We wore masks because we are students, and UT has historically sided with this pedophile and other sexual predators on its faculty. It would jeopardize our academic lives and careers to show our faces in a publicly available video like this.
💬 11           🔁 1            ♡ 10            ⬆️

**Relevant people**

**Fire The Abusers**
@FireTheAbusers
dedicated to the ter
professors guilty of
at The University of

**Trends for you**

Politics · Trending
**#MarieYovanovitch**
20.4K Tweets

US news
Documents appear to show
former US ambassador to ..

Trending in United States
**Aaron Hernandez**
13.3K Tweets

Television
Netflix docuseries on forme
NFL player Aaron Hernande

Politics · Trending
**#NeverWarren**
Trending with: #WarrenIsASn

Twitter

Home

Explore

Notifications

Messages

Bookmarks

Lists

Profile

More

Tweet

**miggs** @ironmiggs · Dec 10, 2019
Replying to @FireTheAbusers
Are these clowns from the left or the right?  Can't tell anymore. ....

💬 1          ⟲ 1          ♡ 4          ⬆

**hazboi** @hazzymg · Dec 10, 2019
Who cares clowns a good enough description

💬          ⟲          ♡ 1          ⬆

**DEBOOSTED RADFEM  XX  #IStandWithMayaF...** · Dec 11, 2019
Replying to @FireTheAbusers
Students Want Professor Fired for Writing About 'Pederasty' but University
of Texas Says It's Protected Speech thedailybeast.com/students-want-...

💬          ⟲ 1          ♡ 1          ⬆

**Enduro Stepdad** @pfastenberger · Dec 10, 2019
Replying to @FireTheAbusers
So what if he came outside? Then what? Did you have a plan?

💬          ⟲          ♡ 5          ⬆

**Crawling Along** @seacucumberesqu · Dec 10, 2019
Replying to @FireTheAbusers
Grounds for a lawsuit here?

💬 3          ⟲ 1          ♡ 17          ⬆

1 more reply

**stephen** @S___Elliott · Dec 10, 2019
Replying to @FireTheAbusers

> **stephen** @S___Elliott · Dec 10, 2019
> Replying to @FireTheAbusers
> You said he was a known pedophile. None of this backs up that assertion.
> That's a big deal, to call someone a pedophile. It's a very serious
> accusation.

💬          ⟲ 1          ♡ 23          ⬆

Search Twitter

6,599 Tweets

K-Pop · Trending
**#BlackOutBTS**
5,861 Tweets

Show more

Terms   Privacy policy   Cookies
More ⌄   © 2020 Twitter, Inc.

# ⚠ NEIGHBORHOOD PERVERT ALERT!

 

THOMAS HUBBARD is a professor of classics at The University of Texas guilty of:

- Trying to lower the age of consent
- Being a known supporter of NAMBLA, the North American Man/Boy Love Association where he published works to argue statutory rape and age of consent laws are burdens
- Teaching a class titled "Mythologies of Rape" in which he encouraged students to write about their own experience with sexual assault or experiences of their friends to see if was "actually" rape under the Texas penal code. He based his grading system on how closely students regurgitated his views. This course was banned from UT after a single semester due to numerous complaints, but the university allowed him to continue teaching.
- Making sexist comments to female students
- Being celebrated in online communities for pedophilia views



Interested in joining the movement and keeping pedophiles and abusers off our streets and universities?

instagram/twitter @firetheabusers
email: firetheabusers@gmail.com

← **Tweet**

⇗ Pinned Tweet



**Fire The Abusers**
@FireTheAbusers

Today, Fire The Abusers confronted known pedophile and UT professor Thomas Hubbard at his own home. Watch him run away, escorted by cops!

> **Fire The Abusers** @FireTheAbusers · Dec 9, 2019
> twitter.com/i/broadcasts/1...

7:27 PM · Dec 9, 2019 · Twitter for iPhone

**66** Retweets  **234** Likes

💬            ⟲            ♡            ⬆️

**Espen Bjerke** @colher23 · Dec 10, 2019
Replying to @FireTheAbusers
pitchforks

💬         ⟲         ♡ 1         ⬆️

**Nathan** @LabelsAreLazy · Dec 10, 2019
Replying to @FireTheAbusers
"you can't hide!" shout the masked children.

💬 1         ⟲ 1         ♡ 56         ⬆️

**Fire The Abusers** @FireTheAbusers · Dec 10, 2019
1. We are adult women.
2. We wore masks because we are students, and UT has historically sided with this pedophile and other sexual predators on its faculty. It would jeopardize our academic lives and careers to show our faces in a publicly available video like this.

💬 11         ⟲ 1         ♡ 10         ⬆️





**Fire The Abusers**
@FireTheAbusers

Follow

We've seen some incorrect claims circulating that FTA is controlled by an off-campus organization called Red Guard Austin. This is not true. UT admin wants to promote this idea as a way to dismiss us, but the truth is that we are a student-led, student-powered movement.

# EXHIBIT E

From: **Dukerich, Janet M** <janet.dukerich@austin.utexas.edu>
Date: Sat, Dec 7, 2019 at 4:57 PM
Subject: Re: plans for Spring
To: tkh@utexas.edu <tkh@utexas.edu>, Stevens, Ann H <Ann.Stevens@austin.utexas.edu>

Hi Tom – I was on a different part of campus for meetings for most of the day but when I did go to the Main building around 3:00 I noticed that the group of students was fairly small and well behaved. I believe there were larger numbers earlier but the tone wasn't as militant as the second sit-in outside of the Provost's office.

I don't think the university is trying to appease these students. I do think the administration is trying to engage with students who are in leadership positions to understand their concerns (some of these concerns are also shared by faculty, especially with regard to confusion and lack of transparency over the policies and procedures we have for Title IX investigations).

I'm happy to bring your proposal up to the provost. It's difficult to predict what will happen spring semester but I think it is helpful to consider a number of different ideas.

Janet

**JANET M. DUKERICH** | Vice Provost for Advocacy & Dispute Resolution | Professor, Management | Harkins & Company Centennial Chair | The University of Texas at Austin | Office of the Executive Vice President and Provost

1

**From:** Thomas K Hubbard <tkh@utexas.edu>
**Date:** Saturday, December 7, 2019 at 1:51 PM
**To:** "Dukerich, Janet M" <janet.dukerich@austin.utexas.edu>, Ann Stevens <Ann.Stevens@austin.utexas.edu>
**Subject:** plans for Spring


Dear Janet and Ann:

Does the Dean of Students Office or UTPD have any estimate of how many students actually attended their big rally yesterday? I looked at it twice from a safe distance (the front porch of Garrison) and it appeared to me as if virtually nobody was paying any attention to them at all. Students were just walking past as if they weren't there. This is not a substantial enough group that the University should be trying to appease them to the extent it has. We can all hope that this movement dies down by next semester, but I fear that it is only going to mushroom and grow with even more COLA faculty being targeted for "bad ideas" rather than actual misconduct. They may see the media coverage as a major victory.

Nevertheless, the reputational damage to the University from Thursday's article in the Statesman, which was also taken up nationally by The Daily Beast, is substantial. As you know, I feel that the response of University Communications could easily be read as acknowledging that I had ideas "that harm people" (first sentence) and that I might be guilty of some misconduct or violation of rules (third sentence). Neither you nor anyone else has yet given me a specific explanation that would support such inferences.

Perhaps it would be in both my and the University's best interest that the Provost's Office or COLA should form a small committee to examine at least the most relevant works in my lengthy scholarly record (a few articles where I do talk about contemporary social constructions of sexuality), send me any questions they have, and then make a more definitive determination whether there is any merit whatever to the inflammatory charges that have been made, initially over social media and now in mainstream press. I would nominate Prof. Lisa Moore (of English), who is the head of the LGBTQ section of the Center for Women's and Gender Studies, to be on such a committee. She has known my work and me for close to 20 years. Experts in criminal justice and developmental or educational psychology might also be knowledgeable. All of my publications have been listed on my annual reports and submitted in full to my department each year, and although this department has seen much conflict in the past (causing former deans to reduce it from 25 tenure-track positions to 15), the department has never used my scholarly interests as grounds for attacking me.

Once that committee has finished and released its findings, I would be willing to participate in a public forum to debate these issues with anyone, including any faculty who have expertise. If the disgruntled student who claims to speak for "Students for Safety" (if it even is a group) wants to participate, let her. Honestly, I don't think she and her cohort are interested in detailed scholarly debate, but if they refuse to come, that will prove something in itself. For students who have serious concerns about these allegations, including those in my own department, who are now confused and distressed, it could be a useful learning opportunity to see how and whether cross-cultural evidence impacts contemporary policy issues. If it doesn't, then why study history at all?

I am trying to come up with constructive proposals here to help both the University and me get over this crisis. Rather than just pandering to student militants, we need to do what we do best, which is to educate them in the techniques of careful scholarship and civil debate. Responsible citizens need to know how to engage their opponents' work with an open mind, rather than immediately demanding they be "cancelled" and removed. If we cannot train our students to do this, the future of democracy itself is in peril.

Thomas Hubbard

From: **Thomas K Hubbard** <tkh@utexas.edu>
Date: Fri, Nov 22, 2019 at 6:57 PM
Subject: Re: Introduction
To: Dukerich, Janet M <janet.dukerich@austin.utexas.edu>
Cc: Ochsner, David A <dochsner@austin.utexas.edu>, Shockley, Carmen L <cshockley@austin.utexas.edu>


Dear Colleagues:
Many thanks for your support during this trying time. I know that careful scholarly nuance can rapidly become distorted by agenda-driven social media in the hands of naive students or malicious scholarly rivals, which is why I have always stayed off social media. I will this weekend draft a short response and run it by David. I do think it is important at the very least that my own undergraduate students not be distracted by this circus at a very stressful time for them, as they finish their papers and prepare for finals. I must at least set the record straight with them by issuing some kind of statement. I am less concerned about the impact on graduate students and colleagues in Classics, as they have known about my work for a long time and have sufficient historical understanding to know that statements about the social functionality of historical sexual practices and constructions do not imply any endorsement of modern law breaking, but can enrich scholarly understanding of the complex dynamics of change in social constructions. This is the research for which the Guggenheim Foundation funded me in 2017-18 (as UT's only Guggenheim Fellow that year, and one of only two in Texas), so they at least felt that these were questions worthy of serious research. For tenured faculty to be harassed for confronting difficult questions in their research and teaching strikes at the very core of why our university exists.
    David, will you be available via e-mail this weekend? There are a number of things I will need your help with, including attacking the false information in Wikipedia and other amateur venues (which I have no experience in editing or challenging, as I spend my time entirely on true scholarly publication). A reporter from the Daily Texan, who is a Classics minor and might be sympathetic, has asked me for comment. I am afraid that if I make none, they will simply run a story airing the claims of the other side. But how we go about it will need some real strategizing with an experienced public relations specialist. Our goal should be to nip this in the bud with an effective and sophisticated response before it gets into the local TV media.
    I attach the flyer that was handed to my 100+ students on Thursday to give you a sense of how inflammatory the claims are. The student who lists herself as contact person dropped my course after missing one of the quizzes and then failing the midterm exam with a grade of 48. When confronting me with her companions (including four activists inside the auditorium whom neither I nor the TAs recognized as legitimate students), she struck me as a highly unstable individual. Is this kind of protest organizing going to become the new norm for students who are failing a course?
    Dean-Jones (the department chair) has not yet said a word to me about any of this, although she apparently knew about it two days ago. This reminds me of the time her predecessor as department chair concealed a death threat against me from a schizophrenic student (which I only found out years later in response to an Open Records request to see my own file). It would be best that she be told by COLA to say nothing to the department until such time as David and I can develop an effective response. Her judgment has been erratic lately, as she is facing stresses and disputes from many directions.
    Many thanks to all for working with me. Getting the truth out is my first priority.
    Thomas K. Hubbard
    James R. Dougherty, Jr. Centennial Professor of Classics (and affiliate of CWGS, CES, and Rapoport Center for Human Rights)

On Fri, Nov 22, 2019 at 6:14 PM Dukerich, Janet M <janet.dukerich@austin.utexas.edu> wrote:

Thanks David. I know that the chair of the Classics department is really interested in guidance, especially with regard to how best to communicate with possible faculty recruits, and graduate students.


Janet


**JANET M. DUKERICH |** Vice Provost for Advocacy & Dispute Resolution | Professor, Management | Harkins & Company Centennial Chair | The University of Texas at Austin | Office of the Executive Vice President and Provost

---

**From:** "Ochsner, David A" <dochsner@austin.utexas.edu>
**Date:** Friday, November 22, 2019 at 5:57 PM
**To:** Carmen Shockley <cshockley@austin.utexas.edu>, "tkh@utexas.edu" <tkh@utexas.edu>
**Cc:** "Dukerich, Janet M" <janet.dukerich@austin.utexas.edu>
**Subject:** Re: Introduction


Hello Carmen,


I plan to visit with Ann Stevens on Monday. I will be in touch with all of you after we meet.


Best,


David

-------------------------------------------

**David A. Ochsner**

Director  |  Office of Public Affairs

College of Liberal Arts

The University of Texas at Austin  |  512.475.9712

liberalarts.utexas.edu

**From:** "Shockley, Carmen L" <cshockley@austin.utexas.edu>
**Date:** Friday, November 22, 2019 at 5:21 PM
**To:** "tkh@utexas.edu" <tkh@utexas.edu>, "Ochsner, David A" <dochsner@austin.utexas.edu>
**Cc:** "Dukerich, Janet M" <janet.dukerich@austin.utexas.edu>
**Subject:** Introduction


Dear David and Professor Hubbard,


I'm writing to introduce the two of you.  I spoke with Professor Hubbard a little while ago.  Our call was focused on classroom management in the event of a disruption.  During the course of the call Professor Hubbard said he would like to talk about a strategy for counteracting the false claims being made about him.  I offered to introduce the two of you since that type of discussion and strategizing is outside of my expertise.


Sincerely,


Carmen


----


**CARMEN  SHOCKLEY** (she/her/hers), Assistant Vice President for Faculty Affairs

The University of Texas at Austin  |  Office of the Executive Vice President and Provost  |  512-471-0240

Students for Safety

FOR IMMEDIATE RELEASE:                                    Contact: Sarah Blakemore
Thursday, November 21, 2019                                      713-851-4247

**Rally for the Removal of Dr. Thomas Hubbard**

AUSTIN, TX - Dr. Thomas K. Hubbard has been advocating for pederasty (pedophilia) for as long as he has taught at the University of Texas. Since 2000, Dr. Hubbard has used his position to further a community of individuals hoping to prey on underage boys. In his academic writing, Hubbard describes physical relationships between men and young boys as "proper learning experiences." Works like "Boys' Sexuality and Age of Consent" encourage these illicit acts. His course "Mythology of Rape" was banned at UT after only one semester.  Furthermore, Hubbard is heavily associated with the North American Man/Boy Love Association (NAMbLA), formerly the world's largest pedophile activist group. He is even on the list of associated individuals on the NAMbLA Wikipedia page.

We are calling for Dr. Thomas K. Hubbard's immediate removal from his position as a professor of the classics department at the University of Texas at Austin. An individual who advocates for violent crime against teen boys had no business teaching the leaders of tomorrow. It is clear to us that the University of Texas does not have its student's safety, health, and welfare in mind. Hubbard's misconduct has been brought to administration before to no avail. We refuse to stand by while this man uses his status to promote pedophilia.

It is our goal to make students aware of Hubbard's disgusting ideals even if the University of Texas protects him. It should be a student's choice whether to learn from a man with Hubbard's record.

###

From: **Ochsner, David A** <dochsner@austin.utexas.edu>
Date: Thu, Dec 5, 2019 at 7:16 AM
Subject: Re: the University's public response
To: tkh@utexas.edu <tkh@utexas.edu>
Cc: Dukerich, Janet M <janet.dukerich@austin.utexas.edu>


Dear Thomas,

I thought you were informed in advance that the university would respond. That was an oversight on my part.

As for the response itself, it clearly states the university's support for First Amendment rights. The university's appropriate role in this case (and I have been involved in dozens of similar cases over the past 30 years here and elsewhere) is not to defend an individual faculty member or engage in an intellectual debate on his or her behalf, but rather to uphold freedom of speech for all faculty and students as guaranteed by the First Amendment. The university also asks of its faculty (per AAUP guidelines) that they make every effort to indicate that they speak for themselves, and not for their profession, unit, or institution, when they express opinions on controversial topics.

I will share your concerns with the dean and my colleagues in University Communications regarding this matter.


David

David A. Ochsner
Director  |  Office of Public Affairs
College of Liberal Arts
The University of Texas at Austin  |  512.475.9712
liberalarts.utexas.edu

---

From: **Thomas K Hubbard** <tkh@utexas.edu>
Date: **Wednesday, December 4, 2019 at 9:20 PM**
To: **"Ochsner, David A"** <dochsner@austin.utexas.edu>, **"Dukerich, Janet M"** <janet.dukerich@austin.utexas.edu>
Subject: **the University's public response**

Dear David and Janet:
I have been 100% transparent with both of you in telling you exactly what I know about this crisis as soon as I learn of it. Unfortunately, that has not been reciprocated from the University's end. Apparently, the University Communications response was sent to my department chair as early as Monday morning, along with information that the Austin American-Statesman was going to run a story on these charges, but I never learned about the University response until today or the reporter's inquiry until late Tuesday, when the reporter contacted me directly.
    I repeat below the University's incredibly lame and un-intellectual response:
*The university condemns ideas or world views that exploit or harm individuals. However, the study of controversial and even offensive ideas is protected by the first amendment — as is the right of others to strongly disagree with and draw attention to those ideas. If someone is alleged to violate university policy or takes actions that threaten the safety of the campus community, the university will respond swiftly, investigating allegations thoroughly and imposing sanctions as warranted.*
Not once is the term "academic freedom" mentioned. Is this concept no longer recognized by the people who communicate on behalf of the University of Texas? The response is problematic from multiple points of view. Just what are the "ideas or world views that exploit or harm individuals"? Since this is the University's response to inquiries about me specifically, the implication seems to be that the University regards my ideas as being in this category. How much time did anyone in either the Provost's office or the university communications bureaucracy spend actually reading my publications (you have a list of

the most relevant ones) to determine whether they contain ideas "that exploit or harm individuals"? The third sentence seems to give credence to the notion that I may have violated university policy (please name which one) or taken actions that threaten safety (again, specify one).

Had I known Monday that this mealy-mouthed equivocation was all you were going to say about me, rather than releasing the careful and nuanced statement (or even a portion of the statement) that I sent you, I would have immediately responded to the Statesman reporter rather than telling her to talk to David, who merely gave a non-response that encouraged more suspicion.

Kowtowing to disruptive extremist groups by statements that appear to give credence to their concerns will not appease them, but merely embolden them (and more knock-off imitators who bear a grudge against one of their professors) to keep adding more and more names to their hit lists. In my case, the attacks have now moved beyond protesting actual personal misconduct by some faculty to attacking faculty by mis-characterizing their ideas with McCarthyite guilt-by-association tactics. If the University continues to pander to these groups, dozens of faculty whose work may in one way or another be controversial will be attacked and smeared by partisans of both the political left and right. In my own case, this was generated by a well-connected and highly privileged student from the extreme right. I was at Berkeley in the 1970s, so I know just how badly weak administrative responses to such attacks on university faculty hurt that university's public support and faculty recruiting. Gov. Reagan cut the university's budget to the bone after the chaos that weak administrative management enabled.

Since David mostly seems concerned that my statement to the Statesman should not in any way appear to speak for the University, I have had to revise the last two sentences of my statement. It previously read, "UT stands behind the academic freedom of its faculty, as President Homer Rainey famously did...." I have now changed it to the following:

"UT has in the past stood behind the academic freedom of its faculty to research controversial issues, as President Homer Rainey famously did in the 1940s when members of the Board of Regents directed him to fire some left-leaning Economics faculty. Whether UT's current leadership will do so remains to be seen."

Let's stop treating Homer Rainey as a proud hero of UT history if we are not going to honor his legacy by adopting the same principled stand in today's deeply polarized political environment.

If the Provost's office wants to empanel a special committee to "investigate" me and read the close to 1000 pages of published scholarship I have written on these matters (not even counting the three books and scores of articles I have published on other topics), it will be a complete waste of time. They won't be able to find anything that supports the inflammatory charges made against me by students who have at most read one article and not competently understood it. I have never said anything, either in writing or in speech, that is more radical than proposing that we should look at how European countries handle age of consent and sex offenders. If that is enough to justify an inquisition, then academic freedom truly is dead at this institution.

Please inform me immediately of any further statements University Communications makes about me and any further student social media chatter making allegations about me. There was social media chatter and great distress among the students in our department over a week ago that I have only been informed about today; students in my course wrote to the department chair demanding an explanation two weeks ago, after the disruption in my classroom, but I was never informed. The department chair has justified not telling me anything she knew because she simply assumed that the two of you were doing it. Sadly, that has not been the case. The flyer handed out to students in my class referred to past complaints about my views to the administration. Why was I never informed of those?

The reputational damage to both me and the department has been substantial, and the University's poor communications strategy and failure to keep me properly informed in a timely way has exacerbated the problems to the point that it is going to be covered in tomorrow's newspaper. I do have documentation of a death threat some years ago from a schizophrenic student that I was never properly informed about, so this seems to be a systemic and long-standing institutional failure. Instead of spending who knows how much money to hire more OIE personnel to investigate and harass faculty and staff over trivial claims of students who have been encouraged to feel "victimized" by exposure to ideas they don't like, why not develop some binding rules on administrative obligations to inform faculty of threats, complaints, and inquiries? This would cost far less and do more to make this an attractive place for cutting-edge faculty to work at. Is it any wonder that so many senior faculty in my department and other COLA departments are opting for early retirement? Feel free to send this e-mail up the chain of command if you think it appropriate.

Thomas K. Hubbard

James R. Dougherty, Jr. Centennial Professor of Classics

From: **Ochsner, David A** <dochsner@austin.utexas.edu>
Date: Mon, Dec 2, 2019 at 4:51 AM
Subject: Re: draft response
To: tkh@utexas.edu <tkh@utexas.edu>
Cc: Dukerich, Janet M <janet.dukerich@austin.utexas.edu>, Bakre, Shilpa P <shilpa.bakre@utexas.edu>

Thomas,

Thank you for sharing this. I am also cc'ing Shilpa Bakre in the President's Office for her advice regarding media outreach.

David

Sent from my iPad

On Dec 1, 2019, at 2:42 PM, Thomas K Hubbard <tkh@utexas.edu> wrote:

David:
Wikipedia took me out of their article immediately and completely after I presented them with some counter-evidence showing that I have publicly stated my disagreement with that group's approach. Reflecting this development, I have come up with a revised version of my statement in response to the various charges. As you suggested, I have put everything into the first person, but I still find the Q&A format the best one for teaching uninformed people about such complex issues. I have consulted with some friends who have long careers in journalism and academia in phrasing my statement this way.
    If the protest continues and there are media inquiries, I authorize you or University Communications to release this as my statement. A third-person version of it will also be available on a non-university website. If the reporter from the Daily Texan, Lauren Grobe, contacts me again, would you prefer that I refer her to you or should I just go ahead and release this document to her? There may prove to be no story here at all, if the student's planned protest fails to mobilize more than a few people.
    I am cc'ing Vice Provost Janet Dukerich, who at this point is the person handling the matter for the Provost's Office. This way, she will be fully informed of the truth when and if students invade her office with demands concerning me. Unlike the other protests, which concern allegations of personal misconduct, this one is attacking academic freedom at its core. Thanks,
    Thomas Hubbard

On Mon, Nov 25, 2019 at 2:24 PM Thomas K Hubbard <tkh@utexas.edu> wrote:
David:
There is, fortunately, no Wikipedia entry for me. It is what Sarah Blakemore cites on her flyer: the Wikipedia entry for the North American Man/Boy Love Association, which has a section on "known associates." Sort of like Joe McCarthy smearing people for associating with this or that organization that had been labeled a "communist front organization." By that criterion, they could label me a communist because I once published an article in an East German publication in the 1980s. I'm actually a Libertarian, which is about as far from being a communist as one could be. I'll contact Jeff Graves to see what advice he has.

Thomas

On Mon, Nov 25, 2019 at 12:50 PM Ochsner, David A <dochsner@austin.utexas.edu> wrote:

> Thomas,
>
> You can request edits by clicking on "View Source" at the top of a Wikipedia entry. Is there a particular entry that contains erroneous information? I couldn't find it.
>
> As for bloggers, that is a bit more challenging. Jeff Graves in UT Legal could probably shed some light on this for you.
>
> David
>
>
> ------------------------------------------
> **David A. Ochsner**
> Director  |  Office of Public Affairs
> College of Liberal Arts
> The University of Texas at Austin  |  512.475.9712
> liberalarts.utexas.edu
>
> **From:** Thomas K Hubbard <tkh@utexas.edu>
> **Date:** Monday, November 25, 2019 at 12:25 PM
> **To:** "Ochsner, David A" <dochsner@austin.utexas.edu>
> **Subject:** Re: draft response
>
> David:
> It may be best to wait until after Thanksgiving, unless there is another demonstration outside/inside my class on Tuesday. My understanding is that her planned rally is for the week after Thanksgiving. If her rally turns out to be a dud with fewer than 10 people showing up, it may be best to ignore it. If, on the other hand, it really draws a crowd, then we will need a response. What I have seen of her flyer and associates does not suggest a high level of sophistication such as one might expect if her father were directly advising her. She struck me as very neurotic and unstable. He may not even know about it yet, but she may have acquired from him homophobic attitudes and the notion that misrepresenting people's ideas is a legitimate modus operandi.
>     I do not have a personal webpage, but I can get someone to create one for this issue when and if it becomes necessary. I am not sure whether you have had your meeting with Dean Stevens yet, but I do want to know how much help the University is willing to provide me in challenging the false information someone recently put up on Wikipedia and certain libelous blogs that have been brought to my attention. The best way to nip in the bud any claims her influential father may eventually make is to take down all the pseudo-evidence they are citing to support their McCarthyite guilt-by-association argument, which is about all they have to go on, since they have of course never read my actual publications. Would this be something Legal Affairs could help me with or is it better handled by the Communications professionals like you? Please let me know who to contact. I am sure Wikipedia and the other web hosts will take it a lot more seriously if challenges come from the University apparatus.
>     Thomas
>
> On Mon, Nov 25, 2019 at 12:05 PM Ochsner, David A <dochsner@austin.utexas.edu> wrote:
>
>> Thomas,
>>
>> One other thing, if you choose to respond, it would be best to post it on your faculty page or personal website rather than on Canvas, which might raise new issues regarding appropriate use of that site. Please let me know if you have any questions.

David

------------------------------------------
**David A. Ochsner**
Director  |  Office of Public Affairs
College of Liberal Arts
The University of Texas at Austin  |  512.475.9712
liberalarts.utexas.edu

---

**From:** "Ochsner, David A" <dochsner@austin.utexas.edu>
**Date:** Monday, November 25, 2019 at 10:55 AM
**To:** "tkh@utexas.edu" <tkh@utexas.edu>
**Subject:** Re: draft response

Thomas,

I have had extensive conversations with my colleagues in University Communications. They are advising that you hold off on issuing a response, for the time being, and perhaps revisit this after the Thanksgiving break, if necessary. That noted, you are of course entirely free to respond if you so wish. If that is your choice, I would consider revising your response, trimming it down to the essentials (using first person, summarizing with bullet points) rather than using the longer Q & A format. Just be aware that anything you write will quickly go viral and reignite an issue that is possibly on the wane.

I will keep you posted on any further developments.

David

------------------------------------------
**David A. Ochsner**
Director  |  Office of Public Affairs
College of Liberal Arts
The University of Texas at Austin  |  512.475.9712
liberalarts.utexas.edu

---

**From:** Thomas K Hubbard <tkh@utexas.edu>
**Date:** Sunday, November 24, 2019 at 10:21 PM
**To:** "Ochsner, David A" <dochsner@austin.utexas.edu>
**Subject:** Re: draft response

David:
Here is some research a friend of mine did on the student-organizer's father, who was Dan Patrick's main campaign strategist. Andrew Cockburn, in Harper's, called him the "Darth Vader of Texas Politics." These are very, very dangerous people who may test the University's commitment to academic freedom in a way that has not happened since Homer Rainey's day. Dean Stevens needs to know the full background of who we are up against here, and perhaps even President Fenves.
    Thomas

from Harpers
https://harpers.org/archive/2017/03/texas-is-the-future/5/

There's a ton of material here on the Blakemore père formenting anti-gay agenda for the political glory of TX Republicans. The most notorious instance is this:

https://www.washingtonblade.com/2016/06/12/texas-lt-gov-patrick-denounced-for-offensive-twitter-post/

other titbits ...

https://www.metroweekly.com/2018/06/texas-lt-governor-claims-victory-failure-anti-trans-bathroom-bill/
https://www.texasmonthly.com/politics/master-of-the-senate/
https://texasscorecard.com/local/briscoe-cain-carries-the-day/
https://www.houstonpress.com/best-of/2003/people-and-places/best-republican-6604634
https://texasscorecard.com/local/briscoe-cain-carries-the-day/
http://www.offthekuff.com/wp/?tag=allen-blakemore
https://gophq.com/quorumreport-com-after-20-years-working-together-blakemore-and-hotze-split-up/

On Sun, Nov 24, 2019 at 2:05 PM Thomas K Hubbard <tkh@utexas.edu> wrote:

David:
One of my graduate students did some research on the former student who is orchestrating this campaign. Her father is a prominent Republican political publicist and campaign strategist in Houston. So this attack may be coming from the social conservative right, trying to piggy-back on the recent Social Justice warrior protests to pursue their own anti-LGBTQ agenda. The people I spoke to in the Provost's office said her "group" (if it even is one) is not one of those they had previously heard about or tracked. I hope that administrators will be willing to stand up against this kind of politicized intimidation of faculty whose viewpoints they may not like.

    Thomas

On Sat, Nov 23, 2019 at 2:43 PM Ochsner, David A <dochsner@austin.utexas.edu> wrote:

Thomas,

Thanks for this. I will share with the dean ahead of our meeting on Monday. I will also consult with my colleagues in University Communications.

David

Sent from my iPhone

> On Nov 23, 2019, at 2:28 PM, Thomas K Hubbard <tkh@utexas.edu> wrote:
>
> David:
> Please find attached what I have come up with as a response to the flyer I sent you yesterday evening. The issues are sufficiently complex that they cannot be reduced to simple sound bites. Unless you advise me otherwise, I will post this on Canvas Monday afternoon so that my class can better understand what the attacks are about, and then send it to the reporter from the Daily Texan.
>     If in fact Dean Stevens is meeting with you over this issue Monday, please make sure she has both this document and the original flyer, so she has a full understanding of what is happening and the background to it. I really fear that President Fenves' actions in capitulating to the demands of demonstrators (and previously, Chancellor McRaven's initiative to waste $1.7 million on a study with a deeply flawed sampling technique and incompetently worded questions that vastly overestimated the incidence of rape and sexual harassment on our campus) have fueled this crisis, and incentivized the demonstrators to move beyond attacking faculty guilty of personal misconduct to now attacking faculty for their research, which the activists have not even taken the time to read or understand.
>     As I said in my previous e-mail, it is best to keep Dean-Jones out of it for the time being. She has a very questionable record of romantic involvement (and eventual marriage) with a graduate student and bullying of faculty in the department to give him favored treatment. Although I have gone to great lengths to work with her constructively, her administrative judgment, like that of her predecessor, is very poor, which is why Dean Diehl allowed the department to decline from 25 faculty lines to 15. I do not trust her to handle this matter competently.
>     Many thanks,
>     Thomas Hubbard
> <Response to Flyer.docx>

# EXHIBIT F

# The Dallas Morning News

🔍   ☰ SECTIONS                                    SUBSCRIBE    ☁ 74°F

**MORE FROM HOMEPAGE**

‹   **Former Cowboys safety Cliff Harris elected to Pro Football Hall of Fame; Drew Pearson falls short**   |   **GM Arlington to move some temporary workers to full-time**   |   **Why has Dallas-Fort Worth been so foggy this week?**   ›

NEWS › POLITICS

# UT students protest at professor's house over his writings on sexual relations between men and boys

Some students say his research on pederasty promotes harmful ideas about sexual contact with minors.



The main building of the University of Texas at Austin.



TELL US WHAT MATTERS ›

TEXAN OF THE YEAR ›

CURIOUS TEXAS ›

NEWSPAPER ARCHIVES ›

PUZZLES AND GAMES ›

TOP 100 PLACES TO WORK ›

AL DÍA - NOTICIAS EN ESPAÑOL   >

OBITUARIES   >

TODAY'S EPAPER   >

   

By María Méndez
8:00 AM on Dec 17, 2019

AUSTIN — Students have staged several protests at the University of Texas at Austin this fall in response to faculty with previous sexual misconduct policy violations remaining in the classroom.

But last week, a smaller group of students took a more aggressive approach, protesting at the home of Classics professor Thomas K. Hubbard for his writings on the age of consent.

Hubbard has not been found guilty of any sexual misconduct violations or crimes, according to UT, and the university has provided security for the professor in the wake of the protest.

But some students say his research on pederasty -- sexual activity between a man and boy -- promotes harmful ideas about sexual relations with minors.

The group **live-streamed** its Dec. 9 protest on the Twitter account Fire The Abusers. A group of women are seen in the broadcast banging on the door of a house while shouting, "Thomas Hubbard, come outside. Pedophile, you can't hide."

Later in the video, Austin police escort Hubbard out of the house. The department confirmed receiving a call Dec. 9 at 6:03 p.m. Protesters dispersed around 6:54 p.m. without any arrests, according to a police spokeswoman.

An Austin eye care store near Hubbard's residence **was also found vandalized** the morning of Dec. 9 with the words "Pedo Hubbard, watch your back." Employees told *The Dallas Morning News* they found the vandalism on the side of the business at around 9:30 a.m. It was covered by that afternoon.

Members of Fire The Abusers declined to provide comment on the record.

Hubbard, 63, told *The News* he is "not personally oriented to underage youth" and has not been found to have committed any crime or sexual harassment during his 40 years of teaching.

"It is no more valid to conclude that scholars who work on sex offender policy and the relevance of cross-cultural evidence are themselves sex offenders than to think that advocates of drug decriminilization [sic] are themselves drug abusers or that advocates of criminal justice reform are criminals," Hubbard said in an email. "Such simplistic thinking chills serious debate and research on vital public policy issues."

 Featured Articles



‹ Previous                    Next ›



**Former Cowboys safety Cliff Harris elected to Pro Football Hall of Fame; Drew Pearson falls short**



**GM Arlington to move some temporary workers to full-time**



**Why has Dallas-Fort Worth been so foggy this week?**



**Fired employee brandished sword at customers at Bishop Arts restaurant, police say**



**Learn how The News' journalists reported a series on an alleged North Texas serial killer**

Hubbard said last week that a uniformed police officer was patrolling his house and that University of Texas police had been driving by his residence every hour.

UT spokeswoman Shilpa Bakre said the university is providing Hubbard with ongoing support, counsel and security. She said the "recent incidents directed at Professor Hubbard are unacceptable."

"Students have the right to contest specific ideas, but threatening anyone's safety violates the law and university standards of conduct," Bakre said in an email. "UTPD is concerned by these threats and actions against our faculty members and will work to protect them from harm."

UT told the ***Austin American-Statesman*** on Dec. 4 that Hubbard's speech is protected.

"The university condemns ideas or world views that exploit or harm individuals," Bakre said in an email. "However, the study of controversial and even offensive ideas is protected by academic freedom and the First Amendment — as is the right of others to strongly disagree with and draw attention to those ideas."

Hubbard told *The News* that his work on pederasty focuses on the "romantic courtship of adolescent males" in antiquity and that he strongly believes in informed consent. He noted that most relationships between men

and teenage boys in Greek literature and art "had to be negotiated and mutually consensual."

"How teen sexuality should be regulated and how legal violations should be punished are legitimate areas of research and debate among scholars and public policy professionals," he said. "Historical and cross-cultural evidence have a place in such discussions."

In a **2010 essay** for the peer-reviewed journal, Thymos: Boyhood Studies, Hubbard questions modern age-of-consent laws, calling them a "sad by-product" of a "naive and self-righteous era."

"Contemporary American legislation premised on children's incapacity to 'consent' to sexual relations stems from outmoded gender constructions and ideological preoccupations of the late Victorian and Progressive Era," Hubbard writes in the essay, which serves as an introduction to other essays on the subject. "We should consider a different 'age of consent' for boys and girls."

But in that same essay, Hubbard notes that "the present set of essays do not represent any consistent program of legal reform, much less advocacy of any particular sexuality, but an effort to further serious intellectual dialogue among the various academic and professional disciplines…"

Hubbard said that some of his work has been distributed by the North American Man/Boy Love Association, a pedophilia advocacy group. The group simultaneously published Hubbard's book **Greek Love Reconsidered** with Wallace Hamilton Press in 2000, according to the *Statesman*.

But Hubbard said that he does not "endorse NAMBLA's idiosyncratic approach to legal reform" and that the group did not influence his work.

Sarah Blakemore, a sophomore from Houston, enrolled in Hubbard's Classical Mythology class this fall but dropped the course after she found out about his pederasty research.

"We'd like him to not be able to use the name of the university while publishing articles that have to do with all of this stuff, at least," she said. "Using his position to further this cause is not something I think should be going on in a public institution."

Hubbard is the latest UT professor to face protests from Fire The Abusers. The group also **disrupted a lecture in November** to confront Sahotra Sarkar, a philosophy and integrative biology professor who was disciplined by UT in 2017 after students complained he talked to them about swimming nude at beaches or posing nude.

Blakemore said she and other students who are concerned about Hubbard and other professors have joined the Coalition Against Sexual Misconduct. The students are **calling for the university to provide a list of all professors with sexual misconduct violations** and remove them from teaching or fire them.

The university has hired the firm Husch Blackwell and formed a **misconduct working group** to review its policies on sexual misconduct, including whether or not to publish online the names of professors with violations.

The working group, which includes university leaders, faculty, staff and students, officially met for the first time last week and discussed the protest at Hubbard's residence, **according to an update from UT's provost**. A student-led forum has also been scheduled for Jan. 27.

Blakemore said the coalition is focused on working with the university to address concerns about faculty who have violated policies. She said she thinks Fire The Abusers' approach can be damaging for students who have been abused.

"We're not going to people's houses. We are not interrupting classrooms," she said. "It can be really triggering to students."

   



**María Méndez**, Politics Reporting Fellow. María Méndez is a politics reporter in The Dallas Morning News' Austin bureau. Send her politics and policy questions, news tips, or food recommendations!

✉ maria.mendez@dallasnews.com

🐦 @anxious_maria

💬 We are currently revamping our comment system and it will return soon. In the meantime, you can **provide feedback here.**

If you have a comment specifically about the story you just read, we encourage you to **submit a letter to the editor.**



## Get Political Points

Receive the latest political news delivered every Tuesday and Thursday from reporters in Austin, Dallas and Washington.

| Email Address | → |

By signing up you agree to our **privacy policy**

### Local Journalism Matters

Stand with us in our mission to discover and uncover the story of North Texas

BECOME A MEMBER >

---

**THE LATEST**

**Former Cowboys safety Cliff Harris elected to Pro Football Hall of Fame; Drew Pearson falls short**

BY DAVID MOORE

**MOST POPULAR ON DALLASNEWS.COM**

1 **Meat Loaf sues Dallas hotel, convention after fall from stage that he's still recovering from**

**Former Cowboys safety Cliff Harris**

**GM Arlington to move some temporary workers to full-time**

BY DOM DIFURIO

**Why has Dallas-Fort Worth been so foggy this week?**

BY JESUS JIMENEZ

**Fired employee brandished sword at customers at Bishop Arts restaurant, police say**

BY LOYD BRUMFIELD

**Learn how The News' journalists reported a series on an alleged North Texas serial killer**

BY NATALY KEOMOUNGKHOUN

2   elected to Pro Football Hall of Fame; Drew Pearson falls short

3   **Why has Dallas-Fort Worth been so foggy this week?**

4   **On a night where Luka Doncic wasn't wonderful, Steve Kerr details why the Mavs' star is so important for the NBA**

5   **Massive Plano development threatened with foreclosure**

6   **Houston Rep. Sylvia Garcia named as an impeachment manager by House Speaker Nancy Pelosi**

---

### The Dallas Morning News

Texas' Leading News Source
Est. October 1, 1885

   

**COMPANY**

About *The Dallas Morning News*

Contact us

Careers

FAQ

**ADVERTISE WITH US**

Autos

Classifieds

Jobs

Obituaries

Public Notices

**BUY**

Photo reprints

Archived articles

Back copies

Commercial reprints

Licensing

**CUSTOMER SUPPORT**

Help and feedback

Manage your account

Newspaper subscription

ePaper

ePaper (Al Día)

Email Newsletters

**WEBSITE SUPPORT**

Terms of service

Privacy policy

Site index

Daily audio
briefing

Vacation
hold/billing

Real. *local.* Journalism.

Copyright © 2020 The Dallas Morning News. All rights
reserved.

<OPINION

# UT President responds to DMN on professor's pedophilia writings

University reviewing complaints



The Main Building at the University of Texas rises over the campus in Austin. (Ilana Panich-Linsman/The New York Times)

By Letters to the Editor
6:33 PM on Dec 20, 2019

To the editors:

This week's editorial by the Dallas Morning News sheds light on **a heated debate that has been taking place on our campus** surrounding the controversial scholarship of UT Austin professor Thomas Hubbard.

Students, UT Austin community members and others are disturbed by Hubbard's writings about sexual relations between teenagers and adults. I understand their concerns about his ideas. I personally find them outrageous.



All faculty at UT Austin have broad academic freedom. This principle has been rooted in American higher education for generations, including the American Association of University Professors (AAUP) **1940 Statement of Principles on Academic Freedom and Tenure**. However, the AAUP statement makes clear that teachers enjoy freedom in the classroom "… but they should be careful not to introduce into their teaching controversial matter which has no relation to their subject."

For the last few years, the university has assigned Professor Hubbard to teach Classics courses that do not relate to the controversial topics in his writings. But we are aware of the concerns and complaints about those classes this semester. We have been and are reviewing them and will take appropriate action, within the bounds of academic freedom and the constitutionally protected right to free speech.

*President Gregory L. Fenves*

*The University of Texas at Austin*

2A  Saturday, May 9, 2020

## CORONAVIRUS INDEX

*A summary of today's virus coverage:*

**Attorney General Ken Paxton** said that election officials in Texas who offer mail ballots to people who normally wouldn't qualify but are afraid of catching the coronavirus could be subjected to criminal punishment. **1A**

**The world** as we've come to know it shifted Friday, in small but satisfying ways. **1A**

**Dallas County health officials** reported a new single-day high of 187 coronavirus cases Friday, along with two deaths. **1A**

**We check in** with businesses and restaurants — and their customers — as they start the reopening process. **1A**

**Several health care associations** in Texas want extra protections from potential lawsuits during the coronavirus pandemic. **7A**

**Gov. Greg Abbott's** partial reopening of Texas on Friday is testing the synergy between El Paso and Ciudad Juárez. **8A**

**Texas Motor Speedway** will host graduation ceremonies this month for 23 Denton County high schools. **1B**

**Retailers have been working hard** to respond to the short-notice lifting of the stay-at-home order, but response from shoppers on Friday was tepid. **3B**

## CORRECTIONS & CLARIFICATIONS

*The Dallas Morning News welcomes comments about published information that may require correction or clarification. Submit comments at dallasnews.com/corrections or call 214-977-8352.*

■ In an editorial published on Dec. 15 regarding scholarship by Dr. Thomas Hubbard, a professor at the University of Texas at Austin, we referred to student protests and said his scholarship would lead to an unraveling of age-of-consent laws. Hubbard was not the cause of any substantial campus protests over his views. His research covers sexual relationships between men and males who have undergone puberty but are under the current age of consent. He does not advocate for pedophilia but researches pederasty, the attraction of adult males to adolescent boys. Hubbard has called for changing age-of-consent laws but not repealing them.

### TEXAS LOTTERY

| Powerball | Lotto Texas |
|---|---|
| Wednesday's numbers | Wednesday's numbers |
| **2 20 49 61 67** | **18 25 30 36 39 40** |
| Powerball: **20** | Jackpot: $13.25 million |
| Jackpot: $43 million | Number of winners: 0 |
| Number of winners: 0 | Winning ticket: N/A |
| Winning ticket: N/A | Next drawing: Saturday |
| Next drawing: Saturday | Est. jackpot: $13.75 million |
| Est. jackpot: $51 million | |

| Mega Millions | Cash Five |
|---|---|
| Tuesday's numbers | Thursday **7 11 20 23 34** |
| **13 19 53 54 63** | |
| Mega Ball: **7** | **Daily 4** |
| Megaplier: **3** | Friday morning **2 8 3 6** |
| Jackpot: $186 million | Friday day **1 3 3 9** |
| Number of winners: 0 | Friday evening **0 4 9 6** |
| Winning ticket: N/A | Thursday night **9 9 3 9** |
| Next drawing: Friday | |
| Est. jackpot: $200 million | **Pick 3** |
| | Friday morning **5 7 8** |
| **Texas Two-Step** | Friday day **1 2 0** |
| Thursday **11 13 27 32** | Friday evening **6 3 5** |
| Bonus ball: **3** | Thursday night **0 3 2** |

Not all results available at press time.
For complete results, visit txlottery.org.

## The Dallas Morning News

**TODAY'S EDITIONS:** Vol. 171, No. 215, 6 sections
Published daily by The Dallas Morning News, Inc., a subsidiary of A.H. Belo Corporation (ahbelo.com, NYSE symbol: AHC) ISSN 2578-0859
954 Commerce St., Dallas TX 75201, 214-977-8222
USPS 147-680. Periodical postage paid at Dallas, TX 75260
Postmaster address: P.O. Box 655237, Dallas, TX 75265-5237

### How to reach us
Our Circulation Customer Service is open Monday through Friday from 7 a.m. to 5 p.m.; Saturday and Sunday from 7 a.m. to noon.

**Manage your account**
Online:
myaccount.dallasnews.com.
Report a delivery issue and request a vacation stop and restart

**Newspaper delivery:**
214-745-8383 or 1-800-925-1500.
Print and digital subscriptions, delivery issues, vacation stops, billing questions. For same-day redelivery, please call before 10 a.m. daily and noon on Sunday.

Newspaper delivery opportunities available: call 214-745-8383 or visit carrier.dallasnews.com

**Loyalty Rewards:**
loyaltyrewards@dallasnews.com

**Advertising**
**Buy an ad:** 1-877-265-3995
dallasnews.com/advertising
**Retail & National or Classified:**
214-745-8123

**Weddings & Engagements:**
214-977-7855

**Newsroom**
**News tips** 214-977-8456
newstips@dallasnews.com
**Arts & Life** 214-977-8408
artslife@dallasnews.com
**Business** 214-977-8429
businessnews@dallasnews.com
**Editorial page** 214-977-8205
editorialboard@dallasnews.com
**Letters to the editor**
www.dallasnews.com/sendletters
**Metro** 214-977-8456
metro@dallasnews.com
**SportsDay** 214-977-8444
dmnsports@dallasnews.com
**The Watchdog** 214-977-2952
watchdog@dallasnews.com
**Editor**
Mike Wilson  214-977-8473
mikewilson@dallasnews.com
**Editor of editorials**
Brendan S. Miniter  214-977-8472
brendan.miniter@dallasnews.com
**Managing editor**
Keith Campbell  214-977-8341
kcampbell@dallasnews.com

**Weekly home-delivery and other rates**

| | Print only | Digital only | Print + digital |
|---|---|---|---|
| 7 days | $18.99 | $6.99 | $17.99 |
| Sunday-Friday | $13.99 | $6.99 | $13.49 |
| Wednesday-Sunday | $12.49 | $6.99 | $12.49 |
| **Friday-Sunday** | $10.99 | $6.99 | $10.49 |
| ** Wednesday & Sunday | $9.49 | $6.99 | $9.49 |
| **Sunday only | $7.99 | $6.99 | $8.49 |

**Single-copy retail price:** $2.99 for Monday-Saturday, $5.99 for Sunday
**Mail rates:** $18.99 for 7 days, $11.23 for Sunday Only.
Service not available in all areas. All home-delivery subscriptions include a $4.99 Thanksgiving Day delivery fee and may include up to five in-depth issues per year. For each in-depth issue, your account balance will be charged an additional fee up to $4.99 in the billing period when the issue publishes. This will result in shortening the length of your billing period. In-depth issues scheduled to date: Puzzle Book (April 26), Classic Cowboys (Aug. 30), Photos of the Year (Dec. 13), Curious Texas (March 14, 2021). Dates are subject to change without notice. A $3 bill-processing fee will be applied to your account. To avoid this fee you can sign up for EZ Pay at myaccount.dallasnews.com or by calling 214-745-8383. A sales tax of 8.25% will be applied to the digital portion of the subscription price for Texas residents. All subscriptions are continuous but you may cancel anytime by calling 888-925-1500.
*In-Sun subscriptions include the Thanksgiving Day issue. ** Wed & Sun and Sunday only include Thanksgiving Day and Black Friday editions.

---

## ONE GOOD THING

# Actor serenades front-line workers

### Broadway baritone joins nightly thank-you chorus

**By JOCELYN NOVECK**
*The Associated Press*





**A small crowd** gathered Monday in Manhattan's Upper West Side to hear stage star Brian Stokes Mitchell (top) sing "The Impossible Dream" from his apartment window. Mitchell recovered from COVID-19 a few weeks ago.
*Photos by Mark Lennihan/The Associated Press*

NEW YORK — It's a stunning sound, emerging amid the clanging and the whooping and the banging and the honking at 7 each night as New Yorkers cheer front-line workers: the velvety, buttery baritone of Brian Stokes Mitchell.

For decades, Mitchell's voice has been one of the most celebrated in the Broadway theater, evoking goosebumps in musicals like *Kiss Me, Kate*, for which he won a Tony, and *Man of La Mancha*, in which he played Don Quixote. Now, with Broadway's houses shuttered due to the coronavirus, the voice rings out from a fifth-floor apartment on the Upper West Side — fittingly on Broadway, a couple of miles up from the theater district.

"This is my guest," Mitchell sings, leaning precariously out his window, launching directly into the weakened part of "The Impossible Dream."

"To follow that star. No matter how hopeless, no matter how far ..."

Below, and across the avenue in their apartments, neighbors cheer. But Mitchell, 62, is looking to serenade crews of ambulances, fire engines, police cars, or medical workers from the nearby urgent care facility. When they do stop and listen — as a city bus did recently — Mitchell sings directly to them. And when people clap, he sweeps his arms over the workers, as if to say: "Not me. Them."

Mitchell's gratitude, expressed mightily the last few weeks, stems from a very personal ordeal. He himself is a survivor of the coronavirus, falling ill in late March. One night, he had a fever nearing 105 degrees, and almost was hospitalized. He's been symptom-free for three weeks.

"I'd been going to the window to applaud for the health care workers like everybody else in New York," he says. "Then one night I spontaneously thought, 'Oh, I think my lungs feel like I can sing now.'"

And so, he did. He thought it would be

a one-night gig. He was mistaken. People kept coming.

"To fight for the right, without question or pause, to be willing to march into hell for a heavenly cause!" Mitchell smiles as he repeats the words, amazed at how appropriate they are for medical workers fighting an "unbeatable foe."

"People think it's just called 'The Impossible Dream,' but it's also called 'The Quest,'" he says. "It's not about DOING the impossible. It's about trying."

It is a terrible time for the theater community, with arts institutions suffering severe economic loss. Mitchell is chairman of The Actors Fund, which helps performing arts and entertainment professionals. He's donating all profits from his latest album, *Plays With Music*, to the fund.

When the city shut down, Mitchell was working on numerous projects. "Everything was canceled," he says. "I have no idea when they'll come back. A year? Six

months? Unfortunately I think our sector will be one of the last to come back fully."

For now, though, Mitchell feels busy with his unpaid gig. "Broadway's closed, but someone's still singing on Broadway!" he quips.

His performance ends with a flourish: "And the world will be better for this, that one man, scorned and covered with scars, still strove, with his last ounce of courage, to reach the unreachable star!"

Mitchell, though, adapts the lyrics to squeeze in words like "one first responder and health care worker." The audience cheers.

"It's three minutes," says onlooker Sari Rubin, "of me remembering that there's good in the world."

*"One Good Thing" is an Associated Press series about acts of kindness and sacrifice during the coronavirus pandemic.*

---

## The Dallas Morning News CHARITIES

The coronavirus crisis has shut down school districts, restaurants and many businesses. Our neighbors are finding themselves struggling to make ends meet. A donation to the Dallas Morning News Charities — even the smallest donation — will help provide a hot meal for a child or assistance for one of our neighbors.

**Total collected**
**$411,146**

Credit card donations gratefully accepted at **dmncharities.com**. Follow the campaign on Twitter or Instagram at **@DMNCharities** or on Facebook at **facebook.com/DMNcharities.**

The CARES Act creates a new "above-the-line" deduction for up to $300 of charitable cash contributions in 2020. This write-off is only available to people who take the standard deduction. The law also relaxes the cap on charitable donations for itemizers, raising the amount that can be deducted from 60% of adjusted growth income to 100% of gross income.

---

## Taking care of yourself and others

### SOCIAL DISTANCING

**Avoid close contact with others.** If you're out in public, maintain a 6-foot radius of personal space.

**If you can work from home,** do. Don't gather in shared public spaces like parks.

**If you have food delivered,** ask that it be left at the door to minimize the risk to you and the delivery person.

**If you go to the store,** go during off-peak hours. While there, stay at least 6 feet from other people. Clean shared surfaces before and after you come into contact with them.

**If you have to go to work** or school, increase the space between you and other people. Stagger schedules. Limit interactions with other people.

### HYGIENE

**Wash your hands** often with soap and water for at least 20 seconds.

**Avoid touching** your eyes, nose and mouth.

**Cover your mouth** and nose with a tissue when you cough or sneeze, or use the inside of your elbow.

**Disinfect** frequently touched surfaces daily.

**Cover your face** when you go

out in public.

**If you have symptoms,** stay in a specific room away from others in your home. Use a separate bathroom, if possible. Wear a face mask if you need to be around others. Don't share dishes, towels, bedding and other personal items.

**If your symptoms get worse,** call your health care provider.

**If you have a medical emergency,** call 911 and let the dispatcher know you have COVID-19.

### Q&A

**Is it safe to open mail and packages?**
Health experts say the risks are very low that the coronavirus will remain on envelopes or packages and infect anyone who handles them. There is no evidence that the virus is spreading through mail or parcels, according to the World Health Organization and U.S. Centers for Disease Control and Prevention. It's still a good idea to wash your hands thoroughly and regularly — and avoid touching your face — after handling deliveries.

*Wire reports,
Centers for Disease
Control and Prevention*

---

## How to help in North Texas

**ALLEN COMMUNITY OUTREACH**
To donate: acocares.org/general_donations
**AMERICAN RED CROSS**
Information: redcross.org
**ARLINGTON LIFE SHELTER**
To donate: arlingtonlifeshelter.org/get-involved
**AUSTIN STREET CENTER**
To donate: austin street.org/give/needs
**THE BRIDGE HOMELESS RECOVERY CENTER**
To donate: bridgenorthtexas.org/give
**CITYSQUARE**
To give: CitySquare.org/food
**MEALS ON WHEELS**
To volunteer: vnatexas.org/get-involved
**METROCREST SERVICES**
To donate: metrocrest services.org
**MINNIE'S FOOD PANTRY**
To donate: minniesfood pantry.org/donate or text MINNIES to 41444.
To volunteer: minniesfood pantry.org/give-time
**MINT FOUNDATION** (helps under-served families and at-risk youth in southern Dallas County)
To donate: mintcares.org
**MISSION OAK CLIFF**
To donate: missionoakcliff.org/donate
**NETWORK OF COMMUNITY MINISTRIES** (supporting Richardson ISD)
To donate: thenetwork.org
**NORTH DALLAS SHARED MINISTRIES**
To donate: ndsm.org/how-you-can-help/donate
**NORTH TEXAS FOOD BANK**
To donate: ntfb.org/give
To volunteer: ntfb.org/get involved/volunteer
**ONE COMMUNITY USA** (supports first-responders)
To donate: onecommunity usa.org/donate-2
**ONE MAN'S TREASURE** (providing clothing to men being released from prison)
To donate: onemanstr.org
**OUR CALLING** (supports homeless community)
To donate: ourcalling.org/get-involved/give
**OUR DAILY BREAD**
To donate: app.etapestry.com/onlineforms/OurDaily Breadinc_1/Donate.html
**PROMISE HOUSE**
To donate: promise house.org/donate

**RECOVERY RESOURCE COUNCIL** (serves the homeless, veterans and others with alcohol and substance abuse issues and behavioral issues)
To donate: recoverycouncil.org/get-involved or 817-332-6329, ext 212
**THE SAMARITAN INN**
To donate: saminn.org
**SALVATION ARMY DFW**
To donate: salvation armydfw.org/iz/about/covid-19-update
**SERVE OUR HEROES** (supports those serving at VA hospitals)
To give: serveourheroes.org
**SHARING LIFE**
To donate: sharinglife outreach.org
**SHIFT DALLAS** (supports food and other service-industry workers)
To donate: shiftdallas.org
**SOUPMOBILE CHURCH**
Needs peanut butter sandwich donations for clients. Drop off sandwiches Monday-Saturday between 8 a.m. and 9 a.m. at 2423 S. Good-Latimer Expy., Dallas.
To donate: soupmobile.org/donate
**SPCA OF TEXAS**
To donate: spca.org/give
**STEWPOT**
To donate: thestewpot.org
**STOREHOUSE OF COLLIN COUNTY**
To donate: thestorehouse cc.org/give
**SUSAN G. KOMEN**
To donate: komen.org/donate/donate.html
**TARRANT AREA FOOD BANK**
To donate: tafb.org/donate
**THANKS-GIVING FOUNDATION**
To donate: thanksgiving.org/support/#
**UNITED WAY**
To donate: unitedwaydallas.org/coronavirus
**THE WARREN CENTER**
To donate: thewarrencenter.org/covid-19-information/
**WILKINSON CENTER**
To donate: thewilkinson center.org/get-involved/donate
**YMCA CHILD CARE** (provides child care for those on the front lines of the crisis)
To inquire: ymcadallas.org/locations/school_age_services/emergency-ymca-childcare

# EXHIBIT G

From:   "Dukerich, Janet M" <janet.dukerich@austin.utexas.edu>

To:     "McInnis, Maurie" <mcinnis@austin.utexas.edu>

        "Susswein, Gary J" <susswein@austin.utexas.edu>

        "Stevens, Ann H" <Ann.Stevens@austin.utexas.edu>

Date:   12/19/2019 11:05:57 AM

Subject:   FW: Vicious editorial in the Dallas Morning News

Please see the message from Tom

**JANET M. DUKERICH** | Vice Provost for Advocacy & Dispute Resolution | Professor, Management | Harkins & Company Centennial Chair | The University of Texas at Austin | Office of the Executive Vice President and Provost

**From:** Thomas K Hubbard <tkh@utexas.edu>
**Date:** Thursday, December 19, 2019 at 9:19 AM
**To:** "Dukerich, Janet M" <janet.dukerich@austin.utexas.edu>
**Subject:** Fwd: Vicious editorial in the Dallas Morning News

---------- Forwarded message ---------
From: **Thomas K Hubbard** <tkh@utexas.edu>
Date: Thu, Dec 19, 2019 at 8:19 AM
Subject: Re: Vicious editorial in the Dallas Morning News
To: Dean-Jones, Lesley A <ldjones@austin.utexas.edu>

Dear Lesley and Janet:
Better yet, I am getting some distinguished psychology and psychiatry professors at other universities to write a letter to the Editor of this rag, informing them of the actual medical definition of "pedophilia" and that it is distinct from what I discuss in the article the Dallas Morning News mischaracterizes.

  What should I do about ordering textbooks for Spring? It increasingly looks as if it may not be safe for me to return to the state except for short visits. As you know, every time the p-word appears in mass media, it brings the nut cases out of the woodwork. Before this editorial, I thought the press coverage was turning in my favor and that things might quiet down for us all, but now I am very pessimistic. I also worry about the negative impact this may have on the University when it gets into the hands of Dan Patrick and his allies. See whether you and Janet can work something out to protect my safety and reputation, while still allowing me to supervise the three dissertation students to whom I am committed.

  Janet, please tell University Communications to make no further response unless they first coordinate it with me to make sure they get the details right. As you see from the editorial, even supposedly educated people go out of control when it comes to this issue and get basic facts (like the clinical definition of "pedophilia") wrong. University Communications' weak initial statement to the Austin paper had the effect of prolonging and exacerbating this crisis. Since this has gone beyond being an attack on me personally to becoming an attack on the University's state funding, are you sure that UT Legal cannot be more helpful? I have contacted an experienced Austin attorney who specializes in media defamation, but he costs $500 an hour and says the law in Texas makes it an uphill fight for plaintiffs.

  I would also now like to ask formally that the University refer this matter to CCAFR, which is the faculty committee that deals with both academic freedom AND responsibility. The Dallas paper is claiming that it is irresponsible for the University to fund someone who does the kind of scholarship I do. I would like to see my name and work cleared by some formal process, however long it takes. This would also have the advantage of keeping my personnel file away from Open Records requests, which are surely coming, if they have not already happened. There is plenty of garbage in my file that malicious parties could quote out of context, going back to some now dormant departmental disputes that eventually resulted in Dean Diehl giving me a huge raise and removing Lesley's predecessor as Chair. One of the exceptions the state Open Records law makes is for files that are under active administrative review. There was also

an agreement made years ago through the Faculty Ombuds office that UT Legal was supposed to let me know if anyone requested to see my file. This way, University Communications can merely tell media inquiries that the matter is under internal review by the appropriate faculty committee.

   Tom

On Thu, Dec 19, 2019 at 5:03 AM Dean-Jones, Lesley A <ldjones@austin.utexas.edu> wrote:

I'm very sorry to see this Tom. I can imagine how frustrating it must be.  Would it be possible to get one of the scholars who wrote for you for the Guggenheim, or even better, the foundation itself, to counter this?

Best,

Lesley.

Sent from my iPad

On Dec 19, 2019, at 1:48 AM, Thomas K Hubbard <tkh@utexas.edu> wrote:

> Janet and Lesley:
> Note that they themselves call my article a "hard read." Doesn't that reveal something about the intellectual level of these editors? I doubt either of you would find it particularly hard to read, as it was written for an interdisciplinary audience.
>    Tom

On Wed, Dec 18, 2019 at 11:43 PM Thomas K Hubbard <tkh@utexas.edu> wrote:

> Who are these editors, none of whom have ever written a scholarly article, to judge whether my scholarship is "slovenly" and "unlearned"? You can see for yourselves the level of annotation and interdisciplinary scope of the article. It is precisely for scholarship on this topic that the Guggenheim Foundation gave me a fellowship in 2017-18. Do they give their coveted awards to "slovenly" and "unlearned" scholars? This unprincipled editorial will truly make public institutions in Texas look like an uninviting environment for scholars. It confirms people's worst stereotypes of the state.
>    If the University feels it would be in its political interest for me to retire earlier than I planned, I have already told Lesley that I would be willing to consider that under certain conditions. But I will only agree to do so if I can retire with honor and no concessions to journalistic lynch mobs that mischaracterize serious scholarship in this repugnant manner.
>    Tom

On Wed, Dec 18, 2019 at 11:27 PM Thomas K Hubbard <tkh@utexas.edu> wrote:

> https://www.dallasnews.com/opinion/editorials/2019/12/18/a-ut-professor-advocates-pedophilia-why-are-we-paying-for-it/
>
> Janet:
> This editorial is the worst thing yet. Whoever wrote it is so uninformed that they do not know the definition of "pedophilia" in the DSM (Psychiatry's handbook) and missed all of the nuances of my paper, which is about mutually consensual relationships with adolescent boys, as practiced by the Greeks with no evidence of psychological harm to the mainly elite adolescents, not pre-adolescents. These are "criminal" only because the US defines them as "criminal," when Germany, Austria, Italy and most other European states don't. What circular logic!
>     This almost certainly is driven by the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This kind of misleading and ignorant editorial is even more threatening to academic freedom than anything the mob at my house did, and appears to call for less state funding of UT. As if taxpayer money is the primary source of the University's support, which as we all know, it isn't. Thanks for anything you can do. I am at my wit's end, already driven to serious PTSD that this politicized attack on scholarship only exacerbates. This demagogy is nothing short of an attack on the University itself, and may be the opening salvo in Lt. Gov. Patrick's next assault on sexual minorities and educated people everywhere.
>                                                                     5/7/2020

Case 1:20-cv-00767-RP   Document 37-1   Filed 08/20/21   Page 173 of 225

I attach the actual paper they are mischaracterizing. Read it for yourself and consider whether it is a fair representation of the full context of what I say. I nowhere argue for a complete abolition of age of consent laws, but merely some reforms that recognize that not all behavior simple-minded people mislabel as "pedophilia" is as monstrous and harmful as zealots assume. The same point was made in the most thorough (and never refuted) meta-analysis published in Psychological Bulletin 1998 (the top journal in academic psychology). At this point, I honestly don't feel I can respond to such anti-intellectual drivel myself.

Tom

From: "Stevens, Ann H" <Ann.Stevens@austin.utexas.edu>

To: "Dukerich, Janet M" <janet.dukerich@austin.utexas.edu>

Date: 12/22/2019 2:38:52 PM

Subject: ██████████████████████████████

Attachments: CC330-grades [UPDATED WITH FINAL MC SCORES].xls

Hi Janet,

I just read Tom's latest message. I now feel that I need to respond to him in some minimal way. It also seems important that I see a copy of the current complaint(s?). I do not plan to share it with him over email at this time.

Here's a brief draft I was thinking of sending –suggestions welcome. It doesn't have an ending yet, not sure there's much more I can say. Happy to collaborate and send a joint response if you are planning to respond also.

Let me know—especially if there's anything in here I shouldn't say.

Ann

DRAFT to Tom:
Dear Tom:

I understand that you are frustrated. Let me clarify that there is not an "investigation" under way. We are following routine procedures by reviewing a complaint and your course content and materials. There was a complaint submitted via the "compliance hotline" in the past few weeks. In response we will review the course materials and discuss with the faculty and others involved the specific concerns. In many cases, this simply confirms that whatever was said was appropriate to the curriculum and consistent with the bounds of academic freedom. Given that all of the relevant parties are now likely away from campus, this process will begin in January.

One difference in your case is that Janet and I did suggest that a faculty committee be appointed (rather than a dean or associate dean handling the matter). This was suggested given the charged atmosphere this semester and given your earlier request for a broader review by faculty. We believed this would be the best way to protect academic freedom while fulfilling our obligation to take seriously concerns raised by students.

Ann Huff Stevens | Dean
COLLEGE OF LIBERAL ARTS
THE UNIVERSITY OF TEXAS AT AUSTIN



| Student Points Possible | ID | SIS User ID | SIS Login ID | Section | quiz1 (read only) | quiz2 (read only) | quiz3 (read only) | quiz4 (read only) | quiz5 (read only) | mid1 (read only) | mid2 | extracredit | final | misc (read only) | Final Points (read only) | Current Score (read only) | Unposted Cur (read only) | Final Score (read only) | Unposted Final Score (read only) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|



From: **Dukerich, Janet M** <janet.dukerich@austin.utexas.edu>
Date: Sat, Dec 21, 2019 at 7:55 PM
Subject: Re: Vicious editorial in the Dallas Morning News
To: tkh@utexas.edu <tkh@utexas.edu>, Dean-Jones, Lesley A <ldjones@austin.utexas.edu>

Hi Tom – I'm going to try to respond as best I can (please don't take offense, but you write very long emails so I might miss something). I apologize for not alerting you about the editorial response from President Fenves. I thought you were monitoring the DMN, and I have been dealing with other faculty who have a number of serious concerns.

While I was consulted during the day-long discussion that occurred while President Fenves considered his response, I was just one voice of many. Yes, I did read your article, as did many of the others who took part of the discussion. I really can't comment on the content of the president's response – it reflect his position, and it is one that he took after much reflection.

I did not ask Lesley why you did scholarship in this area and am not sure who did.

As for the review, no one is suggesting that there should be a review of your scholarship. However, there have been several complaints about the content of the course material this past semester. When we receive such complaints, we routinely ask dean's offices to look into them. In this situation, and as you have suggested yourself, we think forming a faculty group, drawn from your department as well as other relevant departments in COLA, to do a review would be a good idea. It likely will lead to a conclusion that nothing in the classroom has been problematic, which will help us deal with critics. I'm sure this committee, which your dean will form, will work with you on this review. I believe your dean with likely form this committee at the beginning of the spring semester. You might direct questions to her about the process.

I hope this response helps a bit. Janet

**JANET M. DUKERICH** | Vice Provost for Advocacy & Dispute Resolution | Professor, Management | Harkins & Company Centennial Chair | The University of Texas at Austin | Office of the Executive Vice President and Provost

---

**From:** Thomas K Hubbard <tkh@utexas.edu>
**Date:** Saturday, December 21, 2019 at 3:35 PM
**To:** "Dukerich, Janet M" <janet.dukerich@austin.utexas.edu>, "Dean-Jones, Lesley A" <ldjones@austin.utexas.edu>
**Subject:** Re: Vicious editorial in the Dallas Morning News

Dear Janet:

I had genuinely hoped to be able to leave both of you alone over this holiday week and have time to recuperate myself with my family in California. Now that someone else found the link for me, I can understand why you were too ashamed to tell me about the President's disgusting statement to the Dallas Morning News, as you had promised to do in your 9:23 e-mail on Thursday. I take it that you yourself were not at the meeting of the "top administrators" Thursday morning. What this means is that no one who has been in direct contact with me was there, and the information they had was at best third-hand.

Fenves claims to be "personally outraged" by my views. Has he (a structural engineer with no background in history, gender studies, criminal justice, or sexology), or for that matter anyone among the group that met with him and composed his statement, actually read this article or my many other publications on the subject (including an encyclopedia article that I was invited to write because of my expertise)? Or does he merely accept as a given truth the tendentious misrepresentation by a bunch of muckraking newspaper editors who lack any academic background whatever? I sent them to you. Have you yourself read them? Does anyone in University Communications hold a Ph.D. and operate on a high enough intellectual level where they can actually talk with a true scholar to determine what his views actually are? It has been amazing to me that none of them have ever corresponded with me before releasing their half-assed statements. Everything has gone through you, and you were not even at their meeting.

What exactly are the "outraged" Fenves' views on age of consent? His letter doesn't say. Has he ever seriously thought about the issue or read scholarship on it before? Does he believe that Texas' current law (17, with some very complicated exceptions for 14-16 year olds to be with persons close to their own age, but only if it is heterosexual) should be eternally immutable and never subject to change or questioning by academics? Does he believe it should be raised to 18, as in California, Florida, and federal jurisdictions? Does he believe it should be raised to 21 to lower the incidence of campus rape? Or 25, since the young person's brain is not fully developed until that age? Or lowered to 16, as in the majority of US states and Canada? Apparently he thinks it is "outrageous" to talk about European standards of 14-15, which is the most I have ever advocated. If Fenves and his Communications gurus had actually read my article (which I seriously doubt), they would have seen that I do not advocate complete abolition of age of consent, but propose a different age for male and female teens, based on the many psychological studies showing that most males (especially gay and bi-sexual males) later evaluate their teen experiences (even with adults) as not harmful, whereas most females regret them. The US Supreme Court (in Michael M. v. Sonoma County) has explicitly ruled this to be constitutionally permissible.

Someone (was it you?) apparently asked Lesley why I did scholarship on this issue, as if it were merely an irrelevant bee in my bonnet, and she did her best to answer by reminding them that the University is constantly prodding us to be "interdisciplinary" and show the relevance of history to debating issues in the present day. Why didn't this person ask me directly? I could have given the full answer, which is that I am personally committed to criminal justice reform. I do volunteer work and contribute much of my income to a foundation that works on the disproportionate enforcement of criminal laws, including but not limited to the statutory rape laws, on sexual minority defendants. I have also written scholarship on the topic, and know a lot more of the hard social science on it than anyone else at this university. I hate seeing the lost human potential (not to mention the fiscal burden on the state) of well-educated individuals with virtual life sentences, who are rotting in prison because they became involved with some gay teen (or undercover police posing as a gay teen) who went onto an adult website pretending to be 18 when they weren't. The rates of recidivism for such individuals is much lower than for most other categories of crime. This is in an altogether different category from men and women who abuse small children with no idea what they are being asked to do. But current law treats them the same.

It would have been nice if Fenves' statement had mentioned that I myself am the one who first proposed a formal investigation of my work and teaching by the University -- not once, but twice in e-mails to you. My first proposal was a small faculty committee that would include Lisa Moore to represent the perspectives of LGBT faculty. My second proposal was that the matter be referred to CCAFR. I received no substantive answer to either of these proposals, but now I all of a sudden learn (through a letter to the newspaper that I had to find on my own) that an investigation has been launched, with no advanced notice to me. What kind of due process is that? Who is doing the investigation? I demand to know the names and titles of these people. If the grand inquisitors are all hard-core ideological victimologists, it will not be a fair and unbiased process. Why is CCAFR, the appropriate faculty committee, being bypassed?

I take great umbrage at Fenves' defamatory implication that I have introduced "irrelevant" material and advocacy into my curricula. Of all faculty at the University, I am probably the person who does this least. I have not allowed get-out-the-vote activists into my classes (since it is totally irrelevant), I have not allowed discussion of the controversial campus carry law (as many faculty did), etc. One cannot discuss ancient Greece or Rome without commenting on the differing

social constructions of sexuality in those cultures, as most ancient authors deal with sexuality in one way or another (Lesley will confirm this). To call this irrelevant advocacy threatens academic freedom fundamentally and makes it virtually impossible to teach my fields, which include Gender Studies, Human Rights, European Studies (I am an affiliate of all three centers), as well as Classics.

   I honestly don't know what I said in my classes that some alleged "students" could have found controversial. My accusers are very short on the details. In my large lecture class on Greek Mythology this semester, we did briefly discuss some pederastic myths such as Ganymede, Hyacinthus, Cyparissus, and Chrysippus, and noted that Greek elite attitudes did interpret as "pedagogical" things we now view as sex crimes. I noted that Ganymede and Chrysippus were clearly cases of non-consensual rape (although in Ganymede's case he was compensated with immortal youth on Olympus, and Chrysippus' rapist was later punished with murder by his own son, Oedipus), whereas Hyacinthus and Cyparissus (beloveds of Apollo) were ongoing and apparently consensual relationships that were terminated by the boy's premature death, and thus constituted myths of failed initiation. In all, my discussion of these particular myths couldn't have taken more than about 20 minutes during the whole course of the semester. I said nothing about changing contemporary laws.

   A few years ago, I taught some interdisciplinary Honors or Undergraduate Studies classes that were more directly related to sexuality. In both my small seminar "Mythologies of Rape" and my larger lecture class "Sexual Politics and Human Rights" we spent two weeks on the topic of Statutory Rape; the balanced readings included both some victim-oriented scholarship (two chapters from David Finkelhor's Sexually Victimized Children) and some non-victimological perspectives (Judith Levine's chapter in Harmful to Minors, some pages from Susan Clancy's The Trauma Myth, and my own article that is now under attack). Although the student course evaluations weren't great and had various complaints (too much reading, too hard to get an A, not enough time for student discussion in the big class, resentment of having to attend a conference I organized at the end of the semester), I do not recall any complaints about my own article or about the content of the Statutory Rape segment in either course. I once asked Undergraduate Studies Dean Paul Woodruff whether there had been any complaints about the content of my courses in this controversial area, and he said there had been none.
   I am completely dumbfounded. This is an orchestrated smear campaign started by a single well-connected right-wing student, picked up by some violent Marxist/feminist groups, and now joined by major state media and the University President himself. None of us are safe from this kind of harassment. As we all know from course evaluations, students who are upset over having to work hard or getting bad grades can allege that we said something that bears no resemblance to what we actually said, and administrators give it instant credence. In their view, "victims never lie."

   Contrast Fenves' cowardly statement with the bold defense of Camille Paglia's academic freedom by the President of her institution. She has said even more provocative things on the subject of pederasty than I have (see attached). I don't think Homer Rainey responded to the Regents' demand that he fire left-leaning Economics faculty by issuing a public statement calling their economic theories "outrageous" and promising to "investigate" them.

   The University's past pandering to student radicals and media demagogues has been the igniter fluid to the current protests against multiple male faculty, which the University has handled very badly. Our university is really at the point of becoming a "pervasive hostile environment" for both male students and faculty (who are equally protected under Title VII and IX). As I mentioned to you recently in another e-mail, the current protests against male faculty were set ablaze by President Fenves' and Chancellor McRaven's ill-judged enthusiasm in promoting the deeply flawed CLASE project, which over-estimated the incidence of sexual assault and sexual harassment on our campus by using an inaccurate sampling methodology, vague and contradictory questions, and many other basic errors. See my attached two letters to President Fenves and the Regents on that subject, neither of which he has ever had the common courtesy, professionalism, or intellectual depth to respond to. I believe his current actions may constitute retaliation for my having the intellectual integrity to send those letters, which do pertain to some fundamental Title IX and EEO issues, and are thus legally protected from retaliation. As you will see if you read the letters, I know a lot more about basic sexological survey work than most humanities professors and even the headline grabbing social-work "scholar" who was the lead author of the $1.7 million CLASE documents. I also have a track record of having prevailed in a retaliation complaint

against the University once before, that was finally settled by Dean Diehl giving me a substantial raise and removing Lesley's predecessor as department chair.

   Please pass this e-mail along to the Provost, President Fenves, and everyone else who was present at the meeting that drafted Thursday's statement. Also pass it along to whoever the unnamed Grand Inquisitors are who Fenves says are now "investigating" me, and ask them to start communicating with me directly rather than through third parties. I will provide them every piece of information they want. Once the dust settles and some serious publications come out chronicling the media smears, mob violence, and the University's confused response, I am afraid that the leadership of President Fenves and his advisors is going to look very bad to historians, in contrast to Homer Rainey's heroic defense of academic freedom. Although I had previously told you I would be willing to accept an early retirement package on very modest terms, it will now be much more expensive for the University, as President Fenves' letter to the Dallas newspaper leaves me under a dark cloud of suspicion that will hinder my future work in the non-profit sector.

   Thomas K. Hubbard

   James R. Dougherty, Jr. Centennial Professor of Classics

On Thu, Dec 19, 2019 at 9:40 AM Dukerich, Janet M <janet.dukerich@austin.utexas.edu> wrote:

I'm also very sorry to see this editorial and I can only imagine the great stress and anguish that all this has caused you. I will confer with the provost and then schedule some time with your dean and Leslie to talk about plans for next semester. With regard to your thoughts about retirement, we in the provost's office can facilitate what will work best for you and the department.

Janet

Sent from my iPad

   On Dec 19, 2019, at 6:03 AM, Dean-Jones, Lesley A <ldjones@austin.utexas.edu> wrote:

   I'm very sorry to see this Tom. I can imagine how frustrating it must be.  Would it be possible to get one of the scholars who wrote for you for the Guggenheim, or even better, the foundation itself, to counter this?

   Best,

   Lesley.

   Sent from my iPad

   On Dec 19, 2019, at 1:48 AM, Thomas K Hubbard <tkh@utexas.edu> wrote:

      Janet and Lesley:

      Note that they themselves call my article a "hard read." Doesn't that reveal something about the intellectual level of these editors? I doubt either of you would find it particularly hard to read, as it was written for an interdisciplinary audience.

         Tom

      On Wed, Dec 18, 2019 at 11:43 PM Thomas K Hubbard <tkh@utexas.edu> wrote:

Who are these editors, none of whom have ever written a scholarly article, to judge whether my scholarship is "slovenly" and "unlearned"? You can see for yourselves the level of annotation and interdisciplinary scope of the article. It is precisely for scholarship on this topic that the Guggenheim Foundation gave me a fellowship in 2017-18. Do they give their coveted awards to "slovenly" and "unlearned" scholars? This unprincipled editorial will truly make public institutions in Texas look like an uninviting environment for scholars. It confirms people's worst stereotypes of the state.

If the University feels it would be in its political interest for me to retire earlier than I planned, I have already told Lesley that I would be willing to consider that under certain conditions. But I will only agree to do so if I can retire with honor and no concessions to journalistic lynch mobs that mischaracterize serious scholarship in this repugnant manner.

Tom

On Wed, Dec 18, 2019 at 11:27 PM Thomas K Hubbard <tkh@utexas.edu> wrote:

https://www.dallasnews.com/opinion/editorials/2019/12/18/a-ut-professor-advocates-pedophilia-why-are-we-paying-for-it/

Janet:

This editorial is the worst thing yet. Whoever wrote it is so uninformed that they do not know the definition of "pedophilia" in the DSM (Psychiatry's handbook) and missed all of the nuances of my paper, which is about mutually consensual relationships with adolescent boys, as practiced by the Greeks with no evidence of psychological harm to the mainly elite adolescents, not pre-adolescents. These are "criminal" only because the US defines them as "criminal," when Germany, Austria, Italy and most other European states don't. What circular logic!

This almost certainly is driven by the politically powerful father of the right-wing student who started all the trouble. This kind of misleading and ignorant editorial is even more threatening to academic freedom than anything the mob at my house did, and appears to call for less state funding of UT. As if taxpayer money is the primary source of the University's support, which as we all know, it isn't. Thanks for anything you can do. I am at my wit's end, already driven to serious PTSD that this politicized attack on scholarship only exacerbates. This demagogy is nothing short of an attack on the University itself, and may be the opening salvo in Lt. Gov. Patrick's next assault on sexual minorities and educated people everywhere.

I attach the actual paper they are mischaracterizing. Read it for yourself and consider whether it is a fair representation of the full context of what I say. I nowhere argue for a complete abolition of age of consent laws, but merely some reforms that recognize that not all behavior simple-minded people mislabel as "pedophilia" is as monstrous and harmful as zealots assume. The same point was made in the most thorough (and never refuted) meta-analysis published in Psychological Bulletin 1998 (the top journal in academic psychology). At this point, I honestly don't feel I can respond to such anti-intellectual drivel myself.

Tom

# EXHIBIT H



**Edward Hughes TRUMP'S GREATEST AUSSIE SUPPORTER** · Aug 12

University of Texas at Austin professor **Thomas Hubbard**
Here is a boy penis to put in your mouth.
YOU FUCKING SCUM.



   

You are one sick man! You need to go to the guillotine! Only I wouldn't want you head in there... the 1st time!   

**<u>Professor argues it should be legal for grown men to have sex with children. Let that sink in.</u>**

**Is this you?**
**If it is you are a sick bastard and you deserve an severe ass whooping. 😠**
**If you touch a child you should be put out of your misery.**

# ONE DOWN
## TWO TO GO



**ABUSIVE PROFESSORS DESERVE TO DIE!**

**WOMEN HOLD UP HALF THE SKY!**



PWM MFP

PWM MFP

DOMESTIC ABUSER FORMER PROF RICHARD MORRISETT COMMITTED SUICIDE AS A RESULT OF MASS MOVEMENT





PREDATORY PROF SAHORTA SARKAR OFFERED TO BRIBE WOMEN STUDENTS FOR NUDE PHOTOS

PREDATORY PROF COLEMAN HUTCHISON MAKES SEXIST ADVANCES TO STUDENTS & DENIES FUNDING TO THOSE WHO DO NOT ACCEPT



# EXHIBIT I

## Subchapter 10–400. Enforcement and Appeals

### Sec. 10–401. Response to Violations

A student who violates a prohibition in this Chapter may be disciplined under the procedures in Chapter 11 of the *Institutional Rules*. A registered student organization or a sponsored student organization that violates a prohibition in this Chapter may be disciplined under Chapter 6 of the *Institutional Rules*. A member of the public who violates a prohibition in this chapter may be issued a criminal trespass warning (CTW) banning such person from all or part of University property.

### Sec. 10–402. Appeals

a. A University organization aggrieved by a decision under this chapter may appeal to the vice president by letter or by e-mail, also sending a copy to the decision maker, within fourteen days after the day the decision is announced. The appeal must contain the University organization's name and mailing address, a concise description of the decision complained of, the University organization's reasons for disagreeing with the decision, and the date the decision was announced.

b. When timely notice of appeal is received, the decision maker from the academic or administrative unit that controls the room or space will prepare and send to the vice president a copy of the written statement of the reason given for the decision. At the discretion of the vice president, both parties may present oral arguments to an appeal of the decision under this Chapter.

c. The action of the vice president will be communicated by letter or by e-mail to the University organization and the decision maker within five days after the appeal and related documents have been received.

### Sec. 10–403. Further Review by Petition

The issuer of a CTW or a decision maker, or the University person or organization may petition, by letter or by e-mail through the vice president, to the president of the University to review the decision being appealed. The president may establish an ad hoc committee and refer the request to the committee to review the request for appeal and affirm or reverse the underlying determination.  The committee reviews appeals solely at its discretion as determined by a majority vote of the committee members. Petitioners do not have a right to this further review should the committee decide not to provide it.  Decisions by the committee to reverse or affirm the underlying determination are made by a majority vote of the committee members.

# Chapter 11. Student Discipline and Conduct

## Subchapter 11–100. General Provisions

### Sec. 11–101. Preamble

a. The University's expectations for student conduct are grounded in the University Code of Conduct: "The core values of The University of Texas at Austin are learning, discovery, freedom, leadership, individual opportunity, and responsibility. Each member of the University is expected to uphold these values through integrity, honesty, trust, fairness, and respect toward peers and community." University students are also expected to uphold the Student Honor Code: "As a student of The University of Texas at Austin, I shall abide by the core values of the University and uphold academic integrity." University students are also expected to abide by all city, state, and federal laws and statutes and all regulations of the University and The University of Texas System. However, as a community of scholars, the University expects from its students a higher standard of conduct than that required simply to avoid discipline. The principles of the Student Honor Code together with the University Code of Conduct should govern and direct student conduct to promote a safe environment that is conducive to academic success and to ensure that each University student graduates ready to contribute to society as an ethical citizen.

b. This chapter contains regulations for dealing with alleged student violations of University standards of conduct in a manner consistent with the requirements of procedural due process and in accordance with The University of Texas System Rules and Regulations of the Board of Regents' *Rule*: 50101 and the Model Policy for Student Conduct and Discipline promulgated by the Office of General Counsel of the University of Texas System. In addition to the general expectations for conduct set forth in subsection 11–101(a), subchapter 11–400 contains a description of prohibited conduct.

### Sec. 11–102. Application and Jurisdiction

a. This chapter applies to individual students and states the function of students, faculty members and administrative staff members of the University in disciplinary proceedings.

b. A student is subject to discipline for prohibited conduct as outlined in subchapter 11-400 herein that occurs while the student is participating in off-campus activities sponsored by or affiliated with the University, including field trips, internships, rotations, and clinical assignments.

c. Students may be disciplined by the University for violating any standards of conduct on the campus or off of the campus when the incident occurs in connection with an institution-oriented activity, or when the incident has a substantial connection to the interests of the University, or when the behavior is prohibited by University policy regardless of where it occurs, even if they are or may be penalized by civil authorities for the same act.

d. University disciplinary action may be instituted against a student charged with conduct that potentially violates both the civil/criminal law and University policy without regard to the pendency of civil or criminal litigation in court or criminal arrest and prosecution. At the discretion of the dean of students, proceedings under this chapter may be carried out prior to, simultaneously with, or following criminal proceedings off campus. Determinations made and sanctions imposed under this chapter will not be subject to change because criminal charges arising out of the same facts that give rise to the violations of University rules were dismissed, reduced, or resolved in favor of or against the criminal law defendant.

e. University disciplinary action instituted by the Office of the Dean of Students will be based upon the "Preponderance of Evidence" standard.

f. A student remains subject to discipline for prohibited conduct that occurs while suspended.

g. Adjudication of any alleged violation of institutional rules will advance procedurally under *The Institutional Rules Catalog* that is in effect on the day that the Office of the Dean of Students receives notification of the alleged violation and not the date on which the purported infraction is noted to have occurred.

h. For allegations of conduct under Subsection 3-3031 of the Handbook of Operating Procedures that are assigned to Grievance Process Tracks A or B, the University Title IX Office has primary authority and responsibility for administration of the allegation. In those instances, the dean of students will coordinate with the Title IX coordinator, as requested by the University Compliance Office, to provide a discipline decision pursuant to that policy's processes. The provisions in this chapter do not apply to the administration of such allegations. This rule's provision does apply to allegations under 3-3031 that are assigned to Grievance Process Track C ("Track C").

## Subchapter 11–200. Administration of Discipline

### Sec. 11–201. Administration by Dean of Students

The dean of students has primary authority and responsibility for the administration of student discipline. The dean of students works cooperatively with faculty members, hearing officer(s) or the Student Conduct Board in the disposition of academic violations, with appropriate staff members in the Division of Housing and Food Service in the disposition of residence hall violations, and with other appropriate staff members in the disposition of other types of violations.

### Sec. 11–202. Hearing Officer

The hearing officer(s) will be appointed in accordance with procedures established by the president. The president may appoint an individual or an office to coordinate the work of the hearing officer(s). To preclude any appearance of impropriety on the part of the dean of students, the selection and training of hearing officers is under the authority of the president's office and facilitated by the Vice President for Student Affairs.

### Sec. 11-203. Student Conduct Board

The Student Conduct Board (SCB) will be appointed in accordance with procedures established by the Vice President for Student Affairs. The Vice President for Student Affairs may appoint an individual or an office to coordinate the work of the SCB. To preclude any appearance of impropriety on the part of the dean of students, the selection and training of the SCB is under the authority of the president's office and facilitated by the Vice President for Student Affairs.

a. **Composition.** The SCB is composed of students, faculty and staff members.
   1. Student members must be currently enrolled in the University and cannot be an executive officer of any legislative student organization.
   2. Student candidates for membership shall be recommended by a selection committee appointed by the Vice President of Student Affairs. The president will appoint the student members of the SCB upon the recommendation of the selection committee.
b. **Chair.** The chair of the SCB shall be appointed by the Vice President for Student Affairs.
c. **Panels.** The SCB will act through panels appointed ad hoc for each hearing. Each panel shall be composed of five members or three members: four student members and one faculty/staff member, or two student members and one faculty/staff member. The panel foreperson will be selected by the SCB chair.
d. **Quorum.** A quorum of the SCB is a majority. A quorum of a panel of the SCB is a total of three SCB members.  This panel quorum will be at least two students and one faculty/staff member.
e. **Jurisdiction.** The SCB shall only hear matters concerning allegations of academic dishonesty, and general misconduct. The SCB shall not hear matters pertaining to Track C or violent conduct violations.

## Subchapter 11–300. Definitions

In this chapter, unless the context requires a different meaning, the following definitions apply.

1. "Academic Sanction" means a sanction affecting a student's grade, including but not limited to the lowering of a grade on an assignment, test, or in the course.
2. "Advisor" means a single individual whom an accused student may elect to accompany him or her to a meeting with the dean of students or a hearing regarding an alleged violation of University policy. Because the accused student is solely responsible for presenting his or her case during the disciplinary process, an advisor may confer with and advise the accused student but may not advocate for the student in a meeting with the dean of students or in a hearing. A meeting with the dean of students or a hearing may be postponed no more than seven days after the original date to allow for an advisor to attend a meeting with the dean of students or a hearing. If an advisor is directly related to a disciplinary case or if the advisor's presence poses a conflict of interest, the dean of students, the foreperson of the SCB panel, or the hearing officer may dismiss the advisor from the meeting or hearing. Advisors may be dismissed from any disciplinary proceedings if they disrupt the process. If an advisor is an attorney, the dean of students may also be accompanied by an attorney.
3. "Complaint" means a written statement prepared by the dean of students before a Title IX related investigation or a hearing that outlines the alleged violation(s) of a Regents' Rule, University regulation, or administrative rule to be investigated and resolved by the dean of students, the SCB or by the hearing officer.
4. "Complainant" means a person who is reported to be the victim of prohibited content related to a Track C case.
5. "Day" means an 8:00 a.m. to 5:00 p.m. calendar day, and excludes weekends, University holidays, skeleton crew days, and days on which regularly scheduled classes are suspended due to emergent situations; "University holiday" and "skeleton crew days" means days identified in the holiday schedule published by the Office of Human Resource Services. If a deadline defined in this chapter falls on a Saturday, Sunday, University holiday, or skeleton crew day that deadline will be moved to the next day.
6. "Dean of students" means the dean of students of the University of Texas at Austin or the dean of students' delegate or representative.
7. "Disciplinary decision" means a written decision determining that a student alleged to have violated the Regents' *Rules*, University regulation, or administrative rule is, in fact, responsible for such alleged misconduct. The "disciplinary decision" includes the findings of fact in support of the decision along with the assessed sanction or sanctions, if any.

8. "Disciplinary record" or "student disciplinary record" means a student record as defined in Sec. 9–202 of the *Institutional Rules* maintained by the dean of students in connection with a violation or an alleged violation of a Regents' *Rule*, University regulation, or administrative rule. The disciplinary record may include complaints, notices, hearing records, disciplinary decisions, and other documents required under this chapter or deemed relevant by the dean of students. Disciplinary records may be disclosed to outside parties as dictated by subchapter 9–300 of the *Institutional Rules*.

9. "Faculty member" means a person who is employed by the University for the purpose of teaching a class, and who has authority to assign grades for the class.

10. "Hearing officer" means a person appointed by the president to conduct hearings of alleged violations of a Regents' Rule, University regulation, or administrative rule.

11. "HOP 3-3031 Track C cases" or "Track C cases" refers to allegations of conduct that potentially constitutes Sex Discrimination, Sexual Exploitation, Unprofessional/Inappropriate Conduct, Retaliation, False Information or False Complaint, Interference with Grievance Process, as defined in HOP 3-3031. These cases are investigated by the Investigations Unit in University Compliance Services and referred to the dean of students for discipline decision. Notwithstanding this Rule's provisions, for allegations covered under Handbook of Operating Procedures 3-031 Track A and Track B, initiation of the grievance process, investigation, hearing, any discipline determination, and appeal will be according to HOP 3-3031's provisions, which control for such allegations.

12. "Interim Disciplinary Action" means disciplinary action adverse to an Accused Student taken against the Accused Student before finding of responsibility for a policy violation. Interim Disciplinary Action may include suspension, suspension of a right or privilege, or a prohibition from entering campus or any part of campus.

13. "Appellate officer" means a person designated by the president to issue final decisions in a student disciplinary matter.

14. "President" means the president of the University of Texas at Austin.

15. "Respondent" means the person reported to be the alleged perpetrator of conduct related to a Track C case.

16. "Student" means a person who is currently enrolled at the University, or who is accepted for admission or readmission to the University, or who has been enrolled at the University in a prior semester or summer session and is eligible to continue enrollment in the semester or summer session that immediately follows, or who is attending an educational program sponsored by the University while that person is on campus, or who engaged in prohibited conduct at a time when he or she met the above criteria. For the purposes of this chapter, individuals who are not currently enrolled at the University remain subject to the disciplinary process for conduct that occurred while they were enrolled.

17. "Student Conduct Board" (SCB) means the entity or group of persons composed primarily of students, who along with faculty and/or staff, are appointed by the president, as provided in this chapter, to conduct hearings and issue decisions concerning academic dishonesty and general misconduct violations. The SCB shall not hear matters pertaining to Track C cases or violent conduct violations.

18. "Title IX" means Title IX of the Education Amendments of 1972, Pub. L. 92-318, as amended by section 3 of Pub. L. 93-568, 88 Stat. 1855, except sections 904 and 906 thereof; 20 U.S.C. 1681, 1682, 1683, 1685, 1686.

19. "Title IX Coordinator" means the employee of the University with major responsibility for Title IX compliance efforts and who is designated to handle complaints under Title IX.

20. "University" means the University of Texas at Austin. For the purposes of this chapter, "University" also includes all activities and programs sponsored by or affiliated with the University of Texas at Austin regardless of the actual location where such activities or programs occur, including but not limited to, field trips, internships, rotations, and clinical assignments.

21. "Vice President for Student Affairs" means the Vice President for Student Affairs of the University of Texas at Austin and is the administrative officer primarily responsible for the development and administration of policies relating to students, for the development and implementation of services to students, and for the initial preparation of institutional regulations that implement the Model Policy for Student Conduct and Discipline of The University of Texas System.

22. "Witness" means a person who may have information related to a complaint or referral.

## Subchapter 11–400. Prohibited Conduct

### Sec. 11–401. Conduct Expected of Students

As stated in subsection 11–101(a), the University's expectations for conduct are grounded in the University Code of Conduct and the Student Honor Code. While subchapter 11–400 outlines specific examples of prohibited conduct, the University expects from its students a higher standard of conduct than the minimum needed to avoid discipline.

### Sec. 11–402. Academic Dishonesty

a. The dean of students or a faculty member may initiate disciplinary proceedings under subchapter 11–500 against a student accused of academic dishonesty.

b. "Academic dishonesty" or "scholastic dishonesty" includes, but is not limited to, cheating, plagiarism, collusion, falsifying academic records, misrepresenting facts, and any act designed to give unfair academic advantage to the student or another individual (such as, but not limited to, submission of essentially the same written assignment for two classes or courses without the prior permission of the instructor), or the attempt to commit such an act.

c. "Cheating" includes, but is not limited to, any actions or attempts to do the following:

   1. copying from another student's test, paper, project, or other assignment;

   2. failing to comply with instructions given by the person administering a test, project, or other assignment, or given in conjunction with the completion of course requirements;

3. using or possessing materials that are not authorized by the person giving the test, project, or other assignment, including but not limited to class notes, calculators, electronic devices, and specifically designed "crib notes"; the presence of textbooks constitutes a violation only if they have been specifically prohibited by the person administering the test;

4. providing aid or assistance to or receiving aid or assistance from another student, individual, or source, without authority, in conjunction with a test, project, or other assignment;

5. discussing or providing information about the contents of a test with another student who will take the test;

6. capturing or divulging the contents of a test or other assignment when the instructor has not given permission for students to keep or distribute such information;

7. substituting for another person or permitting another person to substitute for oneself to take a class, a test, or any class-related assignment;

8. using, buying, stealing, transporting, soliciting, or coercing another person to obtain answers to or information about an administered test, project, or other assignment;

9. falsifying research data, laboratory reports, other academic work offered for credit, or work done in conjunction with the completion of course or degree requirements;

10. taking, keeping, misplacing, or damaging the property of the University, or of another, if the student knows or reasonably should know that an unfair academic advantage would be gained by such conduct; or altering a test paper, project, or other assignment to gain an academic advantage.

d. "Plagiarism" includes, but is not limited to, the appropriation of, buying, receiving as a gift, or obtaining by any means material that is attributable in whole or in part to another source without any indication of the original source, including words, ideas, illustrations, structure, computer code, and other expression or media, and presenting that material as one's own academic work being offered for credit or in conjunction with a program course or degree requirements.

e. "Collusion" includes, but is not limited to, unauthorized collaboration with another person in preparing academic assignments offered for credit, and collaboration with another person to commit a violation of any section of the rules on academic dishonesty.

f. "Misrepresenting facts for academic advantage" to the University or an agent of the University or The University of Texas System includes, but is not limited to, providing false grades or résumés; providing false or misleading information in an effort to receive a postponement or an extension on a test, quiz, or other assignment for the purpose of obtaining an academic or financial benefit for oneself or another individual; and providing false or misleading information in an effort to injure another student academically or financially.

## Sec. 11–403. Financial Transactions with the University

Students who owe debts to the University may be denied admission or readmission to the University and may have official transcripts, grades, diplomas, and degrees to which they would otherwise be entitled withheld until the debt is paid. Students who write bad checks to the University for tuition and fees will have their registration canceled. Bad checks written to the University for other purposes will subject the student to legal and/or disciplinary action. Matters relating to student financial transactions will be directed by the appropriate administrative office to the Office of Accounting. See Regents' *Rules and Regulations*, Rule 50303 for more information.

## Sec. 11–404. General Misconduct

a. Notwithstanding any action taken on account of the violation by civil authorities or agencies charged with the enforcement of criminal laws, the dean of students may initiate disciplinary proceedings under subchapter 11–500, or make an incident report and determine discipline under HOP 3-3031 when there is a finding of responsibility, against a student who

1. **Local, State, or Federal Law Violations** - engages in conduct that may violate any provision of federal, state, or local laws, whether or not the violation occurs on University property or in connection with any University-oriented activity.

2. **Firearms, Dangerous Materials and Prohibited Items** - possesses, uses, or displays firearms, facsimile firearms, ammunition, explosives, or other items that could be used as weapons, including but not limited to sticks, poles, clubs, swords, shields, body armor or make shift body-armor, masks, helmets and other garments, such as sporting protective gear, that alone or in combination could be reasonably construed as weapons or body-armor on property owned or controlled by the University, without written permission from the dean of students, unless authorized by federal, State or local laws; or, violates Policy 8-1060, Campus Carry, of the Handbook of Operating Procedures.

3. **Harmful Behavior -** behaves in a manner that threatens or endangers the health or safety of any student or employee of the University, or of visitors to the campus.

4. **Sex or Gender Based Harassment** violates the University's prohibition of sex discrimination, sexual harassment, sexual assault, interpersonal violence (including domestic violence and dating violence) and stalking as contained in HOP 3-3031.

5. **Theft and/or Property Damage -** damages, defaces, destroys, tampers with, or takes without authorization property of the University, property belonging to any student or employee of the University, or property of a visitor on the campus.

6. **Hazing -** violates the University's prohibition of hazing as contained in Chapter 14 of the *Institutional Rules*

7. **Alcohol Misconduct** - engages in unauthorized use or possession of alcoholic beverages in a University classroom building, laboratory, auditorium, library building, museum, faculty or administrative office, intercollegiate or intramural athletic facility, residence hall, or any other campus area (see Regents' *Rules and Regulations*, Rule 80102 for more information); or engages in the improper use, possession, or consumption of alcoholic beverages, including but not limited to underage possession of alcohol, underage consumption of alcohol, providing alcohol to a minor, public intoxication, minor driving under the influence of alcohol, driving while intoxicated.

8. **Illegal Drug Use and/or Possession** - engages in the use, possession, or sale of an illegal drug or narcotic, or possession of drug paraphernalia.

9. **Individual and/or Unauthorized Group Disturbance** - engages in speech, including but not limited to verbal, electronic, or written communication, that is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

10. **Unauthorized Access to Artificial Bodies of Water and/or Damage to Other Property** - enters, walks, runs, lies, plays, remains, or is in the water of any fountain or other artificial body of water on the University campus that is not designed and maintained for recreational or therapeutic

purposes; dumps, throws, places, or causes to be placed any material, object, trash, person, animal, waste, or debris in the water of any fountain or other artificial body of water located on the University campus; or damages, defaces, or removes any portion of any fountain, monument, building, statue, structure, facility, tree, shrub, or memorial located on the University campus (see Regents' *Rules and Regulations*, Rule 80110 for more information).

11. **Other Harassment under Subsection 13-204 of the Institutional Rules (Speech, Expression, and Assembly) or HOP 3-3020** - engages in <u>harassment</u> (p.        )

12. **Property** - engages in unauthorized use of property, including keys, equipment, resources, supplies, buildings, or facilities owned or controlled by  the University or The University of Texas System, including unauthorized entry into property, buildings, or facilities owned or controlled by the University or The University of Texas System.

13. **Unauthorized Use of Institutional Technology -** engages in an inappropriate or disproportionate use of an information technology resource owned or controlled by the University or The University of Texas System or uses an information technology resource for an illegal, threatening, or intentionally destructive purpose; prohibited conduct includes, but is not limited to, circumventing system or network security, committing copyright infringement, transmitting unsolicited e- mail, sharing a University-issued password, falsifying an e-mail header, and using resources for personal financial gain or profit.

14. **Stalking -** A course of conduct directed at a specific person that would cause a reasonable person to fear for the person's safety or the safety of others or would cause that person to suffer substantial emotional distress. A "course of conduct" means two or more acts in which a person directly, indirectly or through third parties, by any action, method, device or means, follows, monitors, observes, surveils, threatens or communicates to or about a person or interferes with a person's property. "Reasonable person" means a reasonable person under similar circumstances and with similar identities to the complainant. "Substantial emotional distress" means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling. (Please note that Stalking here in 11-404(a) (14) is separate from the gender or sex-based stalking rule included in HOP 3-3031.)

15. **Gambling -** engages in gambling, including in the residence halls.

16. **Providing False and Misleading Information**
    A. Engages in the falsification of academic records, including but not limited to altering or assisting in the alteration of any official record of the University or The University of Texas System and submitting false information or omitting requested information that is required for or related to any academic record of the University or The University of Texas System. Academic records include, but are not limited to, applications for admission, the awarding of a degree, registration materials, grade change forms, and reporting forms used by the Office of the Registrar. A former student who engages in such conduct is subject to a bar against readmission, revocation of a degree, and withdrawal of a diploma; or,
    B. Furnishes false information to or withholds material information from any University official, faculty member, or staff member acting in the course of his or her duties; or,
    C. Alters or assists in the alteration of any official nonacademic record or document, including parking permits and athletic tickets, of any University office or of The University of Texas System.

17. **Privacy Violation** - engages in surveillance or recording of any type without the subject's knowledge or consent in areas where there is a reasonable expectation of privacy and/or the broadcasting or distribution of such material including sexual exploitation as defined under Handbook of Operating Procedures 3-3031(VII)(B).

18. **Disruptive Conduct**
    A. otherwise engages in the following acts of inappropriate conduct that have the potential to interfere or disrupt the student learning or teaching function of the University: pranks, repeated contact of a harassing nature through a personal or electronic medium, and berating or otherwise abusive behavior; or,
    B.  attempts to commit any violation of University rules or regulations, or to assist another person or persons in committing any violation of University rules or regulations; or,
    C. behaves in a manner that impedes, interferes with, or disrupts any University teaching, research, administrative, disciplinary, public service, learning, or other authorized activity

19. **Failure to Comply**
    A. refuses to identify himself or herself to an institutional representative in response to a request when on any institutional property. A person identifies himself or herself by giving his or her name and complete address, substantiated by a current driver's license, voter registration card, or other official documentation, and by stating truthfully whether or not he or she is a student or employee of the University. An institutional representative includes any member of the Board of Regents; any executive officer or administrative officer of the system; any administrative officer of the University; and any attorney, peace officer, or security officer of The University of Texas System or the University acting pursuant to the authority of Texas law. See Regents' *Rules and Regulations*, Rule 80101, Number 2, Sections 3 and 4 for more information; or,
    B. engages in action that interferes with or obstructs the student disciplinary process. This includes, but is not limited to, failing to appear for a meeting when summoned by letter or e-mail to do so, failing to appear at or testify at a hearing, attempting to intimidate, harass, or unduly influence a potential witness or complainant, failing to timely complete educational outcomes assigned through the Restorative Practices Alternative under HOP 3-3031, and failing to complete disciplinary or administrative sanctions; or,
    C. refuses to identify one's self to a University official, faculty member, or staff member acting in an official capacity; or,
    D. engages in any prohibited conduct while suspended for disciplinary reasons.

20. **Violent Conduct -** engages in actual or threatened violent conduct against a person.

21. **Animal Cruelty -** engages in conduct with an animal that may violate any provision of federal, state, or local laws, whether or not the violation occurs on University property or in connection with any University-oriented activity.

22. **University System and Institutional Violations -** violates any provision of the Regents' *Rules and Regulations* of The University of Texas System, the rules and regulations of the University (including but not limited to administrative rules of campus offices), or specific instructions issued by an administrative official acting in the course of his or her authorized duties.

   A. In the case of disruptive activity on the campus of the University, neither the dean of students nor the president nor any representative of them will negotiate or attempt to negotiate with any person or persons so engaged. When such a situation arises, the dean of students or the president, or their representative, will take immediate action to utilize all lawful measures to halt and eliminate any and all such disruptive activities that come to their attention, and may initiate disciplinary proceedings under subchapter 11−500. See Regents' *Rules and Regulations*, Rule 40502 for more information.

## Sec. 11−405. Prohibition on Retaliation

Retaliation against a person who reports a potential violation under the *Institutional Rules*, assists someone with a report of a violation, or participates in any manner in an investigation or in the resolution of a complaint made under the *Institutional Rules* is strictly prohibited and will not be tolerated. Retaliation includes but is not limited to threats, intimidation, reprisals and/or adverse actions related to an individual's employment or education.  The University will take appropriate steps to assure that a person who in good faith reports, complains about, or participates in an investigation pursuant to this institutional rule will not be subjected to retaliation. Individuals who believe they are experiencing retaliation are strongly encouraged to file a complaint with the University.

# Subchapter 11−500. Disciplinary Procedures

## Sec. 11−501. Investigation

a. When the dean of students receives information that a student has allegedly violated a Regents' *Rule*, University regulation, administrative rule, city ordinance, or state or federal law, the alleged violation will be preliminarily investigated. Upon completing the preliminary investigation, the dean of students may:

   1. dismiss the allegation as unfounded; or

   2. summon the student for a conference and, after conferring with the student:

      A. dismiss the allegation; or

      B. proceed administratively under Sec. 11−504 in every case where the proposed sanction is not a suspension, including suspension of rights and privileges, academic sanction, or expulsion and in other cases where the student elects an administrative disposition; or

      C. prepare a complaint based on the allegation and proceed under subchapter 11−600 in cases where the proposed sanction is suspension, including suspension of rights and privileges, academic sanction or expulsion and the student does not waive his or her right to a hearing.

b. Any student who reports allegations of sex discrimination, sexual harassment, sexual assault, sexual misconduct, interpersonal violence (including domestic violence and dating violence), stalking, or Track C related allegations, either as a complainant or a third party witness, will not be subject to disciplinary action by the dean of students for using and/or consuming alcohol or drugs at or near the time of the alleged incident, provided that any such alcohol or drug use did not, and do not, place the health or safety of any person at risk.

c. All proceedings will provide a prompt, fair and impartial investigation and resolution.

d. Track C allegations will be investigated in accordance with the procedure described in HOP 3-3031 and referred to the dean of students for disciplinary decision. Track C allegations may be resolved through the Restorative Practices Alternative in HOP 3-3031 rather than a formal investigation process.

e. Scientific Misconduct or Misconduct in Other Scholarly Research

   1. If the information received by the dean of students makes allegations of possible misconduct in scientific or other scholarly research, the dean of students will refer the information to the Vice President for Research and/or the Research Integrity Officer for further investigation in accordance with the Handbook of Operating Procedures, 7-1230. The purpose of the investigation is to: explore in detail the allegations; examine the evidence in depth; and, determine specifically whether misconduct has been committed, by whom, and to what extent. The investigation also will determine whether there are additional instances of possible misconduct that would justify broadening the scope beyond the initial allegations. The findings of the investigation will be set forth in an investigation report. The investigative report will then be provided by to the dean of students for adjudication of any academic integrity violations that may be outlined in the investigative report.

   2. Additional Information regarding the Scientific Misconduct or Misconduct in Other Scholarly Research can be found at http://www.policies.utexas.edu/policies/misconduct-science-and-other-scholarly-activities

f. Investigations involving students enrolled in the Dell Medical School

   1. If the dean of students receives a referral involving a student enrolled in the Dell Medical School, the dean of students will notify the dean of the Dell Medical School or his/her designee. Prior to the final resolution of an incident involving a student enrolled in the Dell Medical School, the dean of students shall consult the dean or designee to determine appropriate sanctions consistent with the professional standards outlined by the Dell Medical school and other applicable university rules.

   2. Additional information regarding the professional standards of the Dell Medical School can be found at https://dellmed.utexas.edu/student-policies

## Sec. 11−502. Interim Disciplinary Action

a. Pending a hearing or other disposition of the allegations against a student, if the continuing presence of the student is a potential danger to persons or property or a potential threat of disrupting the academic process or any activity authorized by the University, or in cases where actual or threatened violent conduct against a person is alleged, the dean of students may take such immediate interim disciplinary action as is appropriate to the circumstances. Appropriate actions include, but are not limited to, suspending the right of the student to be present on the campus (including to live in campus residence halls) and to attend classes, and otherwise altering the status of the student.

b.  A student who is suspended or whose status is altered under subsection 11–502(a) may meet with the dean of students to contest the interim disciplinary action taken by the University. A request for a meeting under this subsection must be made, in writing, within five days after the interim disciplinary action was taken. If requested by the student, such a meeting generally will be conducted within ten days after the request for a meeting is made, unless the student agrees in writing to a meeting at a later time. At the discretion of the dean of students, the ten-day period may be extended for a period not to exceed an additional ten days.

  1.  During the meeting with the dean of students, the student may present documentation or other evidence for review by the dean of students in consideration of lifting or altering the interim disciplinary action.  The dean of students shall issue a written decision within seven days of the meeting regarding whether the University's decision to take interim disciplinary action should be reversed, altered, or otherwise left unchanged.

  2.  The student may appeal the decision issued by dean of students under subsection 11-502(b)(1) by submitting a written appeal to the Appellate Officer within three days from the date the dean of students issues his/her decision. The appeal will be reviewed solely on the basis of the written record of the case, any written materials submitted by the student, and the response to the appeal, if any, submitted by the dean of students. Oral argument will not be considered.

  3.  The decision of the Appellate Officer will be communicated in writing to the accused student and the dean of students within seven days after the appeal has been received by the Appellate Officer. Appellate Officer may approve, reject, or modify the interim disciplinary action in question or may require that the original decision be reconsidered for the presentation of additional evidence. The decision of the Appellate Officer shall be final.

c.  A student who is suspended or whose status is altered under subsection 11–502(a) is subject to further disciplinary action for prohibited conduct that takes place during the period of interim disciplinary action imposed under 11-502(a).

## Sec. 11–503. Summoning a Student

a.  The dean of students may summon a student to appear in connection with an alleged violation by sending a message to the student by letter or by e-mail at an address listed in the registrar's records.

b.  The message will direct the student to appear at a specific time and place at least three days after the date of the message if the message is sent by letter, or at least two days after the date of the message if the message is sent by e-mail. In cases involving allegations of actual or threatened violent conduct against a person, or Track C cases, the dean of students has the right to summon the student at least one day after the date of the message, by email, or phone number listed in the registrar's records.

c.  The dean of students may bar or cancel the enrollment or otherwise alter the status of a student (or of a former student as described in subsection 11–300(12) who fails without good cause to comply with a summons sent under subsection 11–503(a) until the student complies with the summons. A letter sent to an address listed in the registrar's records, a letter hand-delivered to the student, or an e-mail message sent to the address listed in the registrar's records will constitute full and adequate notice. The student's failure to provide and to maintain current addresses, refusal to accept delivery of a letter, or failure to receive an e-mail message because the mailbox is full or the message is inappropriately forwarded will not constitute good cause for failure to comply with the summons. Policies on the use of e-mail for official correspondence are given in Appendix M (p. 200).

d.  If an accused student fails to appear as directed in a summons the dean of students may proceed with a hearing before a hearing officer based upon the information available.

## Sec. 11–504. Administrative Disposition by the Dean of Students of Disciplinary Violations

Administrative disposition shall be used in cases where the proposed sanction is a sanction other than suspension, including suspension of rights and privileges, academic sanction, or expulsion and may be used in cases where the proposed sanction is suspension, including suspension of rights and privileges, academic sanction, or expulsion if the accused student agrees to waive his right to a hearing.

a.  In cases where the accused student does not dispute the facts upon which the charges are based, the proposed sanction is not suspension, including suspension of rights and privileges, academic sanction or expulsion and the student agrees to the proposed sanction, the administrative disposition shall be final and there shall be no appeal of the finding of misconduct or the sanction.

b.  In cases where the accused student disputes the facts upon which the charges are based and the proposed sanction is not suspension, including suspension of rights and privileges, academic sanction, or expulsion the dean of students will inform the student of the charges, evidence, findings, and proposed sanction(s); give the student the opportunity to meet with the dean of students or his or her delegate to provide evidence. The dean of students will review all evidence, including the student's response to the allegation, and determine whether the preponderance of evidence supports a finding that a violation occurred. If a violation is deemed to have occurred, the dean of students will assess sanction(s) pursuant to subchapter 11–700 that is appropriate given the allegation and the student's disciplinary record, if any. The administrative disposition may be appealed to the appellate officer. Both the finding of violation and/or the sanction may be appealed. If the accused student does not make a decision within five days of receiving notice of the administrative outcome, the matter shall be final and the student must comply with the assessed sanctions issued by the dean of students or designee.

c.  An administrative disposition may be used in cases where the proposed sanction is suspension, including suspension of rights and privileges, academic sanction, or expulsion. A student who wishes to resolve his or her disciplinary case through an administrative disposition with the dean of students must waive his or her right to hearing reserving his or her right to appeal only the assessed sanction or sanctions to the appellate officer in accordance with Sec. 11–803. A student who does not accept the administrative disposition developed as described in Sec. 11–504 shall resolve the disciplinary case through a hearing before either a hearing officer or, in academic dishonesty or general misconduct cases, a panel of the SCB in accordance with subchapter 11–600. The SCB shall not hear matters pertaining to Track C or violent conduct violations.

d.  If the student fails to complete the assigned sanction or sanctions, the dean of students may pursue a separate rule violation under subsection 11-404(a)(19b) and/or place a bar on the student's registration until the sanction is completed.

e.  In Track C cases, the dean of students, subject to the Family Educational Rights and Privacy Act (FERPA) and other applicable law, shall:

1. proceed to resolve the matter before a hearing officer unless both the accused student and the complainant agree to waiver the hearing procedures in accordance with subsections 11-504(b) or 11-504(c).

2. inform the accused student and complainant as to any disposition of the case or if the accused student or complainant has chosen to proceed to a hearing.

## Sec. 11–505. Disposition by Faculty Members of Academic Violations

a. When a faculty member has reason to suspect that a student has violated University regulations concerning academic dishonesty as defined in Sec. 11–402, the faculty member may:

   1. refer the case to the dean of students, who will proceed under Sec. 11–501. The faculty member is not required to notify the accused student that the disciplinary referral has been made; or

   2. meet with the student(s) involved and discuss the alleged violation(s), the documentation and/or information that supports the charge, and the rights of the student(s) in the disciplinary process. After conferring with the student, the faculty member may dismiss the allegation or proceed under subsection 11–505(b) or subsection 11–505(c).

b. In any case where a student accused of academic dishonesty disputes the facts upon which the charges are based, chooses not to waive the right to a hearing, or chooses to have the case resolved by the dean of students, the faculty member will refer the matter to the dean of students, who will then proceed under Sec. 11–501.

c. With the agreement of both the accused student and the faculty member, a case of academic dishonesty may be resolved through a faculty disposition. A resolution through a faculty disposition does not limit the possibility of additional sanctions being issued by the dean of students as dictated in subsection 11-505(d). Faculty dispositions are used in situations where the accused student does not dispute the facts upon which the charges are based, and the student signs a written waiver of the hearing. If, after hearing the accused student's response to the allegation, the faculty member determines that the preponderance of evidence supports a finding that a violation has occurred, the faculty member will assess a sanction or sanctions pursuant to Sec. 11–702(a). After the student signs the faculty disposition, the faculty member shall send the signed form, the signed waiver of the hearing, and all relevant documentation (including copies of the academic assignment and course syllabus) to the dean of students. In extraordinary circumstances, if the sanction issued in a faculty disposition falls well outside the general scope of sanctions issued in similar cases, the dean of students may communicate with the faculty member to discuss a different sanction.

   1. A student who resolves his or her disciplinary case through a faculty disposition must sign a written waiver of his or her right to a hearing and may appeal only the assessed sanction or sanctions to the appellate officer in accordance with Sec. 11–802.

   2. If the student fails to complete the assigned sanction or sanctions, the dean of students may pursue a separate rule violation under subsection 11-404(a)(19b) and/or place a bar on the student's registration until the sanction is completed.

   3. A student who resolves his or her disciplinary case through a faculty disposition may be placed on up to one year of academic integrity probation, in addition to the sanction assessed by the faculty member.

d. In situations where the dean of students receives a faculty disposition signed by both parties, the dean of students may seek to impose a disciplinary sanction or sanctions in addition to the one assessed in the faculty disposition. Additional sanctions may be levied when the student has a prior disciplinary history or in other situations deemed appropriate by the dean of students. When assessing an additional disciplinary sanction, the dean of students may impose any general sanctions listed in Sec. 11-701 or Sec. 11-703 or any grade-related sanctions listed in subsection 11-702(a). A student who has been issued an additional sanction by the dean of students after signing a faculty disposition may elect to appeal both the grade-related sanction issued in the faculty disposition under Sec. 11-802 and appeal the additional sanction(s) issued by the dean of students as dictated by Sec. 11-803.

## Sec. 11-506.  Pending Academic Investigations and Q-Drops

a. A student may not drop a class if there are any pending investigations of Academic Dishonesty for the class in question.

b. Any drop assigned will not be considered final until any investigations of Academic Dishonesty for the class in question are resolved.

c. Any student who is found responsible for committing academic dishonesty and issued any sanction(s) will not be eligible to drop the class associated with the violation.

d. Any student who is found responsible for committing academic dishonesty and issued any grade-related sanction(s) will not be eligible to change the course grade to Pass/Fail or to Credit/No Credit.

## Sec. 11-507.  Alcohol and Drug Medical Amnesty Policy

Any student who seeks emergency medical assistance for him or herself or others for potential drug or alcohol emergencies may not be subject to formal disciplinary action under this Chapter provided the student: (i) calls 911 when drug or alcohol poisoning is present or suspected; and (ii) stays with the person until medical assistance arrives and cooperates with all emergency and law enforcement personnel. In the event a student calls emergency medical services for another student experiencing a potential drug or alcohol-related medical emergency, the student who experienced the medical emergency may not be subject to formal disciplinary action under this Chapter, as well.

Students eligible for amnesty will be required to participate in an educational program and may be referred for individual drug and/or alcohol counseling, but may otherwise avoid formal disciplinary action under this Chapter. Students who receive amnesty who decline or fail to attend the educational component or fail to comply with a counselor's recommendations will become subject to formal disciplinary action under this Chapter. Student Conduct and Academic Integrity will evaluate students' eligibility for amnesty under this policy; amnesty is not automatic. Students may receive amnesty under this policy on more than one occasion.

This amnesty policy applies only to university rules and policies; it does not preclude or prevent police or other legal actions except if the medical assistance is related to a sexual assault as outlined in Texas Alcoholic Beverage Code, sections 106.04 and 106.05. This policy does not apply to other prohibited behavior such as the sale of an illegal drug or narcotic.

### Sec. 11–508. Additional Amnesty Policy for Reporting of Certain Violations

Per Texas Education Code Section-51.9366, the University may not take any disciplinary action against a student for a violation of the Institutional Rules under this chapter, who in good faith reports to the institution being the victim of, or witness to, an incident of sex discrimination, sexual harassment, sexual assault, interpersonal violence (domestic violence and dating violence), stalking, or other Track C related allegations.  This policy applies to any violation of the Institutional Rules that occurred at or near the time of incident, regardless of the location at which the incident occurred or the outcome of the disciplinary process.  A determination that a student is entitled to amnesty is final and may not be revoked.  This policy does not apply to a student who reports the student's own commission or assistance in the commission of sex discrimination, sexual harassment, sexual assault, interpersonal violence (domestic violence and dating violence) or stalking, or Track C related allegations.

## Subchapter 11–600. Hearing

In cases where the proposed sanction is suspension, including suspension of rights and privileges, academic sanction or expulsion, the accused student may elect to have the charges heard and determined by either a hearing officer or, in cases of academic dishonesty or general misconduct, by a panel of the SCB. The SCB shall not hear matters pertaining to Track C or violent conduct violations. If the accused student does not make a decision within five days of receiving notice of the administrative outcome, the matter shall be heard by a hearing officer. At the discretion of the dean of students, the five-day period may be extended for a period not to exceed an additional five days.

In Track C cases, the complainant or the accused student may elect to have charges heard and determined by a hearing officer. If the accused student does not make a decision within five days of receiving notice of the administrative outcome, the matter shall be heard by a hearing officer.

In cases involving allegations of actual or threatened violent conduct against a person, and within this rule's jurisdiction, the accused student may elect to have charges heard and determined by a hearing officer. If the accused student does not make a decision within five days of receiving notice of the administrative outcome, the matter shall be heard by a hearing officer.

### Sec. 11–601. Duties of the Hearing Officer

a.  The hearing officer will preside over the hearing and will
   1.  determine whether the dean of students has satisfactorily performed the requirements of Sec. 11–603;
   2.  except as otherwise provided in this chapter, determine whether observers may be present; observers will be limited to people attending the hearing for University training purposes;
   3.  rule on the admissibility of evidence and on objections to the procedure;
   4.  facilitate the hearing process, which includes removing from the hearing anyone who is disrupting the process;
   5.  render a written decision, which will contain findings of fact and conclusions as to whether a violation has occurred;
   6.  assess a sanction or sanctions;
   7.  provide the student and the dean of students with a copy of the decision; and
   8.  certify the hearing record.
b.  The hearing officer may question witnesses.
c.  The hearing officer is entitled to have the advice and legal counsel from the Office of General Counsel of the University of Texas System.

### Sec. 11–602. Duties of the Student Conduct Board Panel

a.  The foreperson of the SCB panel will preside over the hearing and will
   1.  determine whether the dean of students has satisfactorily performed the requirements of Sec. 11–603;
   2.  confirm the student's election to a hearing before an SCB panel under subchapter 11-600;
   3.  except as otherwise provided in this chapter, determine whether observers may be present; observers will be limited to people attending the hearing for University training purposes;
   4.  rule on the admissibility of evidence and on objections to the procedure;
   5.  facilitate the hearing process, which includes removing from the hearing anyone who is disrupting the process;
   6.  by a majority vote of the panel, render a written decision, which will contain findings of fact and conclusions as to whether a violation has occurred; and assess a sanction or sanctions;
   7.  provide the student and the dean of students with a copy of the decision; and
   8.  certify the hearing record.
b.  The members of the panel of the SCB may question witnesses.
c.  The SCB is entitled to have the advice and counsel from the Office of General Counsel of The University of Texas System.

### Sec. 11–603. Duties of the Dean of Students

The dean of students will

a.  set the date, time, and place for the hearing and notify the accused student of the date, time, and place;
b.  arrange for recording the hearing as provided in subsection 11–608(f); and
c.  furnish a suitable room, necessary equipment, and clerical assistance for the hearing.

### Sec. 11–604. Notice of Hearing

a.  The dean of students will notify the accused student by letter or by e-mail of the date, time, and place for the hearing. The notice will be delivered in person or sent by e-mail or postal mail to the student at an address listed in the registrar's records.

b. The notice will specify a hearing date at least ten days after the date of the letter or e-mail message, unless the hearing is being held under the conditions required in Sec. 11−502 or as specified in 11-604(c) and 11-604(d). A letter or an e-mail message sent to an address listed in the registrar's records will constitute full and adequate notice. A letter will be considered to have been received on the third day after the day of mailing. An e-mail message will be considered to have been received on the second day after the day of sending the message. A student may request, in writing, that an earlier hearing date be set if feasible to arrange. The hearing officer or the foreperson of the SCB panel for good cause may postpone the hearing and will notify the dean of students and the accused student of the new hearing date. The student's failure to provide and to maintain current addresses, refusal to accept delivery of a letter, or failure to receive an e-mail message because the mailbox is full or the message is inappropriately forwarded will not constitute good cause for failure to comply with the notice. Policies on the use of e-mail for official correspondence are given in Appendix M (p. 200).

c. In Track C cases and cases involving allegations of actual or threatened violent conduct against a person, the notice will specify a hearing date of at least 5 days after the date of the letter or e-mail message.

d. In cases involving allegations of actual or threatened violent conduct against a person, the notice will specify a hearing date of at least 5 days after the date of the letter or e-mail message.

e. Notice sent under subsection 11−604(a) will:
   1. direct the accused student to appear on the date and at the time and place specified;
   2. advise the accused student of his or her rights:
      A. to a private hearing;
      B. to a live hearing, conducted with all parties physically present in the same geographic location or, at the dean of students' discretion, any or all parties, witnesses, and other participants may appear at the live hearing virtually;
      C. to have an advisor at the hearing
      D. to challenge the hearing officer or the members of the SCB panel designated to hear the charges;
      E. to know the identity of each witness who will testify against him or her;
      F. to present testimony of witnesses, to present documentary and other evidence, and to argue in his or her own behalf;
      G. to cross-examine each witness who appears at the hearing and testifies against him or her; and
      H. to appeal under Sec. 11−804;
   3. contain the name of the person appointed to act as hearing officer or the names of the SCB panel appointed to hear the matter;
   4. contain the names of witnesses who may testify against the accused student, a brief summary of the testimony to be given by each, and a list of documentary and other evidence that will be offered against the accused student; the dean of students may supplement the list of witnesses and documents for good cause, as determined by the hearing officer or the foreperson of the SCB panel;
   5. contain a copy of the complaint, which outlines the alleged violation(s); and
   6. notify the accused student that if he or she is advised by an attorney at the hearing, then the dean of students may be advised by an attorney at the hearing. An advisor may confer with and advise the dean of students or the accused student but may not question witnesses, introduce evidence, make objections, or present arguments to the hearing officer.

f. In Track C cases, the dean of students shall provide, subject to the Family Education Rights and Privacy Act (FERPA) and other applicable law, if applicable, to the complainant the same notice given to the accused student. The complainant shall be advised in such cases that he or she has the right to:
   1. attend and participate in the hearing;
   2. have past sexual history with third parties excluded from evidence;
   3. provide testimony at the hearing in a manner that does not require the complainant to directly confront or to be directly questioned by the accused student while still preserving the accused student's right to challenge such testimony, including but not limited to the dean of students to providing testimony on the complainant's behalf;
   4. a live hearing, conducted with all parties physically present in the same geographic location, or at the dean of students' discretion, any or all parties, witnesses, and other participants may appear at the live hearing virtually;
   5. to have an advisor at the hearing;
   6. appear in person and have an advisor at the hearing;
   7. work with and provide input to the dean of students office regarding witnesses and their testimony as well as other relevant evidence and argument in preparation for the hearing and any subsequent appeals;
   8. know the outcome of the hearing decision;
   9. appeal the hearing decision.
   10. submit a response to the accused student's appeal.

g. In situations where a student fails to attend a scheduled hearing, the hearing officer or, if applicable, the panel of the SCB will, at the time of the scheduled hearing, determine if the dean of students provided notice as dictated by subsection 11-604(b) and subsection 11-604(c). If the hearing officer or a majority of the SCB panel determines that the dean of students provided notice as dictated by subsection 11-604(b) and subsection 11-604(c), the dean of students may elect to hold the hearing without the student's participation or reschedule the hearing for a different date. If the hearing proceeds in the accused student's absence, the hearing will be conducted according to the provisions of subchapter 11-600 with a final decision issued by the hearing officer or a majority of the SCB panel as dictated by Sec. 11-609. Even in situations where the student does not attend the hearing, the hearing officer's or the SCB's decision may be appealed to the appellate officer under Sec. 11-804.

### Sec. 11–605. Preliminary Matters for a Hearing

a. Charges against more than one student that arise out of a single transaction or occurrence may, at the discretion of the dean of students, be heard together, but a student may request a separate hearing which the hearing officer or, if applicable, the foreperson of the SCB panel may grant upon finding that a student has shown good cause for a separate hearing.

b. At least five days before the hearing date, the accused student will furnish the dean of students with a list of any witnesses who may testify on behalf of the student, together with a summary of each witness's testimony and a copy of any documents and other evidence the witness may offer; the student may supplement the list of witnesses and documents for good cause, as determined by the hearing officer or, if applicable, the foreperson of the SCB panel. In Track C cases and cases involving allegations of actual or threatened violent conduct against a person within at least three days before the hearing date, the complainant may furnish the dean of students with a list of any witnesses who may testify on behalf of the student, together with a summary of each witness's testimony and a copy of any documents and other evidence the witness may offer; the student may supplement the list of witnesses and documents for good cause, as determined by the hearing officer.

c. At least five days before the hearing date, or three days in Track C cases or cases involving actual or threatened violent conduct against a person, the student will furnish the hearing officer or, if applicable, the SCB panel with
   1. any objection that, if sustained, would postpone the hearing;
   2. the name of the advisor, if any, who will appear with the student, and the advisor's relationship to the student; and
   3. a request for a separate hearing, if desired, and the grounds for such a hearing (if the dean of students has designated that the hearing will be held in accordance with subsection 11–605(a)).

d. At least five days before the hearing date, or three days in Track C cases and cases involving actual or threatened violent conduct against a person, the dean of students will provide to the accused student copies of documents that may be introduced at the hearing available to the accused student.

e. In Track C cases, subject to the Family Education Rights and Privacy Act (FERPA) and other applicable law, copies of the information and/or documents submitted by the accused student and the dean of students as required by this section shall be promptly provided, if applicable, to the complainant. The complainant may submit a request to close the hearing to the hearing officer prior to the hearing. The complainant will furnish the name of his/her advisor, if any, to the hearing officer prior to the hearing.

### Sec. 11–606. Challenges to the Hearing Officer or Members of the SCB Panel

The accused student may challenge the hearing officer or any member of the SCB panel for an alleged lack of fairness or objectivity but is not entitled to disqualify that person from serving. In Track C cases, the complainant may through the Office of the Dean of Students, also challenge the hearing officer on the basis of a lack of fairness and objectivity. The challenge must be in writing, must state the reasons for the challenge, and must be submitted to the hearing officer or the foreperson of the SCB panel through the dean of students at least three days prior to the hearing. It will be up to the hearing officer or the challenged members(s) of the SCB panel, communicated in a written response, to determine whether they can serve with fairness and objectivity. If the challenged person disqualifies themselves, another hearing officer or SCB panel member will be appointed.

### Sec. 11–607. Hearing Procedure

a. The hearing is informal and closed, except that, with the consent of the accused student and the dean of students, the hearing may be open.

b. Although the hearing will proceed generally as follows, the hearing officer or the foreperson of the SCB panel may adjust the sequence of the hearing as necessary to ensure fairness:
   1. the dean of students will submit a copy of the complaint/hearing letter into the hearing record.
   2. the hearing officer or the foreperson of the SCB informs the accused student of his or her rights listed in subsection 11–604(e)(2).
   3. the dean of students and the accused student are each given the opportunity to make an opening statement; the accused student has the right to reserve his or her opening statement until after the dean of students has presented the University's case.
   4. the dean of students is given the opportunity to present the University's witnesses and evidence; during this time, the accused student may question any of the dean of students' witnesses.
   5. the accused student is given the opportunity to present his or her witnesses and evidence; during this time, the dean of students may question any of the accused student's witnesses.
   6. the dean of students and the accused student are each given the opportunity to present rebuttal evidence and argument.
   7. the dean of students is given the opportunity to present a recommendation on a sanction or sanctions.
   8. the accused student is given the opportunity to present a rebuttal and recommended outcome or sanctions.
   9. the dean of students is given the opportunity to present a closing statement.
   10. the accused student is given the opportunity to present a closing statement.
   11. the hearing officer or a majority of the panel of the SCB decides whether a violation has occurred and assesses a sanction or sanctions in accordance with subchapter 11–700.

c. In Track C cases, the following additional rights and procedures apply:
   1. the complainant may attend the hearing;
   2. the hearing officer shall inform the complainant of his or her rights as listed in subsections 11-604(e)(2) and 11-608(b);
   3. the complainant may have an advisor present during the hearing;
   4. the complainant has the right to have past sexual history with third parties excluded from evidence;
   5. the complainant is given the opportunity to make an opening statement and has the right to reserve his or her opening statement until after the dean of students has presented the University's case;
   6. the complainant has the right to question any of the dean of students' witnesses and any of the accused student's witnesses;

7. the complainant is given the opportunity to present his or her witnesses and evidence; during this time, the dean of students and the accused student may question any of the complainant's witnesses;

8. the complainant is given the opportunity to present rebuttal evidence and argument;

9. the complainant is given the opportunity to present a rebuttal to the dean of students' recommendation for sanction or sanctions;

10. the complainant is given the opportunity to present a closing statement;

11. the hearing will be closed at the complainant's request.

### Sec. 11–608. Evidence in Hearings

a. Legal rules of evidence do not apply to hearings under this subchapter; the hearing officer or the foreperson of the SCB panel may admit and give effect to any evidence, including testimony and documentary evidence, that possesses probative value and is commonly accepted by reasonable people in the conduct of their affairs. All evidence admitted during the hearing will be made a part of the record. The hearing officer or the foreperson of the SCB panel will exclude irrelevant, immaterial, and unduly repetitious evidence. The hearing officer or the foreperson of the SCB panel will give effect to the rules of privilege recognized by law.

b. In Track C cases, the complainant shall be allowed to provide testimony at the hearing in a manner, as determined by the hearing officer, that does not require the complainant to directly confront or be directly questioned by the accused student while still preserving the accused student's right to challenge such testimony. In addition, evidence of the complainant's past sexual history with third parties will be excluded.

c. Upon a hearing of the charges, the University has the burden of going forward with the evidence and the burden of proving the charges by the preponderance of evidence.

d. A witness will testify unless otherwise provided in these rules or if the testimony is privileged as recognized by law or is excluded by the hearing officer. If a witness refuses to testify based on a privileged relationship recognized by Texas law, the hearing officer or the foreperson of the SCB may require evidence of the relationship and/or seek legal counsel before making a decision on the assertion of privilege, even if such would require postponing the hearing.

e. The hearing officer or a majority of the SCB panel will decide whether a violation has occurred and assess an appropriate sanction or sanctions solely on the basis of admitted evidence. The accused student's disciplinary record is deemed admitted into evidence during a hearing to help the hearing officer or the SCB panel assess an appropriate sanction or sanctions. The decision as to the accused student's responsibility for the violation at issue will be based solely on the evidence that pertains to that particular violation.

f. A recording will be made of the hearing, under supervision of the dean of students. At the discretion of the dean of students, a court reporter may also be present to prepare a written transcript of the hearing.

### Sec. 11–609. Disciplinary Decision

Before issuing the decision, the hearing officer or the foreperson of the SCB panel will certify the hearing record as defined in Sec. 11–610. If the hearing is recorded and no transcript is requested, then the hearing officer or the foreperson of the SCB shall certify the recording itself as a true and correct record of the hearing. If a transcript is prepared, the transcript is considered part of the hearing record, and the hearing officer may wait to receive it before certifying the hearing record. The hearing officer or the majority of the SCB panel will render a written decision as to whether the accused student has committed a violation and will set forth findings of fact in support of the decision. The sanction or sanctions will also be stated in the decision. The accused student and the dean of students will each be given a copy of the decision. The written decision is the official decision on the matter from which any appeal is taken. The hearing officer or the majority of the SCB panel should make every effort to complete the written decision within ten days of receiving the transcript of the hearing. If the hearing officer or the majority of the SCB panel is unable to issue the written decision within ten days of receiving the transcript, he or she (or in case of a SCB panel, the foreperson) should contact both the accused student and the dean of students to provide a date for completion of the written decision.

In Track C cases, subject to the Family Education Rights and Privacy Act (FERPA) and other applicable law, the dean of students shall, upon receipt of the hearing officer's decision, forward copies of the decision to the complainant, if applicable.

In cases involving allegations of crimes of violence, as defined in the Family Education Rights and Privacy Act (FERPA) and other applicable law, the dean of students shall notify the alleged victim(s) of the final outcome.

### Sec. 11–610. Hearing Record

The hearing record consists of

1. a copy of the notice required under Sec. 11–604;

2. the recording of the hearing certified by the hearing officer or the foreperson of the SCB panel and/or the transcript, if any, certified by the hearing officer, the foreperson of the SCB panel, and the court reporter, together with all evidence admitted under Sec. 11–608;

3. a copy of the complaint/hearing letter, written motions and pleas; and

4. the disciplinary decision of the hearing officer or the majority of the SCB panel.

## Subchapter 11–700. Sanctions

### Sec. 11–701. Authorized Disciplinary Sanctions

a. The dean of students, under subchapter 11–500, or the hearing officer or the majority of an SCB panel, after a hearing under subchapter 11–600, may impose one or more of the following sanctions for violation of the University's expectations of conduct

1. written warning;

2. disciplinary probation;

3. academic integrity probation;

   4. withholding of grades, official transcript, and/or degree;

   5. bar against readmission, bar against enrollment, withdrawal from the University or from a period of enrollment, and/or drop from one or more classes;

   6. restitution or reimbursement for damage to or misappropriation of University or University of Texas System property;

   7. suspension of rights and privileges, including, but not limited to, participation in athletic or extracurricular activities and residing in or entering University housing;

   8. an Academic Sanction including, but not limited to, a failing grade for a test, an assignment, or a class, cancellation of all or part of previously earned course credit;

   9. denial of degree;

  10. deferred suspension;

  11. suspension from the University for a specified period of time;

  12. expulsion (permanent separation from the University);

  13. revocation of degree or withdrawal of diploma;

  14. other sanction or sanctions as deemed appropriate under the circumstances.

b. If a violation of the University's *Institutional Rules*, other than subsection 11–404(a)(11) of this chapter or Sec. 13–204 of the *Institutional Rules*, is committed because of the race, color, religion, national origin, age, disability, citizenship, veteran status, of a student or students directly harmed by the violation, such a discriminatory purpose will be treated as an aggravating factor for the purpose of determining the appropriate sanction or sanctions under subsection 11–701(a). For a complete set of cross-references to all regulation of harassment on the campus, see subsection 13–204 (covering verbal harassment) of the *Institutional Rules* and 3-3031(V)(D) (covering harassment based on gender, sexual orientation, gender identity, or gender expression) of the Handbook of Operating Procedures.

## Sec. 11–702. Authorized Academic Sanctions

a. When a student signs a faculty disposition under Sec. 11–505 for conduct constituting academic dishonesty as defined in Sec. 11–402, the faculty member or the academic dean responsible for the class may impose one or more of the following grade-related sanctions:

   1. no credit or reduced credit for the paper, assignment, or test in question;

   2. retaking of examination or resubmission of assignment;

   3. failing grade or reduced final grade for the class.

b. When a student signs an administrative disposition with the dean of students under Sec. 11–504 or is found by a hearing under subchapter 11–600 to have committed academic dishonesty as defined in Sec. 11–402, the dean of students, the hearing officer or a majority of the SCB panel, as the case may be, may impose any of the grade-related sanctions listed in subsection 11–702(a) and impose any of the general sanctions listed in Sec. 11–701 or 11-703.

c. If a student resolves his or her disciplinary case through a faculty disposition under Sec. 11–505, or an administrative disposition with the dean of students under Sec. 11–504, or is found by a hearing officer or an SCB panel under subchapter 11–600 to have committed academic dishonesty as defined in Sec. 11–402, the student may be placed on up to one year of academic integrity probation, in addition to any other sanction assessed by the faculty member, the dean of students, or the hearing officer or the SCB panel. If the student has been found responsible for two or more academic dishonesty violations, suspension or expulsion as a potential sanction will be considered.

d. If a student is found responsible for a violation under Sec. 11-702 and is also enrolled in an academic program requiring a supplemental application in conjunction with application to UT Austin, a minimum grade point average to matriculate through the program as defined in the Undergraduate Catalog, and a signed commitment to adhere to a program-specific honor code and/or code of conduct, removal from the program as a potential sanction will be considered by the dean of students.

## Sec. 11–703. Pending Actions and Definition of Authorized Sanctions

a. The dean of students, the hearing officer or a majority of the SCB panel may withhold an official transcript, grade, diploma, or degree of a student alleged to have committed a violation of a rule or regulation of The University of Texas System or the University that would reasonably allow the imposition of such sanction. The dean of students may take such action pending a hearing, resolution by administrative disposition, and/or exhaustion of appellate rights when, in the opinion of the dean of students, the best interests of The University of Texas System or the University would be served by this action.

b. As appropriate under the circumstances, the dean of students, the hearing officer or a majority of the SCB panel may impose a bar against the student's readmission or enrollment, may drop the student from one or more classes, or may withdraw the student from the University or from a period of enrollment. This bar may be temporary or permanent in nature. One or more of these sanctions may also be imposed on a student who fails to respond to a summons by the dean of students to discuss an alleged violation of the Regent's *Rules and Regulations*, University regulation, administrative rules, or the University's expectations of conduct. If imposed for failure to respond to a summons, the sanction or sanctions may be reversed when the student responds to the summons as requested.

c. "Written warning" means that the student has been notified that he or she has engaged in behavior that violated a rule or regulation of The University of Texas System or the University and that a further violation or violations of the regulations may result in more severe disciplinary action. The dean of students, the hearing officer or a majority of the SCB panel may impose conditions related to the offense, such as counseling, educational seminars, or unpaid work assignments. Failure to meet the condition(s) will be considered an additional violation.

d. "Disciplinary probation" is a specified period of time during which the student is required to comply with specified terms and conditions that include not engaging in further conduct that would violate a rule or regulation of The University Texas System or the University. A further violation or violations will result in consideration of suspension. The dean of students, the hearing officer or a majority of the SCB panel may impose

conditions related to the offense, such as reporting to the dean of students on a regular basis, counseling, educational seminars, or unpaid work assignments. Failure to meet the condition(s) will be considered an additional violation.

e. "Academic integrity probation" is a specified period of time during which the student is required to comply with specified terms and conditions that include not engaging in further academic conduct that would violate a rule or regulation of The University Texas System or the University. A further academic violation or violations during this time could result in the student's suspension or expulsion. The dean of students, the hearing officer or a majority of the SCB panel may impose conditions related to the offense, such as reporting to the dean of students on a regular basis, counseling, or educational seminars. Failure to meet the condition(s) will be considered an additional violation.

f. "Restitution" is reimbursement for damage to or misappropriation of University property. Reimbursement may take the form of appropriate service to repair or otherwise compensate for damages. Other than in extraordinary circumstances deemed necessary by the dean of students, the University will not facilitate restitution between individuals for conduct-related occurrences.

g. Suspension of rights and privileges is an elastic sanction. The dean of students or the hearing officer may impose limitations to fit the particular case, as in the suspension of rights and privileges to enter or reside in University housing facilities. Suspension of eligibility for official athletic and nonathletic extracurricular activities prohibits the student on whom it is imposed, during the period of suspension, from joining a registered student organization; from taking part in a registered student organization's activities or attending its meetings or functions; and from participating in an official athletic or nonathletic extracurricular activity.

h. A failing grade or other academic sanction may be assigned to a student for a class in which he or she is found to have violated the University's regulations regarding academic dishonesty.

i. A student found to have violated the University's regulations regarding academic dishonesty may be denied his or her degree. If the disciplinary process under this chapter is initiated while the accused student is completing required work for a degree but will not be resolved until after the completion of all required work for a degree, the accused student may be denied his or her degree until the completion of the disciplinary process.

j. Deferred suspension permits the sanction of suspension to be deferred for a student for who there are mitigating circumstances as determined by the dean of students, the hearing officer or a majority of the SCB panel. If a student is found to have violated any rule of the University or The University of Texas System while the sanction of deferred suspension is in effect, the sanction for such a violation may be immediate suspension except in extraordinary circumstances as deemed appropriate by the dean of students. The dean of students, the hearing officer, or a majority of the SCB panel may impose conditions related to the offense, and failure to meet such conditions will be considered an additional violation.

k. Suspension from the University prohibits the student on whom it is imposed, during the period of suspension, from entering the University campus without prior written approval of the vice president for student affairs, from being initiated into an honorary or service organization, and from receiving credit for academic work done during the period of the suspension. Suspension is noted on the official transcript during the term of suspension and shall remain until all conditions of the suspension are met. The notation can be removed upon the request of the student but only after the student's successful completion of the terms of the suspension. The request for the removal of the transcript notation of suspension should be directed to the Office of the Dean of Students. Suspension may also prohibit the student from being admitted to, enrolling at, or entering the campus of another component institution of The University of Texas System without prior written approval of the chief student affairs officer of the institution at which the student wishes to be present. The dean of students, the student's home department or school and/or the Office of the Registrar may, however, permit the student to receive credit for academic work completed at another institution during the period of suspension, except in cases where suspension is imposed for academic dishonesty. The dean of students, the hearing officer or a majority of the SCB panel may impose additional conditions or sanctions related to the alleged offense, and failure to meet such conditions or terms of the sanction will be considered an additional violation.

l. Expulsion is a permanent separation from the University and prohibits the student on whom it is imposed from entering the University campus without prior written approval of the vice president for student affairs. Expulsion may prohibit the student from being admitted to, enrolling at, or entering the campus of another component institution of The University of Texas System without prior written approval of the chief student affairs officer of the institution at which the student wishes to be present. A permanent notation of expulsion will also be placed on the student's official transcript.

m. The academic transcript of a student suspended or expelled for disciplinary reasons shall be marked with "Disciplinary Suspension" or "Expulsion" as appropriate. The University shall maintain a permanent written disciplinary record for every student assessed a sanction of suspension, expulsion, denial or revocation of degree, and/or withdrawal of diploma. A record of scholastic dishonesty shall be maintained for at least five years, and disciplinary records required by law to be maintained for a certain period of time, i.e. Clery violations, shall be maintained for at least the time specified in the applicable law, unless the record is permanent in conjunction with the above stated sanctions.

n. Other sanctions may be imposed when, in the opinion of the dean of students, the hearing officer or a majority of the SCB panel, the best interests of The University of Texas System or the University would be served.

## Subchapter 11–800. Appeal

### Sec. 11–801. Request for Appeal

a. The accused student may request to appeal a sanction assessed by a faculty member under subsection 11–505(c) to the appellate officer.

b. The accused student may request to appeal an administrative disposition by the dean of students under subsection 11-504(b) to the appellate officer.

c. The accused student may request to appeal a sanction assessed by the dean of students under subsection 11–504(c), 11–505(b), 11-505(c)(1) or 11-505(d) to the appellate officer.

d. Either the dean of students or the accused student may request to appeal a disciplinary decision issued by a hearing officer or a panel of the SCB under Sec. 11–609 to the appellate officer.

e. In Track C cases, the complainant has the same independent right to appeal the hearing officer's decision as does the accused student.

f. The accused student, complainant, or dean of students may only appeal an administrative disposition or disciplinary decision based only on one or more of the following grounds:

1. Significant procedural error inconsistent with the processes as outlined in subchapters 11-500 and 11-600.
2. Discovery of any new information unknown or not reasonably foreseeable to the accused student or the dean of students at the time of the hearing that was material to and could have reasonably impacted the disciplinary decision.
3. The sanction(s) determined by the dean of students, hearing officer, or SCB are significantly disproportionate to the violation.

g. The appellate officer shall determine if sufficient grounds for appeal exist under section 11-801(f). If not, the appellate officer will deny the request for appeal thereby sustaining the original decision. If sufficient grounds for appeal exist, the appellate officer will review the appeal in full and issue a final decision.

## Sec. 11–802. Appeal of Academic Sanctions Assessed by a Faculty Member

a. The accused student may appeal the sanction or sanctions assessed by a faculty member under subsection 11−505(c)(1) by submitting a written appeal to the appellate officer within ten days from the date on which the student signed the disciplinary decision. Appeals submitted after 5:00 pm will be received the next day. The written appeal must state the specific reasons for the appeal and must include any related argument as outlined in subsection 11-801(f).

b. The appeal is restricted to the assessed sanction or sanctions.

c. The student must provide a copy of the written appeal to the dean of students on the same date the appeal is submitted to the appellate officer.

d. The dean of students may submit to the appellate officer a written response to the appeal and a copy of the disciplinary decision. These documents, if submitted, must be submitted no later than ten days after the appellate officer received the appeal. Appeals submitted after 5:00 pm will be received the next day. The dean of students must provide a copy of the documents to the accused student. The dean of students' submission of a response to the appeal will not extend the thirty-day period within which the action of the appellate officer will be communicated as outlined in subsection 11−802(f).

e. If the accused student does not submit a written appeal to the Appellate Officer by the deadline, the sanction(s) will become final, and the student waives his or her rights to appeal.

f. The appeal of the sanction or sanctions assessed by the faculty member will be reviewed solely on the basis of the disciplinary decision, the written argument of the student, and the response to the appeal submitted by the dean of students. Oral argument will not be considered.

g. The action of the appellate officer will be communicated in writing to the accused student and the dean of students within thirty days after the appeal has been received by the appellate officer. If the appellate officer is unable to issue the written decision within thirty days, the appellate officer should contact both the accused student and the dean of students to provide a date for completion of the written decision. The decision of the appellate officer will be final.

## Sec. 11–803. Appeal of Administrative Disposition by the Dean of Students

a. An administrative disposition by the dean of students under subsection 11-504(a) is final and is not appealable.

b. The accused student may appeal an administrative disposition by the dean of students under subsection 11−504(b) by submitting a written appeal to the appellate officer within ten days from the date on which the student signed the disciplinary decision issued by the dean of students. Appeals submitted after 5:00 pm will be received the next day. The written appeal must state the specific reasons for the appeal and must include any related argument in accordance with subsection 11-801(f).

c. The accused student may appeal only the sanction or sanctions assessed under subsection 11−504(c) or 11-505(d) by submitting a written appeal to the appellate officer within ten days from the date on which the student signed the disciplinary decision issued by the dean of students or received notice of an additional sanction. Appeals submitted after 5:00 pm will be received the next day. The written appeal must state the specific reasons for the appeal and must include any related argument in accordance with subsection 11-801(f). The appeal is restricted to the assessed sanction or sanctions.

d. In Track C cases, the complainant may also appeal the sanctions assessed under subsection 11-504(c) by submitting a written appeal to the appellate officer within ten days from the date on which the accused student signed the disciplinary decision issued by the dean of students or received notice of an additional sanction. Appeals submitted after 5:00 pm will be received the next day. The written appeal must state the specific reasons for the appeal and must include any related argument in accordance with subsection 11-801(f). The appeal is restricted to the assessed sanction or sanctions.

e. If the original appealing party does not submit a written appeal to the Appellate Officer by the deadline, the sanction(s) will become final, and the student waives his or her right to appeal.

f. The accused student must provide a copy of the written appeal to the dean of students on the same date the appeal is submitted to the appellate officer. In Track C cases, subject to the Family Education Rights and Privacy Act (FERPA) and other applicable law, upon receipt of the accused student's written appeal, the dean of students office shall provide a copy of the written appeal, if applicable, to the complainant

g. In Track C cases, the complainant may submit a written response to the appeal to the appellate officer. The response, if any, must be submitted no later than ten days after the appellate officer received the appeal. The appellate officer will provide a copy of the response to the accused student.

h. The dean of students may also submit a written response to the appeal to the appellate officer. The response, if any, must be submitted no later than ten days after the appellate officer received the appeal. The dean of students must provide a copy of the response to the accused student. In Track C cases, subject to the Family Education Rights and Privacy Act (FERPA) and other applicable law, the dean of students shall provide a copy to the complainant, if applicable, of the written response to the appeal that is submitted to the appellate officer. The dean of students' submission of a response to the appeal will not extend the thirty-day period within which the action of the appellate officer will be communicated as outlined in subsection 11−803(i).

i. The appeal of the sanction or sanctions assessed by the dean of students will be reviewed solely on the basis of the disciplinary decision, the written argument of the student, and the response to the appeal submitted by the dean of students. Oral argument will not be considered.

j. The action of the appellate officer will be communicated in writing to the accused student and the dean of students within thirty days after the appeal has been received by the appellate officer. If the appellate officer is unable to issue the written decision within thirty days, the appellate

officer should contact both the accused student and the dean of students to provide a date for completion of the written decision. The decision of the appellate officer will be final. In Track C cases, subject to the Family Education Rights and Privacy Act (FERPA) and other applicable law, upon receipt of the appellate officer's written decision, the dean of students shall promptly provide a copy of the decision, if applicable, to the complainant.

### Sec. 11–804. Appeal of the Decision of the Hearing Officer or the Student Conduct Board

a. Either the accused student or the dean of students may appeal the disciplinary decision of the hearing officer or a majority of the SCB panel issued under Sec. 11–609 by submitting a written appeal to the appellate officer within ten days from the date the appealing party was notified of the disciplinary decision. Appeals submitted after 5:00 pm will be received the next day. If notice of the disciplinary decision is sent by mail, the date the disciplinary decision is mailed initiates the ten-day period. The written appeal must state the specific reasons for the appeal and must include any related argument. If either party appeals the disciplinary decision, the appellate officer may request that the hearing recording be transcribed; the transcript will be made available to both parties. If a court reporter was present during the hearing and prepares a written transcript immediately thereafter, the transcript is considered part of the hearing record and is made available to both parties.

b. In Track C cases, the complainant may also appeal the disciplinary decision of the hearing officer issued under Sec. 11–609 by submitting a written appeal to the appellate officer within ten days from the date the appealing party was notified of the disciplinary decision. Appeals submitted after 5:00 pm will be received the next day. If notice of the disciplinary decision is sent by mail, the date the disciplinary decision is mailed initiates the ten-day period. The written appeal must state the specific reasons for the appeal and must include any related argument. If either party appeals the disciplinary decision, the appellate officer may request that the hearing recording be transcribed; the transcript will be made available to both parties. If a court reporter was present during the hearing and prepares a written transcript immediately thereafter, the transcript is considered part of the hearing record and is made available to both parties.

c. If the accused student is the appellant, the student must provide the dean of students with a copy of the appeal submitted to the appellate officer on the same date the appeal is submitted to the appellate officer. If the dean of students is the appellant, the dean of students will give, e-mail, or mail a copy of the appeal to the accused student on the same day that the dean of students submits the appeal to the appellate officer. If the copy of the appeal is mailed or e-mailed, the dean of students will send it to an address listed in the registrar's records. In Track C cases, subject to the Family Education Rights and Privacy Act (FERPA) and other applicable law, the dean of students shall provide a copy of an appeal submitted by either the accused student, the complainant or the dean of students, if applicable, to the accused student and the complainant.

d. Following submission of the appeal to the appellate officer, the non-appealing party may submit a written response to the appellate officer. The response, if any, must be submitted no later than ten days after the appellate officer received the appeal. The non-appealing party must provide a copy of the response to the other party. The response must be limited to and specifically related to the arguments originally submitted by the appealing party. New or additional information not specifically related to the original arguments submitted will not be considered on appeal. Submission of a response to the appeal will not extend the thirty-day period within which the action of the appellate officer will be communicated as outlined in subsection 11–804(h).

e. In Track C cases, subject to the Family Education Rights and Privacy Act (FERPA) and other applicable law, the dean of students shall provide a copy of a written response to an appeal submitted by either the accused student, the complainant or the dean of students, if applicable, to the accused student and the complainant.

f. The appeal of the disciplinary decision of the hearing officer or a majority of the SCB panel will be reviewed solely on the basis of the hearing record; the materials presented by the individual appealing that meet the grounds for appeal as outlined in subsection 11-801(f); and any documents submitted by the non-appealing party in response to the appeal. The dean of students will submit the record from the hearing to the appellate officer as soon as it is available to the dean of students.

g. The action of the appellate officer will be communicated in writing to the accused student and the dean of students within thirty days after the appeal has been received by the appellate officer. If the appellate officer is unable to issue the written decision within 30 days, the appellate officer should contact both the accused student and the dean of students to provide a date for completion of the written decision. The decision of the appellate officer will be final. In Track C cases, subject to the Family Education Rights and Privacy Act (FERPA) and other applicable law, upon receipt of the appellate officer's written decision, the dean of students shall provide a copy of the decision, if applicable, to the complainant.

### Sec. 11–805. Authority of the Appellate Officer

The appellate officer may approve, reject, or modify the disciplinary decision or sanction(s) in question or may require that the original hearing be reopened for the presentation of additional evidence and reconsideration of the disciplinary decision.

### Sec. 11–806. Effect of Appeal Upon Disciplinary Action

A timely appeal suspends the imposition of the sanction or sanctions until the appeal is final, but any interim action issued in accordance with 11-502 will remain in effect while the appeal is being considered. Official transcripts, diplomas, grades, or degrees may also be withheld pending conclusion of the appeal as permitted by subsection 11–703(a).

## Subchapter 11–900. Disciplinary Records

### Sec. 11–901. Details of Disciplinary Records

a. The definition of a disciplinary record is listed in subchapter 9-300 and Sec. 11-300(7). Disciplinary records are confidential and may not be disclosed in whole or part except as provided in subchapter 9–300 of the *Institutional Rules*.

b. The disciplinary record will be separate from the student's academic record, will be confidential, and will not be revealed except on request of the student or in accordance with applicable state and federal law, or as otherwise provided in subchapter 9-300.

### Sec. 11–902. Notice to Administrative Offices

a. The dean of students will notify the Office of the Registrar and other appropriate administrative offices if a disciplinary sanction restricts a student from being enrolled at the University during the period of the sanction. A bar may be imposed by the dean of students if one of the following sanctions has been assessed because of violation of a Regents' *Rule* or University rule or regulation:

   1. bar against readmission;

   2. suspension from the University; or

   3. expulsion from the University.

b. The dean of students will notify the Office of the Registrar and other appropriate administrative offices if any of the sanctions of withholding grades, withholding official transcript or degree, denial of degree, or revocation of degree and withdrawal of diploma are imposed.

   Relates to *Handbook of Operating Procedures*, 3-3031.

   Updated September 9, 2020. Edits include changes related to <u>HOP 3-3031 Prohibition of Sexual Assault, Interpersonal Violence, Stalking, Sexual Harassment, and Sex Discrimination</u>, implementing new federal Title IX regulations that were issued in May 2020 and went into effect on August 14, 2020.

# Chapter 12. Counseling and Mental Health Center

## Subchapter 12–100. General Provisions

### Sec. 12–101. Purpose

The purpose of the <u>Counseling and Mental Health Center</u> (CMHC or center) is to assess the needs of students with mental health concerns and connect them to the most appropriate CMHC or community resource. The CMHC provides crisis intervention, individual counseling, group counseling and psychiatric services and medication, if indicated. Prevention and mental health promotion initiatives help students maintain or improve their mental health, so they can maximize their academic and college experience.

### Sec. 12–102. Definitions

In this chapter, unless the context requires a different meaning, the following definitions apply.

1. "Director" means the director of the Counseling and Mental Health Center.
2. "Services" means services provided by the Counseling and Mental Health Center.
3. "University" means The University of Texas at Austin.
4. "Student" means a person enrolled at the University or a person accepted for admission or readmission to the University while that person is on the campus and is eligible for services.

## Subchapter 12–200. Administration

### Sec. 12–201. Duties of the Director

a. The director will:

   1. maintain and administer programs and services so they relate meaningfully to the mental health needs of the student body and the consultation or training needs of faculty and staff;

   2. appoint assistants and coordinators for various phases of program planning, administration and development; and,

   3. designate specific staff members to perform assigned duties in the absence of the director.

b. The director is responsible for the mission and services of the CMHC and is administratively responsible to and reports regularly to the vice president for student affairs.

### Sec. 12–202. Duties of the Associate and Assistant Directors

a. The associate and assistant directors are responsible for the duties assigned by the director.

b. During the director's absence, the associate or assistant directors, as designated, will assume the duties of the director.

## Subchapter 12–300. Services Provided

### Sec. 12–301. Services Provided to Students

The services provide general and specific functions which include:

a. brief assessment and referral to determine which CMHC or community resources are most appropriate for the needs of the student;

b. individual counseling;

c. group counseling, classes, programs and workshops;

d. psychiatric evaluation and medication services;

e. crisis intervention, triage and 24/7 CMHC crisis line;

f. integrated health in collaboration with University Health Services;

g. counselors in academic residence (CARE);

h. diversity counseling and outreach specialist (DCOS) program

# EXHIBIT

# A-5

Camara & Sibley Mail - Hubbard v Blakemore                                          8/20/21, 11:44 AM

 Gmail                                                    Joe Sibley <sibley@camarasibley.com>

---

## Hubbard v Blakemore

---

**Ross Pringle** <rpringle@w-g.com>                                       Tue, Jun 15, 2021 at 8:51 AM
To: "sibley@camarasibley.com" <sibley@camarasibley.com>
Cc: Susan Balagia <sbalagia@w-g.com>, Sarah Blakemore <sarahblakemore@me.com>

To be clear, the client doesn't want to continue litigating, she just wants to recoup substantial out of pocket expenses for this suit.   One resolution is to go ahead with the proposed UT settlement.  Again, I can't oppose Hubbard's request for dismissal with prejudice and my client can ask the court to decide whether to award any fees or expenses to Defendant as the prevailing party if the Court concludes this suit is frivolous, unreasonable, or groundless.

Perhaps Hubbard can get UT to reimburse her fees by paying him an additional amount he can pay her. It would seem to be in his best interest to do so if it facilitates his exit and his ride off into the sunset.

Fortunately, as long as the Plaintiff continues with his claims against SAB, the defense obligation is triggered such that she does not have to fund her entire defense going forward, although her personal counsel remains involved.

Let's discuss—rather than email—when you get a chance.  I have a Zoom hearing at 2.

Thx!

## B. Ross Pringle

**Wright & Greenhill, P.C**  |  900 Congress Avenue, Suite 500  |  Austin, Texas 78701
*direct:*  512-708-5265  |  *main:*  512-476-4600  |  *fax:*  512-476-5382
rpringle@w-g.com  |  wrightgreenhill.com  |  Bio

          

This message is privileged and confidential.  If you are not the intended recipient, please delete the communication.

> On Jun 14, 2021, at 6:47 PM, sibley@camarasibley.com wrote:
>
> Ross —
>
> That's an unfortunate development.   I'll have the client let UT know that the Blakemores would like to continue litigating this.  I would expect, however, that this will terminate the insurance coverage since Sarah had a chance to get out of the case but wants to stay in to recover fees paid out of pocket to personal counsel.  Will you be staying in the case ?
>
> Also, what is the theory of recovery of her attorneys' fees?  I'm assuming some kind of sanctions, which seems absurd.  But if that's the route they choose to go, it's their choice.  They should just be aware that this is going to change the complexion of the case and we will have to proceed differently given this aggressive and and hostile position your client is choosing to take.

Thanks,

Joe

Sent from my iPhone

On Jun 14, 2021, at 6:30 PM, Ross Pringle <rpringle@w-g.com> wrote:

Joe

Following up on on our last conversation

What can you share with me regarding the financial aspect of TKH's settlement with UT?
Given his status as a public employee, I would assume that the details and terms of this
settlement eventually will be public.

There is a substantial amount of attorneys fees, including amounts paid to Hoover
Slovacek early on, that the client is not eager to abandon.  For that reason, although I
won't oppose Plaintiffs' motion to dismiss, I anticipate we won't be able to enter into a joint
stipulation whereby the parties agree each side bears his/her own expenses unless there
is an agreed or judicial resolution of this issue.

## B. Ross Pringle
Wright & Greenhill, P.C  |  900 Congress Avenue, Suite 500  |  Austin, Texas 78701
*direct:* 512-708-5265  |  *main:* 512-476-4600  |  *fax:* 512-476-5382
rpringle@w-g.com  |  wrightgreenhill.com  |  Bio

<image002.png>

<small_orange.png>

This message is privileged and confidential.  If you are not the intended recipient, please
delete the communication.

# EXHIBIT

# A-6



Joe Sibley <sibley@camarasibley.com>

---

## Hubbard v Blakemore, No. 1:20-cv-767

---

**Ross Pringle** <rpringle@w-g.com>                                      Mon, Jan 25, 2021 at 4:25 PM
To: Joe Sibley <sibley@camarasibley.com>
Cc: Susan Balagia <sbalagia@w-g.com>, Sasha Yamatina <ayamatina@w-g.com>, Sarah Blakemore
<sarahblakemore@me.com>, "Leonard J. Meyer" <meyer@hooverslovacek.com>, "Colin L. Guy"
<guy@hooverslovacek.com>

Mr. Sibley

We make the following settlement offer to Plaintiff Thos. K. Hubbard:

Payment of $25,000 by or on behalf of Defendant Sarah Blakemore;
Release of all claims and causes of action against Ms. Blakemore, her insurer Nationwide, parties in
privity with them, and all affiliated or related persons or entities;
Dismissal of the lawsuit with prejudice, each party to bear his/her own costs, fees and expenses; and
Parties to execute comprehensive mutual releases with standard indemnity provision for claims
asserted by, through or under each releasing party.

If you have any questions or concerns, please let me know.

## B. Ross Pringle

Wright & Greenhill, P.C  |  900 Congress Avenue, Suite 500  |  Austin, Texas 78701
*direct:* 512-708-5265  |  *main:* 512-476-4600  |  *fax:* 512-476-5382
rpringle@w-g.com  |  wrightgreenhill.com  |  Bio

  

This message is privileged and confidential.  If you are not the intended recipient, please delete the communication.

# EXHIBIT

# A-7

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DR. THOMAS HUBBARD, PhD. | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| **v.** | § | CA NO. 1:20-cv-00767-RP |
| | § | |
| SARAH ALLEN BLAKEMORE; and | § | JURY DEMANDED |
| JOHN DOES 1 – 10, | § | |
| *Defendants.* | § | |

## Defendant Sarah Allen Blakemore's Motion for Sanctions

Sarah Allen Blakemore ("Defendant" or "Blakemore") files this Motion for Sanctions. In support, Blakemore would respectfully show the court as follows:

### I.      Background and Summary

1. Plaintiff Thomas Hubbard ("Hubbard") has revealed through the lucrative settlement agreement with the University of Texas (the "University") attached to his Motion to Dismiss that the lawsuits brought against Blakemore and two other students were motivated by the improper purpose of pressuring the University to pay him to go away. **Exhibit 1**. Hubbard's $700,000 settlement includes a provision requiring that he dismiss the claims he filed against Blakemore and other students:

> Within five (5) days of Hubbard's Counsel receiving the lump sum payment identified below, Hubbard shall file a motion to dismiss with prejudice (and all sides bearing their own costs and fees) his pending Federal Lawsuits against Sarah Allan Blakemore and various John Does (1:20-cv-767-RP); Hollie Green (1:20-cv-1140-RP), and Zoe Elise Thomas (1:20-cv-1193-RP). On that date, Hubbard shall file, and not revoke, a motion to voluntarily dismiss the Federal Lawsuits, and a proposed order, to affect the same, with prejudice. Hubbard shall take any and all other steps reasonably necessary to dismiss the Federal Lawsuits with prejudice.

**Exhibit 1** at p. 5.

2.   Hubbard has been trying to coerce the University into buying him out since at least August 16, 2009, when he offered to "drop all legal or grievance claims against the University or its employees" and "write no further letters of complaint to university administrators" in exchange for an extortionate payout. **Exhibit 2** at p. 4.[1] After the University rejected Hubbard's proposal in 2009, he filed a spurious complaint alleging age discrimination that was ineffective. A decade later, Hubbard again filed an EEOC complaint and used the lawsuit against Blakemore and two other students as a bargaining chip to great effect in finally needling the University into paying him an amount very close to what he had first demanded in 2009. Hubbard has effectively used the legal system to procure ransom for three young women so that he could feather his retirement nest. The Court has inherent power to sanction this deplorable conduct, as well as statutory authority, and should repair the harm that Hubbard's loathsome negotiation tactics have caused by ordering him to compensate Blakemore for the attorneys' fees she has incurred in defending her constitutionally protected right to express her opinions about the quality and character of Hubbard's inutile scholarship.

3.   Hubbard should be sanctioned not only for bringing this lawsuit for an improper purpose, but also for bringing and maintaining claims that he knew lack evidentiary support. Hubbard's lawsuit against Blakemore included 10 unidentified "John Does" he alleged Blakemore was acting in concert with. Hubbard alleged that the Defendants (inclusive of Blakemore) "were the instigators and initiators of" an act of "mob violence", referring to an incident in which he alleges his "house was attacked and vandalized on December 9, 2019 by militants associated with an explicitly revolutionary organization (the Popular Women's Movement/Movimiento Femenino

---

[1] Hubbard's salary at that time was $79,500 and he attempted to negotiate an early retirement package that would provide him $250,000 a year for three years. He would have received a windfall of over 3x what he had been earning had his scheme succeeded.

Popular) who spray-painted red graffiti on Dr. Hubbard's house in the form of bold letters spelling 'CHILD RAPIST' and a hammer and sickle." **Hubbard's Complaint** at ¶s 6 and 20. Asked about Blakemore's involvement in the attack on his house, Hubbard confessed in his deposition that "my initial assumption was she had nothing to do with it." **Exhibit 3** at p. 201. There has been no evidence developed through the course of this lawsuit to suggest that Hubbard's initial assumptions were wrong and his inclusion of Blakemore as an "instigator and initiator" of an act of "mob violence" is completely baseless.

4.   Despite having initially brought suit against Blakemore and these 10 unidentified individuals in the same proceeding, Hubbard proceeded to file two additional lawsuits involving the same facts against two named individuals: Hollie Green (1:20-cv-1140-RP) and Zoe Elise Thomas (1:20-cv-1193-RP). The Court should question why Hubbard initially brought a single lawsuit against Blakemore and 10 co-defendants, but then elected to proceed with two separate lawsuits based on the same facts and circumstances against Green and Thomas. The Court may logically conclude that Hubbard's decision to proceed with a multiplicity of suits was intended for the improper purpose of driving up defense costs for the named defendants, while still maintaining the claims against the "John Does" for a more sinister purpose.

5.   During the course of this lawsuit, Hubbard discovered that a professor at Brooklyn College, Liv Yarrow, had written a blog post expressing her criticism of scholars who had been convicted of possession of child pornography and other crimes of a sexual nature involving minors. This blog post also made reference to Hubbard's lawsuit against Blakemore. Hubbard responded to the blog post with a letter to Yarrow in which he defended the criminal subjects of her blog post,

downplayed the harmful nature of child pornography[2] and, significantly, threatened to implicate her as one of the "John Does" without any credible basis. **Exhibit 4**. Specifically, Hubbard wrote that "My lawsuit also lists ten John / Jane Does" and that it "might be to my advantage to name a foolish senior classicist as one of them," concluding "[a]re you confident enough in your assertions that you want to volunteer for that role?"[3]

6.   Hubbard's $700,000 settlement with the University has revealed that the lawsuit against Blakemore was part of a broader campaign of asymmetric warfare aimed at coercing the University into paying a hefty ransom to dispose of a nettlesome tenured professor. Hubbard's abuse of the federal court system to gain leverage in his negotiations with the University is reason enough for sanctions. Sanctions are further warranted by his baseless conflation of Blakemore with the unnamed "John Does", unjustifiable multiplicity of suits, and his demonstrated willingness to use this lawsuit to harass others by threatening to drag them into it because, as he has stated, that "might be to my advantage." The Court may award sanctions under both its inherent authority and under Rule 11, as discussed below.

## II.      Arguments and Authorities

7.   Hubbard should be sanctioned for bringing a lawsuit against Blakemore for the improper purpose of extracting an overly generous retirement package from the University and for

---

[2] "The percentage of men who are found to access these images online and are later found to have molested children is very small. Indeed, during the decade or so that such images were fully legal in some European countries like Denmark and Czechoslovakia, and the longer period when they were legal in Japan, rates of actual child molestation went down, and then rose again after the images were banned. I in no way defend people who create or share certain images, but civil libertarians are concerned about the misuses of child pornography laws to seize legitimate art work, such as the photography of Will McBride, Jock Sturges, or Sally Mann, or anthropological records, such as those of Walter Williams. Therapists who work with CP offenders know that most of them are men with active fantasy lives, generalized antinomian tendencies, and often serious substance abuse problems, but they do not have histories of child abuse or even primarily pedophilic orientations."

[3] Hubbard has also threatened numerous other individuals and entities with litigation, but upon information and belief has only commenced suit against Blakemore, Green and Thomas. Hubbard appears to take delight in raising the specter of litigation as a tool for silencing any opinions he finds objectionable, a gross misuse of the federal court system.

maintaining claims that Blakemore acted in concert to instigate an attack on his home, which he has admitted he never believed. The Court's inherent power to issue sanctions "parallels the provisions of Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927" and "those provisions do not repeal or modify the court's inherent power to address litigation abuse." *Thabico Co. v. Kiewit Offshore Servs., Ltd.*, No. 2:16-CV-427, 2017 U.S. Dist. LEXIS 124440, at *12 (S.D. Tex. 2017), citing *Chambers v. NASCO, Inc.* 501 U.S. 32, 45-46 (1991). Under both the Court's inherent power and under Rule 11, Hubbard's conduct is sanctionable because he engaged in bad faith in pursuing frivolous claims with an improper purpose, maintained claims he knew had no factual basis, and vexatiously multiplied the proceedings by filing multiple lawsuits involving the same underlying circumstances.

8.    The path from Hubbard's attempt to extort an early retirement package from the University in 2009 to the $700,000 settlement just reached with the University is not difficult to follow. And the unwitting role that Blakemore and other students played in Hubbard's shakedown is clear.

9.    Hubbard has long expressed dissatisfaction with the uninspiring trajectory of his career, noting in his 2009 demand that he had been considered for positions at prestigious universities ("Yale twice, NYU [and] Illinois") and that he blamed the University for his failure to obtain a more rewarding position at another school. **Exhibit 2** at p. 5. In turn, the University's response to Hubbard's age discrimination complaint included comments characterizing Hubbard as "a major obstacle to effective operations", noted that "his increasingly disruptive and damaging conduct threatens the continuing excellence of our programs" and further observed that "certainly most and possibly all other faculty members would welcome his departure; and while that departure would inevitably cause short-term strain on our graduate program in Greek, it would greatly improve

faculty morale, performance, and recruitment, graduate recruitment and training, administrative efficiency, and undergraduate instruction." **Exhibit 4** at p. 5.

10. Hubbard wanted to leave the University, but not without a payout far in excess of his salary. The University wanted him gone, but could not easily dispose of a tenured professor. Blakemore and other students were caught in the crossfire. With the context of this fractious and dysfunctional relationship between Hubbard and the University, Hubbard's decision to file suit in federal court against three University students who could not be expected to pay any judgment begins to make more sense. Hubbard was adamant he wanted to retire and a highly publicized lawsuit against Blakemore concerning a controversial topic provided powerful leverage that was lacking in his previous attempt to coerce the University into paying him to leave.

11. Courts have recognized similarly sleezy tactics as belying an improper purpose worthy of sanctions. In *Blakeman v. Philip R. Bishop & Bishop, Payne, Harvard & Kaitcer, LLP*, the court recognized that a lawsuit had been brought by the plaintiff "to advance his goal of coercing a settlement" in other litigation. *Blakeman v. Philip R. Bishop & Bishop, Payne, Harvard & Kaitcer, LLP* (In re W. Fid. Mktg.), Nos. 497-45416-BJH-11, 99-4173, 2001 Bankr. LEXIS 2244, at *61 (Bankr. N.D. Tex. 2001). With the benefit of the settlement agreement with the University and Hubbard's personnel files, his illicit motive in pursuing three separate lawsuits against Blakemore and two other students has become transparent.

12. In evaluating whether a suit was brought for an improper purpose, courts are to consider whether the suit at the outset would have been pursued without an improper purpose and whether the methods and manner of prosecuting the claim after the initial filing was to impose unnecessary costs of defense. *FDIC v. MAXXAM, Inc.*, 523 F.3d 566, 584 (5th Cir. 2008). Even where a claimant initiates a lawsuit that reasonably appeared to have merit, pursuing such claim in a

"manner calculated to increase the cost of defense" is grounds for sanctions. *Id.* Hubbard's claims against Blakemore and other students lack merit, his decision to pursue these claims cannot be logically explained absent an improper purpose, and he pursued these claims through a multiplicity of suits intended to unnecessarily increase defense costs.

   *a.) Hubbard's claims against Blakemore were baseless and improperly motivated by a scheme to pressure the University into a lucrative settlement.*

13. Hubbard's claims against Blakemore lack merit, as the flyer that is the subject of his lawsuit is an expression of Blakemore's opinions and/or contains truthful statements, some of which Hubbard has since acknowledged without correcting his pleadings.

14. In his complaint, Hubbard alleged he had been defamed by a statement that he is associated with the North American Man-Boy Love Association (NAMBLA), but has since admitted that he a) published a book through a company operated as a front for NAMBLA (**Exhibit 3** at p. 74 / p. 66  of the deposition); has known Peter Herman a/k/a Peter Melzer, a prominent NAMBLA member, for 20 years and engaged in "a lot of e-mail exchanges with him over the last couple of years" (**Exhibit 3** at p. 70 /p. 52 of the deposition); and has attended two NAMBLA meetings "as part of my research") (**Exhibit 3** at p. 70 /p. 52 of the deposition).

15. Hubbard has also alleged he was defamed by Blakemore's characterization of him as an advocate for pederasty. During his deposition, Hubbard was asked about his publication "Introduction to Special Issue on Boys' Sexuality and Age of Consent." **Exhibit 3** at p. 96 /  p. 157 of the deposition. In that work, Hubbard discusses the proposition that a test originally developed for the cognitively impaired could be applied to children to assess whether they can give effective consent to sexual relations with an adult. *Id.* Hubbard was asked if that is a "good idea" and responded "it's worth considering it." *Id.* at p. 158. In this article, Hubbard also comments that "any hope for positive change in the way our society treats its boys and their

capacity for sexual self-realization (and self-control) must be embedded in a wider agenda of social reform, in conversation with a range of discourses on gender, sexual citizenship, and childhood in all its aspects." Following a question about this comment, Hubbard was expressly asked about his role as an advocate:

```
10              So, you're advo -- are you advocating for
11   a positive change in the way our society treats its boys
12   here?
13       A.   Yes.  That is the whole purpose of this
14   scholarly journal.
```

**Exhibit 3** at p. 158.

16. Hubbard *admits* that he is an advocate for changing age of consent laws (perhaps substituting the safeguard they are intended to provide with some sort of test for the cognitively impaired to assess whether a child really wants to have sex with an adult), yet charges Blakemore with defamation for expressing her opinion that he is an advocate for pederasty. Hubbard is entitled to argue that there is some nuance that has been missed when he poses rhetorical questions like "[t]o what extent can the evidence of the Greek model [of pederasty] be applicable to modern Western societies?" But this is a difference of opinion, opinions are protected from the scope of defamation law, and Hubbard's claim against Blakemore is ultimately without merit.

17. Objectively, it does not make any sense that a university professor who associates with members of NAMBLA, has published work through a NAMBLA affiliated publisher, and waxes poetically about the hypothetical benefits of allowing young boys to engage in sex with adults would bring a lawsuit against a university student who almost certainly does not even have the financial resources to pay him the unlikely event of an adverse judgment. Hubbard's decision to pursue this highly publicized lawsuit only becomes understandable when the link to his EEOC

complaint against the University is exposed and the benefits he hoped would inure to him by bartering with the lawsuits brought against three university students.

*b.) Hubbard pursued his claims in a manner that warrants imposition of sanctions.*

18. If Hubbard's motivation in filing the lawsuit against Blakemore was truly motivated by a proper purpose, such as trying to repair his broken reputation, then he would not have agreed as a material term of the settlement with the University to drop the claims against Blakemore, Green and Thomas. These lawsuits were used as a bargaining chip and it is shameful for Hubbard to have exploited the federal court system to enhance his negotiations with the University. For that, he should be sanctioned.

19. Hubbard could have chosen to include Green and Thomas in the same lawsuit as Blakemore and the "10 John Does." Instead, he filed two nearly identical lawsuits for no discernable purpose other than to contribute to the cost that these three women would collectively incur. Three separate cases, three separate trials. Potentially three separate depositions of Hubbard following three separate series of written discovery exchanges. Three separate poker chips to toss in the pot when it came time to settle with the University.

20. The Court may take note of Hubbard's craven threat against Prof. Liv Yarrow when evaluating his credibility. Hubbard threatened to drag her from New York into a federal court in Texas as one of the "John Does" because it "might be to my advantage to name a foolish senior classicist as one of them." If Hubbard had a legitimate basis to suspect that Prof. Yarrow was one of the "John Does", he was under an obligation to name her as a person likely to have discoverable information in his disclosures; he did not. **Exhibit 5.** This threat against Prof. Yarrow was intended solely to harass her, and just as baseless as the allegation that Blakemore acted in concert with these "John Does" and initiated and instigated the attack on Hubbard's house.

*c.)  Hubbard had no basis to assert that Blakemore instigated and initiated the attack on his house but maintained this claim without any evidentiary basis.*

21. Hubbard never had any reason to believe that Blakemore played any role in the attack on his house, but included this allegation without regard to the absence of any evidentiary support or reason to expect such evidence would be developed. Even after ample opportunity to develop this allegation, Hubbard never withdrew the claim that Blakemore was involved in the attack on his house. He admitted in his deposition he never suspected that she was involved: "my initial assumption was she had nothing to do with it."

22. Hubbard attempts to defend his careless conflation of Blakemore and the assailants who vandalized his house by speculating that her flyer may have motivated them. Following this same train of logic, it is not unreasonable that someone might conclude a predator may be emboldened to act by statements from Hubbard such as: "where age-discrepant relationships are commonplace and positively reinforced, they cause little or no long-term harm to the younger partner and often confer great benefit." **Exhibit 6** at p. 4. Presumably, one of Hubbard's colleagues in NAMBLA may read the words of an esteemed scholar on the subject and feel justified in relenting to unnatural urges previously supressed, confident by virtue of Hubbard's romanticization of these illicit relationships that no harm would ultimately result and that the minor would instead obtain some "great benefit".

23. While Blakemore has a valid basis for expressing her opinions about Hubbard in the flyer she distributed, Hubbard has no excuse for accusing Blakemore of engaging in a criminal conspiracy in his complaint. Hubbard may have assumed he could cower under the cloak of the litigation privilege, but while that privilege may shield him from liability, his wilful decision to

assert this claim in spite of his assumption "she had nothing to do with it" justifies sanctions under the Court's inherent power and/or pursuant to Rule 11.

### III.      Conclusion and Prayer for Relief

24. The requirement in Hubbard's settlement with the University that he dismiss his claims against Blakemore, Green and Thomas in exchange for a $700,000 payout is objective evidence from which the Court may conclude that Hubbard had an improper purpose in pursuing three separate lawsuits concerning the same underlying circumstances. Such a determination is supported by objective evidence of Hubbard's contentious relationship with the University and prior attempts to pressure it into paying him an exorbitant sum to take an "early retirement." Hubbard has maintained claims against Blakemore that he has admitted have no evidentiary basis by lumping her in with the unidentified assailants who vandalized his home. Hubbard's testimony has also revealed that his claims against Blakemore lack merit. Hubbard complains that he has been unfairly characterized as an advocate for pederasty, but extols its benefits and describes himself as an advocate for the gay youth he expects would be well served by reforming age of consent laws. Hubbard has demonstrated he lacks credibility or a conscience by threatening to include another professor in this lawsuit solely for the purposes of harassing her. The Court has inherent power and statutory authority under Rule 11 to impose sanctions against Hubbard and should. Blakemore therefore respectfully requests this Court order Hubbard to reimburse Blakemore the attorneys' fees she has incurred in defending against this lawsuit and for such additional relief as the Court may consider appropriate, up to and including a fine in the amount of the settlement he obtained from the University by agreeing to drop his baseless claims against three of its students.

Respectfully Submitted,

**HOOVER SLOVACEK LLP**

By: *//s// Colin L. Guy*
        Colin L. Guy
        Texas State Bar No. 24083118
        Galleria Tower II
        5051 Westheimer, Suite 1200
        Houston, Texas 77056
        Tel: (713) 977-8686
        Fax: (713) 977-5395
        Email: guy@hooverslovacek.com

**WRIGHT & GREENHILL, P.C.**

By: *//s// Ross Pringle, Jr. (w/permission)*
        Ross Pringle, Jr.
        Texas State Bar No. 16330001
        900 Congress Ave., Ste. 500
        Austin, TX 78701
        Tel: (512) 476-4600
        Fax: (512) 476-5382
        Email: rpringle@w-g.com

**ATTORNEYS FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on this __ day of July 2020, a true and correct copy has been served by electronic service on the following attorneys, pursuant to the Texas Rules of Civil Procedure.

Joseph D. Sibley
sibley@camarasibley.com
Camara & Sibley LLP
1108 Lavaca St.
Suite 110263
Austin, TX 78701
Telephone: (713) 966-6789
Fax: (713) 583-1131

**ATTORNEY FOR PLAINTIFF**

                  By: *//s// Colin L. Guy*
                        Colin L. Guy

# EXHIBIT

## A-8

https://
www.dropbox.com/sh/
aaxjhtobtxqa2q0/
AAA8LhSSIJ09dLQdW
wJw
HjcUa?dl=0

# EXHIBIT

# A-9



## Hubbard v. Blakemore Issues

**Joe Sibley** <sibley@camarasibley.com>
To: Ross Pringle <RPRINGLE@w-g.com>

Thu, Feb 4, 2021 at 5:59 PM

Ross,

1.  We are not going to add anyone else to the suit.

2.  We can present Dr. Hubbard the week after spring break (week of March 22nd) via Zoom.  Let me know if that week works.

3.  Please provide dates for Ms. Blakemore.

Thanks,

Joe